# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHERYL WULTZ, et al.

        Plaintiffs,

    v.                        Civ. No. 08-01460 (RCL)

THE ISLAMIC REPUBLIC OF IRAN, et al.

        Defendants.

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT BANK OF CHINA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

### Introduction

This is a civil action for wrongful death, personal injury and related torts arising from a suicide bombing carried out by the Palestine Islamic Jihad ("PIJ") terrorist organization on April 17, 2006, in Tel Aviv, Israel (the "Bombing").

The Bombing was carried out by the PIJ using material support and resources provided by the Islamic Republic of Iran ("Iran") and several Iranian agencies and instrumentalities, the Syrian Arab Republic ("Syria") and several Syrian agencies and instrumentalities, and the Bank of China Limited ("BOC"), all of which are named as defendants herein.

Daniel Wultz, a sixteen year-old American citizen, was severely injured in the bombing, and died of his injuries some four weeks later. Daniel's father, plaintiff Yekutiel Wultz, also an American citizen, was seriously injured in the bombing but survived. The plaintiffs herein, all U.S. citizens, are the parents, siblings and estate of Daniel Wultz.

Plaintiffs' claims against Iran and Syria and their agencies and instrumentalities are brought pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq.*,

and their claims against BOC are brought under the civil provisions of the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333, and under supplemental causes of action pled under Israeli law.

Plaintiffs filed a First Amended Complaint ("FAC") in this action on January 13, 2009. Dkt. # 12. Service of process on the Iranian and Syrian defendants is in progress. Dkt. # 19, 25.

Defendant BOC has moved pursuant to Fed.R.Civ.P. 12(b) to dismiss the action against it for failure to state a claim, lack of personal jurisdiction and lack of subject-matter jurisdiction (on grounds of nonjusticiability and lack of standing). Dkt. # 15.

As shown below BOC's motion is meritless and should be denied, and the action against BOC should proceed to discovery and trial.

## I.      The FAC States Valid Claims Against BOC Under § 2333 of the Antiterrorism Act

The FAC asserts civil claims against BOC for "international terrorism" under § 2333 of the ATA (the Second Count of the FAC) and for aiding and abetting a violation of § 2333 (the Third Count of the FAC). BOC has moved to dismiss these § 2333 claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. BOC Memo at 18-29.

Unfortunately, BOC's motion substantively misstates the factual allegations of the FAC, the necessary elements of a claim under § 2333 and the case law construing § 2333. Accordingly, before responding to BOC's specific arguments, plaintiffs will first briefly address the allegations of the FAC, the elements of liability under § 2333 and the relevant precedents.

As shown below, the FAC clearly states claims under § 2333, and BOC's motion to dismiss those claims should be denied.

### a.      The FAC's Factual Allegations Against BOC

The FAC asserts that BOC is liable for plaintiffs' harm because it knowingly and intentionally carried out millions of dollars in wire transfers on behalf of the PIJ over a several

2

year period prior to the Bombing, which facilitated and enabled the PIJ to carry out acts of terrorism, including the Bombing. *See* FAC at ¶¶ 63-92, 107-125.

Unfortunately, BOC has reacted to these allegations (which it knows to be true) with a campaign of furious – but completely feigned – self-righteous indignation. BOC has responded to plaintiffs' allegations, *inter alia*, by threatening plaintiffs' attorneys with Rule 11 sanctions and criminal prosecution in China, disparaging plaintiffs' allegations as "fanciful," "scurrilous," "wild" and "reckless" (*see* dkt # 15 at 21-22) and even peppering its instant motion with irrelevant and unethical *ad hominem* attacks on plaintiffs' undersigned counsel and his firm.[1]

Accordingly, lest the Court be misled by BOC's histrionics into believing that the allegations asserted against BOC in this action are "fanciful," plaintiffs have taken the extraordinary step (in the context of a motion to dismiss) of obtaining the sworn declaration of Shlomo Matalon, a recently-retired senior counterterrorism official in the Office of the Prime Minister of the State of Israel, whose testimony – which is based on documentary evidence in the possession of the Israeli government – supports the allegations against BOC. *See* Exhibit A.[2]

---

[1]     BOC also seeks to mislead the Court by argument that because the specific PIJ operative who received the wire transfers on behalf of the PIJ, Said al-Shurafa, does not appear on the list of designated terrorists published by the Office of Foreign Asset Control ("OFAC"), BOC had no choice but to carry out the wire transfers. BOC Memo at p. 2 n. 3. Effectively, BOC is claiming that banks **must** provide banking services to a terrorist organization, as long as the organization is careful to carry out its banking via an operative who has not been designated by OFAC.

This claim is blatant nonsense: every bank has discretion to refuse to open or maintain any account, or to refuse to carry out any transaction, if it knows or suspects the customer's activities are illegal or suspicious – or for any other reason if it sees fit. Thus, the absence of al-Shurafa's name from the OFAC list does not relieve BOC from civil (or criminal) liability under non-OFAC-related legislation. Moreover, here, BOC had actual knowledge that it was providing bank services **to the PIJ** via al-Shurafa (FAC at ¶¶ 69, 77) and the PIJ is of course on the OFAC's list. Thus, because BOC knowingly provided banking services **to the PIJ itself**, BOC did indeed violate OFAC's regulations.

[2]     Further details regarding Mr. Matalon's specific position in the Office of the Prime Minister are contained in a declaration submitted to this court in the matter of *Ungar v. Palestinian*

Mr. Matalon also provides further detail about the exact dates and amounts of some of the transfers carried out by BOC on behalf of the PIJ. *See id.* at ¶ 7.

Additionally, plaintiffs have attached to the FAC a declaration from Gordon G. Chang, an expert on Chinese foreign and domestic policy and government, which supports the FAC's allegations regarding BOC's motives for making the transfers. *See* FAC at Exhibit A.

Needless to say, the truth of plaintiffs' allegations must be assumed for the purpose of disposing of the instant motion to dismiss, and the proper place to ultimately determine the truth of those allegations is at trial. The plaintiffs have nonetheless taken the extra step of submitting the declarations from Messrs. Matalon and Chang, to put paid to BOC's shrill (but artificial) claims that plaintiffs' allegations are nothing but a fanciful calumny.[3]

**b.      Count Two of the FAC States a Valid Claim Against BOC Under § 2333**

Count Two of the FAC is a claim for acts of "international terrorism" under ATA § 2333. Section 2333(a) creates a federal civil cause of action for a U.S. national "injured in his or her person, property, or business by reason of an act of international terrorism" and for the estate, survivors, and heirs of such a person. 18 U.S.C. § 2333(a).

The term "international terrorism" used in § 2333(a) is defined in § 2331 of the ATA as "activities" that meet four cumulative conditions: *First*, the activities must "involve violent acts

---

*Authority*, Case No. 1:04mc90 (EGS), attached hereto as Exhibit B. There, Mr. Matalon explained that he "was responsible for and engaged in the collection of data and information [and] conducting analyses" and that during the last three years of his service (2004-2007) he "**was engaged in monitoring and preventing the transfer of funds to terrorist organizations**." Exhibit B at ¶¶ 2, 4.

[3]      Plaintiffs also note that BOC's claim to be merely an innocent bank rings hollow in light of its record of run-ins with the U.S. legal system. In 2002 BOC was fined $10 million by the Comptroller of the Currency. *See* http://www.occ.treas.gov/FTP/EAs/ea2002-1.pdf. Likewise, in 2005, BOC was penalized by the U.S. Treasury for violating the U.S. sanctions regime on Sudan, a state sponsor of terrorism. *See* http://www.treas.gov/offices/enforcement/ofac/civpen/penalties/02042005.pdf

or acts dangerous to human life"; *Second*, the activities must involve "acts ... that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State"; *Third*, the activities must "appear to be intended: (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and *Fourth*, the activities must "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." § 2331(1).

The FAC more than adequately pleads each of these elements against BOC:

## Acts Dangerous to Human Life

To qualify as "international terrorism" a defendant's conduct must involve either violent acts or **"acts dangerous to human life**." § 2331(1)(A).

The FAC alleges in extensive detail that for several years, BOC knowingly and intentionally carried out millions of dollars in wire transfers on behalf of the PIJ – a notoriously violent designated terrorist group which has murdered scores of innocent civilians, and that those wire transfers enhanced PIJ's ability to carry out more such attacks. *See* FAC at ¶¶ 26-31, 63-77.

The FAC therefore asserts – absolutely correctly – that "BOC's actions were dangerous to human life, since the PIJ is a violent terrorist organization which since its establishment has murdered scores of innocent Israeli and American civilians, and openly proclaims its intention to murder other such innocent civilians." FAC at ¶ 109.

Indeed, the Seventh Circuit recently held that "[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life' within the meaning of § 2331(1)(A). *Boim v. Holy Land Foundation*, 549 F.3d 685, 690 (7th Cir. 2008).

Clearly, then, the FAC adequately alleges this element of an action for "international terrorism" under § 2333.

### Acts That Are Criminal

A defendant's actions will not be deemed "international terrorism" unless they constitute "a violation of the criminal laws of the United States or of any State, or … would be a criminal violation if committed within the jurisdiction of the United States or of any State." § 2331(1)(A).

