# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHERYL WULTZ, et al.

      Plaintiffs,

   v.                                    Civ. No. 08-01460 (RCL)

THE ISLAMIC REPUBLIC OF IRAN, et al.

      Defendants.

## DECLARATION OF PROFESSOR ARIEL PORAT

I, Ariel Porat of Tel Aviv, Israel, declare pursuant to 28 U.S.C. § 1746 as follows:

**A.    Professional Qualifications**

1.    I am the Alain Poher Professor of Law at the Tel Aviv University Faculty of Law and the Fischel-Neil Distinguished Visiting Professor of Law at the University of Chicago. My research, publishing and teaching fields of specialization are tort and contract law.

2.    I am the former Dean of the Tel Aviv University Faculty of Law. I have also been a Visiting Professor at the Boalt Hall School of Law at the University of California at Berkeley, at Columbia University Law School, and at the University of Virginia School of Law.

3.    I am a member of the American Law Institute, a board member of the American Law and Economics Association, and a former president of the Israeli Law and Economics Association. From 1997-2002, I was the Director of the Cegla Center for Interdisciplinary Research of the Law at Tel Aviv University.

4.    I am the founder of the journal THEORETICAL INQUIRIES IN LAW and was its editor-in-chief during the years 1999-2003. I am the author of CONTRIBUTORY FAULT IN THE

LAW OF CONTRACTS (1997 Hebrew), co-author (with A. Stein) of TORT LIABILITY UNDER UNCERTAINTY (Oxford University Press 2001), co-editor (with O. Ben-Shahar) of FAULT IN AMERICAN CONTRACT LAW (Cambridge University Press, forthcoming 2010), and the author of numerous articles on tort and contract law, many of which were published by leading American law reviews.

5.      My articles and books are often cited by the Israeli Supreme Court, and several of my writings were referred to by the reporters of the RESTATEMENT OF THE LAW THIRD, TORTS: LIABILITY FOR PHYSICAL HARM (Proposed Final Draft No. 1, April 6, 2005).

6.      I hold an LL.B (magna cum laude 1983) and a J.S.D. (1989) from the Tel Aviv University Faculty of Law, and I conducted post-doctorate studies as a Visiting Scholar at Yale Law School in 1989 – 1990.

7.      I was admitted to the Israeli Bar in 1984.

8.      A full copy of my curriculum vitae is attached hereto as Exhibit 1.

**B.      Nature of and Basis for This Declaration**

9.      I have been asked by counsel for the plaintiffs in the above-captioned action to provide my professional opinion as to whether the Fourth, Fifth and Sixth Counts set forth in the First Amended Complaint in this action ("FAC") state causes of action under Israeli law in light of the allegations of the FAC.

10.      My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, and upon the statutes, case law and authorities cited herein.

11.     In preparing this opinion I have examined the FAC and the Declaration of Peter Gad Naschitz, executed on March 1, 2009, which was submitted by defendant Bank of China ("BOC") in support of its motion to dismiss this action.

**C.     Allegations of the FAC Relevant to BOC's Liability Under Israeli Law**

12.     The FAC alleges that "BOC executed dozens of dollar wire transfers for the PIJ, totaling several million dollars. These dollar transfers were initiated by the PIJ leadership in Iran, Syria and elsewhere in the Middle East, and were executed by and through BOC's branches in the United States." FAC at ¶ 69. The FAC alleges that these funds were transferred to a senior officer and agent both of the PIJ and of the Hamas terrorist organization ("the Agent"), who transferred the money to the PIJ terrorist leadership in Israel, the West Bank and the Gaza Strip, for the purpose of planning, preparing for and executing terrorist attacks. *Id.* at ¶¶ 69-70.

13.     The FAC further alleges that the "PIJ carried out the PIJ Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out the PIJ's terrorist activity, including bombing attacks against civilians generally and the Terrorist Bombing [which harmed the plaintiffs] specifically." *Id.* at 73. The FAC also alleges that, "[t]he PIJ Transfers substantially increased and facilitated PIJ's ability to plan, to prepare for and to carry out bombing attacks on civilians, including the Terrorist Bombing … The PIJ Transfers were enabled, facilitated and proximately caused by the conduct of defendant BOC." *Id.* at 74-75.

14.     Additionally, the FAC alleges that "[a]t all times, BOC had actual knowledge that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks, and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for and carry out such attacks," because (a) in April 2005 senior Israeli officials met with senior officials of the People's Republic of China ("PRC") regarding the PIJ Transfers, informed them that the PIJ Transfers

3

were being made by the PIJ for the purpose of carrying out terrorist attacks and enhanced the
PIJ's ability to plan, prepare for and carry out such attacks and demanded that the PRC take steps
to halt the transfers (b) the PRC officials conveyed this information to BOC together with the
Israeli demand that the BOC halt the PIJ Transfers and (c) the BOC ignored this demand and
continued to carry out further PIJ Transfers between April 2005 and the date of the Terrorist
Bombing. *Id.* at 77.

**D.      Summary of My Opinion**

15.      In my professional opinion the FAC unquestionably states a cause of action for
Negligence under Israeli law (the Fourth Count of the FAC).

16.      In my opinion the FAC also states a cause of action for Aiding and Abetting
under Israeli law (the Sixth Count of the FAC, captioned by plaintiffs as "Vicarious Liability"),
though this cause of action is less certain than that based on Negligence.

17.      Finally, in my view, the FAC states a cause of action for Breach of Statutory Duty
under Israeli law (the Fifth Count of the FAC), assuming that BOC's conduct constituted a
violation of the criminal statutes cited by the plaintiffs.[1]

18.      In the following sections I discuss these three causes of action in turn.

19.      I would clarify at the outset that there is no decision of the Israeli Supreme Court
(or, so far as I am aware, of a lower court in Israel) directly addressing the question of tort
liability under circumstances similar to those described in the FAC. The Israeli courts simply

---

[1]      As explained below, I do not address herein the question of whether BOC's alleged
conduct would constitute a violation of the criminal provisions at issue, because I am not an expert in
criminal law. I am informed, however, that the plaintiffs will be submitting an opinion from an expert
on Israeli criminal law, supporting plaintiffs' assertion that the conduct attributed to BOC violated
the criminal statutes cited by the plaintiffs. Accordingly, my analysis below of the question of
whether the FAC states a claim for Breach of Statutory Duty as a matter of Israeli tort law proceeds
from the assumption that BOC violated those criminal provisions.

have not had occasion to address the issue. Despite the lack of an on-point precedent, for the reasons detailed below my view is that the FAC states claims for Negligence, Aiding and Abetting and Breach of Statutory Duty under Israeli law.

**E.     Negligence**

**Legal Background**

*General*

20.     Three elements must exist to establish Negligence under Israeli law: (i) the defendant owed a duty of care to the plaintiff (ii) the defendant breached this duty and; (iii) the breach caused injury to the plaintiff. The determination of whether or not a duty of care exists, and to a large extent the determination of whether such a duty has in fact been breached, depends on policy considerations that are resolved by the Israeli courts through a balancing of conflicting interests. *See* Ariel Porat, *Tort Law*, in INTRODUCTION TO THE LAW OF ISRAEL 128 (Kluwer, A. Shapira & K. DeWitt-Arar eds. 1995) (hereinafter: "INTRODUCTION TO THE LAW OF ISRAEL").

21.     There is a clear tendency in the Israeli case law to enlarge the sphere of the applicability of the tort of Negligence, and to impose negligence liability on defendants who would not have borne such liability in the past. This trend is especially pronounced in connection with the liability of public authorities, but it is readily discernible in respect to other types of defendants as well. The tort of Negligence is increasingly employed by the Israeli courts as an effective tool to extend tort liability to new domains that were not formerly governed by the law of torts. *See* INTRODUCTION TO THE LAW OF ISRAEL, at 128.

