# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHERYL WULTZ, et al.

      Plaintiffs,

v.                                          Civ. No. 08-01460 (RCL)

THE ISLAMIC REPUBLIC OF IRAN, et al.

      Defendants.

## DECLARATION OF PROFESSOR EMANUEL GROSS

I, Emanuel Gross, of Herzliya, Israel, declare pursuant to 28 U.S.C. § 1746 as follows:

**A.     Professional Background and Qualifications**

1.     I am a professor of law at the Haifa University Faculty of Law, in Haifa, Israel.

2.     My research, publishing and teaching focus primarily on criminal law, evidence law, criminal procedure and the interplay of law and terrorism, and I have published numerous articles and books on these subjects.

3.     I currently teach and have for many years taught courses in criminal law, criminal procedure, evidence law and law and terrorism.

4.     I was a visiting at scholar Yale Law School (1990-1991) and a visiting professor of law at Villanova Law School (1995), John Marshall Law School, Chicago (1997), Washington College of Law, American University, Washington (2002) and Osgoode Hall Law School, York University, Toronto (2003).

5.     Since 2001 I have been a member of the editorial board of Ius Gentium, published by the Center for International and Comparative Law at the University of Baltimore.

6.      I served as the Chief Judge, District Military Court, Southern Command, Israel Defense Forces (1987-1993), the Deputy Chief Judge, District Military Court, Central Command, Israel Defense Forces (1980-1987) and the Deputy District Military Attorney, Central Command, Israel Defense Forces (1973-1980).

7.      I hold a J.S.D. (1985) an LL.M. (1982) and an LL.B. (1972), all from the Tel-Aviv University Faculty of Law, and I was admitted to the Israeli Bar in 1973.

8.      A true copy of my curriculum vitae is annexed hereto as Exhibit 1.

**B.      Purpose and Basis of This Declaration**

9.      I have been requested by counsel for the plaintiffs in the above-captioned action to provide my professional opinion as to whether the conduct attributed to the Bank of China Limited ("BOC") in the First Amended Complaint ("FAC") in this case violated any Israeli criminal statutes which could serve as the basis for imposing civil liability on BOC under Israeli law for the tort of Breach of Statutory Duty.

10.     My opinion as set forth in this declaration is founded on my academic and professional legal studies, teaching, research and publishing over the course of many years as a law professor, and upon the statutes, cases and other authorities cited herein. In preparing this declaration I have examined the FAC and the Declaration of Peter Gad Naschitz, dated March 1, 2009, that was submitted by BOC in support of its motion to dismiss this action.

11.     Because my expertise is mainly in criminal law this opinion addresses only whether BOC's alleged conduct violated Israeli criminal enactments and whether, in light of their intent and purpose,[1] those criminal enactments can serve as the basis for a civil tort claim for Breach of Statutory Duty. I do not discuss the question of whether the FAC sufficiently

---

[1]      Analyzing the legislative purpose of a criminal statue is a task best performed by a specialist in criminal law.

pleads the other elements of the tort of Breach of Statutory Duty under Israeli law, and I am informed that the plaintiffs are submitting a declaration from Professor Ariel Porat which addresses that question.

## B.     Israeli Criminal Provisions Violated by BOC's Alleged Conduct

12.     The FAC alleges that BOC's conduct violated Section 85 of Israel's DEFENSE REGULATIONS (EMERGENCY PERIOD) – 1945, Section 4 of Israel's PREVENTION OF TERRORISM ORDINANCE, 5708–1948, and Sections 145 and 148 of Israel's PENAL LAW, 5737 – 1977.

13.     As explained below, my opinion is that BOC's alleged conduct violated these three criminal provisions, and that in light of their intent and purpose, those provisions can serve as the basis for a civil action for Breach of Statutory Duty. [2]

### i.     Section 85 of the DEFENSE REGULATIONS (EMERGENCY PERIOD) – 1945

14.     Section 85 of the DEFENSE REGULATIONS (EMERGENCY PERIOD) – 1945 ("DEFENSE REGULATIONS")[3] includes two independent offenses which are applicable in this matter: Subsection 85(1)(c) and Subsection 85(1)(f).

15.     Subsection 85(1)(c) of the DEFENSE REGULATIONS imposes criminal liability on any person who "does any work or performs any service for an unlawful association, unless he

---

[2]     I note that there is nothing controversial about this conclusion. The Israeli Supreme Court has repeatedly held that a criminal prohibition may impose a viable statutory duty upon which a civil action for Breach of Statutory Duty can be based. According to the Court, the fact that an enactment is punitive in nature does not prevent it from serving as a basis for a civil action for Breach of Statutory Duty, provided that it is intended for the benefit or protection of any other person or persons in general. *See e.g.* C.A. 572/74 *Roitman v. Bank HaMizrahi Ltd.*, 29(2) P.D. 57, judgment of Cohen, J., at ¶ 4 (1975); C.A. 245/81 *Sultan v. Sultan*, 38(3) P.D. 169 (1984); C.A. 610/02 *Mifal HaPayis v. Lottonet*, 57(5) P.D. 97 at ¶ 17 (2003); C.A. 9183/99 *Penigstein v. Machzavot Ltd.*, 58(4) P.D. 693, at ¶ 13 (2004).

[3]     This statute is sometimes translated into English as "The Defense (Emergency) Regulations," which is the translation used by BOC and the Naschitz Declaration.

proves that he *bona fide* believed that the work or service was not for an unlawful association." Assuming that the allegations of the FAC are true, BOC clearly violated § 85(1)(c).

16.     On October 29, 1990, the Israeli Minister of Defense designated the Palestinian Islamic Jihad ("PIJ") as an "unlawful association" pursuant to his authority under § 84(1)(b) of the DEFENSE REGULATIONS. *See Reshumot*, 5751, 502. PIJ is therefore an "unlawful association" within the meaning of § 85.

17.     There is also no doubt that the provision of banking and/or wire transfer services fall within the broad term "any service" specified in § 85(1)(c). The Israeli Supreme Court decision in Cr. App. 3827/06 *Doe v. The State of Israel* (March 27, 2007), is directly on point. In *Doe*, the Supreme Court upheld a decision by the Beersheva District Court in which a professional moneychanger in the Gaza Strip was convicted of provision of services to an unlawful association under § 85(c) of the DEFENSE REGULATIONS, because he had carried out a series of funds transfers at the request of a Hamas operative.[4]

18.     The decision in *Doe* makes clear that BOC's alleged conduct constituted provision of services to the PIJ within the meaning of § 85(1)(c).

19.     Mr. Naschitz asserts in his declaration that "provision of services" within the meaning of § 85(1)(c) requires that there be "a contract for services" between the defendant and the unlawful association and that the allegations of the FAC are therefore insufficient because they do not allege that "the Bank had a contract of services with the PIJ." Naschitz Decl. at 18. In a similar vein, Mr. Naschitz also claims that § 85(1)(c) is inapplicable because BOC is not alleged to have provided services directly to the PIJ, but to an individual "who is alleged to be an operant and agent of the Palestinian Islamic Jihad and Hamas." *Id.*

---

[4]     I am informed that the plaintiffs are providing the Court with a translation of *Doe*.

4

20.     With all due respect, these claims lack any foundation. In the first place, nothing in the language of § 85(a)(c) even hints in the slightest at a need for an actual "contract for services" between the defendant and the unlawful association, and there is no case law that would support such an interpretation. Terrorist groups are not in the habit of entering contracts.

21.     Mr. Naschitz' claim that provision of services to a person acting as an "operant and agent" of an unlawful association does not constitute provision of services "for an unlawful association" under § 85(1)(c) is also completely baseless. Unlawful associations, like all defendants which are not natural persons, can act and interact only through their officers, employees and agents. Furthermore, few if any terrorist organizations are incorporated (*see e.g.* Bankr. (Jerusalem) 3158/06 *Gavish v. Hamas* (finding that Hamas is unincorporated and therefore not subject to liquidation proceedings)), or maintain a formal hierarchy of officially authorized or appointed office-holders, employees or agents. As unincorporated associations, terrorist groups are nothing but the sum collective of their operatives, activists and agents at any given time.

