## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

SHERYL WULTZ, et al.

Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants.

Civil File No. 1:08-cv-01460 (RCL)

## SUPPLEMENTAL DECLARATION OF PETER GAD NASCHITZ

I, Peter Gad Naschitz, hereby declare:

1.      This is my second declaration regarding the position of Israeli law in respect of the Israeli law causes of action pleaded against Bank of China Limited ("BOC" or the "Bank") in the First Amended Complaint for Damages dated January 13, 2009 filed in the United States District Court for the District of Columbia in the matter of *Wultz v. Islamic Republic of Iran* ("FAC").

I am giving this declaration in reply to the Declaration of Professor Ariel Porat dated May 18, 2009 and the Declaration of Professor Emanuel Gross dated May 24, 2009, as well as with reference to the Declaration of Shlomo Matalon dated May 16, 2009.

### On Negligence

2.      As stated in my initial declaration ("Declaration") (pages 4-9), the Israeli law of negligence provides no basis to assert that a bank has a notional duty of care with respect to post-withdrawal use of funds transferred through the bank, so as to impose on the bank a duty to

police its customers, their uses of funds and their transferees' uses of funds. Prof. Porat fails to cite a single precedent in support of such a notional duty of care in the Israeli law of negligence – because, to the best of my knowledge, there is no such precedent, and there is no such duty.

3.      In the absence of any precedent imposing such a duty of care on banks, Prof. Porat's declaration puts forward the proposition that an Israeli court might derive the existence of such a notional duty of care from the facts alleged in the FAC and a technical foreseeability of harm, combined with an assertion that the Bank has not discharged a supposed burden to demonstrate that there are considerations of judicial policy to negate such a duty of care. These are my comments in response:

4.      First, as stated in my Declaration (paragraph 7), the Israeli Supreme Court has authoritatively ruled that the duty of care is never to be derived automatically from technical foreseeability, but is rather a question of judicial policy:  Shamgar P. in C.A. 915/91 *Levy v. State of Israel* (1994); recently applied and explained in the manner indicated in my declaration in C.A. 4241/06 *Y. Levy v. State of Israel, Israel Police* (12.3.09, Published in Nevo, Procaccia, J., paragraph 10; and before that in C.A. 5586/03 *Primont v. Doe* (23.9.07, published in Nevo). Therefore, instead of approaching the issue of duty of care based on a mechanical application of an assumed case of technical foreseeability, the meaningful line of inquiry under Israeli law will be to ascertain whether there has ever been an Israeli judicial conclusion that the three requirements for a duty of care are present in the situation of a bank: **"first, foreseeability; second, 'neighborhood' or 'proximity,' and third, a judicial conclusion that it is fair, just and reasonable that a normative duty of care be imposed by force of law."** In fact, there has never been a judicial conclusion that it is fair, just and reasonable to require a bank in tort to ensure that funds transferred through the bank not be used contrary to the interests of public

safety in the jurisdiction of the bank or abroad. Therefore, it is not a correct statement of Israeli law to say that such a duty of care is recognized in Israeli law.

5.      Second, the principle of negligence, as codified in Sections 35-36 of the Civil Wrongs Ordinance, is material to a bank's conduct as the general principle of law that operates to set standards of conduct in the conduct of professions or vocations. The general principle of negligence stated in the Civil Wrongs Ordinance applies equally to all types of persons and entities, including banks. My first declaration should not be construed otherwise, as Prof. Porat apparently has done. My declaration is based on the general principle, elucidated authoritatively in the *Vaknin* case, that the notional duty of care applies between defined classes of actors and defined classes of victims with respect to defined types of harm. It applies to bankers as it applies to members of other professions and vocations. The principle of negligence does not, however, operate to redefine the profession or vocation itself; i.e. it treats a banker as a banker, not as a policeman. Stated otherwise, the principle of negligence does not operate and will not be applied to impute to a banker the notional duty of care of a policeman; for to do so would be redefining the social and public role of banks by imposing new affirmative duties of care on bankers in the area of public safety. There are many reasons why this is so: Banking services fulfill a variety of essential economic and social needs of the general public in a free marketplace. Banking services are considered vital to the public interest and do not bear a direct or natural causal relation to matters of crime prevention with respect to the uses made of money transferred through a bank. To the extent that there is a public interest in intervening in the free marketplace functioning of banks, the duties and responsibilities of banks are defined and redefined from time to time by reams of legislative and regulatory provisions in furtherance of public policy interests such as bank stability, consumer protection and, more recently, public safety. But this intervention and

redefinition is not done by judicial rulings on negligent conduct, which rulings must presuppose the societal function of the actor in order to i) frame the actor's notional duty of care fairly, justly and reasonably, and ii) ascertain the actor's duty of care in fact in the circumstances of specific cases.