Thus, to satisfy this requirement, a § 2333 plaintiff need only point to **any** federal or State criminal provision that was violated by the defendant's conduct, or that **would** have been violated had the defendant acted within the jurisdiction of the U.S. or the State concerned.[4]

In the instant case, the FAC asserts that the criminality requirement is satisfied, because BOC's conduct violated, *inter alia*, the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C. *See* FAC at ¶ 108. This assertion is easily supported by the other allegations of the FAC:

#### 18 U.S.C. § 2339A

Section 2339A of Title 18 criminalizes the provision of "material support or resources" (defined by § 2339A(b)(1) to include "financial services"), when the provider knows or intends

---

[4]   Many of the § 2333 actions brought to date have sought to satisfy this criminality requirement by alleging that the defendant violated one or more of the **criminal** provisions of the ATA itself (i.e. the criminal prohibitions set forth at 18 U.S.C. §§ 2332 - 2339). *See e.g. Boim v. Holy Land Foundation*, 549 F.3d 685 (7th Cir. 2008); *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y. 2005); *Weiss v. National Westminster Bank PLC*, 453 F.Supp.2d 609 (E.D.N.Y. 2006); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704 (E.D.N.Y. 2006).

However, the plain language of § 2331(1)(A) makes clear that the criminality requirement can be based on a violation of **any** federal – or even state law – criminal provision.

that the "material support or resources" are to be used in preparation for, or in carrying out, a violation (*inter alia*) of 18 U.S.C. §§ 2332 (homicide of or infliction of serious bodily harm on a U.S. national outside the United States), 2332b (acts of terrorism transcending national boundaries) and 2332f (bombings of places of public use).

The FAC alleges in extensive detail that BOC provided "financial services" to the PIJ, knowing and intending that those financial services were "to be used in preparation for, or in carrying out" further PIJ terror attacks – attacks which clearly violated 18 U.S.C. §§ 2332, 2332b and 2332f, or would have violated those provisions "if committed within the jurisdiction of the United States" § 2331(1)(A). *See* FAC at ¶¶ 26-31, 63-77 and 112.

Notably, plaintiffs' reliance on BOC's violation of §2339A to satisfy the "criminality" requirement of § 2331(1)(A) is directly supported by the recent *en banc* decision in *Boim*, 549 F.3d 685 ("Giving money to Hamas ... violates ... § 2339A(a), which provides that 'whoever provides material support or resources ..., knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 2332],' shall be guilty of a federal crime. So we go to 18 U.S.C. § 2332 and discover that it criminalizes the killing … conspiring to kill, or inflicting bodily injury on, any American citizen outside the United States. By this chain of incorporations by reference (section 2333(a) to section 2331(1) to section 2339A to section 2332), we see that a donation to a terrorist group that targets Americans outside the United States may violate section 2333."). *Id*. at 690.

Thus, the criminality requirement of §§ 2331(1)(A) and 2333 is met by the allegation that BOC violated § 2339A, which in turn is fully supported by the allegations of the complaint.

<u>18 U.S.C. § 2339B</u>

Section 2339B of Title 18 criminalizes the provision of "material support or resources" (which are defined by § 2339B(g)(4), which incorporates by reference § 2339A(b)(1), as including "financial services"), to a "foreign terrorist organization," if the provider of material support and resources knew (a) that the recipient organization was designated as terrorist organization under § 219 of the Immigration and Nationality Act or (b) that the organization has engaged or engages in terrorist activity and/or terrorism. 18 U.S.C. § 2339B

The FAC contains detailed allegations that BOC provided "financial services" to the PIJ, with actual knowledge that the PIJ had carried out extensive terrorist activity and was continuing to do so. *See* FAC at ¶¶ 26-31, 63-77, and particularly at ¶¶ 28-30 and 77.

The criminality element of §§ 2331(1)(A) and 2333 is therefore also satisfied by the allegation that BOC violated § 2339B, which allegation is clearly supported by the other allegations of the complaint.

<u>18 U.S.C. § 2339C</u>

Section 2339C of Title 18 provides that "[w]hoever ... directly or indirectly, unlawfully and willfully provides ... funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out ... any ... act intended to cause death or serious bodily injury to a civilian … when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government … to do or to abstain from doing any act" has committed a crime. 18 U.S.C. § 2339C.

The term "funds" is defined for purposes of § 2339C as "assets of every kind, whether tangible or intangible, movable or immovable." § 2339C(e)(1).

The FAC alleges that BOC willfully wired millions of dollars to the PIJ, with the knowledge and the intention that the PIJ would use those funds to carry out acts "intended to cause death or serious bodily injury to a civilian." *See* FAC at ¶¶ 26-31, 63-77 and 112. Since, as discussed above, BOC's actions constituted a violation of §§ 2339A and 2339B, those actions were "unlawful," as required by § 2339C.

The FAC also alleges that the purpose of PIJ's terrorist acts "is to intimidate a population, or to compel a government … to do or to abstain from doing any act." *See* FAC at ¶¶ 27, 117.

Thus, BOC's conduct meets all the elements of § 2339C, and so violated that provision.

It is true that criminal liability exists under § 2339C only when certain jurisdictional circumstances are present. *See id*. But this requirement presents no difficulty in the instant case because one of the circumstances giving rise to jurisdiction under § 2339C is when "the offense takes place in the United States and … a perpetrator was a national of another state." § 2339C(b). BOC is the national of another state (i.e. China) and the "offense took place in the United States" because the wire transfers were carried out through BOC's U.S. branches. *See* FAC at ¶ 69. The jurisdictional prerequisite is therefore present.

Furthermore, the criminality requirement of § 2331(1)(A) is met so long as the defendant's actions "would be a criminal violation if committed within the jurisdiction of the United States or of any State." § 2331(1)(A). Therefore, for purposes of § 2331(1)(A), even that part of BOC's conduct which took place outside of the United States is deemed as if it had taken place within the United States. Clearly, then, since BOC's conduct outside of the United States would have violated § 2339C if carried out within the United States (since BOC is a national of a foreign state), the criminality element of § 2331(1)(A) is satisfied.

Thus, the criminality requirement of §§ 2331(1)(A) and 2333 is also fulfilled by the FAC's allegation that BOC violated § 2339C, because that allegation is adequately supported by the other allegations of the FAC.

In summary, the conduct attributed to BOC in the FAC constituted violations of 18 U.S.C. §§ 2339A, 2339B and 2339C (or would have constituted violations of those provisions "if committed within the jurisdiction of the United States"), and the "criminality" element required by §§ 2331(1)(A) and 2333 is therefore sufficiently pled.

## Acts That Appear to Be Intended to Intimidate or Coerce a Civilian Population or Influence the Policy of a Government

A defendant's actions will constitute "international terrorism" only if they "**appear to be intended**" to intimidate or coerce a civilian population or influence the policy of a government by intimidation or coercion. § 2331(1)(B).

Thus, under the plain language if § 2331(1)(B), actual subjective intent does not need to be shown, and a § 2333 plaintiff need only demonstrate that the defendant's actions *appear* to be intended to intimidate or coerce.

This conclusion was adopted by the recent *en banc* decision in *Boim*, 549 F.3d 685. In *Boim*, the Seventh Circuit expressly held that § 2331(1)(B) does not impose a subjective "state-of-mind requirement" and requires only an objective "**external appearance** rather than subjective intent." *Id*. at 694 (emphasis added).

Significantly for the instant case, the *Boim* court found that this "external appearance" of intent requirement will be met whenever a § 2333 defendant provides material support to a terrorist organization with knowledge of the consequences of its actions:

> A knowing donor to Hamas – that is, a donor who knew the aims and activities of the organization – would know that Hamas was gunning for Israelis … that Americans are

frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel (American Citizens Abroad, an advocacy group for expatriates, reports on the basis of State Department data that in 1999 there were about 184,000 American citizens living in Israel, accounting for about 3.1 percent of the country's population, www.aca.ch/amabroad.pdf, visited Nov. 16, 2008), and that donations to Hamas, by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. **And given such foreseeable consequences, such donations would "appear to be intended ... to intimidate or coerce a civilian population" or to "affect the conduct of a government by ... assassination," as required by section 2331(1)** in order to distinguish terrorist acts from other violent crimes, **though it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender**.

*Id*. at 693-694 (emphasis added).

In other words, *Boim* held that where, as here, a defendant knows that it is providing material support to a terrorist group such as Hamas, and knows that its provision of such support will "augment[] Hamas's resources" and thereby "enable Hamas to kill or wound, or try to kill, or conspire to kill more people" – yet like BOC provides that material support nonetheless – the Court can and will conclude, based on the objective appearance of the defendant's conduct, that the defendant shares the terrorist group's goals of intimidating and coercing a government or population within the meaning of § 2331(1)(B).

Plaintiffs respectfully submit that the Seventh Circuit's well-reasoned holding in *Boim* – that the provision of material support to a terrorist organization by a defendant which foresees the consequences of that support creates the "appearance" required by § 2331(1)(B) that the defendant shares the terrorist group's goals of intimidating and coercing a government or a civilian population – should be adopted by this Court.

If the Court adopts the *Boim* rule, there is no question that § 2331(1)(B) is satisfied here, because "subsequent to April 2005 BOC knowingly continued to carry out the PIJ Transfers after being expressly warned of the consequences of its actions and asked to desist [and] that conduct – defiantly continuing to assist the PIJ – created the objective 'external appearance' required by § 2331(1)(B) that BOC shared the PIJ's goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion." FAC at ¶ 111.

However, even if this Court declines to adopt the holding in *Boim*, the requirement set forth in § 2331(1)(B) is easily met in this case because the FAC alleges in extensive detail that BOC carried out the wire transfers at issue with the **subjective intention** of facilitating terrorist attacks in order to intimidate the Israeli government and public. *See* FAC at ¶ 112 and Declaration of Gordon G. Chang, attached as Exhibit A to the FAC.[5]

Thus, in all events, the FAC adequately pleads the "appear to be intended" element required by § 2331(1)(B).