22.     I also note that in Israel, the tort of negligence is also applied to intentional wrongdoings. *See e.g.* C.A. 1678/01 *Weiss v. The State of Israel*, 58(5) P.D. 167.

5

*The Duty of Care*

23.    The statutory basis for the duty of care in Israeli negligence law is § 36 of the Civil Wrongs Ordinance ("CWO"), which provides in relevant part that "every person owes a duty to all persons whom, and to the owner of any property which, a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36.

24.    The Israeli Supreme Court has consistently held that one must distinguish between the *notional* duty of care and the duty of care *in fact*. The decisive question regarding the notional duty of care is "whether, in relation to a particular risk, there is a duty of care." C.A. 125/80 *Vaknin v. Local Council of Bet Shemesh*, 37(1) P.D. 113. In order to answer this question, the court must examine "whether there is proximity (or 'neighbor relations') between the category of defendants to which the defendant belongs and the category of plaintiffs to which the plaintiff belongs, with regard to the type of actions to which the actions of the defendant belong and the type of harm suffered by the plaintiff." *Id.* The decisive question regarding the duty of care in fact is "whether there is a duty of care between the particular defendant and the particular plaintiff with regard to the actions which actually were implemented, and in relation to the harm which was actually suffered by the plaintiff." *Id.*

25.    Accordingly, the first step for a court hearing a Negligence claim under Israeli law is to answer the question: is there a notional duty of care in the case at bar? If the answer is positive, the court must then consider whether a duty of care in fact exists. However, if the answer to the first question is negative, the issue is resolved, and the plaintiff's claim must be dismissed. INTRODUCTION TO THE LAW OF ISRAEL at 128-9. (Note that under Israeli law, both the "category of plaintiffs" and "the type of harm" questions are "duty of care" questions, while

under American law, only the first is a duty question, while the latter is commonly considered as a "proximate cause" question).

26.     The test regarding both the notional duty of care and the duty of care in fact is one of foreseeability. Two questions must be asked regarding each of these duties: the first concerns "technical" foreseeability, and the second concerns "normative" foreseeability. When the notional duty of care is at issue, the first question ("technical foreseeability") is whether members of the category of defendants to which the defendant belongs *could* have foreseen that the type of actions to which the actions of the defendant belong might result in the type of harm suffered by the plaintiff being caused to members of the category of plaintiffs to which the plaintiff belongs. The second question ("normative foreseeability") is whether the members of the category of defendants to which the defendant belongs *should* have foreseen that the type of actions to which the actions of the defendant belong might result in the type of harm suffered by the plaintiff being caused to members of the category of plaintiffs to which the plaintiff belongs. When the duty of care in fact is at issue, these same two questions are asked about the *particular* defendant, the *particular* plaintiff, the *particular* actions in question, and the *particular* harm that was caused. *Vaknin*; C.A. 243/83 *The City of Jerusalem v. Gordon* 39(1) P.D. 113; INTRODUCTION TO THE LAW OF ISRAEL at 129.

27.     If the question of technical foreseeability is answered in the negative, then the question of normative foreseeability becomes moot: technical foreseeability is a prerequisite for the existence of both the notional duty of care and the duty of care in fact. But when technical foreseeability is found to be present, then the question of normative foreseeability arises with full force. Moreover, a legal presumption has been developed by the Israeli case law that whenever technical foreseeability is present, normative foreseeability is present as well, and it is the burden

of the defendant to persuade the court that normative foreseeability should not be recognized. In the final analysis the question of whether normative foreseeability is present is subject to the court's determination, which in turn is based upon policy considerations. As the Supreme Court has explained:

> The rule is, that when the harm is foreseeable (on a technical level) … it also gives rise to a notional duty of care. The "burden" is therefore on those who assert the absence of a duty. Hence, it must be possible to point to special considerations of legal policy, which justify the creation of an exception, which negates the existence of the notional duty of care.

*City of Jerusalem* at 131. *See also Vaknin*; INTRODUCTION TO THE LAW OF ISRAEL at 129; C.A. 4842/05 *Granit Engineering v. Clal Insurance Company Ltd.* (not yet published) (August 12, 2007) at ¶ 10; C.A. 1068/05 *Maimoni v. City of Jerusalem*, (not yet published) (December 14, 2006) at ¶ 13.

28.    The policy considerations weighed by the Israeli courts in deciding whether a duty of care exists are, *inter alia*: the freedom of activity of potential defendants; the protection of both the person and the property of potential plaintiffs; the financial burden that would be placed upon potential defendants if a duty of care were to be imposed; the possible influence of the court's decision on social behavior; the extent to which the risk that resulted in the harm was unusual and unreasonable; the relative ability of the parties to spread the losses; the fear of burdening the courts with excessive litigation; and the fear of groundless or fraudulent claims. INTRODUCTION TO THE LAW OF ISRAEL at 129.

29.    The general trend in the Israeli case law toward enlarging the sphere of liability for Negligence is reflected in the fact that there have been very few decisions over the last 25

years in which the Supreme Court rejected a tort suit for the lack of a duty of care. Usually, the rejection of tort claims has been based on a finding that the defendant was not negligent.

*Breach of the Duty of Care*

30.     The question of whether or not the defendant breached a duty of care owed to the plaintiff is resolved by answering the question of whether or not the defendant acted as a reasonable person would have in the circumstances. *See* CWO § 35.[2]

31.     In examining whether or not the defendant acted as a reasonable person would have in the circumstances, the following general considerations (some of which are similar or identical to the considerations that relate to the duty of care) are taken into account by the Israeli courts: the resources and the means that would have been required to prevent the injury that occurred in the given case; the extent of the injury and the likelihood of its occurrence, viewed in retrospect; the benefit derived from the act, from the omission, or from the activities that caused the harm, including the social value thereof; the balancing of the injured party's interests in personal safety and of the defendant's interests in freedom of action; and the various alternative courses of action that were available to the defendant.

**Application of the Law to the Allegations of the FAC**

*Existence of a Duty of Care*

32.     The main question in this case is whether the BOC owed a duty of care to the plaintiffs. The allegations of the FAC that BOC was specifically informed of the nature, purpose and ultimate use of the PIJ Transfers, and was asked to desist from carrying out further such transfers, leave no doubt that as a technical matter the BOC foresaw, or as a reasonable bank

---

[2]     Since BOC has provided the Court with an English-language translation of the CWO I have occasionally refrained from quoting the language of CWO provisions to avoid unnecessarily lengthening this declaration.

could have foreseen, that the PIJ Transfers would be sent to terrorist organizations and enable the carrying out of terrorist activities. It is not necessary under Israeli law to show that the specific attack which caused the plaintiffs' injury was foreseen or could have been foreseen by the defendant; it is sufficient to show that activities of the same type that caused the harm either were foreseen or could have been foreseen by the defendant.