22.     Thus, as a simple factual matter, in virtually all cases the provision of services for an unlawful association will necessarily require the provider of services to render the services to the association via a natural person who is an operative or agent of the association.[5]

23.     That was precisely the case in *Doe*, where the convicted moneychanger provided wire transfer services for Hamas, via a Hamas operative. The moneychanger never interacted with Hamas per se – *qua* an association. Rather, exactly as BOC is alleged to have done in the instant case, the *Doe* defendant provided services to an individual who was acting on behalf of an unlawful association. *See Doe, passim.* I note that the Supreme Court's decision in *Doe* is one

---

[5]     This reality may well explain why § 85(1)(c) does not require that the service be provided *to* the unlawful association, but rather *for* the association.

of many cases in which a defendant was convicted under § 85(1)(c) for providing services for an unlawful association by providing services to an individual acting on behalf that association.

24.     In sum, the conduct attributed to BOC in the FAC definitely constituted a violation of § 85(1)(c) of the DEFENSE REGULATIONS.

25.     I need not address the elements of the criminal provision set forth at § 85(1)(f), because Mr. Naschitz has expressly conceded in his declaration that the FAC sufficiently alleges that BOC violated § 85(1)(f). *See* Naschitz Declaration at ¶ 19.

26.     Despite this admission, Mr. Naschitz argues that § 85 of the DEFENSE REGULATIONS cannot serve as the basis of a civil claim for Breach of Statutory Duty because the purpose of § 85 is to protect only the state and the organs of government, rather than the public or members of the public, and therefore cannot be considered to be intended "for the benefit or protection of" the plaintiffs, "or of persons generally, or of any class or description of persons to which" the plaintiffs belong, within the meaning of § 63 of the CIVIL WRONGS ORDINANCE (NEW VERSION), 1968 ("CWO"). Naschitz Declaration at ¶¶ 28-29.

27.     Mr. Naschitz bases his argument on § 84(1)(a) of the DEFENSE REGULATIONS, which defines an "unlawful association" as an entity that seeks to harm the State of Israel or the Israeli government and its officials and property. According to Mr. Naschitz, because § 84(1)(a) does not include in the definition of an "unlawful association" organizations which seek to harm the Israeli public or members of the public, § 85 cannot be construed as intended to protect the public and members of the public. With all due respect, this argument is clearly mistaken.

28.     In the first place, Mr. Naschitz has addressed only the first subsection of the definitional provision (§ 84(1)(a)) and ignored the second subsection – i.e. § 84(1)(b). Subsection 84(1)(b) provides that:

> In this part, the expression "unlawful association"
> means any body of persons, whether incorporated or
> unincorporated, and by whatsoever name (if any) it
> may from time to time be known, which –
>
> (a) ***
>
> (b) **is declared by the Minister of Defense to
> be an unlawful association**, including any
> branch, center, committee, group, faction
> or institution of any such body.

DEFENSE REGULATIONS, § 84 (emphasis added).[6]

29.     Thus, while § 84(1)(a) contains a specific definition of an "unlawful association,"

§ 84(1)(b) defines an "unlawful association" as *any* entity so designated by the Defense Minister.

30.     Because the unqualified language of § 84(1)(b) contains no limiting criteria for

making such a designation, it is clear that that provision vests the Minister of Defense with

extremely broad discretion, and certainly empowers him to designate as an "unlawful

association" a terrorist group which, for example, targets *only* Israeli civilians, and not the State,

the government, or their organs and officials.

31.     Indeed, if "unlawful associations" were only those which met the criteria of §

84(1)(a), then § 84(1)(b) would be redundant. The entire purpose of § 84(1)(b) is to allow the

Minister of Defense to designate entities which do *not* meet the conditions set forth in § 84(1)(a).

32.     Therefore, contrary to Mr. Naschitz' assertion, "unlawful associations" within the

meaning of §§ 84-85 of the DEFENSE REGULATIONS are by no means limited to entities which

target only the State and the government, and can just as easily include terrorist groups which

---

[6]     The English version of the DEFENSE REGULATIONS submitted by BOC along with its
motion to dismiss is the original text enacted by the British Mandatory authorities in 1945 (hence the
references to "His Majesty's Government" and the "High Commissioner"). When the DEFENSE
REGULATIONS were adopted into law by the State of Israel in 1948, these British-oriented terms were
replaced with appropriate terms reflecting the fact that this legislation was now Israeli.

exclusively, or additionally, target civilians in Israel. As noted, the PIJ itself was specifically designated as an "unlawful association" under § 84(1)(b) in a declaration issued by the Israeli Minister of Defense on October 29, 1990. *See Reshumot*, 5751, 502.

33.     In sum, Mr. Naschitz' argument is without merit because it ignores § 84(1)(b).

34.     Furthermore, in Cr. A. 312/73 *Masrawa v. State of Israel*, 28(2) P.D. 805, the Israeli Supreme Court held that even when the terrorist organization is not specially designated under § 84(1)(b) and is considered an "unlawful association" **solely by operation of the statutory definition set forth in § 84(1)(a)**, the purpose of the criminal prohibition contained in § 85 is to prevent harm to both individual civilians and the State and government.

35.     In *Masrawa,* the defendant was convicted by a lower court of several crimes, including a violation of § 85 of the DEFENSE REGULATIONS because of his involvement with an underground organization which had not been declared an "unlawful association" pursuant to § 84(1)(b). On appeal, the Supreme Court acquitted the defendant of all charges except the § 85 conviction, which it upheld after finding that the organization in question met the definition set forth in § 84(1)(a). The court then addressed the issue of sentencing, and ruled as follows:

> Since we have acquitted the appellant of all the charges under the State Security Law, it is appropriate that we reduce his punishment.
>
> We do not ignore the severity of the crime for which he was convicted under the DEFENSE REGULATIONS (EMERGENCY PERIOD) – 1945; those who attempt to realize their political goals through the use of live weapons undermine not only the foundation of the State of law and the democratic regime, *but endanger human life* and harm the security of the State. *We must defend the public* against them in a timely manner – before they have an opportunity to carry out their evil designs.

*Id.* at 808 (emphasis added).

36.     Thus, in sentencing the defendant, the Supreme Court took into account the purpose of § 85 and explicitly found (contrary to Mr. Naschitz' interpretation) that § 85 is intended, *inter alia*, to protect human life and the public, even when the organization in question is not designated under § 84(1)(b) and is deemed an "unlawful association" under § 84(1)(a) because of the threat it poses to the State and its organs.

37.     Likewise, in Civ. Action (Jerusalem) 11214/04, *Estate of Abu Miala v. State of Israel* (March 19, 2007) *vacated on other grounds*, C.A. (Jerusalem District Court) 11118/07 *Estate of Abu Miala v. State of Israel* (September 4, 2008), the court found that the DEFENSE REGULATIONS, as well as the PREVENTION OF TERRORISM ORDINANCE and § 145 *et seq.* of the PENAL LAW, "all seek to realize the same purpose which is … preventing terrorism and bloodshed." *Id.* at 6.

38.     Since the Israeli courts have determined that the DEFENSE REGULATIONS are intended to protect "human life" (*Masrawa*) and "prevent[] bloodshed" (*Estate of Abu Miala*) there is no question that the DEFENSE REGULATIONS are intended "for the benefit or protection … of persons generally" within the meaning of CWO § 63, and that a violation of § 85 of the DEFENSE REGULATIONS will give rise to a civil claim for Breach of Statutory Duty by persons who were harmed by that breach.

39.     Finally, Mr. Naschitz also argues that § 85 of the DEFENSE REGULATIONS should not be considered to be for the protection of the public because § 39(a) of the BASIC LAW: THE GOVERNMENT, which governs emergency-ruling making power in Israel, is intended for the protection of the state and its organs. Naschitz Declaration at ¶ 27. But this claim is without any basis at all because – as Mr. Naschitz himself concedes – the force of the DEFENSE REGULATIONS

is in fact *not* contingent on any declaration of a state of emergency. *Id.* at ¶ 28. Thus, in respect

to the DEFENSE REGULATIONS, this entire argument is a red herring.

40.     Accordingly, there is no merit at all in the claim that a violation of § 85 cannot

serve as the basis of an action for Breach of Statutory Duty.