6.      Third, there does not appear to be a case law basis to assume that there is a generalized trend to expand the duty of care over all classes of actors whereby one could predict that the Israeli Supreme Court would impose a duty of care on the Bank as urged by the Plaintiffs, i.e. with respect to the possible prevention of any crime or deliberate wrongdoing and in disregard of the *Vaknin* scheme of judicial legislation of the duty of care within the boundaries of defined classes of potential tortfeasors, classes of potential victims, and types of injury. C.A. 4241/06 *Y. Levy v. State of Israel, Israel Police*, paragraph 10 (12.3.09) [upholding the *Vaknin* notional framework of classes of wrongdoers, classes of injured parties, and types of injury].

Moreover, the fair, just and reasonable test of the notional duty of care continues to be applied in the evolving tort law of the common law jurisdictions which Israel belongs to and which were the source of the rule for Israel. Of considerable persuasive value, then, will be the recent U.K. House of Lords ruling in the matter of *Mitchell and another v Glasgow City Council* [2009] 3 All E.R. 205 (H.L., 18 Feb. 2009). This was an action against a local housing landlord by the surviving wife and daughter of a tenant who had been killed by another tenant whose anti-social tendencies and disruptive behavior towards the deceased had been known to the landlord. The plaintiffs asserted that the landlord had been under a duty of care to warn them against the danger to life owing to the behavior of the anti-social tenant. The case is in point  because it applies the fair, just and reasonable test to a defender

who is sued on the basis that there was technical foreseeability of the deliberate wrongdoing of a third party. That foreseeability itself was a requisite for liability was said to be "trite law" (Lord Brown, 235 e). In terms of the notional duty of care the question was – should landlords be made liable for injuries deliberately inflicted by their tenants?

Lord Hope, *Mitchell* at 214 c-f restates three long-standing propositions of the law of negligence which are valid for Israel as well as the U.K and apply to the instant case as well:

1) Foreseeability of harm is not of itself enough for the imposition of a duty of care;

2) The law does not normally impose a positive duty on a person to protect others;

3) The law does not normally impose a duty to prevent a person from being harmed by the criminal act of a third party based simply upon foreseeability;

The general principle formulated in the judgment (Lord Hope at 220 c-d) regarding foreseeable wrongdoing of a third party is that "*duty to warn another person that he is at risk of loss, injury or damage as the result of the criminal act of a third party will arise only where the person who is said to be under that duty has by his words or conduct assumed responsibility for the safety of the person who is at risk.*" Just as the landlord was exonerated from liability, so too the Defendant BOC did not create the risk of terrorism, did not assume the responsibility for the safety of persons from terrorism in Israel, and therefore cannot be held liable in the law of negligence for the use of the funds by the account-holder, even if it was technically foreseeable that he would make unlawful use of the funds.

7.      Addressing now the status of banks in the law of negligence, the precedents make clear that the courts will not judicially impose on banks a duty of care to the public at large.  As indicated in my Declaration with specific reference to the case law (paragraph 9), the rulings of the Supreme Court have departed to a limited extent from the historic restriction that a bank owes a duty of care solely to its customers, and have extended a bank's duty of care to specific third parties (non-customers) of banks in very specific situations. Although a bank's duty of care in the Israeli law of negligence can apply notionally to third parties, "third parties" per se (the public at large) are never the object of the extended duty of care of banks. Consistent with the scheme of the administration of the law of negligence by the courts, the extension of the notional duty of care has never gone beyond cases where there is a direct relationship between the bank's functions and property interests. Such extension of the duty of care of banks has been strictly limited to cases in which the potential victims belong to a class of persons having some contact with, or reliance upon, bank property, bank-administered property, or a bank's statement or declaration. Those persons having such specific relationship to bank operations are the non-customer persons whom the case law has found that banks "ought to" foresee as persons who could be harmed by bank carelessness in executing transactions. The Supreme Court's guideline is that the extension of the duty of care to persons who are not customers or holders of bank property will be done cautiously, on a careful review of the circumstances of a specific case: *Ayalon v Oppalger Estate,* 59(2) P.D. 349 (2004), Justice Hayut at 369 paragraph 14 *et seq.* This is a clear indication that the Court will not abandon the *Vaknin* system of defining categories of defendants owing duties of care to categories of plaintiffs, and will not favor a general notional duty of care of every person towards the public at large to prevent crime in general.