### Activities Primarily Outside the United States or Transcend National Boundaries

Finally, § 2331(1)(C) of the ATA requires that the defendant's actions "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

---

[5]  It is well settled that "materials attached to the complaint as exhibits may be considered in construing the sufficiency of the complaint." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986) (citing *Goldman v. Belden*, 754 F.2d 1059, 1065 (2nd Cir. 1985); *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984); *AmFac Mortgage Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 430 (9th Cir. 1978)).

It is clear under the allegations of the FAC that BOC's actions – the transfer of funds via its U.S. branches to a branch in China – "transcend[ed] national boundaries in terms of the means by which they are accomplished [and] the locale in which [BOC] operate[s]."

This element is therefore unquestionably met.

Thus, the FAC more than adequately states a claim against BOC for "international terrorism" under § 2333(a) of the ATA.

Defendant BOC asserts that the FAC fails to state a claim under § 2333 for two reasons, both of which are meritless:

BOC first argues that plaintiffs' § 2333 claim should be dismissed under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) because the allegation that BOC carried out the wire transfers because – following the policies of the People's Republic of China ("PRC") – it supports the PIJ's goals of intimidating and coercing the Israeli government (i.e. the allegation set forth in FAC ¶ 112 and in the Chang Declaration) is inherently "implausible." BOC Memo at 21-22.

But BOC's implausibility "argument" is essentially a litany of name-calling, which does nothing more than assume a mocking tone and dismiss plaintiffs' allegations as "fanciful," "scurrilous," "wild" and "reckless" without providing any substantive discussion whatsoever. *Id*. BOC entirely fails to explain – because it cannot – what exactly about this allegation is "implausible." As explained in detail in ¶ 122 and in the Chang Declaration, the People's Republic of China ("PRC") is a totalitarian regime in which all citizens and institutions are expected to, and generally do, support and carry out the policies of the government. Nothing about this allegation is "implausible" in the least – on the contrary, it is common knowledge.

As further explained in FAC ¶ 122 and in the Chang Declaration, one of the PRC's policies – which BOC, like all other Chinese citizens and enterprises, is expected to support – is

to undermine allies of the United States such as Israel, by supporting terrorist groups which harm Israel, such as the PIJ and Hamas. And since this is the PRC's policy – BOC carries it out.

Here again, BOC completely fails to explain what is "implausible" about this allegation, because it cannot. This allegation is presented in detail, and makes perfect sense. That BOC may dispute the accuracy of this allegation (as is its right) does not render it "implausible."

Indeed, BOC's entire argument misapprehends the *Twombly* standard. Under *Twombly*, a "court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success ... must assume all the allegations in the complaint are true (even if doubtful in fact) ... [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C.Cir. 2008) (internal quotation marks and citations omitted).

Moreover, plaintiffs' own detailed and well-explained allegations in FAC ¶ 112 are supported and expanded upon by the sworn declaration of Mr. Chang (Exhibit A to the FAC), and that declaration "may be considered in construing the sufficiency of the complaint." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986) (citing cases).

Additionally, the allegations contained in FAC ¶ 112 and the Chang Declaration are directly supported by the statements and actions of the PRC itself in the public record.

For example, in February 2006, after Hamas won the elections in the Palestinian Authority ("PA") and the United States, Israel and other Western countries halted aid to the new Hamas-led government in the PA, the PRC's Foreign Ministry publicly announced that the PRC would consider providing financial aid to Hamas, if Hamas requested it. *See* Exhibit C.[6]

---

[6]     Downloaded from www.chinadaily.com.cn/english/doc/2006-02/23/content_523370.htm.

Then, in June 2009, the PRC officially invited a Hamas delegation to visit China, and during that visit Hamas leader Mahmud al-Zahar praised the successful "bilateral relationship" between PRC and Hamas:

> "On a bilateral relationship, yes, it was successful," Zahar told AFP in an interview on the second day of his trip to China for a Sino-Arab forum for foreign ministers.
>
> "I met the minister of foreign affairs (Li)... we discussed everything, we addressed our political attitudes."
>
> Zahar's trip to Beijing was a diplomatic coup as it marked only the second time a Hamas government official had visited a United Nations Security Council member nation since the militant Islamic group won the Palestinian elections in January.
>
> A Hamas delegation visited Russia in March.
>
> Israel and the United States have spearheaded international efforts to isolate Hamas over its refusal to renounce violence and recognize the Jewish state's right to exist.

Exhibit D. [7]

Significantly, al-Zahar also confirmed that the PRC was indeed providing the Hamas government with "financial help," *inter alia* for "building projects." *Id*. at p. 2.

Moreover, during a 2007 visit to Iran, a senior official of the Chinese Communist Party informed the Iranian news agency MNA that the PRC does not consider Palestinians' "efforts to liberate their occupied homeland" to constitute terrorism:

> Tian said that China supports the Palestinian people in their efforts to liberate their occupied homeland.
>
> "China has political relations with Israel, but the government and the Communist Party are calling on the

---

[7]     Downloaded from http://www.chinadaily.com.cn/world/2006-06/02/content_607586.htm.

Israelis to withdraw from the occupied lands which belong
to the Palestinians. **They believe that there is a difference
between terrorism and legitimately defending one's
homeland**," he added

Exhibit E. [8]

In other words, the PRC does not consider violent attacks by groups such as the PIJ to be

"terrorism," but rather legitimate activities to liberate the occupied Palestinian homeland.

Finally, the Court should note that in 2005, BOC was sanctioned by the Department of

the Treasury for violating the United States' anti-terrorism sanctions on Sudan. *See*

http://www.treas.gov/offices/enforcement/ofac/civpen/penalties/02042005.pdf.

In light of all the above it is pellucid that the allegations contained in FAC ¶ 112 and the

Chang Declaration are not only plausible but extremely plausible, and that BOC's arguments to

the contrary are absolutely meritless.

(Furthermore, as discussed *supra*, the allegations contained in FAC ¶ 112 and the Chang

Declaration – i.e. the allegations regarding of BOC's subject intent – are not even necessary to

the § 2333 claim under the "external appearance" test formulated in *Boim*. Thus, if this Court

adopts the *Boim* rule (which plaintiffs respectfully believe it should), the allegations contained in

¶ 112 and the Chang Declaration will be unnecessary to the § 2333 claim, and BOC's entire

argument on this score will be mooted).

The second and final ground asserted by BOC to dismiss plaintiffs' § 2333 action for

failure to state a claim is that the FAC does not adequately plead the "state of mind" element

necessary under § 2333. BOC Memo at 23-28. This argument, too, is baseless:

In the first place, BOC misstates the "state of mind" required by § 2333. Purporting to

cite *Boim*, BOC claims that "there can he no liability for alleged terrorist financing under section

---

[8]          Downloaded from http://www.mehrnews.com:80/en/NewsDetail.aspx?NewsID=592559.

2333, as a matter of law, unless the defendant knows it is providing financial services to someone involved in terrorism and does so intending to assist terrorism." BOC Memo at 23.

In fact, however, the ATA requires only that the defendant's actions "**appear** to be intended" to support terrorist goals (§ 2331(1)(B)), and the *Boim* court made perfectly clear that this provision does not impose a subjective "state-of-mind requirement" and requires only an objective "**external appearance** rather than subjective intent," which requirement is met where, as here, the defendant knowingly provided material support to a terrorist organization and foresaw the consequences of its actions. *Boim*, 549 F.3d at 693-694.

Thus, § 2333 and *Boim* require only knowledge and foreseeability, not intent.[9]

Next, BOC asserts that the FAC fails to adequately allege that BOC had the requisite knowledge because the FAC's allegations of knowledge are "conclusory" and formulaic. As "proof" of this point BOC points to the unsurprising fact that other ATA cases have been dismissed for alleging the defendant's knowledge in conclusory fashion. BOC Memo at 23-25.

But a simple reading of the FAC demonstrates that any comparison with the cases cited by BOC and the instant case is ludicrous. The FAC alleges in highly specific detail that in April 2006, BOC was informed by the Israeli government, via the Chinese government, that the wire transfers were being carried out by and for the PIJ (and Hamas), and that the wire transfers were being used to fund terrorist attacks. *See* FAC at ¶ 77.

Thus, the FAC's allegation of knowledge could not be *less* conclusory.

BOC acknowledges the allegations of FAC ¶ 77, as it must, but argues that the Court must ignore these allegations in light of the Act of State doctrine, because deciding whether the PRC did in fact convey the Israeli warning to BOC and approve BOC's decision to ignore that

---

[9]    In any case, even assuming *arguendo* that intent was required, that requirement would be met by the allegations of FAC ¶ 112 and the Chang Declaration, for the reasons discussed above.

warning would require the Court to determine "the validity of official acts of the government of the PRC." BOC Memo at 25-26.

BOC's Act of State argument flies directly in the face of the Supreme Court's holding in *Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400 (1990). The plaintiff in *Kirkpatrick* alleged that the defendant, a business competitor, had obtained a contract in Nigeria by bribing Nigerian officials. The defendant asserted that the case would necessarily require the court to determine whether Nigerian officials had accepted bribes, and that a determination that the Nigerian officials had indeed accepted bribes would constitute a pronouncement by a U.S. court on the validity of the action of a foreign government in its own territory barred by the Act of State Doctrine. *Kirkpatrick, passim.*

The Supreme Court rejected this argument out of hand because the trial court would not need to make any judgment about the ***validity*** of the actions of the Nigerian officials, but rather only that the actions at issue had ***occurred***, as a matter of fact. *See id*. at 406 ("The issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred") (quoting *Sharon v. Time, Inc.*, 599 F.Supp. 538, 546 (SDNY 1984)), and at 405-410.