33.     Since *technical* foreseeability exists, the only question remaining for determining whether a duty of care existed is whether, as a *normative* matter, the BOC should have foreseen that allowing the PIJ Transfers would enable terrorist attacks of the type that harmed the plaintiffs. As discussed above, "[t]he rule is, that when the harm is foreseeable (on a technical level) … it also gives rise to a notional duty of care. The 'burden' is therefore on those who assert the absence of a duty." *City of Jerusalem* at 131. In order to convince the court not to recognize a notional duty of care despite the fact that the harm was foreseeable as a technical matter, the defendant must "point to special considerations of legal policy, which justify the creation of an exception, which negates the existence of the notional duty of care." *Id.* The Naschitz Declaration does not meet this burden, because it does not identify any such "special" policy considerations. Moreover, in my view, the Israeli courts would find that no policy considerations negating a normative duty of care exist in this case; on the contrary, given the allegations of the FAC, Israeli courts would find that normative foreseeability exists in this case and that BOC owed a duty of care to the plaintiffs. My conclusion is based on the following grounds:

a.     Given the extremely high value the State of Israel ascribes to the goal of fighting and preventing terrorism, coupled with the Israeli Supreme Court's general willingness to broaden the scope of liability under negligence law, it is virtually inconceivable that the Israeli

courts would not impose a duty of care on a bank that enabled the transfer of funds to support terrorism, if that bank had actual knowledge about the goal of the transfer, or shut its eyes thereto.

      b.    The trend in the Israeli Supreme Court over the last two decades has been to broaden the scope of liability of banks under negligence law toward third parties in general, and for enabling criminal activities in particular. This tendency supports the imposition of liability in the case at hand. In this regard, I am in disagreement with the assertions made at § 10 of the Naschitz Declaration, which could lead one to erroneously conclude that under Israeli law banks are held to a lower duty of care than other persons. As will be demonstrated below, the contrary is true.

      c.    In other areas as well, unrelated to banks, the Israeli Supreme Court has in recent years imposed Negligence liability for the negligent enabling of, or the negligent failure to prevent, criminal activities toward third parties under certain circumstances. These precedents bolster the view that an Israeli court would find that BOC owed a duty of care to the plaintiffs.

In the following sections I discuss these grounds in detail.

    *a.*    *The High Value Ascribed in Israel to Fighting Terrorism and the General Tendency to Broaden Tort Liability*

34.    The expansion of tort liability by the Israeli Supreme Court over the past years through the broadening of the duty of care is manifested in many areas. One of these areas is the liability of public authorities. Israeli tort law is much harsher than American tort law on public authorities which negligently inflict or fail to prevent harm to individuals. (As will be clarified shortly, there is a close relationship in Israeli law between liability of public authorities and liability of banks). On many occasions the Supreme Court has emphasized that public authorities are more able to bear the losses than are the injured parties and that by imposing liability on

public authorities they have stronger incentives to prevent those losses beforehand. *See e.g. The City of Jerusalem*; C.A. 915/91 *State of Israel v. Levi*, 48(3) P.D. 45.

35.     But more importantly, the Israel Supreme Court has always been very sensitive, as a matter of judicial policy, to the value of securing Israel and its residents from terrorism and other hostile activities. There are several Supreme Court decisions which demonstrate this point; one of them, C.A. 6296/00 *Kibbutz Malkiya v. The State of Israel*, 59(1) P.D. 16, was issued in 2004. In *Kibbutz Malkiya* the question which the Supreme Court addressed was, whether the Israel Defense Forces (IDF), which employed a special technique for preventing terrorists from penetrating the northern border of Israel, should be liable toward farmers for damages to their crops which were caused by the IDF activity. The Supreme Court, dismissing the suit, stated:

> The public has a great interest in this activity. The respondent [the IDF] must take steps of this type in order to ensure public safety. The security activity aimed at protecting the residents of the country in general, and the residents of the area [where the harm was done] specifically, against infiltration by hostile elements, should not be prevented just because there is a risk of harming property near the border.

*Id*. at 22.

36.     In Cr. A. 3827/06 *Doe v. The State of Israel* (March 27, 2007), a professional money changer in the Gaza Strip who had been convicted by an Israeli court of providing services to an unlawful organization in violation of Articles 85(c) and (h) of the DEFENSE REGULATIONS (EMERGENCY PERIOD) - 1945 for carrying out a series of funds transfers at the request of a Hamas leader and was sentenced to imprisonment, appealed both his sentence and his conviction. In rejecting the appeal, the Israeli Supreme Court gave explicit, detailed expression to the weighty policy concerns that the Israeli legal system attaches to preventing terrorism – and particularly the financing of terrorism:

Life in the shadow of terrorist threats has become a global reality in the modern era. The fear of the bloody price extracted by terrorist attacks is no longer the lot of regions and states subject to isolated conflicts; rather, it exists as a real and tangible danger to the lives of millions on every continent, in all corners of the globe. The fight against terrorism has become a global challenge; terrorism has become the enemy of the democratic worldview which aims to ensure human and civil liberties – the right to life, equality, and human dignity, freedom of religion and other liberties which are not in accord with the worldview usually held by the terror organizations.

Terrorism in the modern age is characterized not only by being global, but also by great sophistication, sometimes by a complex organizational structure, by activity that is not sporadic [and] localized, but systematic organizational activity for the purpose of which extensive infrastructures are established to enable training, collection of intelligence and execution of operational activities, all using advanced technology with the goal of producing terrorist activities that will exact a heavy price ... this extensive activity by terrorist organizations depends first and foremost on the existence of a strong well-founded economic infrastructure and the use of financial systems which are placed at the disposal of the terror organizations to fund their activity ...

On this background, the international community has internalized in recent years the importance of adjusting the tools of the fight against terrorism to the new nature of global terrorism. The recognition that a well-founded financial infrastructure is an oxygen line for terrorist entities has led to the channeling of efforts to harm this financial infrastructure, by the use of various legal tools ... [I]n 2005 [the Knesset enacted] the Law Prohibiting Terrorism Financing. The enactment of this law did not come in a vacuum, since Israeli legislation includes provisions though which terrorism financing can be fought (see: Regulations 74, 84 of the [Defense] Regulations [(Emergency Period)]; Articles 3-4 of the Prevention of Terrorism Ordinance, 5708 – 1948; the Law Prohibiting Money Laundering; Article 148 of the Penal Law, 5737 – 1977; Law for Fighting Organized Crime, 5763 – 2003), and therefore its enactment should be seen, chronologically, as part of a process which began with the United Nations' International Convention for the

Suppression of the Financing of Terrorism of 1999 (hereinafter: the "Convention").

In the Convention it was agreed, *inter alia*, that nations should take measures to identify, reveal, freeze or seize funds used or intended for carrying out terrorist attacks, and the crime of terrorism financing was defined. Likewise, Security Council resolutions were adopted on this issue. Israel ratified the Convention and like other states around the world enacted a law governing financing of terrorism (thus for example, in England, Anti-terrorism, Crime and Security Act 2001; in Canada the Anti-Terrorist Act (Bill C-36 2001) was enacted).

The Law Prohibiting Terror Financing defines as crimes a series of actions which serve to propel the terror financing machine, and provides tools – administrative and judicial – to the authorities against terror financing, all of which are in addition to the existing legislation in the sphere of combating terrorism … the Law expresses an up-to-date approach to the fight against terrorism, a comprehensive and inclusive approach which also views with severity activity which supports terrorism through financing it. In this law the legislature expressed its position that a serious punishment should be imposed on a person found to be involved in terrorism, even via carrying out an action with property for terrorist purposes or via an action using terrorist property (Articles 8-9 of the Law Prohibiting Terrorism Financing). These provisions are in addition to others which point to the legislature's strict policy on these issues, as reflected in the provisions regarding forfeiture of property, interlocutory remedies and even administrative seizure of property tainted by terrorism.

The appellant, we note, was not tried for a violation of the Law Prohibiting Terrorism Financing, but was charged with providing a service for an unlawful association pursuant to the [Defense] Regulations [(Emergency Period)]. Nonetheless, the actions for which he was convicted on the basis of his confession, constitute an inseparable link in the chain of terror financing and I therefore believe that it is impossible to ignore, when considering the appeal, the up-to-date, unequivocal position expressed by the legislature in the Law Prohibiting Terrorism Financing

14

*Doe, id.*, at ¶¶ 9-10.