41.     To summarize this section: the conducted attributed to BOC constituted violations

of §§ 85(1)(c) and § 85(1)(f) of the DEFENSE REGULATIONS, and those provisions are intended

for the protection of all persons and can therefore serve as the basis for a Breach of Statutory

Duty claim under CWO § 63.

**ii.     Section 4 of the PREVENTION OF TERRORISM ORDINANCE, 5708-1948**

42.     Section 4 of the PREVENTION OF TERRORISM ORDINANCE, 5708-1948 provides in

relevant part that "[a] person who ... gives money or money's worth for the benefit of a terrorist

organization ... shall be guilty of an offence and shall be liable on conviction to imprisonment

for a term not exceeding three years or to a fine not exceeding one thousand pounds or to both

such penalties." *Id.* at § 4(d).

43.     The term "terrorist organization" is defined in the PREVENTION OF TERRORISM

ORDINANCE as "a body of persons resorting in its activities to acts of violence calculated to cause

death or injury to a person or to threats of such acts of violence." *Id.* at § 1.

44.     It is obvious that PIJ is a terrorist organization under the definition in § 1 and Mr.

Naschitz does not dispute this. Additionally, on June 22, 1989, the Israeli Cabinet formally

declared PIJ a terrorist organization pursuant to § 8 of the PREVENTION OF TERRORISM

ORDINANCE. *See Reshumot*, 5749, 3474.

45.     In my opinion, BOC's conduct as alleged in the FAC violated § 4(d) of the

PREVENTION OF TERRORISM ORDINANCE. The FAC alleges that BOC's branches in the United

States transferred funds to Said al-Shurafa's accounts at a BOC branch in China and that al-Shurafa then withdrew the funds and transferred them to PIJ leaders in the West Bank and Gaza. FAC ¶¶ 69-70. By first transferring funds from the United States to al-Shurafa's accounts and crediting those accounts, and then paying out those funds to al-Shurafa (who transferred them to other PIJ operatives), the BOC clearly "gave money" to PIJ within the meaning of § 4(d).

46.     Mr. Naschitz asserts that BOC did not violate § 4(d) because "[i]t has not been alleged that the Bank gave money to the terrorist organizations in order to fall within sub-section (d); rather the Bank has allegedly only served as a conduit to enable a terrorist operant to transfer money." Naschitz Delcaration at ¶ 16.

47.     But this argument is erroneous. The fact that the money at issue was not owned by BOC – i.e. that BOC did not give its **own** funds to the PIJ – is completely irrelevant, because the Israeli courts have not limited the application of § 4(d) to cases where the defendant contributes its **own** funds to the terrorist organization.

48.     Rather, the Israeli courts have held that the prohibition set forth in § 4(d) includes cases where – like the BOC allegedly did here – the defendant **acted as a conduit for the transfer of funds which did not belong to the defendant** to a terrorist organization. *See e.g.* Ser.Crim.Case (Jerusalem District Court) 8031/07 *State of Israel v. Farach, et al.* (January 28, 2008) at ¶ 2 (defendants convicted under § 4(d) of the PREVENTION OF TERRORISM ORDINANCE for channeling funds from Saudi organization to Hamas).

49.     Thus, directly contrary to Mr. Naschitz' assumption, the Israeli courts have expressly ruled that a defendant which "only served as a conduit" (to use Mr. Naschitz's phrase) for the transfer of funds to a terrorist group has indeed violated § 4(d) of the PREVENTION OF TERRORISM ORDINANCE.

50.     It should also be noted that the international community is currently engaged in an intensive effort to obstruct terrorism, *inter alia* by cutting off terrorists' financial resources.[7] Israel has joined this world-wide trend by enacting laws such as the LAW PROHIBITING MONEY LAUNDERING, 5762-2001, the LAW FOR FIGHTING ORGANIZED CRIME, 5763-2003 and the LAW PROHIBITING TERRORISM FINANCING, 5766-2005, which are aimed *inter alia* at disrupting and interdicting financial activities used to support terrorism.[8] This international effort to prevent terror financing, and the recent legislative trend in Israel reflecting Israel's part in this effort, make it likely that an Israeli court would interpret § 4(d) to include not only acts of giving or channeling money, but also the provision of valuable services (such as banking services, wire transfers, etc.) which facilitate the transfer of money for the benefit of a terrorist organization. Therefore, in my opinion and experience, assuming that the allegations in the FAC are accurate, an Israeli court would find BOC criminally liable for violating §4(d) not only because it channeled funds to the PIJ (conduct which is unquestionably a violation of §4(d) as per *State of Israel v. Farach, id.*) but also on the additional grounds that it provided banking services to the PIJ.

51.     Mr. Naschitz further argues that § 4(d) of the PREVENTION OF TERRORISM ORDINANCE cannot serve as the basis of a civil claim for Breach of Statutory Duty because the purpose of the PREVENTION OF TERRORISM ORDINANCE is to protect only the state and its organs of government, rather than the public, and therefore should not be considered to be intended "for the benefit or protection of" the plaintiffs, "or of persons generally, or of any class or description

---

[7]     *See, e.g.* the INTERNATIONAL CONVENTION FOR THE SUPPRESSION OF THE FINANCING OF TERRORISM (1999); COUNCIL OF EUROPE CONVENTION ON LAUNDERING, SEARCH, SEIZURE AND CONFISCATION OF THE PROCEEDS FROM CRIME (Warsaw, 2005).

[8]     *See also* Cr. App. 3827/06 *Doe v. The State of Israel* (March 27, 2007), at ¶ 9.

of persons to which" the plaintiffs belong, within the meaning of § 63 of the CWO. Naschitz Declaration at ¶¶ 25-29.

52.     Mr. Naschitz bases this argument on the claim that the PREVENTION OF TERRORISM ORDINANCE can remain in force only as long as there is a declared state of emergency in Israel, and that § 39(a) of the BASIC LAW: THE GOVERNMENT, which today governs the issuance of emergency regulations during a state of emergency, indicates that such regulations are intended for the protection of the state and its organs, rather than the public. Naschitz Declaration at ¶ 27. This argument is mistaken for numerous reasons:

53.     First, the PREVENTION OF TERRORISM ORDINANCE is primary legislation – i.e. it is a full-fledged law – and not emergency regulations. Therefore, the provisions of § 39 of the BASIC LAW: THE GOVERNMENT – which govern the issuance of emergency regulations – are completely inapplicable to the PREVENTION OF TERRORISM ORDINANCE, which is a regular law. Thus, Mr. Naschitz confuses and conflates the grounds for the issuance of emergency regulations (which are addressed in § 39(a) but which are irrelevant to actual laws such as the PREVENTION OF TERRORISM ORDINANCE) with the grounds for the declaration of a state of emergency (which is merely a condition for the continued force of the PREVENTION OF TERRORISM ORDINANCE).

54.     Moreover, in fact, there is **no** legislation in Israel which defines or limits the grounds for the declaration of such an emergency. As Mr. Naschitz notes, the original declaration of emergency in 1948 was issued under § 9 of the LAW AND ADMINISTRATION ORDINANCE, 5708-1948. *See* Naschitz Declaration at ¶ 26. But § 9 of the LAW AND ADMINISTRATION ORDINANCE (which was since repealed) did not contain any provision whatsoever limiting or defining the reasons justifying a declaration of an emergency; rather, § 9 stated simply that the Israeli government could declare an emergency if it saw fit to do so.

55.     Section 9 was superseded, as Mr. Naschitz notes (*id.* at n. 13), first by §§ 49-50 of the BASIC LAW: THE GOVERNMENT as enacted in 1992, and then by § 38(e) of the BASIC LAW: THE GOVERNMENT as currently in force. But none of these provisions contain any limitations on the grounds for declaring a state of emergency. Section 49(a) of the 1992 BASIC LAW provided that: "Should the Knesset ascertain that the State is in a state of emergency, it may, of its own initiative or, pursuant to a Government proposal, declare that a state of emergency exists." Exactly so § 38(a) of the BASIC LAW: THE GOVERNMENT as currently in force uses identical language, i.e.: "Should the Knesset ascertain that the State is in a state of emergency, it may, of its own initiative or, pursuant to a Government proposal, declare that a state of emergency exists."