Accordingly, and to the extent that it is the proper scope of this Declaration to opine as to

how the Israeli Supreme Court would rule on the instant question in the future, there is no basis in the Civil Wrongs Ordinance or authoritative judicial precedent for the Court to legislate new affirmative public safety duties of banks with respect to the ultimate use that may be made of the funds going through the conduit of a bank – and thus a duty of care would not be found to apply in the present case.

8.      Similarly, if this matter be addressed solely in terms of the carelessness and foreseeability aspects of the tort of negligence, there appears to be no basis, in the absence of an executive or judicial order directing banks otherwise, to impute a breach of duty of care to a bank with respect to the ultimate use of money by persons to whom the bank transfers funds at the order of an account holder, and to make the bank answerable in tort for violent crime committed by persons in association with customers of a bank.  The examples cited by Prof. Porat relating to the liability of public authorities in Israeli tort case law, which presuppose the notional duty of care, do not support such a proposition. Indeed, the case he cites of the border police being found liable for negligent failure to enforce a judicial order restraining an alimony debtor's  departure from the jurisdiction (*State of Israel v. Suhan*) illustrates precisely the opposite, and supports the proposition in this Supplemental Declaration: If the facts asserted were that the defendant bank, like the border police in *Suhan*, was issued a valid governmental order for enforcement against a bank account but failed to enforce it owing to carelessness, then the bank, having been negligent in the discharge of the duties defined and imposed on it by law, could also be considered as under a duty to foresee the consequences and be liable for them, analogous to a public authority such as the border police.  But in the opposite case, as here – where there is no allegation that a judicial or executive order was issued to the Bank and hence no careless failure to comply with

such an order– the same analogy to the standard of liability for negligence of public authorities operates to vindicate the Bank.

### On the Prohibition of Terrorist Financing Law, 5765-2005 ("POTFL")

9.      It is correct that specific public safety duties are now imposed on banks under Israeli law, but that is by reason of legislative intervention under the suppression of terrorist financing ("STF") laws and the anti-money laundering ("AML") laws. The legislative developments in these realms of the law support the view taken in my Declaration that the definition of the role of banks in society, their responsibilities and the scope of their duties, are properly treated as within the purview of legislation, not the purview of judge-made norms by application of the principle of negligence.

10.     I concur with Prof. Porat that the legislature has by the time of this writing imposed and given effect to public safety duties and responsibilities of banks with respect to the international suppression of terrorist financing in the Prohibition of Terrorist Financing Law, 5765-2005 ("POTFL") and the sub-legislation thereunder.   Prof. Porat (paragraph 79) cites POTFL as a potential basis for imposing criminal liability on the Defendant Bank in respect to Plaintiffs' breach of statutory duty claim. However, as Prof. Porat acknowledges (paragraph 79), POTFL was not mentioned in the FAC, and thus is irrelevant to this claim. Even if it had any possible relevance, POTFL is inapplicable because the POTFL requirements were not in effect at the times relevant to the FAC:

10.1.    The POTFL implements the provisions of the International Convention for the Suppression of the Financing of Terrorism ("STF Convention") in Israeli domestic law.[1]

10.2.    The POTFL was promulgated on January 10, 2005 and came into effect on August 1, 2005.[2] The commencement date of the POTFL thus postdates the dates of bank transfers that are enumerated in paragraph 7 of the Declaration of Shlomo Matalon.  With respect to the providers of banking services, the POTFL is in large part an enabling law that requires sub-legislation for its implementation, including for the provision of duties and powers to banks with respect to terrorist property. Thus, on November 28, 2006, more than seven months after the terrorist bombing of April 17, 2006 that is the subject matter of the FAC, the Minister of Finance signed the Rules on Prohibition of Terrorist Financing (Permit to Take Actions on Property), 5767-2006 ("Permit"). Under the Permit, banks were given the power, *inter alia*, to forfeit or close a suspected terrorist account for the implementation of the POTFL.

To ascertain the date on which the Permit came into effect, it is necessary to observe that the Permit was published in the Official Gazette (*Reshumot*) on December 12, 2006 together with a requisite decree of the

---

[1] International treaties of Israel are signed and ratified by the executive branch, and are not self-executing. An act of parliament (the Knesset) is required to incorporate the provisions of a treaty into domestic law.

[2] POTFL, S. 54: "This law shall take effect on the first of the month following the conclusion of 6 months from the day the Law is published." The POTFL was published in January, 2005. Hence the commencement date was 1 August 2005.