That is exactly the case here: this Court will need to determine only whether the actions of the PRC officials described in ¶ 77 of the FAC did indeed occur as a matter of fact; the Court will not need to determine whether those actions were ***valid*** under PRC law or otherwise. After all, it is BOC, not the PRC, which is the defendant here.

The Act of State argument therefore fails.[10]

BOC next argues that ¶ 77 of the FAC does adequately allege knowledge, because "[m]issing from the allegations [of ¶ 77] are any facts that were actually presented to BOC, or to

---

[10]     BOC also asserts that ruling on this issue would violate the "political question" doctrine. BOC Memo at 26. Plaintiffs address BOC's "political question" arguments *en bloc* in Part IV, *infra*.

the Chinese government or banking officials, about the specific customer, his accounts, or his purported relationship with PIJ." BOC Memo at 26.

This argument is blatantly frivolous. Paragraph 77 of the FAC alleges that the Israeli officials met with PRC officials "regarding the PIJ Transfers," informed the PRC officials that the PIJ Transfers "were being made by the PIJ for the purpose of carrying out terrorist attacks" and demanded that the PRC officials take action to prevent BOC from making further such transfers. Paragraph 77 further alleges that the PRC officials notified the BOC of the Israeli officials' statements that "the PIJ Transfers" were being made by the PIJ for the purpose of carrying out terrorist attacks and of the Israeli officials' demand the BOC halt "the PIJ Transfers" but the BOC continued to carry out further "PIJ Transfers." FAC ¶ 77.

The phrase "PIJ Transfers" used in ¶ 77 is a term of art specifically defined in ¶ 69 of the FAC as referring to dollar wire transfers initiated by the PIJ leadership in Iran, Syria and elsewhere in the Middle East, which were executed through BOC's branches in the United States and transferred to account nos. 4750401-0188-150882-6 and 4762307-0188-034456-6 at a BOC branch in Guanzhou, China, held by Said al-Shurafa. *See* ¶ 69.

Therefore, obviously, whenever ¶ 77 uses the defined term "PIJ Transfers" it is referring to the transfers the details of which are described in ¶ 69. Indeed, to read ¶ 77 without reference to the definition contained in ¶ 69, as BOC proposes, would render ¶ 77 nonsensical.

Finally, BOC's argues that the allegations of constructive knowledge contained in ¶¶ 78-81 of the FAC are insufficient for purposes of § 2333, which requires actual knowledge. BOC Memo at 26-28. This argument is a red herring which does not need to be addressed by the plaintiffs or the Court, because the allegations of ¶¶ 78-81 are not intended to support plaintiffs' § 2333 claim, but rather their supplemental claims brought under Israeli law.

In sum: Count Two of the FAC states a valid claim under § 2333.

**c.      The Third Count of the FAC States a Valid Claim Against BOC for Aiding and Abetting a Violation of § 2333**

The federal courts have held that secondary aiding and abetting liability exists under § 2333 of the ATA. *See Boim v. Quranic Literacy Inst. and Holy Land Foundation*, 291 F.3d 1000 (7th Cir. 2002); *Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571, 583 (E.D.N.Y. 2005).

However, in the recent *en banc* decision in *Boim*, 549 F.3d 685, the majority declined to apply an aiding and abetting theory as a basis for secondary liability, and found that a §2333 defendant will bear primary liability under § 2333 for knowingly providing material support to a terrorist organization.

The Third Count of the FAC assumes that aiding and abetting liability exists under § 2333, and alleges that BOC is liable for plaintiffs' injuries because PIJ's conduct constituted a violation of § 2333, and BOC aided and abetted PIJ's violation of § 2333. FAC ¶¶ 116-125.

Plaintiffs pled aiding and abetting liability, despite the majority holding in *Boim*, for several reasons. In the first place, the *Boim* majority did ***not*** reverse the earlier panel decisions finding that there is aiding and abetting liability under § 2333. *See Boim*, 549 F.3d at 720 ("The *en banc* majority expresses doubts about this holding, although in the end it neither adopts it nor rejects it"). Secondly, this Court is not bound by *Boim*. Plaintiffs respectfully believe that this Court should find – like the minority opinion in the recent *Boim* case, earlier *Boim* panels and the *Linde* court, and for the reasons set forth in those opinions – that there is secondary aiding and abetting liability under § 2333 in addition to primary liability. Finally, plaintiffs pled aiding and abetting because they believed that petitions for certiorari might be filed in *Boim* (and this has indeed occurred) and that the Supreme Court might address this issue next term.

20

BOC seeks to dismiss plaintiffs' aiding and abetting claim on two grounds, neither of which has merit.

BOC first asserts that the aiding and abetting claim should be dismissed because it is duplicative of the Second Count. BOC Memo at 28.

Plaintiffs agree that if the jury ultimately finds BOC directly liable under § 2333, the aiding and abetting claim will be mooted. But unless and until that happens, plaintiffs face the danger that the direct liability claim under § 2333 will not succeed. Accordingly, plaintiffs are entitled to proceed on claim for secondary liability for aiding and abetting. Since the elements of aiding and abetting are substantively different from a direct liability claim under § 2333, it may be that plaintiffs can succeed on the Third Count even if the Second Count is dismissed.

Therefore, there is nothing "duplicative" about the Third Count.

Next, BOC argues that the Seventh Circuit majority ruled that there is no aiding and abetting liability under § 2333. BOC Memo at 29.

However, as noted above – quoting the opinion of Circuit Judge Wood – the majority in *Boim* gave no final ruling on this issue. *Boim* at 720 ("The *en banc* majority expresses doubts about this holding, although in the end it neither adopts it nor rejects it).

Accordingly, BOC's motion to dismiss the Third Count is baseless and should be rejected.

## II.      The FAC States Valid Claims Against BOC Under Israeli Law

The FAC also asserts causes of action for Negligence, Breach of Statutory Duty and Vicarious Liability (aiding and abetting) under Israeli law. *See* FAC at ¶¶ 129-158.

BOC moves to dismiss the Israeli causes of action asserted in the FAC for failure to state a claim under Israeli law. *See* BOC Memo at 29-43.[11]

In support of its assertion that plaintiffs' Israeli causes of action do not state a claim under Israeli law, BOC has submitted a declaration from a Tel Aviv lawyer hired by BOC, Peter Gad Naschitz, along with translations of five Israeli cases which BOC believes support its claim.

As demonstrated in the attached Declaration of Professor Ariel Porat (Exhibit F) and Declaration of Professor Emanuel Gross (Exhibit G), the FAC states valid claims for Negligence, Breach of Statutory Duty and Vicarious Liability (aiding and abetting) under Israeli law, and Mr. Naschitz' arguments to the contrary are baseless.

Also attached hereto are translations of five Israeli Supreme Court decisions cited by Professor Porat and Professor Gross in their declarations. Exhibit H.

The declarations submitted by Professor Porat and Professor Gross speak for themselves and are incorporated herein by reference, and it would be pointless for plaintiffs to summarize them here. Plaintiffs will therefore restrict themselves to the following points:

*First*, the plaintiffs respectfully call the Court's attention to the fact that Mr. Naschitz' declaration is based in great part on his personal opinion without any citation to authority.

*Second*, as discussed in the declarations submitted by the parties, plaintiffs' Breach of Statutory Duty claim turns on whether BOC violated any Israeli criminal statute. Yet, Mr. Naschitz admits in his declaration that he is not an expert in Israeli criminal law. *Id*. at ¶ 15. Therefore, his opinion regarding the Breach of Statutory Duty claim should be disregarded.

---

[11]     BOC also argues in a footnote that if plaintiffs' federal claims are dismissed the Court should decline jurisdiction over their Israeli law claims pursuant to 28 U.S.C. § 1367(c)(3). BOC Memo at 29 n. 13. This request is baseless since, as discussed in Part III *infra*, the Court has both supplemental **and diversity jurisdiction** over plaintiffs' non-federal claims, and plaintiffs' non-federal claims therefore **cannot** be dismissed under § 1367.

*Third*, even assuming that, in general, a lawyer with no academic credentials like Mr. Naschitz qualifies as an expert on the law of the jurisdiction in which he practices (a point plaintiffs do not concede), Mr. Naschitz has shown himself to be a facially unreliable "expert."

For example, Mr. Naschitz claims that the plaintiffs' claims seek to evade a purported rule of "double-actionability" under Israeli law. Naschitz Declaration at ¶ 21. Yet, as Professor Porat and Professor Gross both explain, that rule was completely abolished by the Israeli Supreme Court some five years ago. *See* Exhibit F at ¶¶ 90-91; Exhibit G at ¶ 85 n. 15.

Moreover, Mr. Naschitz' declaration overlooks – or intentionally ignores – the seminal 2007 decision of the Israeli Supreme Court in Cr. App. 3827/06 *Doe v. The State of Israel*, the facts of which are extremely apposite to those of the instant case.

The *Doe* decision involved a professional moneychanger in the Gaza Strip who was convicted by an Israeli court of providing services to Hamas, on the basis of a series of funds transfers he carried out at the request of a Hamas operative. The Supreme Court upheld the conviction, despite the fact that the defendant's conduct took place in the territory of the Palestinian Authority where Hamas is considered a legal organization, and despite the fact that Doe was not a member of Hamas and his provision of financial services to Hamas took place in the context of his regular course of business as a moneychanger.

A translation of *Doe* is included in Exhibit H.

As Professor Porat and Professor Gross explain, the holdings in *Doe* are extremely relevant to and to a great extent dispositive of many elements of plaintiffs' Israeli tort claims.