37.     The decision in *Doe* provides a clear expression of the policy of the Israeli Supreme Court regarding activities – including financial activities – which support or enable terrorism, and of the Supreme Court's view on the role of law in preventing terrorism. Since the question of whether an Israeli court would find that BOC owed a duty of care to plaintiffs depends on policy considerations, the decision in *Doe* is highly predictive of whether the Israeli courts would impose a duty of care in cases like the one at hand – and that they would do so.

38.     In deciding whether to impose a duty of care on banks which transfer funds used for terrorist activities, an Israeli court would be expected to take into account not only the risks that could be reduced if banks took reasonable precautions, but also the possible negative effects such liability might impose on banks' legitimate activity. In my view, however, this consideration would not convince an Israeli court not to recognize a duty of care in cases like the one at hand. Such a consideration might be of relevance in cases where a bank does not have information about the use being made of the money and has no reason to seek out such information. But when a bank is aware that the money its transfers is used for terrorist activities or closes its eyes to that possibility, the concern of interfering with banks' legitimate activity is easily overridden by the need to reduce the risks of terrorist activities. Based on my familiarity with Israeli negligence jurisprudence, I believe that this is the way an Israeli court would look at a case similar to ours.

39.     To summarize, in my view the general tendency to broaden tort liability by the Israeli courts, combined with the high value ascribed by the Israeli courts to the goal of fighting terror – including terror financing – strongly support the conclusion that Israeli courts, in the present case, would impose tort liability on BOC.

40.     The next sections further strengthen this conclusion.

    *b.*     *Broadening Banks' Liability*

41.     Starting in the 1990's, the Israeli Supreme Court issued a number of decisions broadening the scope of negligence liability imposed on banks, both toward customers and toward third parties. The seminal decision in C.A. 5893/91 *Tefachot Mortgage Bank Ltd. v. Tsabach*, 48(2) P.D. 573, delivered by the Supreme Court in 1994, is illustrative of this trend.

42.     In *Tefachot* the bank failed to warn customer A from transacting with customer B who was about to go bankrupt. Customer A sued the bank for the money he lost due to his transactions with customer B. The court addressed the question of whether the bank owed a duty of disclosure to customer A as to the poor financial condition of customer B. The court ruled for the plaintiff (it should be noted that the bank itself, as a creditor of customer B, had a strong interest in customer A transacting with customer B). The court held *inter alia*:

> Banks fulfill many public functions … This characteristic,
> too, justifies, in certain cases, broadening their tort liability
> **toward customers and non-customers**, by drawing an
> analogy to the legal rules which define the liability of
> public authorities.

*Id.* at p. 603 (emphasis added) (quoting A. Porat, LIABILITY OF BANKS FOR NEGLIGENCE – RECENT DEVELOPMENTS, in YEARBOOK OF ISRAELI LAW, 5752-5753 (Israeli Bar – Tel Aviv District), A. Rosen-Zvi ed. (5754) at 324).

43.     In other cases the Supreme Court imposed negligence liability on banks for failing to prevent criminal activities directed at their customers and at third parties.

44.     For example, in C.A. 636/89 *Kecholi v. Barclays Discount Bank*, 45(3) P.D. 265 (and see also the further hearing on this case: C.F.H. 1740/91 *Barclays Discount Bank v. Kostman*, 47(5) P.D. 31), a well-known and respected attorney, who acted on behalf of his

stepfather's bank account as his fiduciary, stole money from the account. The Supreme Court held the bank liable to the stepfather for failing to check the attorney's activities more carefully and warn the stepfather accordingly.

45.     In C.A. 748/88 *Bank North America v. Rechtshefer*, 45(4) P.D. 696, the manager of one of the defendant bank's branches stole money from the plaintiff's bank account. The Supreme Court upheld the lower court's decision imposing liability on the bank for the harm done to the plaintiff.

46.     In C.A. 542/87 *Credit and Savings Fund v. Awad*, 44(1) P.D. 422, bank checks were stolen from a bank, forged and sold to money changers. Naturally, the checks were not honored when the money changers attempted to cash them, and the money changers then sued the bank. The Supreme Court decided for the plaintiffs and found the bank liable in Negligence for failing to warn the public or inform the police about the theft. The Supreme Court rejected the bank's argument that it was not negligent because it had informed the Union of Banks about the theft consistent with the accepted practice followed by all banks, and held that compliance with an accepted commercial practice designed to reduce risk to third parties is not necessarily sufficient to relieve a defendant from negligence liability. The court also rejected the bank's claim that a subsequent criminal act – i.e. the forgery – had broken the chain of causation, finding that the forgery was foreseeable.

47.     In C.A. 5379/95 *Sahar Insurance Co. Ltd. v. Israel Discount Bank*, 51(4) P.D. 464, a bank failed to verify the identity of a person who sought to register himself via the bank as the owner of a certain car (the bank had been empowered by the state to execute such vehicle registrations). That person was a thief who stole the car from the plaintiff. The Supreme Court held that the bank owed a duty of care to the plaintiff (who was not the bank's customer) and

remanded the case to the trial court to determine whether the particular circumstances of the case gave rise to liability.

48.     In C.A. 168/86 *Bank Igud Israel Ltd. v. Le Coudier Ltd.* 42(3) P.D. 77, the Supreme Court held the bank liable for harm done to a third-party in transacting with the bank's customer. Finally, in C.A. 8068/01 *Ayalon Insurance Co. Ltd v. The Executor of the Estate of Haya Ofelger*, 59(2) P.D. 349, an executor of an estate transferred money he stole from the estate account in bank A to a fiduciary account in Bank B and then to his personal account in that latter bank. Both banks were held liable for the harm done to the heirs. Significantly, the Supreme Court explicitly stated that under Israeli law, a bank's duty of care and negligence liability is broader than under English and American law. While the court acknowledged that courts should be more cautious in imposing duties on banks toward third-parties than toward customers, it stated that when there are reasons for the bank to suspect wrongdoing, the bank should take steps to check and prevent harm to third-parties.

49.     It is true that the Israeli case law has not yet addressed a case with circumstances similar to the present one. Nevertheless, a large body of case law – the six cases above are representative examples – has clearly established that banks owe duties of care to a wide range of persons, including third-parties, where the bank is better-positioned than others to prevent the harm. As has been explained, Israeli courts have consistently analogized banks to public authorities in their jurisprudence dealing with the duty of care. Since the Israeli courts are very willing – far more willing than American courts – to impose a duty of care and negligence liability on public authorities, it comes as no surprise that our courts are likewise readily inclined to impose such a duty and such liability on banks.

50.    To summarize this subsection: the willingness of Israeli courts to impose broad negligence liability on banks in general, and to impose such liability for the injurious effects of criminal activities in particular, is predictive of its willingness to recognize a duty of care in a case similar to ours and impose liability accordingly.

   *c.    Negligent Enabling of Criminal Activity*

51.    The question of whether a defendant who could have prevented, by taking due care, criminal conduct of another person which harmed a third-party, should be liable in Negligence to that third-party, has been addressed by the Israeli Supreme Court many times.

52.    In some of these cases the court found no liability because the criminal activity was unforeseeable and therefore constituted an intervening cause which broke the chain of causation between the defendant's conduct and the harm done to the plaintiff.

53.    In other cases, however, when foreseeability (in the technical sense) was not an issue, the Supreme Court imposed negligence liability on defendants who either enabled or failed to prevent a criminal act which inflicted harm on the plaintiff.