56.     Thus, there is no basis whatsoever to assume that the initial declaration of the state of emergency upon which the continued force of the PREVENTION OF TERRORISM ORDINANCE depends, or the subsequent extension of that state of emergency until today, were intended solely to protect the state and its organs, and not the personal security of members of the public.

57.     Second, even assuming for the sake of argument that § 39(a) of the BASIC LAW: THE GOVERNMENT governing the conditions for the issuance of emergency regulations – which provision, as noted, is completely irrelevant to the PREVENTION OF TERRORISM ORDINANCE, which is a regular law – was somehow relevant here, Mr. Naschitz argument should be rejected because the language of § 39(a) actually supports the plaintiffs' position.

58.     Section 39(a) permits the government to issuance emergency regulations "in order to protect the State, ***the security of the public*** and the maintenance of supplies and essential services." § 39(a) (emphasis added). As noted, the CWO provides that breach of an enactment

will give rise to an action for Breach of Statutory Duty if the enactment is intended "for the benefit or protection … *of persons generally*." CWO § 63 (emphasis added). Thus, since regulations issued pursuant to § 39(a) (which, again, do not include the PREVENTION OF TERRORISM ORDINANCE) are intended *inter alia* "to protect … the security of the public," it is clear that such regulations would be covered by § 63 of the CWO.

59.     Third, contrary to Mr. Naschitz' argument, the Israeli Supreme Court has explicitly held that the PREVENTION OF TERRORISM ORDINANCE is "*intended to prevent bloodshed*." H.C.J. 6897/95 *Kahane v. Kroyzer*, 49(4) P.D. 853, 863.

60.     Since the Supreme Court has ruled that the PREVENTION OF TERRORISM ORDINANCE is "intended to prevent bloodshed" it is clear that the provisions of the ORDINANCE are intended "for the benefit or protection … of persons generally" within the meaning of CWO § 63, and that a violation of those provisions gives rise to a civil cause of action for Breach of Statutory Duty by any persons harmed by that breach.

61.     Fourth, the term "terrorist organization" is specifically defined in the PREVENTION OF TERRORISM ORDINANCE as "a body of persons resorting in its activities to acts of violence calculated to cause death or injury to a person or to threats of such acts of violence." *Id.* at § 1. As discussed *supra*, Mr. Naschitz himself argues that because § 84(1)(a) of the DEFENSE REGULATIONS defines an "unlawful association" as an entity that seeks to harm the State of Israel or the Israeli government and its organs, without reference to members of the public, § 85 of the DEFENSE REGULATIONS cannot be construed as intended to protect the public and so cannot serve as the basis for a Breach of Statutory Duty claim.[9] Here, by contrast, a terrorist organization is

---

[9]     As shown above, this claim is in error because it ignores both (i) the second part of the definitional provision, § 84(1)(b), which allows the Defense Minister to designate any group an unlawful association and (ii) the holding of the Israeli Supreme Court that § 85 is intended to protect human life.

defined as an entity which uses violence "calculated to cause death or injury to a person." Thus, applying the line of reasoning that Mr. Naschitz used in analyzing § 85 of the DEFENSE REGULATIONS leads directly to the conclusion that the PREVENTION OF TERRORISM ORDINANCE is intended to protect members of the public from physical harm, and that a violation of any of its provisions therefore creates a viable basis for a Breach of Statutory Duty claim under CWO § 63.

62.     In sum, BOC's alleged conduct violated § 4(d) of the PREVENTION OF TERRORISM ORDINANCE, and that provision is intended for the protection of all persons and as such can serve as the basis for a Breach of Statutory Duty claim under CWO § 63.

### iii.     Section 148 of Israel's PENAL LAW, 5737 – 1977

63.     Section 148 of the PENAL LAW imposes criminal liability on a person "who pays ... a contribution for on behalf of an unlawful association ..."

64.     Mr. Naschitz agrees in his declaration that the PIJ is an "unlawful association" for the purpose of § 148 (*see id.* at ¶ 17) so I need not address this element of the crime.

65.     Mr. Naschitz argues, however, that the FAC does not state a claim that BOC violated this provision because "there is no allegation in the FAC that the Bank paid ... a contribution for ... unlawful associations." Naschitz Declaration at ¶ 17.

66.     I disagree with Mr. Naschitz' conclusion. The FAC alleges that BOC's U.S. branches transferred funds to al-Shurafa's accounts and that BOC then paid those funds out to al-Shurafa, who received the funds on behalf and as an agent of the PIJ. While I have not located any case law interpreting the term "contribution" as used in § 148, in my opinion an Israeli court would find that BOC's alleged conduct constituted a "contribution" within the meaning of § 148, for the reason below.

67.    As discussed *supra*, the Israeli courts have construed § 4(d) of the PREVENTION OF
TERRORISM ORDINANCE as not limited to cases where the defendant contributes its own funds to
the terrorist group and, on the contrary, have expressly held that § 4(d) includes cases wherein
the defendant merely channeled funds which did not belong to it to a terrorist organization. As
noted, § 4(d) of the PREVENTION OF TERRORISM ORDINANCE provides that "[a] person who …
gives money or money's worth for the benefit of a terrorist organization" has committed a crime.
Since there is no substantive difference between the language "give[] money" as used in § 4(d)
and "pay[] a contribution" used in § 148 it is highly likely in my opinion and experience that an
Israeli court would construe payment of a "contribution" under § 148 of the PENAL LAW in
exactly the same way as § 4(d) has been interpreted: i.e., under § 148 the funds contributed need
not be owned by the defendant, and a defendant which, like BOC, acted as a conduit for the
transfer of the payment, will also be liable under § 148.

68.    Mr. Naschitz also argues (as he did in respect to the DEFENSE REGULATIONS and
the PREVENTION OF TERRORISM ORDINANCE) that a violation §§ 145-148 of the PENAL LAW
cannot give rise to a civil claim for Breach of Statutory Duty because the purpose of § 148 is to
protect only "the political order, the government, and state property," and that provision is thus
not intended "for the benefit or protection of" the plaintiffs, "or of persons generally, or of any
class or description of persons to which" the plaintiffs belong within the meaning of CWO § 63.
Naschitz Declaration at ¶ 28.

69.    In fact, however, contrary to Mr. Naschitz' claims, the Israeli courts have
explicitly found that §§ 145-148 of the PENAL LAW are intended for the benefit and protection of
members of the public.

70.     As Mr. Naschitz notes, §§ 145-148 are part of Chapter Eight of the PENAL LAW.

Naschitz Declaration at ¶ 17. The Israeli Supreme Court has determined that the provisions of

Chapter Eight of the PENAL LAW are intended, inter alia, to protect the security of the public:

> The accepted manner in which a state copes with internal
> threats to its security and *the security of the public* is
> through the criminal law. We find in the law various crimes
> *that were intended to protect the security of the state and
> the security of the public* (see primarily **Chapters 7-8 of
> the Penal Code, 5737 – 1977**; *Prevention of Terrorism
> Ordinance, 5708 – 1948)*.

Det. App. 8788/03 *Federman v. Minister of Defense*, (November 5, 2003) at ¶ 9 (emphasis

added).

71.     Moreover, as noted above, in *Estate of Abu Miala v. State of Israel*, the Jerusalem

Magistrates Court[10] held that § 145 *et seq.* of the PENAL LAW, along with the DEFENSE

REGULATIONS and the PREVENTION OF TERRORISM ORDINANCE "all seek to realize the same

purpose which is … preventing terrorism and bloodshed." *Id.* at 6.

72.     Therefore, since §§ 145 – 148 of the PENAL LAW are intended "to protect … the

security of the public" (*Federman*) and to prevent "bloodshed" (*Estate of Abu Miala*) there is no

doubt that § 148 is intended "for the benefit or protection … of persons generally" within the

meaning of CWO § 63, and that a violation of § 148 will give rise to a civil claim for Breach of

Statutory Duty by anyone harmed by that breach.

73.     In summary, BOC's alleged conduct violated § 148 of the PENAL LAW, which is

intended for the protection of all persons and can therefore serve as the basis for a Breach of

Statutory Duty claim under CWO § 63.