Governor of the Bank of Israel extending the identification and reporting powers and duties of banks in the framework of the Prohibition of Money Laundering Law, to the implementation framework of the POTFL: Order on Prohibition of Money Laundering (Duty of Identification, Reporting and Managing of Records of Banking Corporations (Amendment)), 5767-2006 ("Order").   Pursuant to the commencement provisions of the Permit integrated with the Order (§ 23) – the effective date of the Permit and the Order was six months after promulgation (i.e. June 12, 2007) for certain provisions (including the duty to check lists of suspect names and prevent transfers of funds); nine months (September 12, 2007) for other provisions; and January 1, 2009 for yet other provisions.

10.3.   The Minister of Justice's rules implementing the POTFL with respect to foreign persons declared by foreign entities to be terrorist operatives were promulgated on January 8, 2008:   Rules on Prohibition of Terrorist Financing (Declaration of Foreign Terrorist Organization or Foreign Terrorist Operative, 5768-2008 ("Declaration Rules")).

11.   The above summary suffices to show that the Israeli legal mechanisms for the involvement of banks in the war on international terrorism in the STF framework came into partial effect starting only in 2008 and were not in place until after the date of the April 2006 bombing at issue here. Without the legislative effect of the POTFL, the Order, the Permit and the Declaration Rules, a bank did not have the power or the duty to take action against the account of an alleged international terrorist operative.

**Suppression of Terrorist Financing Duties of Banks – and the Conflict of Laws**

12.      In my initial Declaration (paragraphs 21-24), I considered the possible applicability of the Israeli penal laws to the conduct of the Defendant Bank, and, in the absence of facts indicating that the Bank joined the terrorist design to harm Israelis as such, indicated the conclusion that the Israeli penal laws could apply only on the basis of double criminality, i.e. if the Bank's conduct was criminal in both Israel and in China. Such result is pursuant to the double criminality requirement of the relevant parts of the Israel Penal Law Code itself, such domestic law requirement trumping the choice of law rules and making this a case where, insofar as the Israeli criminal statutes are relied upon, a rule of double criminality (and hence double actionability) does indeed apply to the assertions of breach of statutory duty.

13.      In my Declaration I did not consider the direct application of the Israeli choice of law rules, and mentioned them in passing only to illustrate that there has been no precedent for the use of S. 13 of the Penal Law to achieve the opposite result, which would be that S. 13 could somehow be construed to trump the choice of law rules and lead an Israeli court to disregard the law of the place of acting. Not only is there no such precedent, but the Israeli choice of law rules in tort have always taken into consideration the law of the place of acting. Thus, the traditional doctrine of double actionability, inherited from the U.K. common law case of *Phillip v. Eyre*,[3]

---

[3] (1870) L.R. 6 Q.B. 1. Absorbed into Israeli law as per C.A. 180/51 Goldkorn v. Wissotzky, 8 P.D. 262; C.A. 98/67 Liebherr v. "Gazit VeShaham," 21 (2) P.D. 243, 248. See also G. Tedeschi, ed., A. Barak, M. Heshin, I. Englard, The Law of Civil Wrongs, The General Part (Jerusalem, Hebrew, 1976, 2d. Ed.), pp. 517-521. A subsequent line of *dicta* developed an exception to the rule where circumstances  made it just to apply the law having the most significant relationship to the parties and the issues: C.A. 750/79 Klausner v. Berkovitz, 37 (4) P.D. 449, per Ben Porat, J.; C.A. 300/84 Abu Atia v. Arbitisi, 39 (1) P.D. 365, per Straussberg-Cohen, J.; following the developments in the U.S. and the U.K.  in Babcock v. Jackson (N.Y. 1963) Chaplin v. Boys (1969); Reich v. Purcell (Cal, 1967); C. A. 702/87 State of Israel v. Jon Cohen et. al, 48 (2) P.D. 705 (1994), 723-727.

predicated a finding of liability in tort on the tortious liability or tortious character attaching to the defendant's conduct in the place of acting – thereby refuting the notion that questions of tort liability of a foreign defendant can be decided based solely on Israeli law.[4] Prof. Porat has opined (paragraphs 90-91) that the rule of double actionability is not relevant to this discussion because it has been judicially repealed as the main choice of law rule in C.A. 1432/03 *Yinon Manufacturing and Marketing of Food Products Ltd.,* 59(1) P.D. 345 (2004). I beg to differ with this analysis. As stated, a double actionability requirement in tort arises in this specific case as a derivative of the double criminality requirement under the Penal Law. This demonstrates that the repeal of the double actionability rule is not absolute. Moreover, the double actionability rule and, with greater force, the rule adopted in *Yinon,* both negate the possibility of applying the Israeli penal laws as the sole basis for a tort action against a foreign entity which has acted only in the territory of a foreign state: The guiding choice of law rule adopted in *Yinon* is the law of the place of acting - *lex loci delicti* - subject to exceptions. The *lex loci delicti* rule is founded on territorial principles. Its rationale is notably stated in *Yinon,* among other grounds, as based on the reasonable expectation of defendants that when they are acting in their own country, they will not be made subject to the law of a foreign state just because of the fact that they have injured a resident of a foreign state.[5] Thus, the effect of the *Yinon* ruling and the Israeli choice of law rules *per se,* when interjected into this discussion, is precisely to reinforce the territorial principle whereby Chinese law, as the law of the territory of the place of acting, would be deemed by an