Yet, as noted, BOC's purported expert, Mr. Naschitz, has failed to even cite much less address this case.

Accordingly, and for the reasons set forth in the declarations submitted by Professor Porat and Professor Gross, BOC's motion to dismiss plaintiffs' Israeli claims should be denied.

### III.    This Court Has Personal Jurisdiction Over BOC

BOC seeks to dismiss this action for lack of personal jurisdiction on the grounds that BOC lacks minimum contacts with the District of Columbia. BOC Memo at 12-17.

For the reasons set forth below, this argument is not only meritless, but frivolous:

As discussed, *supra*, the lead causes of action asserted against BOC in this action are statutory federal causes of action for acts of "international terrorism" pursuant to 18 U.S.C. § 2333 (the Second Count of the FAC) and for aiding and abetting acts of "international terrorism" pursuant to § 2333 (the Third Count of the FAC). *See* FAC at ¶¶ 106-126.

Pursuant to 18 U.S.C. § 2334, process in a civil action under § 2333 "may be served in any district where the defendant resides, is found, or has an agent." In other words, § 2334(a) permits nationwide service of process in actions under § 2333.

It is well established that where, as here:

> [T]he federal statute creating the cause of action prescribes its own rules for service of process … the Federal Rules provide that service made according to the statute is effective to establish personal jurisdiction over the defendant, regardless of whether a court of the state encompassing the federal district could exercise personal jurisdiction over the defendant. **A district court's exercise of personal jurisdiction over a defendant is constitutional, notwithstanding a complete lack of contact between the defendant and the forum district, so long as the defendant has sufficient contacts with the United States as a whole**.

*Waeltz v. Delta Pilots Retirement Plan*, 301 F.3d 804, 808 n. 3 (7th Cir. 2002) (citations omitted, emphasis added).

Every court to have considered the issue has found that this principle applies fully to civil actions under § 2333 of the ATA, since § 2334 allows for nationwide service of process:

> Because [§ 2334] provides for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes, assuming that the defendant has been properly served, "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (citations omitted); *see, e.g., SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F.Supp.2d 76, 88 (D.R.I. 2001) (personal jurisdiction proper in ATA case when defendants have minimum contacts with United States as a whole, and have been served in any district where they reside, are found, or have an agent).

*Burnett v. Al Baraka Inv. and Development Corp.*, 274 F.Supp.2d 86, 95-96 (D.D.C. 2003). *See also e.g. Klieman v. Palestinian Authority*, 467 F.Supp.2d 107 (D.D.C. 2006) (same); *Biton v. Palestinian Interim Self-Government Authority*, 310 F.Supp.2d 172 (D.D.C. 2004) (same); *Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 59 (D.R.I. 2004) ("[T]he court finds … that it has personal jurisdiction over the PLO and the PA by virtue of the nationwide service of process provision of 18 U.S.C. § 2334(a) … Plaintiffs have demonstrated that the PA and PLO have minimum contacts with the United States as a whole … The court may, therefore, exercise personal jurisdiction over the PLO and PA without violating the Due Process Clause of the Fifth Amendment.").

BOC has not challenged service of process in this action, nor is there any question that BOC has constitutionally sufficient contacts with the United States as a whole. As BOC's own declarant confirms, the BOC has two branches in New York and one in California. *See* Declaration of Wang Lijun at ¶ 3. BOC's branch on Madison Avenue in New York provides a full range of banking services to individual customers, corporate customers and financial

institutions. *See* Exhibit I.[12] Likewise, BOC's New York Chinatown branch "is a full service branch" which provides a wide range of banking services to "personal and business customers." Exhibit J.[13] And BOC's Los Angeles branch "specializes in all aspects of international trade finance and settlement, such as L/C and standby L/C issuance, advising, negotiating, documentary collection and discounting. The branch also provides asset-based lending, term loans and commercial real estate loans, as well as participation in various loan syndications." Exhibit K.[14]

Clearly, then, BOC easily has sufficient contacts with the United States as a whole to satisfy the Due Process clause. Indeed, BOC does not even deny that it has minimum contacts with the United States, and has therefore conceded this point.

Accordingly, because BOC was served pursuant to the nationwide service of process provision of § 2334 and its contacts with the United States are more than sufficient to satisfy the Fifth Amendment this Court has personal jurisdiction over BOC.

BOC acknowledges that the courts have unanimously found that in § 2333 actions the Court must examine the defendants' contacts with the United States as a whole, but attempts to distinguish those cases on two grounds, both of which are meritless.

*First*, BOC claims that the existing precedents applying §§ 2333-2334 applied an "expansive approach to personal jurisdiction" because the defendants in those cases were actual terrorist organizations. BOC Memo at 14. BOC argues that since it is a bank, not a terrorist organization, this "expansive approach" to personal jurisdiction should not be applied to it. *Id*.

This argument is baseless:

---

[12]     Downloaded from http://www.bocusa.com/portal/Index?lang=1.
[13]     Downloaded from http://www.bocusa.com/portal/Info?id=364&lang=1&.
[14]     Downloaded from http://www.bocusa.com/portal/Info?id=365&lang=1&.

In the first place, as a matter of plain empirical fact, none of the courts which previously considered personal jurisdiction in § 2333 actions found, held or even so much as hinted that a nationwide minimum contacts test applied because the defendants at issue were terrorist organizations. Rather, they simply construed §§ 2333-2334 in accordance with the long-established rule that "[i]n a federal question case, the starting point of this Court's minimum contacts analysis is the Due Process Clause of the Fifth Amendment … The relevant inquiry under such circumstances is whether the defendant has minimum contacts with the United States as a whole, rather than whether the defendant has minimum contacts with the particular state in which the federal court sits [provided that] service of process is authorized by a federal statute or rule." *Ungar v. Palestinian Authority*, 153 F.Supp.2d 76, 87 (D.R.I. 2001) (citing *Lorelei Corp. v. County of Guadalupe*, 940 F.2d 717 (1st Cir. 1991) and *United Elec., Radio and Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080 (1st Cir. 1992)).

Thus, the nationwide contacts test for actions under § 2333 was created not by the **courts** but by **Congress**, which expressly provided for nationwide service of process in § 2334.

Moreover, § 2333 does not differentiate between official "terrorist organizations" which commit acts of international terrorism and other types of defendants – including banks – which commit acts of international terrorism. Indeed, the defendants in many pending § 2333 cases currently headed for trial are banks. *See e.g. Linde v. Arab Bank, PLC*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) (denying motion to dismiss § 2333 action against bank); *Weiss v. National Westminster Bank PLC*, 453 F.Supp.2d 609 (E.D.N.Y. 2006) (same); *Strauss v. Credit Lyonnais, S.A.*, 2006 WL 2862704 (E.D.N.Y. 2006) (same).

Plaintiffs allege (and those allegations are supported by the Matalon Declaration and will be proven at trial) that the BOC committed acts of international terrorism within the meaning of

§ 2333. Accordingly, the extent of this Court's personal jurisdiction over BOC is identical to that which applies to every other § 2333 defendant, bank or not. While BOC self-importantly boasts that it is "the fifth largest commercial bank in the world" (BOC Memo at 14) that fact does not entitle it to any special treatment or status under the law.

*Second*, BOC claims that the cases applying the nationwide contacts test in § 2333 cases did so in reliance on Fed.R.Civ.P. 4(k)(2), rather than § 2334, and Rule 4(k)(2) is inapplicable to the BOC since it is subject to suit in New York and California. BOC Memo at 14-15.

This argument, too, fails as a matter of empirical fact because a number of these precedents expressly relied on § 2334 and **not** on Rule 4(k)(2). *See Ungar v. Palestinian Authority*, 304 F.Supp.2d 232, 259 (D.R.I. 2004) ("[T]his court finds that it has personal jurisdiction over Hamas pursuant to the nationwide service of process provisions of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(D). Hamas has minimum contacts with the United States as a whole … As the court has determined that it has personal jurisdiction over Hamas pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Rule 4(k)(1)(D), it is unnecessary to discuss whether the court could exercise personal jurisdiction over Hamas pursuant to Rule 4(k)(2)"); *Ungar*, 325 F.Supp.2d at 48 n. 35 ("As the court concludes that it has personal jurisdiction over the Palestinian Defendants pursuant to the nationwide service of process provision of 18 U.S.C. § 2334(a) and Fed.R.Civ.P. 4(k)(1)(D), it is unnecessary to discuss whether the court could exercise personal jurisdiction over them pursuant to Rule 4(k)(2).").

Furthermore, this argument rests on the premise that the nationwide contacts test is dependent on Rule 4(k)(2), and that where Rule 4(k)(2) does not apply (e.g. when the defendant is subject to the jurisdiction of one or more of the States) the nationwide contacts test will not

apply even if Congress has provided for nationwide service. But this premise ignores the simple

fact that Rule 4(k)(2) was enacted only in 1993, and the courts applied the nationwide contacts

test where Congress had permitted nationwide service of process **well prior** to the 1993

enactment of Rule 4(k)(2). As one 1989 case explained:

> Plaintiff brings this action, *inter alia*, under the Securities
> Exchange Act of 1934, 15 U.S.C. sec. 78a et seq. and
> RICO, 18 U.S.C. sec. 1961 *et seq*. Both of these statutes
> authorize nationwide service of process. 15 U.S.C. sec.
> 78aa (1934 Act); 18 U.S.C. sec. 1965(d) (RICO). Where
> federal laws provide for nationwide service ... the minimum
> contacts analysis of *International Shoe v. Washington*, 326
> U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ... [is]
> inapposite. Under nationwide service statutes, a defendant
> need only maintain minimum contacts with the United
> States as a whole, rather than any particular state, for a
> federal court to exercise personal jurisdiction consistent
> with the due process clause. *Haile v. Henderson National
> Bank*, 657 F.2d 816, 824-26 (6th Cir. 1981) *cert. denied* 455
> U.S. 949, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1982). *See also
> Securities Investor Protection Corp. v. Vigman*, 764 F.2d
> 1309, 1314-1316 (9th Cir. 1985); *Fitzsimmons v. Barton*,
> 589 F.2d 330, 332-35 (7th Cir. 1979); *Mariash v. Morrill*,
> 496 F.2d 1138, 1142-43 (2nd Cir. 1974).