54.    Thus, for example, in C.A. 126/85 *R.G.M. Mart v. The State of Israel*, 44(4) P.D. 272, the police failed to respond to the robbery of a diamond shop even though an alarm system connected the shop to the police station. The police were unaware of the robbery because the duty officer at the station had failed to active the alarm. The court held the police liable in Negligence for the harm caused the plaintiff by the robbery. In another case, C.A. 429/82 *The State of Israel v. Suhan*, 42(3) P.D. 733, the border police failed to prevent a man from unlawfully leaving the country despite the existence of a court order prohibiting him from doing so because of an outstanding alimony debt owed to the plaintiff. The court recognized a notional duty of care owed by the border police to the plaintiff, and remanded the case to the trial court to

decide the issues of duty of care in fact and breach of the latter duty. In a third case, C.A. 1678/01 *Weiss v. The State of Israel*, 58(5) P.D. 167, the plaintiff sued the police for failure to protect him from an on-going campaign of harassment by his neighbors. The Supreme Court imposed negligence liability on the police for its negligent failure to act.

55.     Similarly, in C.A. 704/71 *Agbaria v. Hameiri*, 26(1) P.D. 743, the defendant left his tractor with the keys in the ignition, thereby enabling an unauthorized driver to illegally drive the tractor and inflict injury on a third party. The court imposed negligence liability on the defendant. Finally, in C.A. 3510/99 *Valas v. Egged*, 45(5) P.D. 826, the plaintiff was attacked by criminals near a bus station operated by Israel's main public bus company. The Supreme Court recognized a notional duty of care owed by the bus company to the plaintiff, and remanded the case to the trial court to decide the issue of duty in fact and breach.

56.     Thus, Israeli courts will impose a duty of care and negligence liability on parties who negligently enable or fail to prevent harm to a third-party that resulted from the criminal conduct of another person. Such a duty and such liability will be imposed under Israeli law when the criminal conduct was foreseeable as a technical matter, and when the party who could have prevented the harm is a public authority, a quasi-public entity (which under Israeli case law would include entities such as banks (*Tefachot*) and public transportation companies (*Valas*)) or itself played a role in creating the risk (*Agbaria*).

57.     Since BOC was specifically warned about the use to which the PIJ funds transfers were being put, there is no question that PIJ's criminal conduct was foreseeable (in the technical sense). Furthermore, the BOC, as a bank, is considered a quasi-public entity in the Israeli negligence case law, and as such is required to bear duties of care similar to those borne by public authorities with respect to preventing criminal activities facilitated by its conduct.

20

Moreover, BOC played a role in creating the risk, by carrying out the wire transfers. Therefore, for this reason, too, it appears clear that an Israeli court would find that BOC owed a duty of care to the plaintiffs in this case.

*Breach of the Duty of Care and Causing Harm*

58.     Assuming that BOC had a duty of care under Israeli law, the breach of that duty is self-evident. Given the allegations of the FAC I see no possibility that an Israeli court would find that the duty of care was not breached here.

59.     Since the FAC alleges that BOC's conduct caused or contributed to the execution of the terrorist attack which caused plaintiffs' injuries, there is no uncertainty about causation "in fact" and therefore there are no "cause in fact" issues to be discussed.

60.     I also note that I am in a complete disagreement with the view expressed at ¶ 12 of the Naschitz Declaration, according to which § 64(2) of the CWO relieves BOC of liability because the actions of the terrorists were the decisive cause of the injury.

61.     In numerous cases the Supreme Court has held that § 64(2) does not break the chain of causation between the negligence of a defendant and the harm caused – even if the harm was caused by the intentional conduct of another person – provided that the intentional conduct of the other person was foreseeable. *See e.g.* C.A. 576/81 *Ben-Shimon v. Barada*, 38(3) P.D. 1, 8-10; C.A. 6649/96 *Hadassah Medical Organization v. Gilead*, 53(3) P.D. 529, 545-6; C.A. 8199/01 *Estate of Miro v. Miro*, 57(2) P.D. 785, 790-794. *See also R.G.M. Mart, Suhan, Weiss, Agbaria* and *Valas*, cited above.

62.     Thus, under § 64(2), the test is foreseeability, and if the intervening cause was foreseeable by the defendant then the chain of causation is not broken. (In actions based on other

torts, Israeli courts sometimes mention two additional tests: "a risk test" and "a common sense test," but in Negligence cases these tests are completely subjugated to the foreseeability test.).

63.     Applying the § 64(2) foreseeability test to the present case makes clear that the chain of causation between BOC's conduct and the harm caused was not broken, given its actual knowledge of the use made of the PIJ Transfers. Notably, for purposes of the § 64(2) foreseeability test an allegation of actual knowledge is not even necessary: the chain of causation will not be deemed broken under § 64(2) so long as BOC could have foreseen, in the technical sense, that the PIJ Transfers would be used for terrorist activities.

64.     I also disagree with the view expressed at ¶ 11 of the Naschitz Declaration, according to which BOC is not liable for Negligence under Israeli law because the terrorist attack did "not emanate naturally or in the ordinary course from a party's use of banking services." Again, the test for causation in Israel is foreseeability, not other tests such as the "ordinary course of events." Thus, the question of whether, as a matter of fact, the bombing was a natural or ordinary result of BOC conduct (and under the allegations of the FAC the bombing was indeed a natural result of BOC conduct), is irrelevant under Israeli law. All that matters under Israeli law is that such bombings were a foreseeable result of BOC's conduct.

65.     Finally, according to ¶ 11 of the Naschitz Declaration, the "but for" causation test is not satisfied in the case at hand. With all due respect, this conclusion is directly contradicted by the allegations of the FAC, which explicitly assert that BOC's conduct facilitated the bombing attack which caused harm to the plaintiffs. There is thus no doubt that the FAC adequately pleads causation under Israeli negligence law. I would also note that the causation theory presented by the Naschitz Declaration is overly simplistic. There are numerous precedents in Israel (and in the U.S. and England as well) which apply causation tests different from the

"but for" test suggested by Naschitz Declaration to situations involving multiple tortfeasors or multiple causes. *See generally* Ariel Porat & Alex Stein, TORT LIABILITY UNDER UNCERTAINTY (Oxford University Press, 2001). For two illustrative cases given by the Israel Supreme Court which applied a causation test adapted to multiple causes situations *see* C.A. F.H. 15/88 *Melech v. Kornhauser* 44(2) P.D. 89; C.A. 285/86 *Nagar v, Vilensky* 43(3) P.D. 284.

### Conclusion Regarding Negligence

66.     In my professional opinion, the FAC most definitely states a valid claim for Negligence under Israeli law.

## F.     Aiding and Abetting

67.     Section 12 of the CWO provides in relevant part that "any person who joins or aids in, authorises, counsels, commands, procures or ratifies any act done or to be done, or any omission made or to be made, by any other person shall be liable for such act or omission."

68.     Supreme Court decisions applying § 12 are rare, and there is, I believe, some uncertainty as to its scope of application.

69.     In C.A. 1636/98 *Rav Bariach Ltd. v. Havshush Auto Parts Trading House (1987) Ltd.*, 55(5) P.D. 337, 351-52 (a patent infringement case), the Supreme Court held that liability under § 12 is equivalent to the joint tortfeasors doctrine under English law, and that "there must be concerted action towards a common end. A person who only facilitated (as opposed to procured) a tort would not be liable as joint tortfeasor." *Id.* at 349 (quoting J.R. Clerk, W.H.B. Lindsell, ON TORTS, (London) (18th ed. by A.M. Dugdale and others) (2000)).

70.     In C.A. 6871/99 *Rinato v. Rom* 56(4) P.D. 72 (a libel case), the Supreme Court clarified the conditions for the application of § 12. The court held:

> Liability under § 12 requires a mental state of awareness ...
> A person participating in an enterprise which ultimately

> results in injury, will be liable [under section 12], if in
> joining the primary tortfeasor he knew where he was
> headed ...