---

[10]     Notwithstanding the fact that the name of this court (which in Hebrew is actually the
"Court of the Peace") is usually translated into English (as an artifact left over from the British Mandatory
period) as "Magistrates Court," the judges of the court are regular, full judges, not magistrates.

**C.    Israel Has Extraterritorial Jurisdiction Over the Criminal Violations at Issue**

74.    Despite the fact that the conduct attributed to BOC in the FAC did not occur in Israel, that conduct violated the Israeli criminal statutes discussed above because Israel has extraterritorial criminal jurisdiction over the crimes at issue, under § 13 of the PENAL LAW.

75.    Section 13 of the PENAL LAW provides in relevant part that:

> (a) Israeli penal law shall apply to foreign offences against:
>
>> (1)  the security, foreign relations or secrets of the State;
>> (2)  ...
>> (3)  ...
>> (4)  ...
>> (5)  ...
>
> (b) Israeli penal law shall apply also to foreign offences against:
>
>> (1)  the life, person, health, freedom or property of an Israeli national, resident of Israel, or public servant as such;
>
> ...

PENAL LAW, § 13. [11]

76.    The decision of the Israeli Supreme Court in Cr. App. 3827/06 *Doe v. The State of Israel* (March 27, 2007), makes clear beyond doubt that § 13 of the PENAL LAW applies to the conduct attributed to BOC in the FAC.

77.    As noted above, the defendant in *Doe* was a professional moneychanger in the Gaza Strip who was convicted by an Israeli district court of providing services to an unlawful

---

[11]    Mr. Naschitz asserts that only § 13(b)(1) is relevant here, and that the other provisions of § 13 "are not applicable to this case." Naschitz Declaration at ¶ 20. This claim is unfounded, given that the FAC very clearly alleges that the PIJ (and, according to FAC ¶ 112, BOC as well) sought to harm both the civilian population in Israel and the security of the State of Israel. Section 13(a) is therefore fully relevant to the allegations of this case.

association under § 85(c) of the DEFENSE REGULATIONS, on the basis of a series of funds transfers he carried out at the request of a Hamas operative. *See Doe* at ¶¶ 1, 11-12.

78.     In *Doe* the Supreme Court held that § 13(a)(1) and 13(b)(1) of the PENAL LAW applied to Doe's conduct, despite the fact that his conduct took place in the territory of the Palestinian Authority, i.e. in the Gaza Strip, where Hamas is considered a legal organization, and despite the fact that Doe was not a member of Hamas and his provision of financial services to Hamas took place in the context of his regular course of business as a moneychanger. *Id.* at ¶¶ 3, 4, 7.[12]

79.     The facts of *Doe* are substantively identical to those of the instant case. The FAC alleges that the PIJ is engaged in a campaign of terrorism which seeks to harm Israel's security and kill its citizens, and that BOC carried out millions of dollars in wire transfers for the PIJ over a period of several years.[13] If those allegations are true then there is no doubt, in light of the Supreme Court's decision in *Doe*, that § 13(a)(1) and 13(b)(1) of the PENAL LAW apply to BOC's conduct.

80.     Despite the Supreme Court's holding in *Doe* (which he does not mention), Mr. Naschitz argues in his declaration that § 13 is irrelevant to BOC's conduct because application of § 13 "turn[s] on a characterization of the defendant's **motives and objectives** as to whether they were directed against Israelis as such" and whether the defendant itself committed violence against Israelis. *Id.* at ¶ 20 (emphasis added). Mr. Naschitz concludes that "the allegations in the FAC do not evince a motivation of the Bank to harm Israelis as such. Therefore, Penal Law § 13 would not apply. Secondly, in my opinion, the condition of Penal Law § 13 whereby violence

---

[12]     The phrase "Area A" used in *Doe* is a term of art drawn from the Oslo Accords referring to the area under the jurisdiction of the Palestinian Authority, which included, at the time of the events discussed in *Doe*, virtually the entire Gaza Strip.

[13]     Notably, in *Doe* only several hundred thousand dollars were wired. *See id.*

has been committed by the defendant against Israelis is also not fulfilled by the allegations in the FAC." *Id.* at 22.

81.    In the first place Mr. Naschitz' argument is mistaken because the FAC does indeed allege that BOC's actions were directed at Israel. *See* FAC at ¶ 112.

82.    Moreover, with all due respect, Mr. Naschitz' conclusions fly directly in the face of the decision in *Doe*. In *Doe*, there was no allegation that the defendant – who was not a terrorist but just an ordinary moneychanger – *intended* to harm Israel or Israelis at all; rather, the Supreme Court found that § 13 applied because the defendant knew that the transfers were being made at the request of a Hamas operative and therefore also *knew, or should have known*, that the funds being transferred were intended in one form or another for the general activities of the organization, including terrorist activities against Israeli targets. *Doe* at ¶ 7. Thus, § 13 does not require *intent*, but only *knowledge*, actual or implied. Since the FAC alleges that in April 2005 BOC was explicitly warned about the precise nature of the wire transfers (FAC at ¶ 77) the knowledge requirement is satisfied in this case.

83.    Furthermore, in *Doe* the defendant did not carry out any violent act against Israel or Israelis – indeed, there was no evidence in that case that the funds at issue were ever used by Hamas itself to commit such violence. Thus, the claim in Mr. Naschitz' declaration that § 13 applies only when "violence has been committed by the defendant against Israelis" (*id.* at 22) is clearly without basis.

84.    Thus, in my opinion, there is no doubt that BOC's conduct was within Israel's extraterritorial criminal jurisdiction under § 13, assuming the allegations of the FAC are true.[14]

---

[14]    Because the FAC relies only on § 13 of the PENAL LAW and because jurisdiction under that provision is so clear, I do not address Mr. Nashitz' discussion of whether there is extraterritorial criminal jurisdiction under § 14 of the PENAL LAW.

85.     My opinion is unaffected by the fact that Mr. Naschitz' is unaware of any case in which a Breach of Statutory Duty claim was based on the violation of a criminal provision over which Israel has extraterritorial jurisdiction under § 13. Naschitz Declaration at ¶ 21. If in fact there has not been such a case to date, that is likely because Israel would not normally have *civil* long-arm jurisdiction over a foreign defendant which, as BOC is alleged to have done, committed crimes outside of Israeli territory (unless, for example, the defendant had an office or agent for service of process in Israel). In other words, Israel's extraterritorial criminal jurisdiction is far more extensive than its civil long-arm jurisdiction, and Israel criminalizes conduct which is beyond the civil personal jurisdiction of its courts. The absence to date of a case presenting similar circumstances is therefore meaningless. The important point is that Mr. Naschitz is unable to cite any case in which such claims were **rejected**.[15]

86.     The sole relevant question is whether the plaintiffs' claims are valid as a matter of substantive Israeli law; as shown above, they clearly are.

**D.      Conclusion**

87.     It is my opinion that BOC's alleged conduct violated the three Israeli criminal provisions cited in the FAC and that those criminal enactments can serve as the basis for a civil action for Breach of Statutory Duty, in light of their intent and purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

May 2 , 2009

_____
                                       Emanuel Gross

---

[15]     Mr. Naschitz also charges that plaintiffs' Breach of Statutory Duty claims are an attempt to "circumvent" the doctrine of "double actionability." Naschitz Declaration at ¶ 21. This claim is rather peculiar, since the Supreme Court totally repealed the "double actionability" doctrine in C.A. 1432/03 *Yinon Food Products v. Kara'an*, 59(1) P.D. 345, 372 (2004).