---

[4] "A person should not be permitted to claim in [the forum] … in respect of a matter for which civil liability does not exist, or is excluded, under the law of the state in which the wrong was committed" – Lord Wilberforce in *Chaplin v. Boys* [1969] 2 All E.R. 1085, 1102 B.

[5] *Yinon,* 373 d-e.

Israeli court as the law applying to the conduct of the Defendant Bank, so that no liability would be imposed on the Bank unless such liability attached under PRC law.

## Aiding and Abetting a Tort – Sec. 12 of the Civil Wrongs Ordinance

14.     Prof. Porat (paragraphs 67-69) and I are in agreement that Israeli law requires that a defendant has to "join in" the tort of the primary tortfeasor in order to be liable for aiding and abetting a tort under Sec. 12 of the Civil Wrongs Ordinance. I have stated the principle based on leading authority, as requiring "concerted action." This is supported moreover by the language of Sec. 12 and the background jurisdiction of the common law. It is also supported by the language of the STF Convention. STF Convention, Article 2, section 5 provides that [emphasis added]:

> 5. Any person also commits an offence if that person:
>     (a) Participates as an accomplice in an offence as set forth in paragraph 1 or 4 of this article;
>     (b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 4 of this article;
>     (c) Contributes to the commission of one or more offences as set forth in paragraphs 1 or 4 of this article by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:
>         (i)     Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of an offence as set forth in paragraph 1 of this article; or
>         (ii)    Be made in the knowledge of the intention of the group to commit an offence as set forth in paragraph 1 of this article.

15.     The first difference between my Declaration and Prof. Porat's regarding this issue appears to be that Prof. Porat, in paragraph 71 of his declaration, opines on the assumption that the FAC alleges that the Defendant Bank, BOC, was interested in supporting the terrorist activities of the PIJ. That is not an assumption which I would view as warranted by the FAC: Indeed I see no allegation in the FAC to the effect that BOC was interested in the terrorist

activities. The absence of such an allegation means that the FAC does not disclose a cause of action for the Defendant Bank's liability under Civil Wrongs Ordinance S. 12.

16.     In paragraph 72 of his declaration, Prof. Porat seems to depart from the principles of Civil Wrongs Ordinance S. 12 in favor of "Israeli tort law in general," which he says is not concerned with the defendant's actual motives. But the law is clear on this point: S. 12 is indeed concerned with the intention of the actor.

It should be considered that the aiding and abetting liability under S. 12 is different than the authorizing or ratifying liability forms of liability, also bundled into Sec. 12 under the general heading of "vicarious liability." Yet once these are unbundled the subjective requirements of aiding and abetting become clear, as stated above and in my Declaration (pages 22-23) in reliance on *Rav Bariach v. Habshush*. In cases where there is no relationship of principal and agent, or employer and employee, between the defendant and the main tortfeasor, then merely facilitating the act of another as opposed to procuring or joining in the act or acting in concert with the main tortfeasor – does not constitute aiding and abetting liability under S. 12 of the Civil Wrongs Ordinance. Making banking services available falls squarely within the concept of merely facilitating. Indeed, that is among the functions of banks, to serve as a conduit for the transfer of funds. Moreover, the discussion of the distinct elements of aiding and abetting liability in the case of *Rinat v. Rom*, C.A. 6871/99, cited by Prof. Porat (paragraph 70), contains the following clarification in paragraph 12 of the judgment that should be noted:

> It is required that the contribution or participation of the person be in the commission of the act of tort and not be the inadequate commission of a permitted act.  If I permit a person to drive my car, and he drives it for his own personal purposes and causes harm by his negligence, I will not be liable.