*Obee v. Teleshare, Inc.*, 725 F.Supp. 913, 915 (E.D.Mich. 1989). *See also e.g. Kitto v. Thrash

Oil & Gas Co.*, 1990 WL 33217 at * 1 (W.D.N.Y. 1990) ("[E]ach of the federal statutes the

plaintiffs have relied upon – *viz*., the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. §§

77o and 77q(a), the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b)

and 78t(a), and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1961 *et seq*. – provide for nationwide service of process … thus, for personal jurisdiction

purposes, [defendant] needed only to have had minimum contacts with the United States as a

whole rather than specifically with New York").

Thus, because § 2334 provides for nationwide service of process, the relevant jurisdiction for minimum contacts analysis in § 2333 actions is the United States as a whole, ***irrespective*** of whether Rule 4(k)(2) is applicable to the specific defendant.

Finally, BOC also argues that an exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." BOC Memo at 15-17.

But this argument is based entirely on the assumption – which as shown above is wrong – that the relevant jurisdiction for minimum contacts analysis is the District of Columbia and not the United States as a whole. BOC nowhere claims that despite its extensive contacts with the United States as a whole, the exercise of personal jurisdiction here based on its U.S. contracts would offend "fair play and substantial justice." BOC makes no such claim because it cannot: it is patently obvious that given its extensive presence and activities in the United States, the exercise of jurisdiction over BOC in this case comports fully with "fair play and substantial justice."

In sum, BOC's arguments are meritless, and this Court has personal jurisdiction over BOC because the FAC asserts causes of action against BOC under § 2333 and BOC was served pursuant to § 2334 and has sufficient minimum contacts with the United States as a whole.

As discussed above, the FAC also asserts three non-federal claims against BOC. *See* FAC at ¶¶ 126-158. Those supplemental causes of action arise from the same conduct that gave rise to the § 2333 claims. *Id*. This Court has subject-matter over those non-federal causes of action under 28 U.S.C. § 1367 because they arise from the same nucleus of operative fact as the § 2333 claims. Therefore, this Court also has pendent personal jurisdiction over BOC to hear plaintiffs' non-federal causes of action:

> Because the Court has jurisdiction over Ms. Farrah with respect to Counts I and II of the complaint, it may exercise

supplemental jurisdiction over the remaining counts under
28 U.S.C. § 1367 as well:

> [U]nder the doctrine of pendent personal
> jurisdiction, where a federal statute authorizes
> nationwide service of process, and the federal and
> state claims "derive from a common nucleus of
> operative fact," the district court may assert
> personal jurisdiction over the parties to the related
> state law claims even if personal jurisdiction is not
> otherwise available.

> *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049,
> 1056-57 (2d Cir. 1993); *see also Oetiker v. Jurid Werke,
> G.m.b.H.*, 556 F.2d 1, 4-5 (D.C.Cir. 1977); 4 Charles Alan
> Wright & Arthur R. Miller, *Federal Practice and
> Procedure* § 1069.2 (2d ed. Supp. 2000). All of the counts
> of the complaint relate to the same operative facts-namely,
> Ms. Farrah's allegedly fraudulent investment scheme in
> which Mr. Poling contributed $100,000. Moreover, the
> Court can perceive no hardship to defendant in requiring
> that these additional counts be litigated in the District of
> Columbia because she must come to this Court to defend
> against the first two counts of the complaint. The Court
> concludes that under the doctrine of supplemental personal
> jurisdiction, it may exercise jurisdiction over Ms. Farrah
> with respect to counts III through IX of the complaint. It
> therefore denies defendant's motion to dismiss for lack of
> personal jurisdiction.

*Poling v. Farrah*, 131 F.Supp.2d 191, 194 (D.D.C. 2001) (footnote omitted).

Thus, the Court has personal jurisdiction over BOC for all counts of the FAC, and its

motion to dismiss for lack of personal jurisdiction should be denied.

## IV.   Alternatively, If the § 2333 Claims Are Dismissed, the Case Against BOC Should be Transferred to the Southern District of New York

The plaintiffs are domiciliaries of Florida and the decedent was a domiciliary of Florida

at the time of his murder. *See* FAC at ¶¶ 3, 5-7. BOC is a corporation organized under the laws

of the People's Republic of China ("PRC") headquartered in the PRC (*id.* at ¶ 24) and is therefore a citizen of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2) and (c).[15]

Thus, even in the event that plaintiffs' § 2333 claims are dismissed (which plaintiffs respectfully hope and believe to be unlikely), the federal courts would retain diversity jurisdiction to hear plaintiffs' non-federal causes of action pursuant to 28 U.S.C. § 1332(a)(2).

However, if the § 2333 claims were dismissed, ***this*** specific federal Court would lack personal jurisdiction over BOC, because (absent the § 2333 claims) the relevant jurisdiction for minimum contacts analysis would be the District of Columbia only, and not the United States as a whole, and BOC lacks minimum contacts in the District of Columbia.

Thus, if the plaintiffs' § 2333 claims are dismissed, the proper course of action would not be to ***dismiss*** the remaining claims for lack of personal jurisdiction, but rather to ***transfer*** the case against BOC to the Southern District of New York pursuant to 28 U.S.C. § 1406(a).

Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." § 1406(a).

In *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465-67 (1962) the Supreme Court held that § 1406(a) authorizes a transfer even when the transferring court lacks personal jurisdiction. *See also e.g. Lozano v. Civiletti*, 89 F.R.D. 475, 480 (D.D.C. 1980) ("Section 1406(a) authorizes the transfer of cases, 'however wrong the plaintiff may have been (with regard to) venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.'" (quoting *Goldlawr*).

---

[15]     In *Zahavi v. Bank of China* Civ. No. 08-06236 (C.D.Ca.), BOC argued that it is a citizen of California for diversity purposes because it has a branch in Los Angeles. *See Zahavi*, dkt. # 30 at 8-10. While that claim is frivolous it is also completely irrelevant here: it is undisputed that BOC has no presence in Florida. Thus, even if BOC was a citizen of California, diversity jurisdiction would exist.

Thus, if this Court were to dismiss plaintiffs' § 2333 claims (which would negate this Court's personal jurisdiction over BOC), it would be authorized by § 1406(a) to transfer the remaining claims against BOC to a federal court which has jurisdiction over BOC.

Though § 1406(a) affords the Court an option of either dismissing the case or transferring it, the section is clear that "if it be in the interest of justice," *id.,* the action should be transferred to the appropriate venue rather than dismissed. Transferring, rather than dismissing, the instant case is "in the interest of justice" for several reasons:

*First*, this is not some garden-variety business dispute. This case arises from the terrorist murder of an American citizen. The plaintiffs should have their day in court.

*Second*, dismissing the case might well leave the plaintiffs unable to re-file elsewhere because (barring a successful tolling argument or some other exception) the statute of limitations on some or all of their non-federal claims may have expired. Transferring a case under § 1406(a) to prevent a limitations dismissal is recognized as being "in the interest of justice." *See e.g. Lozano*, 89 F.R.D. at 479-480 ("Where a district court must choose between dismissing or transferring a case in which the statute of limitations has run, transfer is the better choice where the plaintiffs allege a substantial claim."); *Caremark Theraputic Services v. Leavitt*, 405 F. Supp. 2d 454 (S.D.N.Y. 2005) (case transferred in interests of justice where claim would be time barred if dismissed); *Domond v. Great American Recreation Inc.*, 116 F. Supp. 2d 368 (E.D.N.Y. 2000) (court transferred action venue when it lacked personal jurisdiction and found that interests of justice required transfer to avoid statute of limitations problem).

*Third*, this is not a case where plaintiffs filed in a district which obviously lacked personal jurisdiction over the defendant. On the contrary, if the FAC validly states a claim under § 2333 – which plaintiffs strongly believe to be the case – then this Court does indeed have

personal jurisdiction over BOC. The jurisdictional problem will only arise if this Court finds that the § 2333 claims fail to state a cause of action. Plaintiffs should not be penalized with a dismissal of their valid non-federal claims merely because their § 2333 claims, asserted fully in good faith, are found to be insufficient.

Therefore, if plaintiffs' § 2333 claims are dismissed, the remaining claims against BOC should be transferred to the Southern District of New York. BOC expressly admits that it is "subject to the general jurisdiction of the courts of New York". BOC Memo at 15. Moreover, as BOC itself points out, it is currently a defendant in *Elmaliach v. Bank of China*, Civ. No. 09-2130 (PGG) (S.D.N.Y.) which arises from the same conduct at issue in this case (but was brought by non-U.S. victims under non-federal causes of action).[16]

It is well established that the Court is not required to transfer the entire case, and that the proper course is to sever the defendant whose case is being transferred but to proceed with the case against the defendants over which the Court has jurisdiction – in this case the Iranian and Syrian defendants. *See Sharp Electronics Corp. v. Hayman Cash Register Co.*, 655 F.2d 1228, 1230 (D.C.Cir. 1981) ("If the court remains convinced that venue does not lie in this district, **the appropriate course of action** would appear to be severance of the action, allowing plaintiff to proceed against the local defendants in this district, and transferring the case as to the New Jersey defendants under section 1406(a).") (emphasis added). *See also In re Vitamins Antitrust Litigation*, 270 F.Supp.2d 15 (D.D.C. 2003) (severing and transferring cases against certain defendants).