*Id.* at 84.

71.     Assuming, as alleged in the FAC, that BOC was aware that the PIJ Transfers were used for terrorist activities and that BOC was interested, for whatever reason, in supporting those activities, in my opinion BOC would certainly be liable under § 12.

72.     Moreover, even disregarding the allegation that BOC was interested in supporting PIJ's terrorist activities, I believe that it is more than likely that BOC would be held liable by the Israeli courts under § 12, at least from the time it was explicitly warned that the PIJ Transfers were being used to facilitate terrorist activities. Israeli tort law, in general, is not concerned with the defendant's actual motives. Where the defendant's full awareness of the consequences of her acts is alleged, it is neither necessary nor practical to inquire into her internal motives.

73.     For this reason, it is my opinion that because the FAC alleges that BOC continued to carry out the transfers even after becoming fully aware of their purpose, the FAC states a claim for liability under § 12 of the CWO.

**G.     Breach of a Statutory Duty**

**Legal Background**

74.     In order to establish liability for the tort of Breach of Statutory Duty under § 63 of the CWO, the following conditions must be established: the defendant breached a duty imposed by statute; the statute was intended for the benefit or the protection of either the particular plaintiff, the class to which the plaintiff belongs, or the public as a whole; the breach of the duty caused some injury to the plaintiff; and the harm done was of the type of harm that the statute was intended to prevent. However, if the statute indicates that the legislature did not intend for

the party injured by the breach of the statutory duty to have a cause of action under tort law, then the plaintiff's action shall be dismissed, even if the formal elements of this tort, as specified above, are satisfied. INTRODUCTION TO THE LAW OF ISRAEL at 135.

75.    As is the case with Negligence, the Supreme Court has extended the boundaries of the tort of Breach of a Statutory Duty in the last two decades. This trend is reflected in the fact that statutes that previously were not regarded as giving rise to a cause of action for Breach of Statutory Duty are now so interpreted. INTRODUCTION TO THE LAW OF ISRAEL at 135.

76.    As noted, in order for the defendant to be held liable, the plaintiff must show that the defendant's conduct violated a statute. The Interpretation Ordinance defines the term "statute," and clearly indicates that statutes comprise not only the laws that are enacted by the Knesset (Israel's parliament), but also the regulations promulgated by the executive branch, as well as by municipalities. INTRODUCTION TO THE LAW OF ISRAEL at 135-136.

77.    For our purposes it is especially important to clarify the distinction made in the case law between a statute that is, on the one hand, intended to protect the interests of individuals (including a group of individuals or the public as a whole), and a statute that is, on the other hand, intended solely to protect the social fabric, or the interests of the State or the Government. A violation of the first type of statute establishes a cause of action for breach of a statutory duty, regardless of whether the legislation is intended to protect the interests of all individuals or just the interests of certain categories of individuals; whereas a violation of the second type of statute does not give rise to tort liability. *Vaknin, id.*; INTRODUCTION TO THE LAW OF ISRAEL at 136.

**Application of the Law to the Allegations of the FAC**

78.    The FAC alleges that BOC violated the following criminal provisions:

i)    Section 4 of Israel's PREVENTION OF TERRORISM ORDINANCE, 5708 – 1948;

25

ii)  Sections 145 and 148 of Israel's PENAL LAW, 5737 – 1977;

iii)  Section 85 of Israel's DEFENSE REGULATIONS (EMERGENCY PERIOD) – 1945.

79.      A law that was not mentioned in the FAC, which was enacted in January 2005 and became effective six months later, is the LAW PROHIBITING TERRORISM FINANCING 5765 – 2005, which could also be a potential basis for imposing criminal liability on the BOC for the conduct alleged in the FAC.

80.      It is beyond my area of expertise to address whether BOC's alleged conduct would constitute a violation of the criminal provisions at issue. However, I am informed that the plaintiffs will be submitting an opinion from an expert on Israeli criminal law which concludes that the conduct attributed to BOC violated the criminal statutes cited by the plaintiffs as well as the LAW PROHIBITING TERRORISM FINANCING.

81.      Accordingly, my analysis herein of whether the FAC states a claim for Breach of Statutory Duty as a matter of Israeli tort law proceeds from the assumption that BOC did indeed violate the criminal statutes cited by the plaintiffs and the LAW PROHIBITING TERRORISM FINANCING.

82.      As has been explained, a suit based on Breach of Statutory Duty, must be based on violation of a statute aimed at protecting individuals (or, in other words: private interests), and not solely the interests of the state or the Government, or the social fabric.

83.      There is no Israeli Supreme Court decision addressing the question of whether antiterrorism laws could serve as the basis for a Breach of Statutory Duty claim. But in my opinion it is highly likely that the Israeli courts would answer that question positively, for the following reasons:

84.     *First*, by their very nature antiterrorism laws are aimed not only at protecting societal interests, but also at protecting the persons and property of private individuals from being harmed in terrorist attacks.

85.     *Second*, there will usually be no real difficulty in finding that the violation of an antiterrorism law was the cause of the harm done to an identifiable victim.

86.     *Third,* there is no policy reason to prohibit a victim of a terrorist attack from suing a wrongdoer who violated a criminal antiterrorism statute and thereby caused the victim's harm. Take a case, for example, where a defendant paid a certain amount of money to a terrorist, knowing that that terrorist will use the money to finance a suicide bombing attack. Why shouldn't the victims injured in the attack be permitted to sue the financier for breaching a statute prohibiting such behavior?

87.     *Fourth*, imposing tort liability in such cases would promote the goal of fighting terrorism and, as shown above, the Israeli Supreme Court ascribes a very high value to fighting terrorism and considers the law to have an important role in that fight.

88.     Thus, in my view, the criminal statutes at issue (those cited by the plaintiffs in the FAC and the Law Prohibiting Terrorism Financing) were clearly intended for the benefit and the protection of the instant plaintiffs, the class to which the plaintiffs belong (i.e. the class of innocent civilians) and the public as a whole. Moreover, the harm done to the instant plaintiffs was precisely of the type that these statutes were intended to prevent.

89.     Finally, for the reasons discussed above in regard to Negligence, it is clear that the FAC adequately alleges causation for the purposes of the cause of action for Breach of Statutory Duty.

90.     Mr. Naschitz also asserts in his declaration that the plaintiffs' Breach of Statutory

Duty claims are barred by the rule of "double actionability" under which "the plaintiff must

show that conduct complained of is a tort both according to the law of the forum as well as the

law of the place of the commission of the tort." Naschitz Declaration at ¶ 21.

91.     Mr. Naschitz' "double actionability" argument is inaccurate, since the "double

actionability" rule was completely abolished by the Israeli Supreme Court in a decision issued in

2004. *See* C.A. 1432/03 *Yinon Food Products Manufacturing and Marketing v. Kara'an*, 59(1)

P.D. 345, 372.[3]

92.     Accordingly, in my opinion, if BOC's alleged conduct constituted a violation of

some or all of the criminal statutes at issue (those cited by the plaintiffs in the FAC and the LAW

PROHIBITING TERRORISM FINANCING), the FAC adequately pleads a cause of action for Breach of

Statutory Duty under Israeli law.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

May ⟨⟨⟩⟩, 2009                                    _A. Porat_

                                                  Ariel Porat

---

[3]     In *Yinon Food*, the Supreme Court adopted a general choice-of-law rule for tort
actions based on the place of the commission of the tort (*lex loci delicti*), except in cases where
applying the law of the forum is in the interests of justice. *Id.* at 374.