**Emanuel Gross**                                            **January 2009**

## CURRICULUM VITAE

1.     **Personal Details**

Name: Emanuel Gross

Date of Birth: May 5, 1948

Country of Birth: Romania

Date of Aliyah: 1950

Citizenship: Israeli

Identity Card Number: 043708361

Marital Status: Married +2

Permanent Home Address: 5 Neve Oved, Nof- Yam, Herzlia, 46625

Home Telephone Number: 972-9-958-4418

Office Telephone Number: 972-4-828-8139

Electronic Address: egross@research.haifa.ac.il

Fax Number: 972-4-824-0681

2. **Higher Education**

| Period of Study | Name of Institution and Department | Degree | Date of Degree |
|---|---|---|---|
| 1968-1972 | Faculty of Law, Tel Aviv University | LL.B. | March, 1973 |
| 1973-1982 | Faculty of Law, Tel Aviv University | LL.M. | April 1983 |
| 1983-1987 | Faculty of Law, Tel Aviv University | J.S.D. | May 1988 |
| 1989-1990 | Yale School of Law (Professor Abe Goldstein – host) | Visiting Scholar (post doc.) | |

3. **Academic Ranks and Tenure in Institutes of Higher Education**

| Dates | Name of Institution and Department | Rank/Position |
|---|---|---|
| 1988-1992 | Faculty of Law, Bar-Ilan University | Lecturer |
| 1993-1997 | Faculty of Law, University of Haifa | Lecturer |
| 1998-2006 | Faculty of Law, University of Haifa | Associate Professor |
| 2006- | Faculty of Law, University of Haifa | Full Professor |

4. **Offices in University Academic Administration**

1994-1995: Chair of the Library Committee, Faculty of Law.

* 1997- : Chair of Students Committee, Faculty of Law.

* 2006- : Chairman of the committee for the LL.M. degree for judges, Faculty of Law.

5. **Scholarly Positions and Activities outside the University**

1972-1977: Military Attorney, I.D.F.

1977-1987: Military Judge, I.D.F.

1987-1993: President of the Military Tribunal of Southern Command, I.D.F.

1994-1996: Special legal adviser to the Knesset's (the Parliament of Israel) Constitution, Statutes and law Committee.

*1995- : Legal commentator on Israeli and foreign media.

1997: Special legal adviser to the Knesset's Committee of Women affairs.

*2001- : Member of the editorial board of *Ius Gentium*, Center for International and Comparative Law, University of Baltimore, U.S.A.

2004:  Member of the "Round Table" committee for law and Terrorism. The Israeli Democracy Institute.

*2008: Referee – The Melbourne Journal of International law, Australia.

2

6. **Participation in Scholarly Conferences**

a. **Active Participation**

| Date | Name of Conference | Place of Conference | Subject of Lecture/Discussion/Comments |
|---|---|---|---|
| 1989 | The Annual Conference of the Criminology Association | Bar-Ilan University | The Crown Witness |
| 1989 | The Military Courts Approach toward Illegal Drugs | Tel Aviv University | The Punishment Policy |
| **1993** | **Codification of Criminal Law** | **University of Haifa** | **The Criminal Code in Emergency Times** |
| **2004** | **Human Rights and Terrorism: Democracy Versus Terrorism** | **Temple University, Philadelphia** | **The Israeli Experience in the War on Terrorism** |

b. **Organization of Conferences or Sessions**

| Date | Name of Conference | Place of Conference | Subject of Conference/ Role at Conference/ Comments |
|---|---|---|---|
| 2002 | International Conference: Democracy versus Terrorism: Where are the Limits? | University of Haifa | Member of the organization committee |
| *2006- | Judge's annual conference | University of Haifa | Organization of the conference on behalf of the Faculty of Law |

7. **Colloquim Talks and other Invited Addresses**

1993: Medical Conference on Ethics Problem: H.I.V, Legal Aspects, Rambam Hos.

1993: Medical Ethics Informed Consent, Rappoport School of Medicine, Haifa.

1995: The Mistake Defense in Rape Trials, Tel Aviv and Haifa Faculties of Law, Women in   Criminal Trials.

1996: The Constitutional Rights of the Victim in Criminal Proceedings, The Supreme Court, Jerusalem, Conference of Justices from England and Israel, on Comparative Criminal Law.

1997: The Comparison Between the Military Criminal Justice and The Civil System. University of Haifa, I.D.F. and The Israeli Society.

1997: The Constitutional Reforms in Criminal Procedure, Neve-Ilan, Judges Advanced Studies.

1997: Punishment Factors Toward Users of Alcohol, Ramat Gan, Ministry of Social Affairs, Conference on Alcohol Abuse.

1997: Constitutional Aspects of the New Arrest Law, Hod Hsharon, The Civil Rights and the New Detention Law.

1997: The effects of the New Arrest Law on the Army, The Israeli Academy of Military Law.

1998: Victims Rights, Leeds, England

1999: Evidentiary Aspects of Defending Human Rights, Amsterdam, Netherlands.

2000: Human Rights and Terrorism the right Balance, The Israeli Perspective, Golden Gate University, San Francisco.

2001: Incitement Offences, The Israeli Democracy Institute, Jerusalem.

2002: Law and Terrorism: University of Haifa.

2003: Obedience to the Law, The Netanya Academic College of Law.

2003: The right to die, University of Haifa.

2003: The Rule of Law and Terrorism. Osgoode Hall, Toronto

2003: The Effects of Terrorism On the Rule of Law, John Marshall School of Law, Chicago.

2003: The Definition of International Crimes in the Rome Statute, Jerusalem.

2004: The Legal implications of the "Security Fence". Osgoode Hall, Toronto.

2004: Democracy Versus Terrorism –The Israeli view. Yale Law School, New-Haven.

2004: Combating Terrorism: Do we need an Emergency Constitution? Cornell School of Law, New York.

2005: The Struggle of Democracy on Terrorism: The Israeli Experience. John Marshall Scholl of Law, Chicago.

* 2005: Liberation of Security Prisoners: ICT, The Interdisciplinary Center, Herzlia

* 2005: Celebrating a Decade to 'Amendment 39th' of the Israeli Penal law. Tel Aviv University.

* 2006: Celebrating the Retirement of President Aharon Barak, Chief Justice of the Supreme Court: His Impact on the Law. University of Haifa.

* 2006: The Institute of Advanced Judicial Studies: Seminar on Penalty. Neve Ilan.

* 2007: The Annual Conference of the Israeli Bar Association: How Israel should conduct its Struggle on Terrorism: Eilat.

* 2007: The Annual Beer Shiva Conference: Plea Bargaining on Juvenile offenders. Beer Shiva.

* 2007: Advance Studies for Tel Aviv District Attorney: Corruption offences. Jerusalem.

* 2007: The Institute for Advance Studies for Legal Assistances: Exclusionary rule in Israel, following the ruling on *Isahcarov v. The State of Israel* by the Supreme Court. Jerusalem.

* 2007: Annual Conference: Haifa Faculty of Law and The Institute of Advanced Judicial Studies: The role of procedure in making justice. Haifa University.

* 2007: International Conference of the American Association of Jewish Lawyers and Jurists: "Protecting Human Rights and Democratic Values in an age of Terrorism" Washington Dc.

* 2007: Honours Class 2007: The Struggle of Democracy Against Terrorism. Leiden, Netherland.

* 2007: Center for Law and Security: Colloquium Class: The Struggle of Democracy Against Terrorism: Lessons from the United States, United Kingdom and Israel, NYU. (Sept. 26th)

* 2007: Department of Near Eastern Languages and Civilizations, The struggle of Democracy against Terrorism: The Israeli Experience. Yale University, New-Haven. (Sept. 28th)

* 2007: National Coordinator for Counterterrorism: "Countering radicalization: perspectives and strategies from around the globe" Hague, Netherland. (October 22nd)

* 2008: SAIS/Rand Terrorism Trials Colloquium, Washington DC (January 10th)

* 2008: Coimbra Portugal, Fighting Within Human Rights (July 16, 17).