*Id.* (citing the authoritative treatise of Barak et. al, General Theory of Torts). To my mind the situation of the bank and its customer is somewhat analogous: the bank may enable its customer to transfer money, but the bank itself is not transferring its money, and (in the absence of common design) is not liable for the use that the customer or customer's associates make of the money. Moreover, money is not something that by its nature is a dangerous thing like a car; the dangerous or harmful use can only emanate from the purpose for which the money is going to be used.  Accordingly, the case of a bank customer's alleged use of transfers of money to promote terrorist violence bears no natural consequence from the rendering of the banking service that allowed the customer to transfer the money – but rather, the tort itself is a tort requiring a motive or intention of the primary tortfeasor to put the money to use to promote violence by others, who will commit the underlying tort of assault.   By definition, then, the subject aiding and abetting tort is a tort of motivation and intention, so that the tort of aiding and abetting, in order to be disclosed by the FAC against the Defendant, would also have to credibly state such motivation and intention of the Defendant.

**Breach of Statutory Duty**

17.     As stated, there is no precedent for the proposition that a construction of Sec. 13 of the Penal Law can be used to apply the provisions of the Israeli criminal law to a tort claim for the purpose of extending the tort of breach of statutory duty in a manner that overrides the ordinary application of the Civil Wrongs Ordinance and the choice of law rules in tort. No such precedent is presented by Profs. Porat or Gross, either.

18.     While in theory it is possible for a given case to disclose both a specific tort and the "framework" tort of breach of statutory duty – based on an applicable statute – in Israeli tort

practice it is accepted that insofar as the Civil Wrongs Ordinance defines a given type of conduct as a tort, and the same conduct is prescribed by the general criminal law, the Civil Wrongs Ordinance is to be applied and the tort of breach of statutory duty is not applicable. For example, the tort of assault (Civil Wrongs Ordinance, s. 23) would be the framework of civil liability for a murder or a killing, not a theory of breach of statutory duty under S. 63 combined with the criminal prohibition of murder or manslaughter. Likewise, the tort of conversion (S. 52) would be the basis of civil liability for theft; and the tort of fraud (s.56) the basis of civil liability to the victim of fraud – to the exclusion of the breach of statutory duty theory based on violation of the criminal law.

Accordingly, where the Civil Wrongs Ordinance applies a specific tort that overlaps with a criminal prohibition, the accepted meaning is that the definition and scope of the tort are determined by the Civil Wrongs Ordinance. Moreover, the Civil Wrongs Ordinance provides remedies for civil wrongs committed in Israel (s. 3). There is no tort law equivalent to the special extension of criminal law under s. 13 of the Penal Law.

In view of these considerations, the attempt of the Plaintiffs to arrive at the application of Israeli security legislation and S. 13 of the Penal Law as the basis for a tort claim that would not otherwise be recognized under Israeli law, appears to be both anomalous as well as unprecedented.

19.      Prof. Porat and Prof. Gross have both avoided mention of the discussion of the civil essence of the breach of statutory duty by then Supreme Court President Aharon Barak in the leading case of *Vaknin*, already cited in my first Declaration. That a criminal statute is for the benefit and protection of the public as a whole from, *inter alia* bloodshed, does not mean that it qualifies as a statute imposing a duty on the defendant for the protection of the plaintiff within

the meaning of the tort of breach of statutory duty. The identification of the objectives and protected interests in the Israeli security legislation, as discussed in my Declaration, lead to the clear conclusion that the prohibitions under the security legislation cited by the Plaintiffs create criminal prohibitions in the context of the war against terrorism, but are not intended to create rights of action for breach of statutory duty.

20.     The history of the Defense Regulations as security legislation for the protection of the regime of the British Mandate for Palestine that has been left in force in the State of Israel since independence is clear and undisputed, as is the analysis of Sec. 85 of the Defense Regulations in light of the definition of "unlawful association" that is given Sec. 84 (1) (a) thereof.   Prof. Gross however seems to indicate the unqualified language of Sec. 84 (1) (b) as an independent source of sub-legislation whereby the Minister of Defense has the power to alter the objects of the Defense Regulations and their enabling legislation and create civil wrongs. This expansive, civil law oriented interpretation of the decree making power of the minister is unfounded: In accordance with accepted principles of statutory interpretation, the lack of limiting criteria in sub-section 84(1)(b) of the Defense Regulations does not release the Minister of Defense from the overall meaning and purpose of the Defense Regulations in their context, as emergency legislation for the protection of the State in a state of emergency or war. Nor does it release the Minister from the guiding criteria for the use of the discretion that is contained in sec. 84(1)(a). In other words, the Minister of Defense is clearly empowered by the Defense Regulations to exercise discretion to declare associations illegal – but that is for the purpose of defending the State, which is the purpose of the Defence Regulations and Sec. 85 as a whole. Again, there is no need to legislate a statute for the protection of persons from bodily harm, because that interest is already protected pursuant to the Civil Wrongs Ordinance.