---

[16]     The *Elmaliach* action now pending in the S.D.N.Y. was originally filed in a California state court in Los Angeles captioned as *Zahavi v. Bank of China*. BOC removed *Zahavi* to federal court and the plaintiffs ultimately dismissed it without prejudice and re-filed it in a New York state court captioned as *Elmaliach v. Bank of China* (minus several of the original *Zahavi* plaintiffs). BOC then removed *Elmaliach* to the S.D.N.Y.

BOC may argue that if the case is to be transferred, it should be transferred to California, not New York. The Court should reject any such argument for two reasons. First, when the *Zahavi v. Bank of China* case was pending in California, BOC moved to dismiss *Zahavi* on the basis of the California statute of limitations. *See Zahavi v. Bank of China* Civ. No. 08-06236 (C.D.Ca.), dkt. # 44 at 2-4. Since preventing a statute of limitations dismissal is one of the purposes of § 1406(a) (*see Lozano*, *Caremark* and *Domond*, *id*.) it would make no sense to transfer the case to a jurisdiction where BOC will assert a limitations defense. Second, as noted, *Zahavi* is no longer pending in California whereas the related *Elmaliach* case is pending in the Southern District of New York. It would clearly be most efficient for the federal courts and the parties to have two closely-related cases heard in the same court (likely by the same judge).

Therefore, if the case against BOC is transferred, it should be to New York. [17]

Plaintiffs clarify and strongly emphasize that they make this request in the alternative to transfer the case (if their federal claims are dismissed) purely out of an **extreme abundance of caution**, and it should in no way be construed as reflecting any lack of confidence whatsoever in their federal claims.

## V.     Plaintiffs Have Standing to Bring This Action

BOC asserts that this action should be dismissed for lack of constitutional standing, because "Plaintiffs' alleged injuries are too causally attenuated from" the PIJ wire transfers. BOC Memo at 4-5.

Specifically, BOC asserts that the causal chain is too attenuated because (a) plaintiffs would not have been injured without the actions of various third parties (i.e. the PIJ and its

---

[17]     Thus, in light the above, if BOC's arguments against applying the nationwide contacts test had any merit (which they do not), the proper course would be transfer of the case against BOC to the S.D.N.Y. under § 1406(a), rather than dismissal for lack of personal jurisdiction.

operatives) and (b) the FAC does not allege that the PIJ lacked the means to finance and carry out the Bombing without the PIJ Transfers. *Id*. at 5.

This argument fails for several reasons:

First, contrary to BOC's assumption, the fact that the injury was caused indirectly, in that it involved the actions of various third parties, by no means negates Article III standing. *See Warth v. Seldin*, 422 U.S. 490, 505 (1975) ("When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights").

Second, BOC's argument that plaintiffs would have Article III standing only if PIJ could not have obtained the funds to carry out the Bombing except via the PIJ transfers is conjured out of thin air – BOC cites no authority for such a proposition because none exists.

Third, BOC's argument has been correctly rejected in the past by federal courts hearing cases involving the indirect provision of support for terrorism or for human rights violations. For example, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y. 2003), plaintiffs brought suit against a Canadian energy company, alleging that it collaborated with Sudan's policy of ethnically cleansing civilian populations to facilitate oil exploration activities. The defendant, Talisman, moved to dismiss for lack of Article III standing, on the grounds that "plaintiffs fail to allege injuries 'fairly traceable' to Talisman's actions. According to Talisman, plaintiffs' injuries resulted from the acts of Sudan, not of Talisman." *Id*. at 333. The court rejected this argument on the grounds that "international law makes clear that incitement to genocide, as well as complicity in gross human rights violations, violates

international law" and that such a violation "does not necessarily require the participation in the physical commission of the illegal act." *Id*.

The recent decision in *Mastafa v. Australian Wheat Bd. Ltd.*, 2008 WL 4378443 (S.D.N.Y. 2008) also resoundingly rejected the standing argument BOC seeks to make here:

> Defendants first argue that the Court lacks jurisdiction to hear plaintiffs' claims because plaintiffs have not satisfied the standing requirements of Article III.
>
> Defendants argue that ... plaintiffs have not alleged that "but for defendants' conduct, the injuries caused by the Hussein regime would have abated." Defendants argue that plaintiffs instead allege injuries that came "at the hands of the Hussein regime, a third party not before the court."
>
> Plaintiffs indeed do not allege that defendants themselves were the "but for" cause of plaintiffs' injuries. Instead, they allege that defendants "aided and abetted the Saddam Hussein regime" in its commission of acts that caused injuries to plaintiffs, by providing "substantial assistance ... through the form of kickbacks and/or financial assistance in violation of Security Council Resolution 986." This is sufficient for purposes of Article III … The injuries resulting from the Hussein regime's acts are thus "fairly traceable" to any who aided and abetted their commission. ***Similarly, the injuries are not "the result of the independent action of some third party not before the court" because the acts of the Hussein regime are not "independent" of steps taken to aid and abet those acts***.
> ...
> [T]here are many cases factually analogous to this one in which federal courts have held that plaintiffs may state claims for aiding and abetting the acts of others without even addressing Article III causation … These courts would have been obliged to consider standing *sua sponte* had it presented a colorable impediment to their assertion of jurisdiction … That they did not suggests not careless oversight, but rather that ***defendants have taken the Supreme Court's language out of context to craft a novel but ultimately meritless argument***.

*Id*. at *2-3 (emphasis added, internal citations omitted).

The decision in *Mastafa* is perfectly apposite here: the terrorist activities executed by PIJ using the funds from the PIJ Transfers are not "independent" of BOC's carrying out of those transfers.

Fourth, if BOC's argument were correct, § 2333 would be unconstitutional, or at least unconstitutional as applied to defendants who knowingly provide material support and resources to terrorist organizations. That would mean that the decision in *Boim* is completely erroneous, and that the case against all the *Boim* defendants must be dismissed. That would also mean that most if not all of the judgments entered by this Court under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7) (now § 1605A) are void for lack of subject-matter jurisdiction, since – under BOC's theory – the plaintiffs in those cases lacked standing to sue Iran merely on the basis of its provision of material support and resources to terrorist groups such as Hamas and the PIJ, because the causal link between Iran's actions and the plaintiffs' damages – which involved many third parties – was too attenuated.

Indeed, BOC's claim that plaintiffs have no standing because additional parties were involved in the chain of causation and because PIJ could have obtained the funds for the Bombing from elsewhere is in substance a claim that Article III requires a type of causation far more demanding than that required by well settled principles of tort law. If BOC's assertion were correct, the federal courts would be unable to hear – and for the past 200 years should not have heard – tort actions based on civil conspiracy or respondeat superior theories, or those involving multiple tortfeasors each of whom contributed in some way to the harm.

In short, BOC's standing theory is frivolous.

BOC also asserts that the "FAC's implausible conclusory assertions that the wire transfers 'enable[d]' PIJ to carry out the attacks, (*e.g.*, FAC ¶ 72) are plainly insufficient" to plead causation. BOC Memo at 5.

This claim is specious as well as misleading, since it ignores the plethora of highly detailed allegations contained in the FAC which explain that "Terrorist organizations such as PIJ need wire transfer and other banking services in order to plan, to prepare for and to carry out terrorist attacks" (¶ 71), that "Provision of wire transfer or other banking services to PIJ enables PIJ to plan, to prepare for and to carry out terrorist attacks, and enhances PIJ's ability to plan, to prepare for and to carry out such attacks" (¶ 72) and that "PIJ carried out the PIJ Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out the PIJ's terrorist activity, including bombing attacks against civilians generally and the Terrorist Bombing specifically" (¶ 73).

Similarly, the FAC assets that the "PIJ is subject to strict economic sanctions programs imposed by the United States … (collectively hereinafter: "U.S. Sanctions Regime") [which are] intended to prevent PIJ from conducting banking activities, and thereby limit its ability to plan, to prepare and to carry out terrorist attacks" (¶¶ 63-64), that "The U.S. Sanctions Regime is effective when it is observed and enforced. PIJ is unable to conduct banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime" (¶ 65) and that "If all banks and financial institutions around the world observed and enforced the U.S. Sanctions Regime, the ability of PIJ to conduct banking activities would be severely restricted, and PIJ's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced" (¶ 66).

All these allegations regarding terrorist organizations' need for both funds and banking services are not only highly plausible but common knowledge, and they more than adequately support plaintiffs' bottom-line allegation that "The PIJ Transfers substantially increased and facilitated PIJ's ability to plan, to prepare for and to carry out bombing attacks on civilians, including the Terrorist Bombing" (¶ 75) and that BOC is therefore liable for plaintiffs' injuries.

## VI.     This Case Does Not Present Nonjusticiable Issues

BOC also claims that the action against it should be dismissed because it presents nonjusticiable questions. BOC Memo at 5-12.

This argument has two prongs both of which, as shown below, are meritless.

The first part of BOC's nonjusticiability argument focuses on the allegations in ¶¶ 77 and 112 of the FAC, that the PRC approved BOC's execution of wire transfers for the PIJ and that BOC carried out those transfers because it shares the PRC's policy of supporting terrorist activities aimed at undermining Israel as a U.S. ally. BOC asserts that the Court cannot determine the truth of these allegations without violating the political question doctrine. BOC Memo at 6-10.