In a recent decision, the Israeli Supreme Court upheld a decision of the Central District Court
ruling that Israeli law would apply to an action brought against the Palestinian Authority ("PA") and
the PLO arising from a terrorist attack in Tel Aviv, because the place of the commission of the tort –
i.e. the terrorist attack itself – was Israel, notwithstanding the fact the tortious conduct attributed to
the PA and PLO was alleged to have occurred outside of Israel. *See* C.A. 11019/08 *Palestinian
Authority et al. v. Azuz* (April 14, 2009) at ¶¶ 4, 7; Civ. Action 5984-08-07 (Central District) *Azuz v.
Palestinian Authority et al.* (November 23, 2008) at p. 23.

Thus, in my opinion under Israeli choice-of-law rules, Israeli law would apply to this case if
it were before an Israeli court because the terrorist attack occurred in Israel, irrespective of the fact
that BOC's conduct is alleged to have occurred in the United States and China.

August, 2008

# Ariel Porat

## Education

| | |
|---|---|
| 1979-1983 | LL.B. (magna cum laude), Faculty of Law, Tel Aviv University (first in a class of 105) |
| 1983-1985 | LL.M. Studies, Faculty of Law, Tel Aviv University |
| 1986-1989 | J.S.D. (direct course for the degree of JSD), Faculty of Law, Tel Aviv University |
| 1989-1990 | Visiting Scholar (Post Doctorate Studies), Yale Law School, New Haven, U.S.A. |

## Experience

| | |
|---|---|
| 2008-present | Board Member of the American Law and Economics Association (ALEA) |
| 2010 (forthcoming) | The Global School, NYU |
| 2006-present | Incumbent, The Alain Poher Chair in Private Law, Tel Aviv University |
| 2006-present | Fischel-Neil Distinguished Visiting Professor of Law, University of Chicago |
| 2005-present | Member of the American Law Institute |
| 2002-2006 | Dean, Faculty of Law, Tel Aviv University |
| 1999-2003 | Founder and Editor in Chief, *Theoretical Inquiries in Law* |
| 1997-2002 | Director of the Cegla Center for Interdisiplinary Research of the Law |
| 2002-2003 | President, The Israeli Law and Economics Association (ILEA) |
| 1990- present | Professor of Law, Faculty of Law, Tel Aviv University |

## Visits

| | |
|---|---|
| 2003 (F), 2005 (W) 2006(F), 2008 (W) | |
| 2008 (F), | Fischel-Neil Visiting Professor of Law**,** University of Chicago Law School |
| 2005 (F), 2007 (F) | Visiting Professor of Law**,** Columbia University School of Law |
| 2004 (F) | Visiting Professor of Law, University of Virginia School of Law |
| 1998-1999 | Visiting Professor of Law, University of California at Berkeley School of Law |
| 2001(W) 2002(S) | Visiting Faculty, Olin Center for Law and Economics, University of California at Berkeley |

| 2007 (F) | Distinguished Visitor, University Of Southern California (one week visit) |

## Publications in English

### Books

*Tort Liability under Uncertainty* (Oxford University Press 2001) (with A. Stein).

*Fault in American Contract Law* (Cambridge University Press, forthcoming 2010, ed. with O. Ben-Shahar)

### Articles

"Private Production of Public Goods: Liability for Unrequested Benefits" 108 *Michigan Law Review* (forthcoming 2009)

"Forward: Fault in Contract Law" 107 *Michigan Law Review* (forthcoming 2009) (with O. Ben-Shahar)

"Criminal Responsibility for Unspecified Offenses" 94 *Minnesota Law Review* (forthcoming 2009) (with A. Harel)

"A Comparative Fault Defense in Contract Law" 107 *Michigan Law Review* (forthcoming 2009)

"Book Review: Tsachi Keren-Paz, Torts, Egalitarianism, and Distributive Justice" *Legal Studies* (forthcoming 2009)

"Offsetting Risks" 106 *Michigan Law Review* 243 (2007).

"Unconventional Use of Transaction Costs," *Boilerplate: Foundations of Market Contract* (Cambridge University Press, Omri Ben Shahar ed.) 66 (2007) (with D. Gilo).

"Total Liability for Excessive Harm," 36 *Journal of Legal Studies* 63 (2007) (with R. Cooter).

"When Do Irreparable Benefits Matter? A Response to Douglas Lichtman on 'Irraparable Benefits'" 116 *Yale L.J. Pocket Part* 385 (2007)

"Liability Externalities", 1 *Tort Law Journal* (Columbia University School of Law) (Forthcoming 2006) (with R. Cooter).

"The Hidden Roles of Boilerplate and Standard Form Contracts," 104 *Michgan Law Review* 983 (2006) (with D. Gilo).

"Promoting Consensus in Society Through Deferred Implementation Agreements," 56 *University of Toronto Law Journal* 151 (2006) (with O. Yadlin).

"Enforcement of the Law by Impartial Actors," 5 *Theoretical Inquiries in Law* 1 (2005) (with E. Benvenisti).

"Decreasing Liability Contracts," 33 *Journal of Legal Studies* 157 (2004) (with R. Cooter).

"Indeterminate Causation and Apportionment of Damages: An Essay on Holtby, Allen and Fairchild," 23 *Oxford Journal of Legal Studies* 667 (2003) (with A. Stein).

"The Many Faces of Negligence," 4 *Theoretical Inquiries in Law* 105 (2003).

"Anti Insurance," 31 *Journal of Legal Studies* 203 (2002) (with R. Cooter).

"Should Courts Deduct Non-Legal Sanctions from Damages?" 30 *Journal of Legal Studies* 401 (2001) (with R. Cooter).

"Questioning the Idea of Correlativity in Weinrib's Theory of Corrective Justice," 2 *Theoretical Inquiries in Law* 161 (2001).

"Enforcing Contracts in Dysfunctional Legal Systems: The Close Relationship Between Public and Private Orders," 98 *Michigan Law Review* 2459 (2000).

"Does Risk to Oneself Increase the Care Owed to Others? Law and Economics in Conflict," 29 *Journal of Legal Studies* 19 (2000) (with R. Cooter).

"Liability for Uncertainty: Making Evidential Damage Actionable," 18 *Cardozo Law Review* 1891 (1997) (with A. Stein).

"The Contributory Negligence Defence and the Ability to Rely on the Contract," 111 *Law Quarterly Review* 228 (1995).

"Tort Law," in *Introduction to the Law of Israel* 127, Kluwer, Holland, A. Shapira ed. (1995).

"Contributory Negligence in the Law of Contracts: Toward A Principled Approach," 28 *University of British Columbia Law Review* 141 (1994).

## Publications in Hebrew

### Books

*Comparative Fault in Contract Law* (The Institute for Legislative Research and Comparative Law 1997).

### Articles

"Advocating a General Duty of Restitution" *Tel Aviv University Law Review* (forthcoming 2009).

"Under what Conditions the Parties to a Contract Will Allow 'Efficient Breach'?" *Daniel Friedmann Book*  171, N. Cohen & O. Grosskopf eds.  (2008).

"Offsetting Risks and Defensive Medicine" 30 *Tel-Aviv University Law Review* 9 (2006).

"Lost Years, Lost Income and the Value of Human Life" *Essays in Memory of  Professor Menashe Shava,* A. Barak & D. Friedmann eds. 143 (2006).

"Achieving Consensus for Wealth Redistribution Through Deferred-Execution Agreements" 28 *Tel-Aviv University Law Review* 717 (2004) (with O. Yadlin).

"The Tobacco Industry Litigation and the New Challenge of Tort Law," 33 *Mishpatim (Laws)*, *The Hebrew University of Jerusalem Law Journal* 477 (2003).

"Liability for Lost Chances: An Exact Science or Law?" 27 *Tel-Aviv University Law Review* 357 (2003).