**\*** 2008: The Catholic University, Lisbon Law and Terrorism, The Israeli Perspective (July 14th).

**\*** 2008: HDC State Conflict with Non State Actors: Reconceptualizing Duties and Liabilities (Sept. 10th)

**\*** 2008: Global Violence, National Security, and Law – Comparative Outlook. Israeli Law and Society Association (ILSA) International Conference, The Hebrew University, Jerusalem. (December 26th)

## 8. <u>Scholarships, Awards and Research Grants</u>

### <u>Grants Awarded</u>

February 2001: Enbar foundation – for an article on terrorism.(See Publications – Part C.3)

## 9. <u>Teaching</u>

### a. <u>Courses Taught in Recent Years</u>

| Year | Name of Course | Type of Course Lecture/Seminar/Workshop | Degree B.A./M.A./M.Sc/Ph.D. |
|------|----------------|------------------------------------------|------------------------------|
| 1988 | *Enforcement of Criminal Justice System* (Bar Ilan University) | Lecture | LL.B. |
| 1991 | *Criminal Procedure* (Bar Ilan University) | Lecture | LL.B. |
| 1991 | *Evidence* (Bar Ilan University) | Lecture | LL.B. |
| 1992 | *Criminal Procedure* (University of Haifa) | Lecture | LL.B. |
| 1993- | *Criminal Law* (University of Haifa) | Lecture | LL.B. |
| 1993- | *Evidence* (University of Haifa) | Lecture | LL.B. |
| 1993 | *The Criminal Defenses* (University of | Seminar | LL.B. |

| | Haifa) | | |
|---|---|---|---|
| 1995 | *Comparative Criminal Procedure* (Villanova School of Law) | Seminar | LL.M. |
| 1997- | *The Sexual Offenses* (University of Haifa) | Seminar | LL.B. + LL.M. |
| 1997 | *Command and Obedience* (Tel-Aviv University) | Seminar | LL.B. |
| 1997 | *Comparative Criminal Procedure* (John Marshal School of Law) | Seminar | LL.M. |
| 1999-2000 | *Evidence* (Hebrew University of Jerusalem) | Lecture | LL.B. |
| 1999-2000 | *Criminal Procedure* (Hebrew University of Jerusalem) | Lecture | LL.M. |
| 2000 | *Comparative Criminal Procedure* (Baltimore School of Law) | Seminar | LL.M. |
| 2000 | *The Victim's Constitutional Rights* (Baltimore School of Law) | Seminar | LL.M. |
| 2002 | *Introduction to the Israeli Legal System* (American University Washington College of Law) | Seminar | LL.M. |
| 2003 | *The Rule of Law and Terrorism* (Osgoode Hall Law School, York University, Toronto) | Seminar | LL.B. |
| 2004 | *The Rule of Law and Terrorism* | Seminar | LL.B. |

| 2005- | *The Struggle of Democracy Against Terrorism (University of Haifa)* | Seminar | LL.B. + LL.M. |
|-------|---------------------------------------------------------------------|---------|---------------|
| 2005- | *Human Rights in Times of Emergency (University of Haifa)* | Seminar | LL.B. + LL.M. |
| 2005- | *The Criminalization of the Freedom of Expression – The Verbal Offences (University of Haifa)* | Seminar | LL.B. + LL.M. |

     b. **Supervision of Graduate Students**

| Name of Student | Title of Thesis | Degree | Date of Completion / in Progress | Details of Publication |
|-----------------|-----------------|--------|----------------------------------|------------------------|
| Shira Pacter | The limits on powers used by democracy in fighting Terrorism | LL.M. | 2003 | |
| Asaf Arduf | "No case to Answer" | LL.M. | 2004 | NO CASE TO ANSWER (The Research Institute for the studies of Law and Economics, 2005) |
| * Karin Meridor | The Provocation requirement in Homicide offences | LL.M. | 2007 | |
| * Gabi Alevi | The Legal definitions of Secondary Accessories in Penal Law | Ph.D. | 2007 | COMPLICITY IN CRIMINAL LAW (Ono Academic College, 2008) |
| * Joseph | The Military | Ph.D. | 2008 | |

| | | | | |
|---|---|---|---|---|
| Aronson | legal core and the way it explores the accidents in the army | | | |
| * Shira Alkaly | The Boundaries of Using Deception in Police investigations | LL.M. | *In progress* | |
| * Tchia Shachar | The probability requirements in incitements offences | Ph.D. | *In progress* | |
| * Oshera Canzapulski | The arrest Paradigm in Israel - Does it work? | Ph.D. | *In progress* | |
| * Camal Camal | Judicial review over the war on terrorism – critical discussion and a suggestion for a new paradigm | LL.M. | *In progress* | |
| * Ihab A'asla | The arrest policy of the courts – Does it fulfills the constitutional requirements? | LL.M. | *In progress* | |
| * Judge Mordechai Argaman (Joint supervision with Professor Dan Bein) | The authority of the examining magistrate in the State of Israel | Ph.D. | *In progress* | |

## 10. **Miscellaneous**

**\*** Contribution to the Joint Research Project on *"Participation in Crime: Criminal Liability of Leaders of Criminal Groups and Networks – A Comparative Legal Analysis" (conducted on behalf of the ICTY)* – Writing the country report on the State of Israel. Max Planck Institute for Foreign and International Criminal Law, Freiburg Germany. (2005).

# PUBLICATIONS

Note: For joint publications, the authors have contributed equally unless otherwise specified.

### A. Ph.D. Dissertation

The Crown Witness, 440 pp., Tel Aviv University, 1988. (Hebrew)
Supervisors: Professor Shelef Leon & Professor Levi Yuval. (See also: B.1)

## B. Scientific Books (Refereed)

### Authored Books - Published

1. THE CROWN WITNESS (Ramot, Tel Aviv University, 1988), 430 pp. (Hebrew).

2. THE RULE OF LAW AND TERRORISM, 2004, (Nevo, Jerusalem, 2004), 700 pp. (Hebrew).

* 3. THE STRUGGLE OF DEMOCRACY AGAINST TERRORISM: LESSONS FROM THE UNITED STATES, THE UNITED KINGDOM AND ISRAEL (Virginia University Press, 2006) 350pp. (English)

## C. Articles in Refereed Journals

### Published

<u>In English</u>

1. *The Magna Carta of The Defendant According to The New Bill of Rights In Israel – A Comparative Study*, 8 PACE INTERNATIONAL LAW REVIEW 91-127 (1996)

2. *Shifting the Balance Between the Rights of Victims and Rights of Defendants in Criminal Proceedings: A Comparative Study of Israeli and American Law*, 15 TEL AVIV UNIVERSITY STUDIES IN INTERNATIONAL LAW 199-237 (2000)

3. *Human Rights in Administrative Proceedings: A Quest for Appropriate Evidentiary Standards*, 31 CALIFORNIA WESTERN INTERNATIONAL LAW JOURNAL 215-239 (2001)

4.   *Legal Aspects of Tackling Terrorism: The Balance Between the Right of a Democracy to Defend Itself and the Protection of Human Rights*, 6 UCLA JOURNAL OF INTERNATIONAL LAW & FOREIGN AFFAIRS 89-168 (2001)

5.   *Human Rights v Terrorism: Does A Democracy Have A Right To Hold Terrorists As Bargaining Chips? And The Problem of Administrative Detention*, 18 ARIZONA JOURNAL OF INTERNATIONAL LAW 721-791 (2001)

6.   *Thwarting Terrorist Acts by Attacking the perpetrators or their Commanders as an Act of Self-Defense. Is this Legitimate? – Human Rights versus the State's Duty to Protect its Citizens*, 15 TEMPLE INTERNATIONAL & COMPARATIVE LAW JOURNAL 195-246 (2001)

7.   *Democracy's Struggle Against Terrorism: The Powers of Military Commanders to Decide Upon the Demolition of Houses, the Imposition of Curfews, Blockades, Encirclements and the Declaration of an Area as a Closed Military Area: The Struggle Against Terrorism Versus Human Rights – The Appropriate Balance*", 30 GEORGIA JOURNAL OF INTERNATIONAL & COMPARATIVE LAW 165-231 (2002)

8.   *Terrorism And The Law: Democracy in the War Against Terrorism-The Israeli Experience*, 35 LOYOLA OF LOS ANGELES LAW REVIEW 1161-1212 (2002)

9.   *Self-defense against Terrorism – What Does it Mean? The Israeli Perspective*, 1 JOURNAL OF MILITARY ETHICS 91-108 (2002)

10.   *The Influence of Terrorist Attacks on Human Rights in the United States: The Aftermath of September 11, 2001*, 28 NORTH CAROLINA JOURNAL OF INTERNATIONAL LAW & COMPARATIVE REGULATION 1-101 (2002)

11.   *Trying Terrorists-Justification For Differing Trials Rules: The Balance Between Security Considerations and Human Rights*, 13 INDIANA INTERNATIONAL & COMPARATIVE LAW REVIEW 1-97 (2002)