It is correct that the Defense Regulations are not formally dependent on the declared state of emergency for their validity. Analytically however the objects and protected interests of the Defense Regulations are identical to those enumerated in §39(a) of the Basic Law: The Government, which Prof. Gross agrees governs emergency rule making power in Israel. If this were not so, the Defense Regulations of 1945 would be considered as repugnant to the Basic Law and hence could be considered as either void or repealed by implication. The interpretative presumption must be that the continued force of the Defense Regulations of 1945 is subject to the Basic Law.

21.      Where security legislation is subject to the valid declaration of a state of emergency by the Knesset - that seems to be a tell-tale sign that such legislation is intended to protect the state and public from security threats and is not intended to apply to the defendant for the protection of the plaintiffs in the meaning of the tort law.  Tort norms created by statute are, after all, civil norms and standards of conduct imposed on some persons for the protection of others from certain types of harm. Such norms and standards of conduct between persons, and for the protection of private interests, have no relation to and are not contingent on a declared state of emergency.

22.      Prof. Gross correctly states that there is no controversy about the general principle that a criminal statute may impose a viable statutory duty upon which a civil action may be based. That general statement is correct, but the cases he cites make it clear that the statute has to also create a civil duty of one person to another. Thus, the first case cited by Prof. Gross (on p. 3, fn. 2) of C.A. 572/74 *Roitman v. Bank HaMizrahi* dealt with the question whether an act of perjury - a criminal offense which is not a specific tort under the Civil Wrongs Ordinance – confers a cause of action for breach of statutory duty. The ruling was that it does not confer such

a cause of action, notwithstanding the damage that is done to the victim in consequence of the offense. In any event, the analysis of the statute must be specific to the statutory duty under discussion, and in the security legislation the purposes of the legislation are defined therein, and so they add nothing to the protection of private interests under the Civil Wrongs Ordinance. The conclusion that Prof. Gross has reached with respect to the security legislation has no precedent in tort law and contradicts the declared purposes of the legislative provisions of the emergency legislation, the relevant portions of the Basic Law: The Government and the opinion of the court in *Vaknin*. Therefore, his opinion does not reflect the position of Israeli law.

23.     In opining that the FAC discloses commission of the security offenses alleged by the Defendant Bank, Prof. Gross's opinion seems to equate the conduct of the Bank that is disclosed by the FAC with that of the defendant in Cr. App. 3827/06 *Doe v. The State of Israel* (2007) and also seeks to base the application of Penal Law s. 13 thereon. A comparison of the operative parts of that judgment with the FAC will show that there is no basis to do so:

First, I must entirely disagree with Prof. Gross' characterization of the *Doe* case as one of an "ordinary moneychanger" and one in which the defendant provided financial services to Hamas "in the context of his regular course of business as a moneychanger." The judgment makes it clear that *Doe* did not act as a mere moneychanger in a bazaar or shopping center, but rather assumed responsibility for a money transferring operation for Hamas at the direct request of the commander of the military wing of Hamas in Gaza. He was, then, in a direct contract for services with Hamas. He also traveled, especially to Dubai, to carry out the transfer of funds from Dubai as a substitute for his brother-in-law, who had been expelled from Dubai for such illegal activity. *Doe*, though not a formal member of Hamas, knowingly and intentionally exerted special effort to provide material support to Hamas in Gaza, and this was observed by the court.

In such circumstances, he was convicted of offenses related to knowing and intentional provision of material support to the terrorist organization, and S. 13 criminal jurisdiction was held to apply.

In the case asserted in the FAC, the Defendant Bank made banking services available to a person who was allegedly using the money to provide material support to anti-Israeli terrorist organizations, an allegation disregarded by the PRC government. In this factual situation, the alleged terrorist operative, not the Bank, is the person whose position is analogous to that of *Doe*. In terms of the Bank, the Bank, unlike *Doe,* was rendering the services in the ordinary course of banking business to an existing account. The fact of the Bank operating in the rendition of ordinary banking services in the ordinary course of business negates, first and foremost, the existence of the requisite intention and motivation to cause harm to Israelis or Jews in order to find Sec. 13 criminal jurisdiction. Therefore the *Doe* case has no bearing on the subject case.[6]

Secondly, in the absence of the requisite knowledge and intent, the fact that the Bank's services facilitated the transfer of funds by the alleged operative to Hamas and/or the PIJ, as opposed to acting in concert with a terrorist operative, does not make the Bank an aider or abettor under either Israel's criminal law or civil law.