This argument fails for multiple reasons:

*First*, the allegations at issue (the allegation in ¶ 77 that the PRC approved BOC's execution of wire transfers for the PIJ and the allegations of ¶ 122) are only necessary to this action if this Court rejects the holding in *Boim* (discussed above) that subjective intent to further terrorism is not a necessary element of § 2333, and that § 2331(1)(C) requires only an "external appearance" which is satisfied by knowledge and foreseeability.

If the Court adopts the holding in *Boim*, as plaintiffs respectfully believe it should, all the allegations which BOC paints as nonjusticiable will be rendered unnecessary to the § 2333 claim, and the Court need make no finding in respect thereto.

Likewise, the allegations at issue are unnecessary to plaintiffs' non-federal claims.

Accordingly, if the Court adopts the *Boim* rule BOC's argument will be mooted, and in any case the allegations challenged by BOC as nonjusticiable are irrelevant to, and so cannot serve as the basis to dismiss, the non-federal claims.

*Second*, contrary to BOC's claim, determining whether these allegations are true, as a matter of fact, in no way requires the Court to "pass[] judgment" on the PRC. BOC Memo at 6.

The defendant before the Court is the BOC not the PRC, and the issue placed before the Court by the allegations in ¶¶ 77 and 112 is the subjective intent and motives of the BOC. The plaintiffs allege that BOC had a certain intent, and explain the origin of that intent (i.e. a desire to follow and carry out the policies of the PRC). But the **origin** of BOC's intent is merely background information and is not an element of the claim at all. It is the **existence** of the intent which is an element of the claim (assuming that the Court rejects *Boim* and finds that subjective intent is required) – not the **reasons for** that intent. Thus, the Court would not need to determine **why** BOC had that intent, but rather **only the fact that it did indeed have it**.

*Third*, even assuming *arguendo* that the Court could not determine the existence of BOC's intent without determining whether in fact the PRC maintained the policies alleged by the plaintiffs, that would not require the Court to "pass judgment" on those policies. As discussed *supra* in regard to the Act of State Doctrine, the issue would be not whether the PRC's policies are valid or invalid, good or evil, but merely whether – as a matter of empirical fact – they exist.

*See Kirkpatrick* 493 U.S. at 406 ("The issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred").

Determining whether, as a matter of fact, a foreign government maintains a certain policy does not implicate the "political question" doctrine any more than it does the Act of State doctrine.

Indeed, federal courts can and do consider whether foreign governments have certain policies – including highly repugnant and embarrassing policies – all the time. *See e.g. Fessehaye v. Gonzales*, 414 F.3d 746, 753 (7th Cir. 2005) (considering whether the Eritrean government had a "policy of deporting ethnic Ethiopians"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 344 (S.D.N.Y. 2003) (analyzing Canada's foreign policy toward Sudan); *Najjar v. Ashcroft*, 257 F.3d 1262, 1287-1288 (11th Cir. 2001) (analyzing the United Arab Emirate's political censorship policies); *Zouaoui v. Gonzales*, 133 Fed.Appx. 401 (9th Cir. 2005) (considering whether Algeria has policy of persecuting Christians); *Massaquoi v. Attorney General*, 2008 WL 4946203 at *3 (3rd Cir. 2008) (Considering whether "Liberia has a policy of state action directed against the mentally ill."); *Pena-Cabrera v. I.N.S.*, 85 F.3d 637 (Table) (9th Cir. 1996) (considering whether left-wing Nicaraguan government had "general policy of persecution" of rightists); *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2nd Cir. 2004) (considering whether Egyptian authorities have a policy of torturing criminal suspects); *Akhtar v. Gonzales*, 406 F.3d 399, 404-405 (6th Cir. 2005) (examining whether Pakistan had a policy of persecuting Mohajirs); *Al-Harbi v. I.N.S.*, 242 F.3d 882, 894 (9th Cir. 2001) (concluding that Iraq had policy of persecuting persons evacuated by U.S. airlift); *In re J-E-*, 23 I. & N. Dec. 291, 303 (BIA 2002) (*en banc*) (considering whether "the Haitian authorities use torture as a matter of policy.").

Thus, like the courts in the cases cited above (which are only a small sampling of similar precedents) this Court, too, is free to determine whether, as a matter of fact, the PRC maintains the policies alleged, without implicating the political question doctrine in any way.

BOC nonetheless asserts, in reliance on the declaration of one Charles W. Freeman III, that making factual findings about whether the PRC maintains the policy alleged "would represent an encroachment by the courts on the political branches with respect to important and sensitive foreign policy issues." BOC Memo at 8.

This argument fails for multiple reasons. In the first place, it is the judiciary, not the political branches, which has been entrusted with the mandate of hearing § 2333 actions, and in making any factual findings necessary therein. Moreover, Mr. Freeman does not speak for the Executive Branch of the United States, and the Executive Branch itself – which, as this Court knows well, is quick to do so when it believes its foreign policy interests are threatened by a lawsuit – has not filed any Statement of Interest in this case. Since the Executive Branch has not asserted any "encroachment" on its foreign policy prerogatives, no such encroachment exists.

Furthermore, it is absurd to claim – as BOC and Mr. Freeman do – that a finding by this Court that PRC supports anti-Israel terrorist activities will harm U.S.-PRC relations, when the PRC itself has openly and publicly pledged and provided support for Hamas, officially hosted Hamas delegations and voiced its position that resistance to Israeli occupation (i.e. terrorism) is not really terrorism. *See* Exhibits C, D and E.

What BOC and Mr. Freeman are asking the Court to do is play make-believe, and pretend that the PRC's openly declared policies and actions do not exist.

Furthermore, Mr. Freeman has not been forthcoming about his background. In discussing his credentials, Mr. Freeman states that "[a]s the son of a senior U.S. diplomat and one-time

Mandarin Chinese interpreter for President Nixon … I am a second generation 'China hand.'" Freeman Decl. at 5.

Since Mr. Freeman bases his credentials as a witness, *inter alia*, on his paternal legacy of involvement with Chinese affairs, it is only fair to inform the Court that Mr. Freeman's father, Charles Freeman Jr., was recently forced to resign his appointment as Chairman of the National Intelligence Council because of his business ties to PRC-owned corporations and his defense of the PRC's human rights violations (the Tiananmen Square massacre). *See* Exhibits L[18], M.[19]

In withdrawing his nomination, Mr. Freeman *père* made a speech – condemned by the Washington Post editorial board as a "screed" and a "grotesque libel" – blaming a sinister Zionist cabal for forcing his resignation. *See* Exhibit L.

Thus, **BOC's declarant has family business ties to PRC-owned corporations**, and appears to be not merely a "second generation 'China hand'" but rather a second generation mouthpiece for the PRC and apologist for PRC violence (in his case – PRC support for terrorism; in his father's case – the Tiananmen Square massacre).[20]

Mr. Freeman's testimony is therefore worthless.

The second prong of BOC's nonjusticiability argument is that the Court lacks "satisfactory criteria for a judicial determination" of whether the PRC does in fact maintain the policies alleged by plaintiffs. BOC Memo at 10-12.

To putatively "drive home" this point, BOC sarcastically asks whether "Plaintiffs expect the Court to require Chinese and Israeli government officials to produce documents in response to discovery requests, and to submit to depositions?" *Id*. at 10.

---

[18]     Downloaded from http://www.washingtonpost.com/wp-dyn/content/article/2009/03/11/AR2009031103384_pf.html.
[19]     Downloaded from http://www.newsweek.com/id/188725/output/print.
[20]     Whether Mr. Freeman III shares his father's anti-Israeli animus is unknown.

This argument is a red herring and can be swiftly disposed of. While it may indeed be impossible for plaintiffs to obtain discovery from foreign governments (at least from the Chinese government), such an evidentiary hurdle (one frequently encountered in all manner of garden-variety suits) has absolutely nothing whatsoever to do with a lack of "satisfactory criteria for a judicial determination" under the political question doctrine.

This Court can determine the existence *vel non* of the PRC's policies (assuming such a determination is even necessary) in the same way it determines the existence of any other fact: i.e. via documentary evidence and the testimony of knowledgeable witnesses (lay and expert).

The judges of this Court have had no difficulty determining the policies of Iran, Libya and Iraq in the numerous cases brought under 28 U.S.C. § 1605(a)(7), nor did the courts in *Fessehaye, Presbyterian Church of Sudan, Najjar, Zouaoui, Massaquoi, Pena-Cabrera, Khouzam, Akhtar, Al-Harbi* and *In re J-E-* (cited above) have any difficulty ruling on the respective foreign and domestic policies of Eritrea, Canada, Algeria, Liberia, Nicaragua, Egypt, Pakistan, Iraq and Haiti.

In sum, BOC's nonjusticiability argument is entirely meritless.

## VII.    Conclusion

BOC's motion to dismiss should be denied in all respects and this case should proceed to discovery and trial.

Plaintiffs, by their Attorney,

_____/S/_____
Robert J. Tolchin
D.C. Bar No. NY0088
JAROSLAWICZ & JAROS, LLC
225 Broadway, 24th floor
New York, New York 10007
(212) 227-2780

## **CERTIFICATION**

I hereby certify that on May 26, 2009, I served the instant memorandum by ECF on the

counsel listed below.

**Walter P. Loughlin**
**David Taylor Case**
**Sarah P. Kenney**
**Siubhan J.E. Magee**
K & L GATES LLP
1601 K Street, NW
Washington, DC 20006-1600

**Mitchell R. Berger**
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037

_____/S/_____
Robert J. Tolchin