"Standard Contracts," in *Contracts*, Vol. 3, 729, D. Friedmann & N. Cohen, eds(2003).

"Negligence and Self-Risk," 26 *Tel Aviv University Law Review* 321 (2002).

"Negligence and Interests," 24 *Tel Aviv University Law Review* 275 (2000).

"Compensation for Risk-Creating and Loss of Chances," 23 *Tel Aviv University Law Review* 605 (2000).

"The Evidential Damage Doctrine: A Response to Critique" 30 *Hebrew University of Jerusalem Law Journal* 349 (1999)(with A. Stein).

"Israeli Law - The Seventies," in *The Courts of Law - Fifty Years of Adjudication in Israel* 98 (1999) .

"Justice Considerations and Behavior-Guiding Considerations in the Law of Contracts," 22 *Tel Aviv University Law Review* 647 (1999).

"The Evidential Damage Doctrine: A Positive Analysis of the Law," 21 *Tel Aviv University Law Review* 191 (1998) (with A. Stein).

"Negligence Law in the Supreme Court: Search for the Underline Theory," 3 *Yearbook on Israeli Law* 357 (1996).

"Collective Responsibility in the Law of Torts, " 23 *Mishpatim (Laws)*, *The Hebrew University of Jerusalem Law Journal* 311 (1994).

"Means of Payments," in *The Law of Obligations - General Part* 431, D. Friedmann, ed. (1994).

"Apportionment of Payments," in *The  Law of Obligations - General Part* 569, D. Friedmann, ed. (1994).

"Application of the Contributory Negligence Defence in the Law of Contracts," 18 *Tel Aviv University Law Review* 103 (1993).

"Tort Law," 2 *Yearbook on Israeli Law* 247 (1993).

"Tort Law," 1 *Yearbook on Israeli Law* 221 (1991).

"Sharing Responsibility in Cases of Frustration of Contract," 16 *Tel Aviv University Law Review* 65 (1991).

"Hardship to Third Parties and the Remedy of Specific Performance," in *Luvenberg Book* 138, D. Friedmann & I. Shilo, eds. (1987).


**Editing**

Ariel Rozen-Zvi: *Religion, Liberalism, Family and Society - Collection of Articles* (Ramot Press 2001).

*Judicial Activism in Israel* (Ramot Press 1993).

*Cases and Materials in Tort Law* Vol. 1-5 (1992)  (with Daniel More).

17 *Tel Aviv University Law Review* (1991-2).

## Presentations

"Enforcing Contracts in Dysfunctional Legal Systems: The Close Relationship Between Public and Private Orders." Conference on Empirical Research in Commercial Transactions (*Michigan University*, February 2000)

"Should Courts Deduct Non-Legal Sanctions from Damages?" Law & Econ. Workshop (*UC Berkeley*, 2000)

"The Many Faces of Negligence." The Comparative Law & Economics Forum (*Brussels*, Belgium, June 2000)

"Anti-Insurance." Law & Econ. Workshop (*UC Berkeley*, February 2001)

"Anti-Insurance." Law & Econ. Workshop (*Michigan University*, February 2001)

"Anti-Insurance." Law & Econ. Workshop (*Hamburg University*, Germany, November 2001)

"Anti-Insurance." Law & Econ. Workshop (*Chicago University*, November 2001)

"Anti-Insurance." Law & Econ. Workshop (*Toronto University*, Canada, November 2001)

"Anti-Insurance." The Annual Conference of the American Law & Econ. Association (*Washington DC*, May 2002)

"Decreasing Liability Contracts." Conference on the Economic Analysis of Contract Law (*Virginia University*, September 2002)

"Decreasing Liability Contracts." The Annual Conference of the American Law & Econ. Association (*Toronto University*,  September 2002)

"The Intercation between Criminal and Non-Legal Sanctions." Lecturing to Ph.D Students (*The European University*, Florence, February 2003)

"Decreasing Liability Contracts." Law & Econ. Workshop (*Columbia University*, April 2003)

"Decreasing Liability Contracts." Faculty Workshop (*Chicago University*, April 2003)

"Deferred Implementation Agreements". Law & Econ. Workshop (*UC Berkeley*, September 2003)

"Implementing the Law by Impartial Agents". Conference on Regulating Conflict of Interests – (*University of Pennsylvania*, A joint conference with Cegla Center, October 2003)

"Deferred Implementation Agreements". The Annual Conference of the American Law & Econ. Association (*Northwestern University*, May 2004)

"Deferred Implementation Agreements". Law & Econ. Workshop (*Virginia University*, September 2004)

"Total Liability for Excessive Harm." Law & Econ. Workshop (*UC Berkeley*, September 2004)

"Total Liability for Excessive Harm." Faculty Workshop (*Chicago University*, February 2005)

"Total Liability for Excessive Harm." Faculty Workshop (*Northwestern University*, February 2005)

Conference on Risks (*University of Pennsylvania*, March 2005)

"Total Liability for Excessive Harm". The Annual Conference of the American Law & Econ. Association (*NYU*, May 2005)

"Liability Externalities and Mandatory Choices." Law & Econ. Workshop (*UC Berkeley*, September 2005)

"The Hidden Roles of Boilerplate". Conference on Boilerplates in Standard Form Contracts (*Michigan University*, September 2005)

"Total Liability for Excessive Harm". Faculty Workshop (*Columbia University*, October 2005)

"Total Liability for Excessive Harm". Law & Econ. Workshop (*Harvard University*, October 2005)

"The Hidden Roles of Boilerplate". Law & Econ. Workshop (*Hamburg University*, January 2006)

"The Hidden Roles of Boilerplate". The Annual Conference of the American Law & Econ. Association (*UC Berkeley*, May 2006)

"Liability Externalities and Mandatory Choices." Conference on Tort law and the Modern State (*Columbia University*, September 2006)

"Offsetting Risks." Law & Econ. Workshop (*Pennsylvania University*, October 2006)

"Liability Externalities and Mandatory Choices." Law & Econ. Workshop (*Stanford University*, November 2006)

"Offsetting Risks." The Annual Conference of the American Law & Econ. Association (*Harvard University*, May 2007)

"Advocating a General Duty of Restitution." Work in Progress Workshop (*University of Southern California*, September 2007)

"Offsetting Risks." Faculty Workshop (*University of Southern California,* September 2007)

"Advocating a General Duty of Restitution." Work in Progress Workshop (*Columbia University*, October 2007)

"Advocating a General Duty of Restitution." Tort Law Group (*NYU*, October 2007)

"Expanding Restitution: Liability for Unrequested Benefits." Faculty Workshop (*Chicago University*, February 2008)

"Expanding Restitution: Liability for Unrequested Benefits." The Annual Conference of the American Law & Econ. Association (*Columbia University*, May 2008)

"Liability for Lapses: 'First Order' or 'Second Order' Negligence?" The Annual Conference of the American Law & Econ. Association (*Columbia University*, May 2008)

"Liability for Lapses: 'First Order' or 'Second Order' Negligence?" The Cegla International Conference on Patients' Safety (*Tel Aviv University*, May 2008)

"Aggregating Probabilities Across Offences in Criminal Law." Sienna-Tel-Aviv-Toronto Conference in Law & Economics (*Tel Aviv University*, June 2008)

"A Comparative Fault Defense in Contracts." Conference on Fault in Contract Law (*Chicago University*, September 2008)

"Aggregating Probabilities Across Offences in Criminal Law." Law & Econ. Workshop (*Chicago University*, October 2008)

A Conference on the Restatement (Third) on Torts (Wake Forest University, April 2009)

A Conference on Causation (University of Aberdeen, Scotland, June 2009)