12.   *Use of Civilians as a Human Shield: What Legal and Moral Restrictions Pertain to a War Waged by a Democratic State Against Terrorism?*, 16 EMORY INTERNATIONAL LAW REVIEW 445-493 (2002)

13.   *The Laws of War Waged Between Democratic States and Terrorist Organizations*, 15 FLORIDA JOURNAL OF INTERNATIONAL LAW 389-480 (2003)

14.   *Defensive Democracy: Is It Possible to Revoke the Citizenship, Deport or Negate the Civil Rights of a Person Instigating Terrorist Action Against His Own State?* 72 UNIVERSITY OF MISSOURI KANSAS CITY LAW REVIEW 1-71(2003)

15.   *The Struggle of a Democracy Against Terrorism - Protection of Human Rights: The Right to Privacy Versus the National Interest – The Proper Balance*, 37 CORNELL INTERNATIONAL LAW JOURNAL 27-95 (2004)

16.  *The Struggle of Democracy Against The Terror of Suicide Bombers - Ideological and Legal Aspects*, 22 WISCONSIN INTERNATIONAL LAW JOURNAL 597-710 (2004)

*17.  *Combating Terrorism: Does Self-Defense Include the Security Barrier? The Answer Depends on Who You Ask*, 38 CORNELL INTERNATIONAL LAW JOURNAL 569-582 (2005)

*18  *Fighting Terrorism: Bringing Democratic Regimes to Non-Democratic countries: The Legal Implications*, 16 TULANE JOURNAL OF INTERNATIONAL AND COMPARATIVE LAW 17-47 (2007)

<u>In Hebrew</u>

19.  *Agent Provocateur as a Defense in Criminal Trial*, 27 HAPRAKLIT 107-116 (1987)

20.  *Passive Euthanasia, Legal Aspects*, 29 HAPRAKLIT 162-178 (1989)

21.  *The Privilege Against Self Incrimination – A Landmark in the Struggle of Human to Humanity?*, 7 BAR-ILAN STUDIES IN LAW 167-191 (1989)

22.  *The Plea Bargaining and the Search of Truth*, 3 PLILIM – ISRAEL JOURNAL OF CRIMINAL JUSTICE 251-262 (1993)

23.  *Legal Activism and the Adversary System of Law*, 17 TEL AVIV UNIVERSITY LAW REVIEW 867-93 (1993)

24.  *Demyanuk Trial and the Search for Truth*, 4 PLILIM – ISRAEL JOURNAL OF CRIMINAL JUSTICE 299-310 (1994)

25.  *Criminal Code in Time of Emergency*, 3 HAIFA UNIVERSITY JOURNAL OF LAW AND GOVERNMENT 263-277 (1995)

26.  *The Mistake Defense in Rape Trials in Israel*, 32 HAPRAKLIT 334-346 (1995)

27.  *The Defendant Basic Rights According to the New Basic Laws in Israel*, 13 BAR-ILAN STUDIES IN LAW 155-183 (1996)

28.  *The Scope of Review of Fact Findings Process by the Appellate Courts – A Critical Study*, 20 TEL AVIV UNIVERSITY LAW REVIEW 551-601 (1996)

29.  *The Constitutional Active Relief in Criminal Law*, 4 HAIFA UNIVERSITY JOURNAL OF LAW AND GOVERNMENT (1998) 433-489

30.  *Exclusionary Rule In Israel – Does it Exist?*, 30 MISHPATIM – Hebrew University Law Review 145-183 (1999)

31.  *The Battered Woman, Is It Not The Time for The Criminal Law to Defend Her?*, 44 HAPRAKLIT 102-139 (1999)

32.  *The Constitutional Dimensions of the Arrest Law in the Army*, 5 HAIFA UNIVERSITY JOURNAL OF LAW AND GOVERNMENT 437-464 (2000)

33.  *A Reasonable Doubt in Deliberations of Professionals Panels*, 1 KIRYAT HAMISHPAT 229-259 (2001) (co-authored with Michal Orcaby)

34.  *The Victim's Constitutional Rights: A Comparative Study*, 17 BAR-ILAN STUDIES IN LAW 419-457 (2002)

**Accepted for Publication**

*35.  *How to Justify an Emergency Regime and Preserve Civil Liberties in Times of Terrorism?,* 30pp., SOUTH CAROLINA JOURNAL OF INTERNATIONAL LAW AND BUSINESS (in English)

*36.  *The Application of the Public Interest Doctrine on the Criminal Defenses*, 30 pp., HAIFA LAW REVIEW (with Dr. Gabi Halevi) (in English)

*37.  *Appealing fact finding: Is it Possible - A revised critical study*, 60 pp., JUSTICE GABI BACH BOOK (in Hebrew)

*38.  *The Struggle of Democracy Against Terrorism: The suicide bombers - Do we have any legal answers for this phenomenon?*, 50 pp., JUSTICE DORNER BOOK (in Hebrew)

## D.  **Articles or Chapters in Scientific Books (which are not Conference Proceedings)**

**Published**

39.  *Moral Dimensions in Enforcing the Criminal Law*, SHILAW BOOK 401-441 (1999)

## E. **Articles in Conference Proceedings**

**Published**

40.  *The Constitutional Status of the Victim*, Conference of Israeli and British Justices in the Supreme Court, Dec. 1996

41.  *Human Rights in Administrative Proceedings: A Quest for Appropriate Evidentiary Standard*, Second World Conference on New Trend in Criminal Investigation and Evidence, Amsterdam, Dec. 1999

## F.  Summary of my Activities and Future Research Plans

A few years ago, I decided to explore the legal dimensions of fighting terrorism by a democracy. Since then, I have published many articles in US law reviews and a book on this area in Israel and in the United States (published by the Virginia University Press). This area of Law and Terrorism is now my main interest and I devote most of my time to research and teaching this field.

Since the publication of my new book entitled: The Struggle of Democracy against Terrorism, I have been asked very frequently to attend a variety of International forums to discuss my book or derivative subjects related to the area of law and terrorism. My writings are very frequently cited by scholars around the globe.

In light of my special expertise and extensive writings in this field, I am frequently requested to participate or otherwise contribute to conferences and other legal projects in this field. In the past two years, I have been invited to give speeches in Washington DC, Leiden Netherlands, and Coimbra and Lisbon, Portugal.

In 2008, I have also been requested by Professor Shephen Schulhofer, from NYU Law School, to join an *amici curiae* in support of the appellant, in the matter of *Lakhdar Boumediene v. George W. Bush* – an appeal filed to the Supreme Court regarding the constitutional rights that should be awarded to unlawful combatants held by the United States at Guantanamo Bay, Cuba.

I also taught a seminar on law and terrorism at Osgoode Hall, York University, Toronto. In addition, I am a member of a committee at the Israeli democracy institute studying the ways a democracy should conduct its war against terrorism.

As an expert to the criminal law, I am frequently requested by the media (both written and televised) in Israel and abroad to comment on actual legal problems. Recently, in light of the deadly terrorist attack in Mumbai, India, I have been requested by a prominent newspaper in India to introduce its audience with the Israeli experience in fighting terrorism.

A few years ago, I have also been requested by one of the leading law firms in Chicago to testify as a legal expert at a trial against the Hamas Organization. I was asked by Prof. Koh, the dean  of Yale law school to join the *amicus curiae* of comparative law scholars and experts on the laws of the United States, United Kingdom and Israel in support of the respondent Jose Padilla in the case of Donald Rumsfeld v Jose Padilla before the Supreme Court. My article: *Human Rights v Terrorism: Does A Democracy Have A Right To Hold Terrorists As Bargaining Chips? And The Problem of Administrative Detention*, 18 ARIZONA JOURNAL OF INTERNATIONAL LAW 721-791 (2001) was cited as a support for the brief.

In addition, I was invited by the Yale Law School to give a talk before the Human Rights Workshop sponsored by Schell Center, on the subject of : Law and Terrorism, the Israeli Perspective. The talk was scheduled for October 1st 2004. I

have also been invited by the Cornell Law School, the Center for International and Comparative to give a talk on the need of an emergency constitution for combating terrorism, the event took place on October 7, 2004.

I am continuing with the research programs, mainly on the area of law and terrorism but not exclusively. I am also devoting time to explore the areas of my other expertise: criminal law and evidence.