24.      Prof. Gross opines that on the facts stated in the FAC the Bank has "contributed money" to the terrorist organizations and relies (pages 12-13) on the case of *Farach* as authority for the proposition that even a conduit for funds provided to a terrorist organization is guilty of the provision of support offense under Section 4(d) of the Prevention of Terrorism Ordinance. However, *Farach* dealt with fundraising for a terrorist organization. In that sense, the defendant

---

[6] For analysis of the requisite intent and motivation under S. 13 of the Penal Law and the other relevant provisions of the criminal law, I defer to the opinion of a criminal law expert, Prof. Kenneth Mann.

in *Farach* was not transferring his own money in the sense that Prof. Gross is indicating. Fundraising is clearly an instance of procuring funds and giving them to the terrorist organization as a form of financial support – and thus is materially distinct from the case at hand that is alleged against the Bank. The Bank has not provided its own financial resources or procured the financial resources of others for the terrorist organizations. The attempt to derive from a fundraising case the general principle that providing a banking service to another who is transferring the funds to a terrorist organization will constitute the offense of providing money or money's worth (support) to the terrorist organization, so that there is no longer a distinction between the persons procuring and providing the support and the Bank through which they are doing so, has no basis in law, and disregards the functions of banks.

**Causation Principles**

25.     The definitions of legal causation set down in Sec. 64 of the Civil Wrongs Ordinance apply equally to all forms of fault, i.e. all civil wrongs (torts). In consequence of the element of causation, it follows that where a defendant is at fault by reason of having committed a civil wrong, liability will not attach unless the defendant's civil wrong is in fact the cause or one of the causes of the harm complained of by the plaintiff. The test for factual causation remains the "but for" (*sine qua non* or necessary condition) standard. The "but for" test has been consistently upheld and applied as a condition of liability, even where the degree of causal contribution of a specific fault is uncertain among multiple causes: C.A. 44/08 *General Health Services v. Kessler*, paragraph 13 of the judgment (19.5.09, published electronically in Nevo; following C.A. 243/83 *Jerusalem Municipality v. Gordon*, 39(1) P.D. 113, 128 (1985); and now C.A. 4241/06 *Levy v. State of Israel, Israel Police* (12.3.09, Published in Nevo, paragraph 10. Granted, there are exceptional cases wherein, strictly speaking, the "but for" causal link could not

be substantiated among multiple actors and the test has been adapted to meet the circumstances, e.g. in a case cited by Prof. Porat where several powerful dogs bit the victim (*Melech v. Kornhauser*). In such a case, the owners of the dogs – each of whose bite would have been a sufficient cause of the injury – were held liable, even though each could point to a different dog and argue that there was no proof that their dog's bite was not the "but for" cause. Such a case is quite different, however, than the case of the Defendant Bank which has allegedly made banking services available to a terrorist operative: the enabling of a transfer of funds does not have a direct or natural relation to the terrorist bombing, and the Bank's conduct was not a "but for" cause or a sufficient cause of the injury. Nor is that even alleged in the FAC. The necessary conclusion is that the FAC does not disclose the element of causal connection as required for a cause of action in the Israeli law of tort.

26.      It is correct that after examining factual causation, a court will consider the normative aspect of causation, to determine whether a party's conduct "ought to" be deemed the cause of a specified harm. Where I have stated in my declaration that terrorist bombings do not emanate from the natural course of things in the context of a bank transfer by a bank customer, it is indicated as a factor negating a finding of causation between the bank's alleged negligent enabling of the transfer and the harm done to the victims of the terrorist bombings.

27.      In terms of ascertaining whether the fault of another person is the decisive cause of the damage so as to sever the causal connection between the fault of a wrongdoer and the damage, there is no basis in the case law to confine the inquiry to the foreseeability test in the manner that Prof. Porat seems to be suggesting. The considerations are foreseeability, risk and common sense.

28.     Hence my opinion is that on the tort principles codified in the Civil Wrongs Ordinance, the terrorist bombings themselves are to be deemed the decisive cause of the harm, and those who perpetrated them the persons liable for the harm. The application of the same standards leads to a finding of absence of any causal connection between the Defendant Bank's conduct and the harm. There is no basis to forego the "but for" requirement of factual causation since there is no uncertainty present about the fact that the making of the banking services available was not a sufficient, or "but for" cause of the terrorist bombing; whereas the conduct of those perpetrating the terrorist violence was such a cause.  Nor is there uncertainty about the terrorist bombings being the decisive cause of the injuries. It follows that, in terms of Israeli law, the conduct of the BOC cannot be held to have been the legal or proximate cause of the terrorist bombing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: July 24, 2009, at Tel-Aviv, Israel

_____
Peter Gad Naschitz
Naschitz, Brandes & Co., Advocates