# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHERYL WULTZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08-cv-1460 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## MEMORANDUM OPINION

---

I.  Introduction .................................................................................................... 4
II.  Background ..................................................................................................... 5
    A.  A PIJ Suicide Bomber Allegedly Blew Up a Restaurant in Tel Aviv ................... 5
    B.  Plaintiffs Make Five Claims Against BOC Related to the Tel Aviv Bombing ...... 6
III.  Discussion ...................................................................................................... 8
    A.  Justiciability ................................................................................................ 8
        1.  Standing ............................................................................................... 8
            a.  Standing Requires Injury in Fact, Causation, and Redressability... 9
            b.  Plaintiffs Have Standing ............................................................ 10
        2.  Political-Question Doctrine .................................................................. 15
            a.  Political Questions Are Those Issues Reserved for the Political
               Branches and Unsatisfactory for Judicial Determination ............. 15
            b.  Plaintiffs' Claims Do Not Raise Political Questions ................... 17
               i.  Adjudication of Plaintiffs' Claims Does Not Intrude
                    Upon Foreign Relations of the Executive Branch ........... 17
               ii.  The Issue of Whether Adjudication of Plaintiffs'
                    Claims Depends on Criteria Unsatisfactory for Judicial
                    Determination Is Unripe ................................................ 21
    B.  Subject-Matter Jurisdiction ......................................................................... 22
        1.  Subject-Matter Jurisdiction Over a Case to Which a Foreign Sovereign
            Is a Party Turns on Sovereign Immunity ................................................ 22
        2.  Instrumentalities of Foreign States Are Presumptively Immune ............. 24
        3.  BOC Is Not an Instrumentality of China ................................................ 25
    C.  Personal Jurisdiction ................................................................................... 27
        1.  Plaintiffs Have the Burden of Alleging Jurisdictional Facts ................... 27
        2.  Plaintiffs Have Met Their Burden .......................................................... 28
            a.  The Court Has Personal Jurisdiction Under the ATA ................. 28

      b.      The Court Has Personal Jurisdiction Under the Fifth Amendment ................................................................... 29

           i.     BOC Must Have Sufficient Minimum Contacts With the United States ............................................. 29

           ii.    BOC Has Sufficient Minimum Contacts With the United States ............................................. 31

      c.      The Court Has Pendent Personal Jurisdiction as to Claims Under Israeli Law ....................................... 36

D.    Venue ........................................................................................ 37

    1.      BOC Waived its Objection to Improper Venue ........................ 38

    2.      Regardless, Venue Is Proper Under the Doctrine of Pendent Venue ....... 39

E.    Sufficiency of Plaintiffs' Pleadings ........................................... 41

    1.      Plaintiffs Must Plead a Short and Plain Statement Showing That They Are Entitled to Relief ................................................. 41

    2.      Plaintiffs Have Sufficiently Pled Count Two: Primary Liability ............. 44

      a.      Primary Liability Under the ATA Requires a Chain of Incorporations ................................................. 45

      b.      Plaintiffs Adequately Plead Eligibility ......................... 48

      c.      Plaintiffs Adequately Plead Injury ............................... 48

      d.      Plaintiffs Adequately Plead an Act of International Terrorism .... 49

           i.     Plaintiffs Adequately Plead Acts Dangerous to Human Life ........................................... 49

           ii.    Plaintiffs Adequately Plead Violations of U.S. Criminal Law ....................................... 50

                I.     Plaintiffs Adequately Plead Violations of 18 U.S.C. § 2339A ................................... 51

                II.    Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 2339B ................................... 54

                III.   Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 2339C ................................... 55

            iii.   Plaintiffs Adequately Plead Appearance of Intention to Intimidate Civilians, Influence Government Policy, or Affect Government Conduct ............................ 58

           iv.    Plaintiffs Adequately Plead Transcendence of National Boundaries ....................................... 60

      e.      Plaintiffs Adequately Plead Ordinary Tort Requirements ........... 60

           i.     Plaintiffs Adequately Plead Intentional Misconduct ........ 61

           ii.    Plaintiffs Adequately Plead Proximate Causation ........... 66

      f.      Conclusions Concerning Count Two ............................. 67

    3.      Plaintiffs Have Sufficiently Pled Count Three: Secondary Liability ........ 68

      a.      Secondary Liability Exists Under the ATA ..................... 68

      b.      Plaintiffs Adequately Plead a Claim for Secondary Liability ....... 73

    4.      Plaintiffs Have Sufficiently Pled Count Four: Negligence ................... 74

      a.      Liability for Negligence Requires Duty, Breach, Injury, and Causation ................................................. 74

      b.      Plaintiffs Adequately Plead Duty ................................. 75

i. Duties Arise When Injury Is Foreseeable .......................... 75
ii. Plaintiffs Have Adequately Pled That BOC Was Under a Duty ................................................................................. 78
c. Plaintiffs Adequately Plead Breach ............................................. 82
i. Breach Occurs When a Person Under a Duty Acts Unreasonably With Respect to the Duty.......................... 82
ii. Plaintiffs Have Adequately Pled that BOC Breached its Duty..................................................................................... 83
d. Plaintiffs Adequately Plead Injury ............................................... 83
e. Plaintiffs Adequately Plead Causation.......................................... 83
i. Factual Causation Exists Where, But For a Defendant's Act or Omission, a Plaintiff's Injury Would Not Have Occurred.......................................................................... 83
ii. Plaintiffs Adequately Plead That BOC Factually Caused Their Injury ...................................................... 86
iii. Legal Causation Exists Where Injury Is Foreseeable, Within the Field of Risk, and Causation Fits Common Sense .............................................................................. 87
iv. Plaintiffs Adequately Plead That BOC Legally Caused Their Injury ................................................................... 88
5. Plaintiffs Have Sufficiently Pled Count Five: Breach of Statutory Duty . 91
a. Breach of Statutory Duty Operates as a General Private Cause of Action for Violation of Israeli Law ......................................... 91
b. Plaintiffs Adequately Plead That BOC Was Under A Duty Imposed by Three Israeli Penal Laws........................................... 92
c. Plaintiffs Adequately Plead That the Relevant Penal Laws Were Intended for the Benefit of the Public ................................. 97
d. Plaintiffs Adequately Plead That BOC Breached its Duties....... 101
i. Plaintiffs Adequately Plead a Violation of Israel's Prevention of Terrorism Ordinance ............................... 102
ii. Plaintiffs Adequately Plead a Violation of Israel's Penal Law .................................................................................. 103
iii. Plaintiffs Adequately Plead a Violation of Israel's Defense (Emergency) Regulations ................................. 106
iv. The Court Will Not Consider Whether Plaintiffs Have Pled a Violation of Israel's Prohibition on Terrorist Financing Law ............................................................... 108
e. Plaintiffs Adequately Plead That Their Injuries Were Caused by BOC's Breach ...................................................................... 109
f. Plaintiffs Adequately Plead That They Suffered Injuries of the Sort Intended to Have Been Prevented by the Relevant Penal Statutes...................................................................................... 110
g. The Double-Actionability Rule Has Been Replaced, and Its Replacement Does Not Apply ................................................... 110
6. Plaintiffs Have Sufficiently Pled Count Six: Vicarious Liability........... 113
F. Duplicity of Plaintiffs' Claims............................................................................ 116

3

   1.  Claims Duplicative of Others Should Be Dismissed ............................. 116

   2.  Plaintiffs' Secondary-Liability Claim Is Not Duplicative of Their
     Primary-Liability Claim ....................................................................... 117

IV. Conclusion ................................................................................................... 118

## I. Introduction.

The Bank of China, Ltd. ("Bank of China," "Bank," or BOC) has moved the Court to dismiss all claims against it. Def. BOC's Mot. to Dismiss the 1st Am. Compl., Mar. 5, 2009, ECF No. 15 [hereinafter BOC's Mot.]. The Bank has advanced several arguments in favor of its motion: that the case is nonjusticiable because plaintiffs lack standing, *id.* at 4–5, and because plaintiffs' claims raise political questions, *id.* at 5–12; that the Court lacks personal jurisdiction over the Bank, *id.* at 12–18; that venue is improper, Reply Mem. of P. & A. in Support of BOC's Mot. 4–9, July 24, 2009, ECF No. 42 [hereinafter BOC's Reply]; that plaintiffs fail to state any claim upon which relief can be granted, BOC's Mot. at 18–28, 29–44; and that plaintiffs make duplicative claims, *id.* at 28–29. To this list, the Court will sua sponte add consideration of whether the Bank is entitled to immunity from suit as an instrumentality of China. Plaintiffs oppose all arguments. Pls.' Mem. in Opp'n to BOC's Mot., May 26, 2009, ECF No. 31. [hereinafter Pls.' Opp'n]; Pls.' Surreply, Oct. 20, 2010, ECF No. 80.

In this memorandum opinion, the Court will first provide an overview of plaintiffs claims against BOC and will second discuss why the Court will reach the merits of those claims: plaintiffs have standing, plaintiffs' claims do not raise nonjusticiable political questions, the Bank is not entitled to sovereign immunity, the Court has personal jurisdiction over the Bank, venue is proper, plaintiffs have adequately pled claims upon which relief may be granted, and plaintiffs have not pled duplicative claims. The Court will thus deny the Bank's motion.

## II.    Background.

Plaintiffs make five claims against BOC: that BOC committed an act of international terrorism in violation of U.S. law, that BOC aided and abetted acts of international terrorism committed by others in violation of U.S. law, that BOC is liable for negligence under Israeli law, that BOC is liable for a breach of a statutory duty under Israeli law, and that BOC is vicariously liable for acts of the Palestinian Islamic Jihad (PIJ) under Israeli law.  All five claims arise under the same set of alleged facts.  This part of the opinion summarizes those facts and claims.

### A.    A PIJ Suicide Bomber Allegedly Blew Up a Restaurant in Tel Aviv.

On April 17, 2006, a Palestinian suicide bomber allegedly attacked a restaurant in Tel Aviv, State of Israel ("Israel") ("Tel Aviv bombing" or, as referred to by plaintiffs, the "Terrorist Bombing").  1st Am. Compl. ¶ 1, Jan. 13, 2009, ECF No. 12 [hereinafter FAC].  Daniel Wultz allegedly suffered severe physical injuries, resulting in his death, further resulting in economic injuries to his estate.  *Id.* ¶¶ 87, 100.  Daniel's father also allegedly suffered physical injuries in the attack.  *Id.* ¶¶ 88, 101.  Finally, several of Daniel's family members allegedly also suffered emotional and financial injuries.  *Id.* ¶¶ 101–02.

In the wake of the bombing, Mr. Wultz's estate and family members ("plaintiffs") have brought suit against several defendants, including BOC.  *See* FAC.  Concerning BOC, plaintiffs specifically allege that between 2003 and the date of the attack, "BOC executed dozens of dollar wire transfers for the PIJ, totaling several million dollars."  *Id.* ¶ 69.  These transfers allegedly "were initiated by the PIJ leadership in Iran, Syria[,] and elsewhere in the Middle East, and were executed by and through BOC's branches in the United States."  *Id.*  Transferred moneys were allegedly received into accounts owned by officers and agents of the PIJ and used "for the purpose of planning, preparing for[,] and executing terrorist attacks" in general.  *Id.* ¶¶ 69–70.

These transfers, therefore, allegedly "substantially increased and facilitated PIJ's ability to plan, to prepare for[,] and to carry out" the particular bombing at issue in this case.  *Id.* ¶¶ 74, 92.

During the years when the alleged transfers were made, the PIJ was designated by the U.S. Department of State as a "foreign terrorist organization."  Review of Designation of Foreign Terrorist Organizations, 74 Fed. Reg. 4069, 4069 (Jan. 22, 2009); Redesignation of Foreign Terrorist Organizations, 68 Fed. Reg. 56,860, at 56,861 (Oct. 2, 2003); Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112, at 55,112 (Oct. 8, 1999); FAC ¶ 6.  During this same time, the PIJ was also listed by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) as a "specially designated terrorist" and "specially designated global terrorist" entity.  31 C.F.R. ch. V, app. A (2006); 31 C.F.R. ch. V, app. A (2005); 31 C.F.R. ch. V, app. A (2004); 31 C.F.R. ch. V, app. A (2003).  The holder of a BOC account for whom transfers were made—Said al-Shurafa—however, has never been similarly designated by the State or Treasury Departments.  *See generally* U.S. Dep't of the Treasury, OFAC, *Terrorism: What You Need to Know About U.S. Sanctions* (Oct. 19, 2010), http://www.treasury.gov/offices/ enforcement/ofac/programs/terror/terror.pdf (identifying designees, not including Mr. Al-Shurafa).  Notably, the transfers allegedly continued even after Israel notified the People's Republic of China (PRC or "China") of the transfers and demanded that China force BOC to cease any further transfers.  FAC ¶ 77.

### B.    Plaintiffs Make Five Claims Against BOC Related to the Tel Aviv Bombing.

In count two of their first amended complaint, plaintiffs' claim that BOC committed "an act of international terrorism" subjecting it to civil suit under the Antiterrorism Act (ATA), which, in relevant part, permits "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors,

or heirs, [to] sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).[1]  Plaintiffs base their claim on a chain-of-corporations theory, alleging that BOC intentionally and knowingly provided financial services to an agent of the PIJ, thereby proximately causing plaintiffs' injury.  FAC ¶¶ 106–15.  Plaintiffs thus assert a theory of primary liability: BOC is allegedly liable for its own acts.

In count three of their first amended complaint, plaintiffs' second claim that BOC aided and abetted the commission of an act of terrorism by the PIJ.  *Id.* ¶¶ 116–25.  Plaintiffs thus allege a theory of secondary liability: BOC is allegedly liable for acts of the PIJ.[2]

In counts four, five, and six of their first amended complaint, plaintiffs third, fourth, and fifth claim that, under the law of Israel, BOC committed the civil wrong of negligence by providing financial services to the PIJ knowing it would conduct terrorist attacks, *id.* ¶¶ 126–40, committed a breach of a statutory obligation by violating several Israeli criminal laws, *id.* ¶¶ 141–52, and should be held vicariously liable for actions of the PIJ, *id.* ¶¶ 153–58.

---

[1] The current text of 18 U.S.C. § 2333 should not technically be referred to as the "Antiterrorism Act."  The current text was enacted by the Federal Courts Administration Act of 1992.  Pub. L. No. 102-572, § 1003(a)(4).  A previous version of § 2333, however, was enacted by the Antiterrorism Act of 1990.  Pub. L. No. 101-519, § 132(b)(4), 104 Stat. 2240, 2251.  Changes between the two laws were minimal.  The Court will therefore follow the common practice of referring to current § 2333, as well as surrounding sections, as the Antiterrorism Act.

[2] Some courts have confusingly used the phrase "aiding and abetting" not only to refer to secondary liability for aiding and abetting a primary violator of the ATA, but also to the actions of another primary actor acting in a secondary-like capacity.  *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2007) [hereinafter *Boim III*] (en banc) (comingling terminology "when the primary liability is that of someone who aids someone else, so that functionally the primary violator is an aider and abettor or other secondary actor").  A partially dissenting judge in that case criticized that conceptualization as "one that straddles both primary and secondary liability."  *Id.*, 549 F.3d at 707 n.5 (Rovner, J., concurring in part and dissenting in part).  To avoid any confusion, this Court uses the phrase "aiding and abetting" only to refer to aiding-and-abetting—that is, secondary—liability.

### III.    Discussion.

This section will first evaluate BOC's arguments relating to justiciability: that plaintiffs lack standing and raise political questions. They do not. The Court will then turn to subject-matter jurisdictional issues: whether BOC is entitled to sovereign immunity as an instrumentality of China. Because BOC is not such an instrumentality, it is not entitled to immunity from this suit. The Court will then address personal jurisdictional issues: whether fundamental fairness permits plaintiffs to haul BOC into this Court. It does. The Court will then examine venue, concluding that this Court is a proper place for plaintiffs to raise their claims. Finally, the Court will evaluate defendant's remaining arguments concerning plaintiffs' individual claims: that plaintiffs fail to state any claims upon which relief may be granted and make duplicative claims. Plaintiffs' claims may warrant relief and are not duplicative.

#### A.    Justiciability.

BOC raises two arguments concerning justiciability: that plaintiffs lack standing and raise political questions. If plaintiffs lack standing to sue the Bank of China or if the complaint raises political questions, then the case is nonjusticiable and must be dismissed. This case is justiciable because plaintiffs have standing to sue BOC and plaintiffs' claims do not raise political questions.

##### 1.    Standing.

Parties must have standing to sue. That is, a plaintiff must have suffered an injury in fact that was caused by a defendant and that is redressable by a court. If plaintiffs lack standing to sue BOC, then this case is nonjusticiable and must be dismissed. Because plaintiffs sufficiently

allege a causal chain between BOC and alleged injuries suffered that are redressable under various theories of recovery pled by plaintiffs, plaintiffs have standing.

### a. Standing Requires Injury in Fact, Causation, and Redressability.

The Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992) (quoting U.S. Const. art. III, § 2, cl. 1). The requirement that plaintiffs have standing to sue is born of this case-or-controversy requirement. *Id.* at 560 (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Whether a plaintiff has standing is composed of three elements. "First, the plaintiff must have suffered an 'injury in fact.'" *Id.* To constitute an "injury in fact" the injury must be "concrete and particularized"— that is, it "must affect the plaintiff in a personal and individual way." *Id.* at 560, 560 n.1 (citing *Allen*, 468 U.S. at 751; *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740–41 (1972)). The injury must also be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* A causal connection exists where the injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these three elements. *Devlin v. Scardelletti*, 536 U.S. 1, 6–7 (2005) (citing *Defenders of Wildlife*, 504 U.S. at 555). When ruling on a motion to dismiss for want of standing, the trial court "must

accept as true all material allegations of the complaint." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)). With these considerations in mind, the Court now turns to plaintiffs' allegations relating to standing and BOC's arguments that such allegations are insufficient.

## b.    Plaintiffs Have Standing.

BOC does not contest that the claimant has suffered an injury in fact, nor does it argue that the injuries alleged are non-redressable. *See* BOC's Mot. Rather, BOC argues that "[s]tanding cannot be established here because [p]laintiffs' alleged injuries are too causally attenuated from the wire transfers allegedly executed by the Guangzhou branch of BOC." *Id.* at 5. According to BOC, because "[t]here are innumerable third parties without whose 'independent action' [p]laintiffs would not have been injured," the injuries on which the claims are based are not fairly traceable to its alleged execution of the fund transfers. *Id.* (quoting *Greenberg v. Bush*, 150 F. Supp. 2d 447, 455 (E.D.N.Y. 2001). The issue, however, is not merely whether independent third parties are involved, but rather whether a sufficient causal chain is established between the alleged actions of a defendant and the injury suffered by the claimant. *See Allen v. Wright*, 468 U.S. 737, 759 (1984).

The circumstances of *Greenberg*, 150 F. Supp. 2d at 447, the case cited by BOC for the proposition that causation is too attenuated, are quite different from the facts alleged in this case. In *Greenberg*, plaintiffs argued that foreign-policy actions of the executive branch supporting the establishment of a Palestinian state had "weaken[ed] and paralyze[d]" Israel in violation of

longstanding policy favoring the creation and maintenance of a Jewish homeland in the Middle East. The plaintiffs thus concluded that these actions resulted in terrorist attacks on Israel. *Id.* at 449–50. The plaintiffs made no attempt to prove a causal chain between these foreign-policy decisions and the terrorist acts perpetrated by third parties. The absence of that causal chain led the court to conclude that the plaintiffs lacked standing. *Id.* at 454–55. According to the court, "[i]t would be difficult to imagine a clearer example of a third party's actions breaking the causal chain." *Id.* at 455.

This case is distinguishable from *Greenberg* because, per plaintiffs' allegations, there are links in a causal chain—and plaintiffs have connected them. According to defendant's motion, the "implausible conclusory assertions that the wire transfers 'enable[d]' PLJ to carry out the attacks . . . are plainly insufficient" for purposes of standing. BOC's Mot. 5 (quoting FAC ¶ 72). Defendant's assertion is an oversimplified characterization of plaintiffs' allegations. The first amended complaint alleges that for several years predating the bombing, BOC executed dozens of wire transfers totaling several million dollars to and from an account owned by Mr. Al-Shurafa. FAC ¶ 69. Those transfers were allegedly initiated by the PIJ, executed in part through BOC branches in the United States, and eventually directed to members of the PIJ to plan, prepare for, and execute terrorist activities, including the bombing at issue in this case. *Id.* ¶¶ 69–70, 74, 77, 92. Based on these allegations, the Court finds that plaintiffs have adequately pled injuries that are fairly traceable to BOC's alleged actions.

This finding is supported by two other recent decisions addressing standing for claims brought against financial institutions under the ATA. In *Rothstein v. UBS AG*, scores of victims and their families brought suit alleging that UBS had executed fund transfers to Hamas and Hezbollah, the perpetrators of the attacks out of which the suit arose. 647 F. Supp. 2d 292

(S.D.N.Y. 2009), *appeal dismissed*, No. 09-4108-cv (2d Cir. Aug. 26, 2010), *filed as* Pls.' Notice

of New Appellate Auth. Relevant to Def. BOC's Pending Mot. to Dismiss, Ex. A, ECF No. 77-1.

The court explained the causal chain alleged by the plaintiffs:

> [The] plaintiffs allege that the Iranian government is a recognized sponsor of
> terrorism and has funded and supported Hamas, Hezbollah, and other Palestinian
> terrorist organizations; that these terrorist organizations require U.S. cash dollars
> to carry out their activities; and that UBS's involvement in banknote transactions
> with Iranian counterparties had the effect of providing U.S. cash dollars to the
> Iranian government, which, in turn, supplied the aforementioned terrorist
> organizations with U.S. cash dollars that were used to facilitate terrorist acts. This
> indirect facilitation, plaintiffs argue, makes UBS liable to plaintiffs for the harms
> they suffered at the hands of the terrorist groups.

*Id.* at 294. The court then identified several breaks in that chain: (1) the plaintiffs did

"not allege that UBS is a primary or even relatively significant source of U.S. banknotes for the

Iranian government"; (2) the plaintiffs did not consider that "cash dollars have multiple

legitimate uses besides funding terrorism"; and (3) the plaintiffs made no allegations "showing

that the terrorist groups here in question raise their funds from monies transferred from Iran." *Id.*

The court thus concluded that the "plaintiffs' allegations here are far too speculative to provide

the plausible indication of . . . causation necessary to establish plaintiffs' standing in this case."

*Id.* In the instant case, however, plaintiffs have alleged a flow of money *directly* into the coffers

of the PIJ, FAC ¶ 69—an organization entirely devoted to terrorist activity, and thus one that is

unlikely to use wired moneys for any other purpose, *see* Holly Fletcher, Council on Foreign

Relations, *Palestinian Islamic Jihad* (Apr. 10, 2008), http://www.cfr.org/publication/15984

(noting that "the PIJ offers no social services," but rather engages solely in terroristic violence).

The claimants' causation allegations are therefore not speculative like those considered in

*Rothstein*.

In *Goldberg v. UBS AG*, the plaintiffs brought significantly similar claims alleging that UBS had transferred funds to Hamas, the perpetrator of the bombing out of which the suit arose. 660 F. Supp. 2d 410 (E.D.N.Y. 2009). The court explained the causal chain: (1) the plaintiffs alleged that Hamas is financed through false charities, one of which is the Association de Secours Palestinien (ASP); (2) UBS maintained an account for ASP and transferred money to ASP and other Hamas-controlled entities; and (3) that because Hamas had been designated a foreign terrorist organization by the State Department, and because ASP had been designated as a Hamas fundraising entity by the OFAC, UBS knew the result of transferring the money—the funding of terrorist violence. *Id.* at 415–16. Thus, where UBS had transferred funds directly to a terrorist-affiliated entity, and knew or had reason to know of that entity's terrorist affiliation, the court found that the plaintiffs had adequately pled standing.

The circumstances of *Goldberg* parallel those now before the Court. BOC allegedly transferred funds directly from PIJ operatives to an account it maintained for Mr. Al-Shurafa, a PIJ agent. FAC ¶ 69. BOC urges the Court to distinguish *Goldberg* from this case, arguing that here, BOC performed financial services for an individual "who has never been designated as a member of a terrorist organization by any Government agency, and has never appeared on the OFAC list." Def. BOC's Resp. to Pls.' Notice of New Auth. 2, Sept. 29, 2010, ECF No. 54 [hereinafter BOC's Resp. to Pls.' New Auth.]. BOC thus claims that, unlike the defendant in *Goldberg*, it had no knowledge that it was effectively providing financial services to the PIJ. *Id.* Below, the Court discusses an overarching knowledge requirement applicable to civil actions brought under 18 U.S.C. § 2333(a). *See* discussion *infra* Part III.E.2.e.i. As more fully discussed in that part, Israeli officials allegedly informed China, which informed BOC, that the transfers were enabling the terrorist activities of the PIJ. FAC ¶ 77. Therefore, as in *Goldberg*,

plaintiffs have pled the knowing provision of financial services to terrorists resulting in terrorist violence.

In addition to its attenuation argument, BOC contends that causation fails because "[t]here can be no genuine claim that PIJ lacked the means to finance and carry out the April 17, 2006 bombing without the wire transfers from Guangzhou." BOC's Mot. 5. But the question is not whether, absent the wire transfers by BOC, it would have been impossible for the PIJ to carry out the bombing. Rather, the question is whether "it could reasonably be inferred that," absent the wire transfers, "there is a substantial probability" that plaintiffs would not have been injured. *Greenberg*, 150 F. Supp. 2d at 455. Such an inference may be based on "general factual allegations of injury resulting from the defendant's conduct" because, on a motion to dismiss, courts will "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Nat'l Wildlife Fed.*, 497 U.S. at 889).

A review of the factual allegations set forth in the first amended complaint demonstrates that plaintiffs have sufficiently pled causation for purposes of standing. First, plaintiffs allege that "[t]he PIJ is subject to strict economic sanctions programs imposed by the United States as the result of its designation" as a foreign terrorist organization and specially designated global terrorist entity, the enforcement of which is intended to limit the PIJ's "ability to plan, to prepare[,] and to carry out terrorist attacks." FAC ¶¶ 63–64. Second, were these sanctions universally enforced by financial institutions, plaintiffs allege that "the ability of PIJ to conduct banking activities would be severely restricted, and PIJ's ability to plan, to prepare[,] and to carry out terrorist attacks would be significantly reduced." *Id.* ¶ 66. Third, plaintiffs allege that "very few banks and financial institutions . . . do not observe and enforce the U.S. Sanctions

Regime," among which is BOC.  *Id.* ¶ 67.  Finally, the first amended complaint alleges that BOC executed "dozens of . . . wire transfers . . . totaling several million dollars" on behalf of Mr. Al-Shurafa, a BOC account holder and "a senior officer and agent both of the PIJ and of the Hamas terrorist organization," which were "*necessary* for planning, preparing and carrying out" the attack for which relief is sought.  *Id.* ¶¶ 69, 73 (emphasis added).  Rather than "implausible conclusory assertions," BOC's Mot. 5, these allegations are supported by specific references to dates, amounts, and geographical distribution of funds by BOC on behalf of the PIJ's leadership. In light of these factual allegations, it can reasonably be inferred that, absent the wire transfers, there is a substantial probability that claimants would not have suffered the harm alleged.

### 2.    Political-Question Doctrine.

Political questions are those that have been reserved to the executive or legislative branches of government and that are not well suited for determination by courts.  If plaintiffs' claims raise political questions, then this case would be nonjusticiable and must be dismissed. Although plaintiffs' claims allege facts concerning the conduct of the Chinese government, those allegations do not intrude upon the foreign policy of the United States, and BOC's allegations concerning unsuitability for determination by courts are unripe.  Accordingly, plaintiffs' claims do not raise nonjusticiable political questions.

### a.    Political Questions Are Those Issues Reserved for the Political Branches and Unsatisfactory for Judicial Determination.

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution" by the executive and legislative branches.  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Thus, the doctrine makes nonjusticiable those "political decisions that are by their nature committed to the political branches to the exclusion of the

judiciary." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (quoting *Antolok v. United States*, 873 F.2d 369, 379 (D.C. Cir. 1989)). Two considerations guide a court's testing for nonjusticiable political questions: "the appropriateness under our system of government of attributing finality to the action of the political departments" and "the lack of satisfactory criteria for a judicial determination." *Baker v. Carr*, 369 U.S. 186, 210 (1962) (citing *Coleman v. Miller*, 307 U.S. 433 (1939)).

Based on those considerations, the Supreme Court in *Baker* identified "six independent tests for the existence of a political question":

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (quoting *Baker*, 369 U.S. at 217) (quotation marks removed). Under the *Baker* analysis, "[t]o find a political question . . . [a court] need only conclude that one factor is present, not all." *Schneider*, 412 F.3d at 194. However, upon finding that a claim implicates "none of the [six] characteristics that *Baker v. Carr* identified as essential to . . . rais[ing] a political question," a court may treat that claim as justiciable for purposes of the political question doctrine. *U.S. v. Munoz-Flores*, 495 U.S. 385, 395 (1990).

When undertaking the *Baker* analysis, a court must remember that "the mere fact that a case touches on the political process does not necessarily create a political question beyond courts' jurisdiction." *In re Nazi Era Cases Against German Defs. Litig.*, 129 F. Supp. 2d 370 (D.N.J. 2001) (citing *Nixon v. Herndon*, 273 U.S. 536, 540 (1927); *Can v. United States*, 14 F.3d

160, 163 (2d Cir. 1994)).  For instance, "[d]isputes involving . . . foreign policy decisions are

'quintessential sources of political questions.'" *El-Shifa Pharm. Indus. v. United States*, 559

F.3d 578, 583 (D.C. Cir. 2009) (quoting *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir.

2006)).  Nonetheless, "it is 'error to suppose that every case or controversy which touches

foreign relations lies beyond judicial cognizance.'" *Japan Whaling Ass'n*, 478 U.S. at 229–30

(quoting *Baker*, 369 U.S. at 211).  Unless applicable *Baker* factors are "inextricable from the

case at bar, there should be no dismissal for nonjusticiability on the ground of a political

question's presence." *Baker*, 369 U.S. at 217.

### b.      Plaintiffs' Claims Do Not Raise Political Questions.

BOC argues that the first amended complaint raises nonjusticiable political questions

under two prongs of the *Baker* analysis.  First, BOC maintains that the complaint "involve[s]

issues which are constitutionally committed" to the Executive Branch by virtue of its plenary

power over foreign affairs.  BOC's Mot. 9.  Second, BOC argues nonjusticiability due to the lack

of "'satisfactory criteria for a judicial determination' of the issues." *Id.* at 10 (quoting *Baker*,

369 U.S. at 210).  The Court will deny BOC's motion with respect to the political-question

doctrine, finding that the Court may adjudicate all claims presented without implicating "policy

choices and value determinations constitutionally committed for resolution" by the executive and

legislative branches, *Japan Whaling Ass'n*, 478 U.S. at 230, and that concerns about the

difficulty of evidentiary compulsion raised by BOC's motion are unripe.

### i.      Adjudication of Plaintiffs' Claims Does Not Intrude Upon Foreign Relations of the Executive Branch.

BOC first contends that the claimants' allegations raise "issues which are constitutionally

committed to a coordinate political department"—the Executive Branch.  BOC's Mot. 9.  It is

true that "foreign relations are 'quintessential sources of political questions,'" *id.* (quoting

17

*Bancoult*, 445 F.3d at 433), and that "the power to conduct foreign affairs is constitutionally committed to the political branches," *id.* (citing *Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990)). These broad generalizations do not, however, render nonjusticiable all claims that have some relation to a foreign government's "political policies and goals . . . with respect to other foreign powers." *Id.*

Acceptance of BOC's characterization of the political question doctrine would be a significant departure from the traditionally accepted scope of the doctrine in the context of foreign affairs. For instance, in *Japan Whaling Ass'n*, the petitioners argued that the claims against them were "unsuitable for judicial review because they involve foreign relations and that a federal court, therefore, lack[ed] the judicial power" to hear those claims under the *Baker* analysis. 478 U.S. at 221. The Court rejected the petitioner's reasoning, ruling that "*Baker* carefully pointed out that . . . it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Id.* at 229–30 (quoting *Baker*, 369 U.S. at 211). Unless one of the six factors of the *Baker* analysis is "*inextricable* from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Baker*, 369 U.S. at 217 (emphasis added). To the extent that the claimant's allegations implicate any of the *Baker* factors, the Court finds that those allegations are extricable from the Court's adjudication of the underlying claims.

BOC argues that "[p]laintiffs' attempt to litigate the political policies and goals of the Chinese government with respect to other foreign powers, including the United States and Israel, its relationship to Chinese citizens and corporations in connection with its policies, the alleged communications between Israeli and Chinese counterterrorism officials, and the Chinese government's alleged disregard of Israeli government concerns about terrorism invite[s] judicial

encroachment on matters assigned by the Constitution exclusively to the political branches of government." BOC's Mot. 9–10. BOC thus takes issue with three paragraphs of plaintiffs' complaint: paragraph 77, which alleges that Israeli officials informed China, which informed BOC, that the wire transfers at issue were enabling the terrorist activities of the PIJ, and paragraphs 112 and 123, which allege that BOC actually intended to "intimidate or coerce a civilian population"; "influence the policy of a government by intimidation or coercion"; or "affect the conduct of a government by mass destruction." 18 U.S.C. § 2331(1)(B).

Concerning paragraphs 112 and 123, because, as the Court concludes below, actual intent is not required—plaintiffs need only plead the appearance of intent—the Court need not consider these allegations with respect to the plaintiffs' claims under the ATA. *See* discussion *infra* Part III.E.2.d.iii. These allegations of actual intent also have nothing to do with plaintiffs' claims under Israeli law. Pls.' Opp'n 41. Because the Court will not consider them, there is no concern that these allegations will raise a political question to be decided by the Court.

Concerning paragraph 77, whatever political character there may be to allegations that Israeli officials met with Chinese officials, and that BOC thereafter knew it was providing financial services to the PIJ but did nothing to stop it, is extricable from the resolution of plaintiffs' claims. Plaintiffs do not attempt, as BOC puts it, to "litigate . . . political policies and goals." BOC's Mot. 9. Plaintiffs do not ask this court to "pass judgment" on whether those policies are "valid or invalid, good or evil." Pls.' Opp'n 41. Indeed, considering the Court's determination that only *appearance* of intent is relevant under § 2331(1)(B), plaintiffs do not ask the Court to say anything at all with respect to the actual policies or goals of China. Plaintiffs merely ask the Court to determine whether, as a matter of fact, China received certain information from Israel. *See* discussion *infra* Part III.E.2.e.i. (discussing in detail plaintiffs'

allegations made in FAC ¶ 77). Ruling on that issue will not require the Court to intrude on the foreign policy prerogatives of the executive.

BOC, through an expert declaration on the nuances of the Sino-U.S. relationship, argues that judicial determination of other, more sensitive policy issues, would intrude on those prerogatives. Freeman Decl. 7–17, Mar. 4, 2009, ECF No. 15-16 (arguing that adjudication of allegations as to, among other things, Chinese direction of BOC decisions for ideological purposes, Chinese foreign policy goals of undermining the United States and Israel, and Chinese support for radical Islamic terrorism would intrude on the foreign policy of the United States). Because only the appearance of intent is at issue under § 2331(1)(B), the Court need not consider these allegations, which relate to actual intent. BOC does not explain how or why adjudication of the mere fact that China received certain information from Israel will in any way affect foreign affairs. The Court is content that it may therefore decide the issue at trial.

This conclusion is buttressed by *Lev v. Arab Bank, P.L.C.*, a recent case also involving the alleged provision of financial services by a foreign bank to Hamas. No. 08-cv-3251, 2010 WL 623636 (E.D.N.Y. Jan. 29, 2010). Although *Lev* concerned claims brought under the Alien Tort Claims Act, *id.* at *1, the district court's reasoning on the political-question issue is apposite to analysis under the ATA. In *Lev*, as here, "no action by a coordinate branch of the United States government . . . is involved." *Id.* at *4. And as discussed above, any political ingredient of the Court's consideration plaintiffs' alleged facts is merely incidental. Moreover, "the United States has enacted legislation implementing international conventions condemning . . . the provision of financial services to terrorist groups." *Id.* (citing *Almog v. Arab Bank, P.L.C.*, 471 F. Supp. 2d 257, 282–83 (E.D.N.Y. 2007)). If anything, then, far from intruding on the political branches' political interests, the Court's application of those laws *furthers* those interests. *See*

*also Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F. Supp. 2d 86, 110 n.19 (D.D.C. 2003)

[hereinafter *Burnett I*] (concluding, without significant discussion, that suit under the ATA

against a Saudi Arabian bank for allegedly providing financial services to Al-Qaeda did not raise

nonjusticiable political questions).

> ii.    **The Issue of Whether Adjudication of Plaintiffs' Claims Depends on Criteria Unsatisfactory for Judicial Determination Is Unripe.**

The second argument BOC advances for dismissal under the *Baker* analysis is a lack of

"'satisfactory criteria for a judicial determination' of the issues" presented.  BOC's Mot. 10

(quoting *Baker*, 369 U.S. at 210).  According to BOC, "the Judiciary has neither the aptitude,

facilities[,] nor responsibility" to overcome the difficulties of evidentiary compulsion in "the

realm of foreign affairs where the Constitution grants operational powers only to the two

political branches." *Id.* (citing *Ange v. Bush*, 752 F. Supp. 509, 513 (D.D.C. 1990).  "What

discovery will take place to develop evidence in support of, and in opposition to, the FAC's

contentions about the Chinese government's policies with respect to Israel, the United States,

terrorism, and counterterrorism?" asks BOC.  *Id.*  "Do [p]laintiffs expect the Court to require

Chinese and Israeli government officials to produce documents in response to discovery

requests, and to submit to depositions, on the subject of governmental policies and goals with

respect to terrorism, including an exploration of the inner councils of these governments?" BOC

adds rhetorically.  *Id.*

BOC thus argues that discovery via compulsion orders to China is the only way plaintiffs

could prove up their case, but that the Court cannot issue such orders, so plaintiffs' claims

depend on criteria that are unsatisfactory for judicial determination.  This argument is unripe.

Plaintiffs have not yet attempted to acquire evidence of their allegations through discovery.  The

Court will not guess how plaintiffs will attempt to prove their case, whether through discovery requests to China, Israel, or any other entity, or whether through some other as-yet unimagined means. Just as "it is premature to dismiss the case as involving political questions on the chance that discovery may bump up against issues of confidentiality," *Al-Quraishi v. Nakhla*, No. 08-cv-1696, 2010 WL 3001986, at *19 (D. Md. July 29, 2010), so too is it premature to dismiss this case on the chance that discovery may bump up against noncooperation by China or Israel. Not until the Court is presented with a discovery dispute, or at least until after the parties formulate a discovery plan, can the Court decide whether plaintiffs have raised a political question with respect to evidentiary compulsion.

## B.    Subject-Matter Jurisdiction.

Although neither party has raised the issue of sovereign immunity, the general impression that BOC is linked to China herself gives the Court pause to consider the issue sua sponte. If BOC is entitled to sovereign immunity as a corporate instrumentality of China, for the Court to have jurisdiction over the subject-matter of this case, BOC must fall into some exception to that immunity. BOC, however, is not such an instrumentality and is therefore not entitled to immunity. BOC has not made any arguments in its motion that the Court lacks subject-matter jurisdiction, and the Court finds no other subject-matter jurisdictional issues necessary to address sua sponte.

### 1.    Subject-Matter Jurisdiction Over a Case to Which a Foreign Sovereign Is a Party Turns on Sovereign Immunity.

The Foreign Sovereign Immunities Act of 1976 (FSIA) provides "the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). The FSIA jurisdictional provisions consist of two parts. First, "[28 U.S.C.] § 1604 bars federal and state courts from exercising jurisdiction when a

foreign state *is* entitled to immunity." *Id.* at 434.  Second, "[28 U.S.C.] § 1330(a) confers

jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a

foreign state is *not* entitled to immunity." *Id.*  Thus, under the FSIA, "a foreign state is

presumptively immune from the jurisdiction of United States courts; unless a specified exception

applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."

*Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. §§ 1605–1605A (enumerating

exceptions to the general rule of foreign sovereign immunity).

Because "subject-matter jurisdiction turns on the existence of an exception to foreign

sovereign immunity," the Court may raise the issue sua sponte.  *Verlinden B.V. v. Cent. Bank of

Nigeria*, 461 U.S. 480, 495 n.20 (1983).  Further, because a foreign sovereign has "immunity

from trial and the attendant burdens of litigation, and not just a defense to liability on the merits,"

*Foremost-McKesson*, 905 F.2d at 443, this Circuit requires a district court "to decide the

predicate issues of jurisdiction and sovereign immunity at its earliest opportunity," *Peterson v.

Islamic Republic of Iran*, 563 F. Supp. 2d 268, 271 n.2 (D.D.C. 2008) (citing *Phoenix

Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000)).  "To defer the

question . . . [would] 'frustrate the significance and benefit of entitlement to immunity from

suit.'"  *Phoenix Consulting*, 216 F.3d at 39 (quoting *Foremost-McKesson*, 905 F.2d at 449).

Although neither plaintiffs nor BOC have raised the issue of sovereign immunity, BOC has

previously been presumed immune when "the Bank was wholly owned and operated by the

People's Republic of China."  *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 985, 991–

1001 (10th Cir. 2007).  Accordingly, and because it is appropriately early in this litigation, the

Court should raise and resolve this issue sua sponte.

## 2. Instrumentalities of Foreign States Are Presumptively Immune.

Other than for purposes of service of process, a "foreign state" entitled to immunity under the FSIA is defined to include any "agency or instrumentality" of that state. 28 U.S.C. § 1603(a). This Circuit "follows a categorical approach when determining whether a foreign governmental entity should be considered 'a foreign state or political subdivision' rather than an 'agency or instrumentality of the nation.'" *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 48 n.10 (D.D.C. 2009) (quoting *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003)). "Under the categorical approach, if the core functions of the entity are governmental, it is considered the foreign state itself." *Id.* If the core functions are commercial, however, then the entity qualifies as an agency or instrumentality of a foreign state. *Id.*

The Court's analysis does not end, however, with this categorical distinction. Upon finding that an entity's core functions are commercial, a district court must also determine whether the entity constitutes an agency or instrumentality as defined by the FSIA. The entity thus must be (1) a separate legal person, corporate or otherwise, from the foreign state; (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b)(1)–(3). Concerning the second criterion, the Supreme Court has held that "a foreign state must itself own a majority of the shares of a corporation if the corporation is to be deemed an instrumentality of the state under the provisions of the FSIA." *Dole Food Co. v Patrickson*, 538 U.S. 468, 480 (2003). Therefore, "a subsidiary of an instrumentality is not itself entitled to instrumentality status," regardless of the degree of control the foreign state exercises

over that subsidiary. *Id.* at 473, 477. Importantly, "instrumentality status is determined at the time of the filing of the complaint." *Id.* at 480.

### 3. BOC Is Not an Instrumentality of China.

Pleadings and papers filed with the Court state that BOC is "the fifth largest commercial bank in the world," BOC's Mot. 14, and that it "does extensive business throughout the United States and holds significant assets in the United States." FAC ¶ 24. BOC's core functions are therefore commercial in nature, and BOC is therefore properly considered an instrumentality of China under the categorical analysis.

Concerning the definitional analysis, BOC satisfies the first and third criteria for classification as an agency or instrumentality of China: BOC is a legal person separate from China and is neither a citizen of this country nor created under the laws of a country other than the United States or China. BOC, *Annual Report 2008*, at 1 (2008), http://pic.bankofchina.com/bocappd/report/200904/P020090430343687728848.pdf (discussing BOC's history, including its incorporation in China). It is less clear, however, that BOC satisfies the second criterion, which limits instrumentality status to those corporations in which a foreign state *directly* owns a majority of shares or other ownership interest at the time the suit was filed. *Dole Food*, 538 U.S. at 478, 480.

At the beginning of 2008, BOC was principally owned by China SAFE Investments Limited ("SAFE"), which held 67.49% of BOC's shares. BOC, *Annual Report 2007*, at 89 (2007), http://www.boc.cn/en/investor/ir3/200812/P020081212710831551281.pdf. By the end of 2008, SAFE had marginally increased its holdings to 67.52%. BOC, *Annual Report 2008*, *supra*, at 77 (2008). It is therefore reasonable to infer that SAFE owned a majority interest in BOC on August 22, 2008, the date on which this action was filed.

SAFE, which stands for "State Administration of Foreign Exchange," is also known by its Chinese name: Central Huijin Investment Company, Ltd. ("Huijin"). Wang Jianxi, Executive Vice President, Chief Risk Officer, China Investment Corp., *Commercial Banking Reform*, *in* China's Emerging Financial Markets 107, 114 (Min et al. eds., 2009). Huijin operates as an investment arm of the Chinese government. *Id.*; BOC, *Annual Report 2008*, *supra*, at 79 ("Huijin makes equity investment in key state-owned financial institutions . . . ."). But Huijin is not directly owned by China; instead, Huijin is a subsidiary of the China Investment Corporation (CIC), China's sovereign wealth fund. CIC, Overview, http://www.china-inv.cn/cicen/about_cic /aboutcic_overview.html (last visited Oct. 20, 2010) ("CIC[] is an investment institution established as a wholly state-owned company . . . . Huijin[] is wholly-owned subsidiary of CIC."); Amadan Int'l, *The Creation of the China Investment Corporation* 6, 16 (2008), http://www.amadaninternational.com/reports/TheCreationoftheChinaInvestmentCorporation.pdf; *see also* Jamil Anderlini, *China Investment Arm Emerges From Shadows*, Fin. Times, Jan. 5, 2008, http://www.ft.com/cms/s/0/fd0b7e6e-bb2f-11dc-9fbc-0000779fd2ac.html; *China's Trillion-Dollar Kitty Is Ready*, Asia Times Online, Oct. 2, 2007, http://www.atimes.com/atimes/ China_Business/IJ02Cb01.html.

Thus, when this action was filed on August 22, 2008, BOC was several corporate entities removed from direct ownership by China. Unfortunately for BOC, a transitive property of ownership does not apply under the FSIA: although China owns CIC, CIC owns Huijian, and Huijian owns BOC, China does not therefore directly own BOC. As an indirect subsidiary of China, BOC is not an instrumentality of China and is not presumed immune under the FSIA. The Court, therefore, is not statutorily barred from exercising subject-matter jurisdiction over claims against BOC.

BOC has not made any arguments in its motion that the Court lacks subject-matter jurisdiction, and the Court finds no other subject-matter jurisdictional issues necessary to address sua sponte.  Accordingly, the Court will now turn to issues of personal jurisdiction.

### C.    Personal Jurisdiction.

BOC argues that the Court lacks personal jurisdiction over it.  Plaintiffs thus have the burden of asserting jurisdictional facts supporting the Court's exercise of personal jurisdiction over BOC.  As discussed below, plaintiffs have satisfied their burden.

### 1.    Plaintiffs Have the Burden of Alleging Jurisdictional Facts.

"When a defendant asserts that the court lacks personal jurisdiction, the burden is on the plaintiff to prove that jurisdiction can be exercised." *Burnett I*, 274 F. Supp. 2d at 97 (citing *Baltierra v. W.V. Bd. of Med.*, 253 F. Supp. 2d 9, 13 (D.D.C. 2003)).  Satisfaction of plaintiffs' burden requires "a *prima facie* showing of jurisdiction, but the burden is 'only a minimal one.'" *Id.* (quoting *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 104 (D.D.C. 2002)); *see* Fed. R. Civ. P. 12(b)(2).  "In order to meet its burden, plaintiffs must allege specific facts on which personal jurisdiction can be based; it cannot rely on conclusory allegations." *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 111 (D.D.C. 2006) (citing *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998)).

When assessing whether a plaintiff has adequately pled jurisdiction over a defendant, "the Court must resolve factual discrepancies in the record in favor of the plaintiff." *Gilmore v. Palestinian Interim Self-Gov't.*, 422 F. Supp. 2d 96, 99 (quoting *Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)) (internal quotation marks omitted).  However, "the Court need not treat all of the plaintiffs' allegations as true." *Estate of Klieman*, 467 F. Supp. 2d at 112.  "Instead, the court 'may [also] receive and weigh affidavits and other relevant matter to

assist in determining the jurisdictional facts.'" *Id.* (quoting *Jung v. Assoc. of Am. Med. Colls.*, 300 F. Supp. 2d 119, 127 (D.D.C. 2004)).

### 2. Plaintiffs Have Met Their Burden.

First, the Court has personal jurisdiction under the ATA, which permits national service of process. Second, BOC has sufficient minimum contacts, both general and specific, with the United States such that requiring its defense of plaintiff's ATA claims in this Court does not offend traditional notions of fair play and substantial justice. Third, as to plaintiffs' claims based on Israeli law, the Court may exercise pendent personal jurisdiction over BOC.

### a. The Court Has Personal Jurisdiction Under the ATA.

The Federal Rules of Civil Procedure provide that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1). The ATA authorizes nationwide service of process to establish personal jurisdiction over a defendant. 18 U.S.C. § 2334(a) (noting that a defendant "may be served in any district where the defendant resides, is found, or has an agent"). "A plaintiff may utilize a statute's nationwide service of process to establish personal jurisdiction . . . if the plaintiff asserts merely a colorable claim under the statute." *Burnett I*, 274 F. Supp. 2d at 97–98 (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 941–42 (11th Cir. 1997); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993)). If a defendant moves for dismissal for failure to state a colorable claim under 18 U.S.C. § 2334(a), that motion "should be granted 'only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of the court, or otherwise devoid of merit as not to involve a federal controversy.'" *Burnett I*, 274 F. Supp. 2d at 98 (quoting *Republic of Panama*, 119 F.3d at 947).

BOC argues that plaintiffs fail to state a colorable ATA claim—that is, that plaintiffs'

ATA claim is not one upon which relief may be granted. BOC's Mot. 13. This argument falls

flat. For the reasons stated below, the Court finds that plaintiffs have stated an ATA claim upon

which relief may be granted. *See* discussion *infra* Part III.E.2.–3. The Court will not belabor

that discussion here. BOC does not argue that it was served not with process within the United

States, and the docket sheet for this case indicates that summons was issued to BOC. *See* Fed. R.

Civ. P. 4. The Court therefore has no reason to doubt that BOC was appropriately served under

§ 2334. Therefore, the Court has jurisdiction over BOC under the ATA.

### b. The Court Has Personal Jurisdiction Under the Fifth Amendment.

Although the Court has personal jurisdiction under the ATA, it still must inquire whether

it has personal jurisdiction under the Due Process Clause of the Fifth Amendment—that is,

whether requiring BOC to defend against ATA claims in this forum comports with traditional

notions of fair play and substantial justice. That inquiry, however, is informed by the national-

service-of-process provision of the ATA; when evaluating BOC's minimum contacts with this

forum, the forum is the entire United States. Based on BOC's contacts with the United States,

both in general and specific to the facts alleged in this case, the Court has personal jurisdiction

over BOC as to plaintiffs' ATA claims.

### i. BOC Must Have Sufficient Minimum Contacts With the United States.

Nationwide service of process does not dispense with the requirement that an exercise of

personal jurisdiction comport with the Due Process Clause of the Fifth Amendment. Due

process requires that a defendant "have certain minimum contacts with . . . [the forum] such that

the maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 320 (1945) (internal quotation marks omitted); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Depending on the sort of contacts a defendant has with a given jurisdiction, a court may exercise either general personal jurisdiction or specific personal jurisdiction over a defendant.  A court has specific personal jurisdiction when a defendant's contacts with the forum derive from the defendant having purposefully directed its activities toward the forum and when the litigation arises out or of relates to those activities.  *Rudzewicz*, 471 U.S. at 472; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).  Conversely, a court has general personal jurisdiction when a defendant has sufficiently minimum contacts with the forum, but where those contacts are unrelated to the litigation.  *Helicopteros*, 466 U.S. at 414 n.9.

"Because the . . . [ATA] provides for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes, assuming that the defendant has been properly served, 'is whether the defendant has had minimum contacts *with the United States*.'"  *Burnett I*, 274 F. Supp. 2d at 95–96 (emphasis added) (quoting *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994)); *see also Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005) (holding that ATA authorization of nationwide service of process permits due process analysis based on party's contacts with the United States as a whole).  It will rarely be the case under the ATA that "a defendant who has minimum contacts with the United States nonetheless will be unduly burdened by the assertion of jurisdiction" such that the "inconvenience rise[s] to a level of constitutional concern."  *Burnett I*, 274 F. Supp. 2d at 96 n.5 (quoting *BCCI Holdings*, 119 F.3d at 947) (internal quotation marks omitted).  "Such instances . . . are highly unusual and . . . require that a defendant make a showing of constitutionally significant inconvenience of litigating in the chosen forum."  *Id.*

(citation omitted) (quoting *BCCI Holdings*, 119 F.3d at 947) (citation omitted) (internal quotation marks omitted).

BOC argues that use of the national-contacts standard is only appropriate to provide "redress to plaintiffs injured by international terrorist organizations which had *no traditional ties to or presence in the United States*." BOC's Mot. 14. Unfortunately for BOC, nothing in the text of interpretative history of the ATA justifies BOC's attempt to distinguish itself from other litigants to which the national-contacts test has been applied. BOC's interpretation is wholly unsupported by the language of the statute, which provides that the national-contacts test applies to "*[a]ny civil action* under section 2333 . . . *against any person*," § 2334(a) (emphasis added), not simply those persons lacking traditional ties to or presence in the United States. In an attempt to convince the Court to read this limitation into the text, BOC cites several cases where the national-contacts test was applied to what BOC calls "shadowy international terrorist organization[s]." BOC's Mot. 14 (citing *Estate of Klieman*, 467 F. Supp. 2d 107; *Biton*, 310 F. Supp. 2d at 172; *Burnett I*, 274 F. Supp. 2d 86; *see Gilmore*, 422 F. Supp. 2d 96; *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9 (D.D.C. 2003) [hereinafter *Burnett II*]). None of these cases, however, support the proposition that a national-contacts test applies *only* to terrorist organizations. The Court, therefore, will not accept BOC's invitation to make a special exception in this case. The national-contacts test applies to BOC.

### ii. BOC Has Sufficient Minimum Contacts With the United States.

Plaintiffs allege that "BOC has branches in California and New York, does extensive business throughout the United States[,] and holds significant assets in the United States." FAC ¶ 24. The complaint further alleges that "BOC executed dozens of dollar wire transfers for the PIJ, totaling several million dollars," a portion of which "were executed by and through BOC's

branches in the United States." *Id.* ¶ 69. None of these assets are held in the District of Columbia, nor does BOC have a branch in D.C. BOC thus argues that its contacts, or lack thereof, with the District of Columbia, are insufficient to establish either general or specific personal jurisdiction under the relevant provisions of the D.C. Code. BOC's Mot. 12–13 (citing D.C. Code §§ 13-422 to 13-423). BOC's focus on a lack of contacts with the District is misplaced; as the Court has concluded above, the proper inquiry is whether BOC has minimum contacts with the United States as a whole. It does.

The alleged jurisdictional fact that BOC does extensive business in the United States through its own branches supports a finding of general personal jurisdiction. Such a finding is supported by *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, a case in which a federal court did *not* find general personal jurisdiction over a foreign bank where the bank merely engaged in a correspondent relationship with banks in the forum. 701 F.2d 889, 891–92 (11th Cir. 1983). Under such relationships, in-forum banks provided financial services to customers of foreign banks. *Id.* Such a relationship provided insufficiently minimum contacts with the forum by the foreign bank in that case. *Id.* In this case, however, BOC does business directly through its own branches, not indirectly through third-party correspondents. BOC's contact with the United States is therefore far more significant. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 819–20 (S.D.N.Y. 2005) [hereinafter *Terrorist Attacks I*] (denying foreign bank's motion to dismiss for lack of personal jurisdiction in part because the bank operated a branch office in the United States).[3] BOC's contacts with the United States thus support the assertion of general personal jurisdiction.

---

[3] The procedural history of the multidistrict litigation under the heading *In re Terrorist Attacks on Sept. 11, 2001* is very complex, including well over one dozen published opinions.

Moreover, the alleged jurisdictional fact that BOC knowingly performed a wire transfer for the PIJ thorough one of its U.S. branches supports a finding of specific personal jurisdiction. "In the absence of any allegations that a bank has ties to a terrorist organization, or that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets," the mere provision of routine banking services that benefitted a terrorist organization "in some general, nondescript manner" will not support a finding of specific personal jurisdiction based on the contacts created by such provision. *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-570 (GBD), 2010 WL 2484411, at *25 (S.D.N.Y. June 17, 2010) [hereinafter *Terrorist Attacks III*]. Where a bank has knowledge that it is funding terrorists, however, contacts created by such funding can support such a finding. *See, e.g.*, *id.* For example, in *Terrorist Attacks III*, the district court concluded that the Dubai Islamic Bank (DIB) "was an intentional, knowing[,] and direct participant in providing money laundering services to al Qaeda, which allowed for direct funding of terrorist attacks" against the United States, which supported the Court's specific personal jurisdiction over the DIB. *Id.* Plaintiffs have pled similar jurisdictional facts in this case: Israeli officials allegedly informed China, which informed BOC, that the transfers were enabling the terrorist activities of the PIJ. FAC ¶ 77; *see* discussion *infra* Part III.E.2.e.i. BOC's contacts with the United States thus support the assertion of specific personal jurisdiction.

---

Courts have been inconsistent in the short citations they have used when referring to the various opinions. Accordingly, this Court will refer to these cases as *Terrorist Attacks I*, *Terrorist Attacks II*, and so on, based on the date on which each opinion was issued, but will only assign numbers to cases cited in this memorandum opinion. The Court will not, in an attempt to maintain a consistent use of a short citation form used in other cases, "skip over" cases not cited in this memorandum opinion, because no such consistency exists. *Cf. infra* note 6 (adopting consistently used short citation forms for a different line of cases).

BOC further argues that it could not reasonably anticipate being subject to suit in the District of Columbia due to its lack of contacts with the District and because the Court has no discernable interest in adjudication of the matter due to the attenuated connection between the subject matter of the suit and the District. BOC's Mot. 15–17. Both of these arguments fail.

With regard to BOC's capacity to foresee suit in the District of Columbia, the Court notes that BOC is a sophisticated international financial institution that plaintiffs allege "has branches in California and New York, does extensive business throughout the United States[,] and holds significant assets in the United States." FAC ¶ 24. As such, it is reasonable to presume that BOC is fully aware of U.S. law concerning financial institutions, including provisions of the ATA criminalizing material support to terrorist organizations. Likewise, BOC should be aware that *any* party subject to a civil claim under § 2333 may be hauled into *any* U.S. District Court, per the provision of nationwide service of process. § 2334(a). Taking plaintiffs' allegations to be true, the Court therefore finds that BOC could have reasonably foreseen that providing Mr. Al-Shurafa and PIJ with financial services would give rise to a civil claim under § 2333 and, by virtue of that claim, that BOC would be subject to litigation in any U.S. district court in this country.

As for this jurisdiction's interest in adjudication of the matter, the Court finds the Circuit's reasoning in *Mwani v. Bin Laden* persuasive. 417 F.3d 1 (D.C. Cir. 2005). In *Mwani*, Kenyan victims and their families brought suit against Osama bin Laden, Al-Qaeda, and the then-named Transitional Islamic State of Afghanistan in relation to the terrorist bombing outside the American embassy in Kenya. *Id.* With regard to Mr. Bin Laden and Al-Qaeda, the district court concluded that personal jurisdiction was inappropriate, in part due to a lack of physical connections between the District of Columbia, the defendants, and the underlying events. *Id.* at

11.  On appeal, however, the Court of Appeals ruled that when personal jurisdiction is based on national contacts under Federal Rule of Civil Procedure 4(k)(2), due process is satisfied so long an actor has "purposefully directed his activities at residents of the forum." *Id.* at 12 (internal quotation marks omitted).

Thus, the Court of Appeals found that Mr. Bin Laden and Al-Qaeda had purposefully directed their activities toward the District of Columbia by orchestrating the bombing of the American embassy in Kenya to kill American and Kenyan employees; attempting to "cause pain and sow terror in the embassy's home country, the United States"; and engaging in an "ongoing conspiracy to attack the United States, with overt acts occurring within [the United States'] borders." *Id.* at 13.  Because plaintiffs' injuries arose from those activities, and those activities were directed generally at residents of the United States, this Circuit concluded that an exercise of personal jurisdiction was proper based on the purposeful direction of the activities toward the District of Columbia as the U.S. capital.  This due-process analysis set forth in *Mwani* is readily applicable to this case.  Like *Mwani*, the exercise of personal jurisdiction is based on the defendant's contacts with the nation as a whole, the claimants and defendant are all nonresidents of the forum, and plaintiffs' injuries were attributable to a terrorist attack on foreign soil.

Plaintiffs further allege that "[a]t all times, BOC had actual knowledge that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks" targeting American interests.  FAC ¶ 77.  Similar to *Mwani*, then, the direction of terrorist activities toward American interests in this case shows that the PIJ "engaged in unabashedly malignant actions directed at [and] felt in this forum." *Mwani*, 417 F.3d at 13 (internal quotation marks omitted).  Just as the Court would have an interest in adjudicating a suit against the PIJ for those malignant actions, so too does it have an interest in the adjudication of a suit against BOC, which

plaintiffs allege has provided material support to the PIJ that "enhanced the PIJ's ability to plan, prepare for and carry out . . . [terrorist] attacks." FAC ¶ 77.

Because PIJ allegedly purposefully directed terrorist activities toward the United States with the allegedly knowing support of BOC through the provision of financial services, it comports with due process to require BOC to defend itself in this Court. Because BOC allegedly does business with and holds assets in the United States, BOC has sufficient minimum contacts with the United States to support the exercise of general personal jurisdiction. Because BOC allegedly performed a transfer of money through one of its branches in the United States as part of the provision of financial services to the PIJ at issue in this case, BOC has sufficient specific minimum contacts to support specific personal jurisdiction. Therefore, the Court has personal jurisdiction over BOC with respect to plaintiffs' ATA claims.

### c. The Court Has Pendent Personal Jurisdiction as to Claims Under Israeli Law.

On deciding a motion for dismissal of claims arising under Israel's Civil Wrongs Ordinance, another court of this District explained:

> [T]he D.C. Circuit has adopted the doctrine of "pendent personal jurisdiction," whereby a court may assert personal jurisdiction over a defendant "with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."

*Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90–91 (D.D.C. 2006) (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 5 (D.C. Cir. 1977))).[4] Requiring claims with respect to

---

[4] The court ultimately avoided the issue of pendent personal jurisdiction in *Sisso* because defendant Hamas was an unincorporated association which could neither sue or be sued in the District of Columbia. 448 F. Supp. 2d at 91.

which the Court will entertain pendent personal jurisdiction to derive from a nucleus of operative fact common with other claims with respect to which the Court has original personal jurisdiction insures against due-process concerns over hauling the defendant into court to defend against the former, because the defendant is already justifiably hauled in to defend against the latter. *See* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.7 (discussing due process concerns implicated by pendent personal jurisdiction); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

The Court has already found personal jurisdiction to be appropriate with regard to plaintiffs' ATA claims. *See* discussion *supra* Part III.C.2.a.–b. Furthermore, plaintiffs' ATA claims and those raised under Israeli law derive from a common nucleus of operative fact: BOC's alleged provision of financial services to the PIJ and the PIJ's subsequent attack giving rise to plaintiffs' injuries. Therefore, the Court has pendent personal jurisdiction over BOC with respect to plaintiffs' claims under Israeli law.

### D.     Venue.

By not raising the issue of improper venue until it filed its reply to plaintiffs' opposition to its motion to dismiss, BOC waived its right to challenge venue as improper. To allow BOC to dispute venue for the first time in its reply would unduly burden plaintiffs by forcing them to respond to the new argument and risk hasty decisionmaking by this Court without full briefing on the issue. Plaintiffs, however, have undercut this concern by volunteering a response in the form of a surreply. Accordingly, the Court considers whether venue is appropriate and concludes that it is, not under the ATA, but as pendent to venue over plaintiffs' main claim brought under the Foreign Sovereign Immunities Act.

### 1.    BOC Waived its Objection to Improper Venue.

Venue is proper under the ATA "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." § 2334(a).  In its reply to plaintiffs' opposition to BOC's motion, BOC argues, for the first time, that this Court is an improper venue for this action because plaintiffs do not reside in this district and because BOC does not reside, was not served, and does not have an agent in this district. BOC's Reply 4–9.  BOC, however, has waived its venue objections.  Fed. R. Civ. P. 12(h)(1).

The *only* mention of the word "venue" in BOC's 45-page motion to dismiss is in a footnote pondering why "[p]laintiffs and their counsel may have chosen this forum."  BOC's Mot. 16 n.6.  BOC posits that it must have been "because of their focus on the defendants who are foreign state and foreign government officials . . . and the venue provision specifying that for a civil action 'brought against a foreign state or political subdivision thereof,' this District is the appropriate venue."  *Id.* (quoting 28 U.S.C. § 1391(f)(4)).  Indeed, that section, along with "the rules of pendent venue," are what plaintiffs plead as the basis for the propriety of venue in this district.  FAC ¶ 4.  But nowhere in its motion does BOC contest the propriety of venue, either under § 2334(a), § 1391(f)(4), or any other theory.  BOC's reply, which devotes several pages to the subject, is the first document in which BOC makes any allegations as to the impropriety of venue.  BOC's Reply 4–9.

"As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply."  *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008); *see, e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (not considering an argument when plaintiffs "raised it for the first time in their reply brief").  Accordingly, by not raising its venue concerns in its original motion, BOC has waived those concerns.

The Court notes, however, that the policy underlying the application of waiver principles to BOC may not fully apply in this case. The Court of Appeals explained in *McBride v. Merrell Dow & Pharm., Inc.* that "[c]onsidering an argument advanced for the first time in a reply brief . . . is not only unfair to" the opposing party, "but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." 800 F.2d 1208, 1211 (D.C. Cir. 1986). That is because the opposing party is not entitled to file a surreply to address new issues raised for the first time in a reply. In this case, however, plaintiffs moved for and were granted leave to file a surreply. Pls.' Mot for Leave to File Br. Surreply, Sept. 29, 2009, ECF No. 53 [hereinafter Pls.' Mot.]; Mem. 2, Oct. 20, 2010, ECF No. 78; Pls.' Surreply. Ironically, by crafting their opposition to BOC's new venue argument as a request for permission to respond to that argument—and then by submitting a response—plaintiffs effectively negated the policy reasons for not allowing consideration of the new argument: the burden of being made to submit a response to it and the concern that the Court will not be fully briefed on it. Accordingly, the Court feels, as plaintiffs say, "constrained . . . to address this new argument." Pls.' Mot. 1.

## 2. Regardless, Venue Is Proper Under the Doctrine of Pendent Venue.

Ordinarily, venue must be established under 28 U.S.C. § 1391, but this general venue statute applies only in the absence of a more specific venue statute. Section 1334(a) is one such more specific statute. Plaintiffs have not adequately pled and cannot adequately plead facts supporting venue under § 1334(a): plaintiffs do not reside in this district and BOC does not reside, was not served, and does not have an agent in this district. "Generally, a plaintiff must 'demonstrate proper venue with respect to each cause of action and each [defendant].'" *Elemary v. Philipp Holzmann, A.G.*, 533 F. Supp. 2d 144, 149 (D.D.C. 2008) (quoting *Lamont v. Haig*,

590 F.2d 1124, 1135 (D.C. Cir. 1978)).  So, says BOC, this Court is not a proper venue.  Under the doctrine of pendent venue, however, it is.

"[W]here venue is proper for some, but not all, claims and where . . . the claims arise out of the same core of operative facts, plaintiffs may rely on the doctrine of 'pendent venue' to cure any venue defect."  *Sisso*, 448 F. Supp. 2d at 82 n.8 (citing *Washington v. Gen. Elec. Corp.*, 686 F. Supp. 361, 362 (D.D.C. 1988)); *see also Elemary*, 533 F. Supp. 2d at 149 ("[W]hen venue lies for some of the plaintiff's claims, the doctrine of pendent venue may allow the court to hear the rest.").  Plaintiffs' core claim is that which they lay out in count one: a claim brought under the FSIA-created federal cause of action against the Islamic Republic of Iran, the Syrian Arab Republic, and several other foreign-state defendants alleging the provision of material support and resources to the PIJ thus facilitating the Tel Aviv bombing.  FAC ¶¶ 93–105; 28 U.S.C. § 1605A(c).  This Court is clearly a proper venue for claims brought against Iran, Syria, and other foreign-state defendants under the FSIA, as the general venue statute specifically provides that civil actions against foreign states "may be brought . . . in the United States District Court for the District of Columbia." § 1391(f)(4).

In *Sisso*, the court applied the pendent venue doctrine to permit a claim under the ATA with venue pendent to claims alleged under the FSIA.  448 F. Supp. 2d at 82 n.8.  This Court will do the same.  Plaintiffs' allegations against BOC arise out of the same core of operative facts as plaintiffs' core claim against foreign-state defendants: the alleged provision of material support and resources to the PIJ, thus facilitating the attack causing plaintiffs' injuries.  As a matter of "judicial economy, convenience, and fairness," then, it makes sense to hear plaintiffs' claims against BOC along with their claims against the foreign-state defendants.  *Beattie v. United States*, 756 F.2d 91, 103, 103 n.80 (D.C. Cir. 1984) (internal quotation marks omitted), *overruled*

*on other grounds*, *Smith v. United States*, 507 U.S. 197 (1993).  Therefore, under the doctrine of pendent venue, this Court is a proper venue.[5]

### E.    Sufficiency of Plaintiffs' Pleadings.

Plaintiffs must plead a short and plain statement showing that they are entitled to relief. That is, plaintiffs must plead facts sufficient to state a claim upon which relief may be granted. Plaintiffs have pled five such claims, all based on BOC's alleged provision of financial services to the PIJ.  First, plaintiffs adequately plead that BOC committed an act of international terrorism for which it is liable under the Antiterrorism Act.  Second, plaintiffs adequately plead that BOC also aided and abetted the commission of an act of international terrorism by the PIJ.  Third, plaintiffs adequately plead that BOC acted negligently under the law of Israel by providing financial services to the PIJ despite knowing its terroristic goals and activities.  Fourth, plaintiffs adequately plead that BOC breached several statutory duties imposed by Israeli penal laws prohibiting the provision of support to terrorist groups.  Finally, plaintiffs adequately plead that BOC is vicariously liable under Israeli law for the terrorist acts of the PIJ.  The Court will therefore deny BOC's motion to dismiss for failure to state a claim.

### 1.    Plaintiffs Must Plead a Short and Plain Statement Showing That They Are Entitled to Relief.

The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it

---

[5] BOC carries its venue argument into the issue of personal jurisdiction, arguing that the venue provision of § 2334(a) is a "condition precedent to the nationwide service of process provision" which governs personal jurisdiction and that because venue is improper, plaintiffs cannot establish personal jurisdiction.  BOC's Reply 5–9.  Plaintiffs disagree.  Pls' Surreply 1–3. Because the Court concludes that this is a proper venue under the doctrine of pendent venue, the Court need not reach this additional argument concerning personal jurisdiction.

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Rule 8 standard is not satisfied where a pleading offers only "labels and conclusions," "a formulaic recitation of the element of a cause of action," or "naked assertion[s] devoid of further factual enhancement." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555, 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (emphasis added). *Twombly*'s facial plausibility standard is satisfied when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). Therefore, based on the factual allegations within the plaintiff's complaint, a court must conclude that it is not merely possible, but also plausible, that the plaintiff is entitled to relief. *Id.* ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–158 (2d Cir. 2007)).

When considering whether dismissal of a complaint is appropriate for failure to state a claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), a court must "assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged," *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 18 (D.C. Cir. 2008) (internal quotations marks omitted). The Court, however, need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the

plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

In briefing the Court on their arguments in favor or against BOC's motion, both plaintiffs and BOC have submitted several declarations concerning issues of both fact and law.  *See* Naschitz Decl., Mar. 1, 2009, ECF No. 15-14; Lijun Decl., Dec. 15, 2008, ECF No. 15-15; Freeman Decl.; Matalon Decl., May 16, 2009, ECF No. 31-1; Porat Decl., May 18, 2009; ECF No. 31-6; Gross Decl., May 24, 2009, ECF No. 31-7; Mann Decl., July 24, 2009, ECF No. 42-1; Naschitz Supp. Decl., July 24, 2009, ECF No. 42-2; Stern Decl., Sept. 29, 2009, ECF No. 79-1. "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  The Court thus excludes all statements made in declarations concerning facts at issue in this case as matters outside the pleadings.  Declarations concerning how Israeli law should be interpreted, however, do not present matters outside the pleadings; instead they inform the Court on matters *within* the pleadings.  Under the authority of Federal Rule of Civil Procedure 44.1, which permits a court to consider "any relevant material or source" when evaluating the application of foreign law, the Court will thus consider these declarations, but only to the extent that plaintiffs' legal experts make declarations as to how Israeli law is interpreted.  To the extent that plaintiffs' legal experts make declarations as to facts outside the pleadings, the Court will ignore them.

Concerning plaintiffs' claims based on Israeli law, "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Fed. R. Civ. P. 12(d).  Plaintiffs have done so.  FAC ¶ 127 ("[P]laintiffs hereby give notice of their intention to rely on the law of the State of Israel.").  Similar to U.S. law, Israeli law is composed

of legislation, regulations, and judicial interpretations thereof.  Ruth Levush, *Israeli Law Guide* (Nov. 24, 2007), http://www.llrx.com/features/israel3.htm; Yoram Shachar, *History and Sources of Israeli Law*, *in* Introduction to the Law of Israel 1, 8 (Amos Shapira & Keres C. DeWitt-Arar eds., 1995).  These interpretations carry precedential value, with Israeli Supreme Court decisions "followed, as a matter of practice and almost without exception, by all courts in Israel, including by the Supreme Court itself."  Shachar, *supra*, at 8–10; *see also* Levush, *supra*.  When evaluating whether plaintiffs have stated claims upon which relief may be granted under Israeli law, the Court will therefore evaluate the text of relevant Israeli law with appropriate deference to Israeli Supreme Court interpretations thereof.

Further, "[i]n determining foreign law, the court may consider any relevant material or source, . . . whether or not submitted by a party."  Fed. R. Civ. P. 44.1.  In addition to caselaw and statutory materials submitted by the parties, the Court will thus consider several third-party sources discussing that caselaw and those materials.  The Court also notes that English translations of Israeli law often use British English, not American English.  The Court's quotations of words with spellings such as "organisation" for "organization" or "defence" for "defense," are, therefore, intentional.  With these standards and considerations in mind, the Court now turns to whether plaintiffs have stated claims upon which relief may be granted.

### 2. Plaintiffs Have Sufficiently Pled Count Two: Primary Liability.

To state a claim of primary liability under the ATA, a plaintiff must plead facts as to all statutory elements of the claim, established through a chain of incorporations, as well as overarching elements of ordinary tort law.  Plaintiffs have done so.

## a.     Primary Liability Under the ATA Requires a Chain of Incorporations.

The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  § 2333(a).

"International terrorism" means activities that

> (A)     involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States . . . ;
> (B)     appear to be intended—
>> (i)     to intimidate or coerce a civilian population;
>> (ii)     to influence the policy of a government by intimidation or coercion; or
>> (iii)     to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C)     occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum . . . .

18 U.S.C. § 2331(1).  Three criminal laws, all part of the ATA, are particularly relevant to civil cases brought under the ATA: 18 U.S.C. §§ 2339A, 2339B, and 2339C.

The first law makes it a federal crime to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various terrorism-related criminal statutes.  § 2339A(a).  "Material support or resources" includes, among other things, "financial services."  § 2339A(b)(1).  Among the referenced terrorism-related criminal statutes are 18 U.S.C. §§ 2332(a), 2332a(a)(1), and 2332f(a)(1), which criminally prohibit, among other things, the extraterritorial killing of a U.S. national, the extraterritorial use of a weapon of mass destruction against a U.S. national, and the extraterritorial bombing of a place of public use, respectively.  These laws make further referential incorporations of, for example, definitions of key terms.  *See, e.g.*, § 2332(a)

(referencing definitions of "murder," "voluntary manslaughter," and "involuntary manslaughter" located elsewhere in title 18).

The second law makes it a crime to "provide[] material support or resources to a foreign terrorist organization" with "knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism." § 2339B(a)(1). The statute also defines several terms by reference to other sections of title 18. *See id.*

Finally, the third law makes it a crime to, among other things,

> by any means, directly or indirectly, unlawfully and willfully provide[] or collect[] funds . . . with the knowledge that such funds are to be used, in full or part, to carry out . . . any . . . act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

§ 2339C(a)(1). As with the other two laws, this law incorporates several definitions by reference to other statutes. *See* § 2339C(e).

The ATA thus compels a "chain of incorporations" from § 2333(a), which references international terrorism, to § 2331(1), which defines international terrorism, to whatever federal criminal laws the violation of which a plaintiff might plead, which are referenced in the definition of international terrorism, and further to whatever additional referential incorporations those criminal laws might make. *Boim III*, 549 F.3d at 691; *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1012–16 (7th Cir. 2002) [hereinafter *Boim I*].[6] Additionally, the ATA requires

---

[6] The *Boim* cases have a complicated procedural history. *Boim I* upheld the district court's denial of a motion to dismiss for failure to state a claim, agreeing that the provision of financial assistance can come within the scope of the ATA. 291 F.3d 1000, *aff'g Boim v. Quaranic Literacy Inst.*, 127 F. Supp. 2d 1002 (N.D. Ill. 2001). The district court then granted summary judgment with respect to some defendants and proceeded to trial on the others. *Boim v.*

allegations of intentional misconduct—in addition to other state-of-mind requirements incorporated in §§ 2339A–2339C—and proximate causation. *Boim III*, 549 F.3d at 691–98; *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004) (citing *Boim I*, 291 F.3d at 1011–12 (interpreting "by reason of" language of § 2333(a) as requiring a showing that defendant's actions proximately caused plaintiffs' injuries)). Courts have thus evaluated claims against those who provided financial services or assistance to terrorist groups under this chain-of-incorporations theory, inquiring whether plaintiffs should be held primarily liable for their own actions: the provision of financial services or assistance. *See, e.g.*, *Boim III*, 549 F.3d 685; *Goldberg*, 660F. Supp. 2d at 426–27; *In re Terrorist Attacks on September 11, 2001*, 462 F. Supp. 2d 561 (S.D.N.Y. 2006) [hereinafter *Terrorist Attacks II*]; *Weiss v. Nat'l Westminster Bank, P.L.C.*, 453 F. Supp. 2d 609, 622–32 (E.D.N.Y. 2006).

BOC does not deny the availability of the chain-of-incorporations theory to plaintiffs; indeed, BOC argues that it is "the only theory available" to plaintiffs under the ATA. BOC's Mot. 19. Instead, BOC criticizes the "labyrinthine route" through which plaintiffs attempt to plead a chain of incorporations, arguing that theirs is "a theory so utterly implausible—indeed irrational—that it falls well short of the *Twombly* standard." *Id.* at 20–22. BOC additionally argues that plaintiffs have failed to adequately plead facts relating to BOC's state of mind to support the elements of knowledge or intent required by the ATA and the other statutes it

---

*Quaranic Literacy Inst.*, 340 F. Supp. 2d 885 (N.D. Ill. 2004). Following a trial in which all defendants were found liable, some defendants appealed, and the Court of Appeals vacated the judgment and remanded the case. *Boim v. Holy Land Found for Relief & Dev.*, 511 F.3d 707 (7th Cir. 2007) [hereinafter *Boim II*]. Plaintiffs then petitioned for a rehearing en banc, which was granted, yielding *Boim III*. 549 F.3d 685. For a fuller explication of this history, see *Boim III*, 549 F.3d at 688.

Also, for an excellent summary of the *Boim* cases as well as other cases involving suits against banks brought under the ATA, see Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 326–39 (2008).

incorporates.  *Id.* at 23–28.  Although BOC does not specifically argue that plaintiffs have failed to adequately plead proximate causation, *see id.* at 19–23, the Court will nonetheless also address this issue, which is implied by BOC's general argument that plaintiffs have failed to adequately state a primary-liability ATA claim.  For the reasons discussed below, the Court disagrees with BOC: plaintiffs have adequately pled links in a plausible chain of incorporations, including those relating to state of mind, and have also adequately pled proximate causation.

### b.    Plaintiffs Adequately Plead Eligibility.

To be eligible for civil relief under the ATA, a plaintiff must either be a U.S. national or an estate, a survivor, or an heir of a U.S. national.  § 2333(a).  A national of the United States is "a citizen of the United States" or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  8 U.S.C. § 1101(a)(22); *see* 18 U.S.C. § 2331(2). Plaintiffs plead that the one estate-plaintiff in this case is the estate of an individual who was a U.S. citizen while living, and further plead that all other survivor-plaintiffs are survivors of a U.S. citizen, and are U.S. citizens themselves.  FAC ¶¶ 3, 5–7.  Plaintiffs have therefore adequately pled their eligibility under § 2333(a).

### c.    Plaintiffs Adequately Plead Injury.

After pleading eligibility, plaintiffs must allege that they suffered some injury to their person, property, or business.  § 2333(a).  Personal injury includes "[a]ny invasion of a personal right, including mental suffering" in addition to physical or financial suffering.  *Black's Law Dictionary* 802 (8th ed. 2004).  Family members of decedents can therefore suffer "mental anguish, emotional pain and suffering, [and] loss of society, companionship, comfort, protection, marital care, attention, advice or counsel."  *Biton*, 310 F. Supp. 2d at 182 (internal quotation marks omitted).

First, plaintiffs plead that Daniel Wultz, the estate of whom is a plaintiff, "was severely injured in the Terrorist Bombing, and died of his injuries on May 14, 2006." FAC ¶¶ 3, 100. Second, plaintiffs plead that Yekutiel Wultz—Daniel's father—"was seriously injured in the Terrorist Bombing but survived," suffering "severe physical, psychological, emotional[,] and other injuries . . . including[] disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship[,] and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and loss of future income." *Id.* ¶¶ 3, 100–01. Finally, plaintiffs plead that Sheryl Wultz, Amanda Wultz, and Abraham Leonard Wultz—Daniel's mother, sister, and brother, respectively—suffered "severe injury, including . . . pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium." *Id.* ¶ 3, 6–7, 100, 102. Plaintiffs have thus adequately alleged injury under the ATA.

### d. Plaintiffs Adequately Plead an Act of International Terrorism.

As part of the chain of incorporations, plaintiffs must allege an act of international terrorism, which, in turn, requires that plaintiffs allege acts dangerous to human life; violations of U.S. criminal law; the appearance of intention to intimidate civilians, influence government policy, or affect government conduct; and transcendence of national boundaries. § 2331(1). Plaintiffs have adequately pled these allegations.

### i. Plaintiffs Adequately Plead Acts Dangerous to Human Life.

After pleading injury, plaintiffs must allege that BOC committed an act of international terrorism, § 2333(a), which must include allegations that BOC's activities were violent acts or acts dangerous to human life, § 2331(1)(A). The first amended complaint alleges that defendant BOC provided "extensive banking services to PIJ," which thereby "enable[d] PIJ to plan, to

49

prepare for and to carry out terrorist attacks," including the attack in this case. FAC ¶¶ 69, 72. The complaint further alleges that the defendant's provision of financial services to Mr. Al-Shurafa and the PIJ was "dangerous to human life, since the PIJ is a violent terrorist organization" the only goal of which is to engage in terroristic violence, including the murder of Israeli and American citizens. *Id.* ¶ 109.

Plaintiffs' pleadings are similar to those made in *Goldberg*, which arose out of a bus bombing allegedly carried out by Hamas. 660 F. Supp. 2d at 416. In that case, the plaintiffs alleged that Hamas, which had been designated a foreign terrorist organization by the State Department, was financed through false charities. *Id.* at 415–16. UBS allegedly maintained an account for one of these charities and transferred money to it and other Hamas-controlled entities. *Id.* The court denied a motion to dismiss by UBS for failure to state a primary-liability claim under § 2333, concluding that the "plaintiffs have sufficiently alleged that defendant UBS committed acts of international terrorism," necessarily including allegations that the provision of financial services constitutes an act dangerous to human life. *Id.* at 427. This Court reaches a similar conclusion: plaintiffs have adequately pled the commission of an act dangerous to human life.

> **ii.      Plaintiffs Adequately Plead Violations of U.S. Criminal Law.**

After pleading acts dangerous to human life, plaintiffs must continue their allegations that BOC committed an act of international terrorism by alleging that BOC violated a criminal law of the United States. § 2331(1)(A). Plaintiffs thus allege that BOC's actions constitute "a violation of . . . the criminal provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which prohibit the provision of material support and resources to terrorist organizations." FAC ¶ 108. Adequately pleading a violation under any single provision would suffice for purposes of the plaintiffs'

primary liability claim, but based on the allegations set forth in the first amended complaint, the Court finds plaintiffs have sufficiently pled BOC's violation of all three applicable laws.

## I. Plaintiffs Adequately Plead Violations of 18 U.S.C. § 2339A.

Section 2339A makes it a crime to "provide[] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of" various terrorism-related criminal statutes. § 2339A(a). Plaintiffs have pled facts satisfying these elements.

First, material support or resources include, among other things, "financial services." § 2339A(b)(1). BOC protests that it merely engaged in the "routine provision of banking facilities," not "acts of international terrorism." BOC's Mot. 22. Material support or resources, however, can include "even the 'provision of basic banking services,'" so long as other elements of § 2339A(a), such as knowledge, are met. *Weiss*, 453 F. Supp 2d at 2006 (citing *Terrorist Attacks I*, 349 F. Supp. 2d at 833, 835) (quoting *Linde v. Arab Bank, P.L.C.*, 384 F. Supp. 2d 571, 588 (E.D.N.Y. 2005)). *Compare Terrorist Attacks I*, 349 F. Supp. 2d at 835 ("Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability."), *with Linde*, 384 F. Supp. 2d at 588 ("Given plaintiff's allegations regarding the knowing and intentional nature of [Arab] Bank's activities there is nothing 'routine' about the services the Bank is alleged to provide."). Plaintiffs have alleged that BOC provided financial services to the PIJ by executing dozens of wire transfers totaling millions of dollars to an agent of the PIJ. FAC ¶ 69. Plaintiffs thus plead facts in satisfaction of this first element of § 2339A, particularly considering facts also pled as to knowledge, which are discussed below.

Second, among the various terrorism-related criminal statutes referenced in § 2339A are 18 U.S.C. §§ 2332(a), 2332a(a)(1), and 2332f(a)(1). The first statute proscribes murder—"the unlawful killing of a human being with malice aforethought." 18 U.S.C. §§ 1111(a), 2332(a)(1). Plaintiffs allege that the PIJ maliciously killed several human beings by meticulously planning for and successfully carrying out the Tel Aviv bombing with the intent to kill civilians in a crowded restaurant. FAC ¶¶ 82. Plaintiffs thus plead facts satisfying the elements of the first statute.

The second statute proscribes, among other things, the use "without lawful authority" of a "weapon of mass destruction . . . against a national of the United States while such national is outside of the United States." § 2332a(a)(1). A weapon of mass destruction is, among other things, "any destructive device," which includes "any explosive," such as a "bomb." 18 U.S.C. §§ 921(a)(4)(A)(i); 2332a(c)(2)(A). Plaintiffs allege that "[t]he PIJ is a radical terrorist organization" that works toward its goal—"the destruction of the State of Israel"—"by carrying out terrorist attacks against Jewish civilians," including the Tel Aviv bombing. FAC ¶¶ 27, 82. Terrorism is fundamentally extra-legal. *See* 8 U.S.C. § 1182(a)(3)(B)(iii) (defining "terrorist activity" to mean, in part, "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State)"). Plaintiffs thus adequately plead that the PIJ lacked lawful authority to engage in its attack. Plaintiffs further plead that the PIJ exploded "a powerful explosive device covered with nails and other metallic projectiles. FAC ¶¶ 84–85. Plaintiffs thus adequately plead the use of a weapon of mass destruction. Plaintiffs also plead the use of the weapon against Daniel Wultz and Yekutiel Wultz, both alleged U.S. nationals, while they

were outside the United States in Tel Aviv, Israel. FAC ¶¶ 1, 3, 5, 87–88. Plaintiffs thus plead facts satisfying the final elements of the second statute.

Finally, the third statute proscribes, among other things, the delivery, placement, discharge, or detonation of "an explosive or other lethal device in, into, or against a place of public use . . . with the intent to cause death or serious bodily injury. § 2332f(a)(1)(A). Plaintiffs plead that an agent of the PIJ carried the aforementioned explosive device to the public—and very crowded—Rosh Ha'ir restaurant and detonated it, intending to kill and maim Jewish civilians. FAC ¶¶ 82–85. Plaintiffs thus plead facts satisfying the elements of the third statute. Because plaintiffs have pled facts as to the elements of §§ 2332(a), 2332a(a)(1), and 2332f(a)(1), plaintiffs have therefore pled facts in satisfaction of the criminal-law-violation element of § 2339A.

Third and finally, liability under § 2339A attaches only when the provider of material support or resources knew or intended that its financial services would be used in preparation for or carrying out violations of the various criminal-law provisions referenced in subsection (a). § 2339A(a). Such provider need not have had the "specific intent to aid or encourage the particular attacks that injured plaintiffs." *Linde*, 384 F. Supp. 2d at 586 n.9. Thus, plaintiffs need only allege that BOC provided financial services knowing or intending that such provision would generally facilitate the terrorist activities of the PIJ. *Id.*; *Estate of Parsons v. Palestinian Auth.*, 2010 WL 2169617 at *2 (D.D.C. 2010); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008). Below, the Court discusses the overarching knowledge requirement imposed by § 2333. *See* discussion *infra* Part III.E.2.e.i. As more fully discussed in that part, Israeli officials

allegedly informed China, which informed BOC, that the transfers were enabling the terrorist

activities of the PIJ. FAC ¶ 77. Plaintiffs have thus adequately pled knowledge under § 2339A.

## II. Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 2339B.

Section 2339B makes it a crime to "provide[] material support or resources to a foreign

terrorist organization" with "knowledge that the organization is a designated terrorist

organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that

the organization has engaged or engages in terrorism." § 2339B(a)(1). The law defines

"material support or resources" by reference to § 2339A, which includes the provision of

financial services. § 2339B(g)(4). The law also defines "terrorist activity" to mean "any activity

which is unlawful under the laws of the place where it is committed (or which, if it had been

committed in the United States, would be unlawful under the laws of the United States or any

State) and which involves," among other things, "the use of any . . . explosive," 8 U.S.C.

§ 1182(a)(3)(B)(iii); § 2339B(a)(1); and, relatedly, defines engagement in terrorist activity to

mean, among other things, "to commit . . . , under circumstances indicating an intention to cause

death or serious bodily injury, a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(I);

§ 2339B(a)(1). Finally, the law defines "terrorism" to mean "premeditated, politically motivated

violence perpetrated against noncombatant targets by subnational groups or clandestine agents."

22 U.S.C.A. § 2656f(2); § 2339B(a)(1).

As discussed above, material support or resources include the provision of financial

services, § 2339A(b)(1), and plaintiffs have adequately pled the provision of such services by

BOC, *see* discussion *supra* Part III.E.2.d.ii.I. Plaintiffs plead that the PIJ is a designated foreign

terrorist organization. FAC ¶ 31. The only remaining issue, therefore, is whether plaintiffs

adequately plead that BOC provided financial services to the PIJ with the requisite state of mind.

Discussing the state-of-mind requirement, the Supreme Court recently stressed that "Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717 (2010). Therefore, by alleging that defendant had knowledge of an organization's connection to terrorism by one of the three means provided at § 2339B(a)(1), a plaintiff can sufficiently plead the state of mind necessary to plead a violation of § 2339B.

Below, the Court discusses the overarching knowledge requirement imposed by § 2333. *See* discussion *infra* Part III.E.2.e.i. As more fully discussed in that part, Israeli officials allegedly informed China, which informed BOC, that the transfers were enabling the terrorist activities of the PIJ. FAC ¶ 77. Plaintiffs thus adequately allege that BOC at least knew that it provided financial services to an organization that had previously engaged in terrorism and terrorist activities.

### III. Plaintiffs Adequately Plead a Violation of 18 U.S.C. § 2339C.

Section 2339C makes it a crime to, among other things,

> unlawfully and willfully provide[] or collect[] funds . . . with the knowledge that such funds are to be used, in full or part, to carry out . . . any . . . act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

§ 2339C(a)(1).

Provision includes "giving, donating, and transmitting" funds, § 2339C(e)(4), and collection includes "raising and receiving" funds, § 2339C(e)(4). Thus, providing financial services to a terrorist organization falls within the scope of § 2339C, to the extent that the financial institution receives and transmits the organization's funds. *See, e.g.*, *Weiss*, 453 F.

Supp. 2d at 628–30 (concluding, after reviewing legislative history, that "maintenance of bank accounts[] and processing of deposits and withdrawals" constitutes provision and collection under § 2339C); *Linde*, 384 F. Supp. 2d at 588 (denying motion to dismiss claims against bank for provision of financial services under § 2339C where bank received funds as deposits and transmitted funds to terrorist organizations).  Plaintiffs plead that BOC transmitted and received funds for the PIJ on several occasions.  FAC ¶ 69.  There is no indication that BOC's provision of financial services was done against its will.  Plaintiffs thus adequately plead the first element of a claim under § 2339C.

Plaintiffs also plead facts concerning the act described in subsection (a)(1), which the statute refers to as a "predicate act."  § 2339C(e)(6).  By allegedly carrying out the Tel Aviv bombing, the PIJ allegedly intended to kill and maim Jewish civilians with the purpose of intimidating those civilians to leave Israel and compelling the Israeli government into acceding to its demands.  FAC ¶¶ 27, 82–85.

Concerning state of mind, § 2339C does not require a showing of specific intent that the defendant acted to further the organization's terrorist activities or that it intended to aid or encourage the particular attack giving rise to a plaintiff's injuries.  *Boim I*, 291 F.3d at 1023–24. Mere knowledge that the funds provided and collected would be used to carry out the predicate act is enough.  *See e.g.*, *Linde*, 384 F. Supp. 2d at 588 (denying motion to dismiss where the plaintiffs alleged that a financial institution knew that funds received as deposits and transmitted to various organizations "were to be used for conducting acts of international terrorism."). Below, the Court discusses below the overarching knowledge requirement imposed by § 2333. *See* discussion *infra* Part III.E.2.e.i.  As more fully discussed in that part, Israeli officials allegedly informed China, which informed BOC, that the transfers were enabling the terrorist

activities of the PIJ. FAC ¶ 77. Plaintiffs have thus adequately pled that BOC knew that its provision and collection of funds would be used to carry out terrorist attacks such as the Tel Aviv bombing. Importantly, it is "not . . . necessary that the funds were actually used to carry out a predicate act." § 2339C(a)(3). BOC's knowledge that they could be, even if they actually were not, is enough.

Regardless of whether plaintiffs have pled facts as to the elements of a claim under § 2339C(a), a court cannot entertain such a claim unless it has jurisdiction as provided by § 2339C(b). Subsection (b) provides different rules for when a court may entertain claims for offenses under subsection (a) depending on whether the offense took place within or outside the United States. If within, a court has jurisdiction where, among other situations, an offense "resulted in the carrying out of a predicate act against . . . a national of another state," § 2339C(b)(1)(E)(i), an offense "resulted in the carrying out of a predicate act committed in an attempt to compel another state or international organization to do . . . any act," § 2339C(b)(1)(F), or an offense "resulted in the carrying out of a predicate act . . . outside the United States," § 2339C(b)(1)(G)(i). If outside, a court has jurisdiction where, among other situations, an offense "resulted in the carrying out of a predicate act against . . . any national of the United States," § 2339C(b)(2)(C)(iii). Plaintiffs allege that BOC engaged in violations of § 2339C both within and outside the United States. FAC ¶ 69 (alleging BOC received and transferred funds "through BOC's branches in the United States" as well as through a branch in Guanzhou, China).

Below, the Court discusses the causation requirement imposed by § 2333. *See* discussion *infra* Part III.E.2.e.ii. As more fully discussed in that part, BOC's provision of financial services, including receipt and transfer of funds, proximately caused plaintiffs' alleged injuries by

facilitating the Tel Aviv bombing. Accordingly, the Court is satisfied that plaintiffs have pled allegations that BOC's alleged offense under § 2339C(a)(1) "resulted in" the bombing, as that term is used in § 2339C(b). As for the rest of the requirements of § 2339C(b), first, plaintiffs plead that the bombing was carried out against, among others, Daniel Wultz and his father, both U.S. citizens, FAC ¶ 3, 5, 87–88, thus satisfying both § 2339C(b)(1)(E)(i) and § 2339C(b)(2)(C)(iii). Second, plaintiffs plead that the purpose of the bombing was to compel the Israeli government to accede to the PIJ's demands, FAC ¶¶ 27, 82–85, thus satisfying § 2339C(b)(1)(F). Third, plaintiffs plead that the bombing took place in Tel Aviv, Israel, outside the United States, FAC ¶ 1, thus satisfying § 2339C(b)(1)(G)(i). Plaintiffs have therefore pled facts supporting jurisdiction under several provisions of § 2339(C)(b).

### iii. Plaintiffs Adequately Plead Appearance of Intention to Intimidate Civilians, Influence Government Policy, or Affect Government Conduct.

After pleading violations of U.S. criminal law, plaintiffs must continue their allegations that BOC committed an act of international terrorism by alleging the appearance of BOC's intention to intimidate civilians, influence government policy, or affect government conduct. § 2331(1)(B). Despite BOC's protestation that such allegations "cross[] the line from implausibility to absurdity," BOC's Mot. 22, the Court concludes that plaintiffs have adequately pled these allegations.

To constitute an act of terrorism, an act dangerous to human life and violative of U.S. criminal law must also "appear to be intended" to do one of three things: "intimidate or coerce a civilian population"; "influence the policy of a government by intimidation or coercion"; or "affect the conduct of a government by mass destruction, assassination, or kidnapping." § 2331(1)(B). At first glance, it does seem remarkable that BOC—an internationally respected

financial institution with branches in this country—would actually intend to facilitate the terroristic murder of American civilians by the PIJ. Unfortunately for BOC, actual subjective intent is not what the ATA is concerned with. Instead, the law requires only that a defendant's acts "*appear* to be intended" to achieve one of the three enumerated items. § 2331(1)(B) (emphasis added); *Boim III*, 549 F.3d at 694 (finding that satisfaction of § 2331(1)(B) is based on "a matter of external appearance rather than subjective intent"). Plaintiffs allege that the objective intent standard is satisfied "by the fact that subsequent to April 2005[,] BOC knowingly continued to carry out the PIJ Transfers after being expressly warned of the consequences of its actions and asked to desist." FAC ¶ 111. Thus, defendant's actions allegedly "created the objective 'external appearance' . . . that BOC shared the PIJ's goals of intimidating and coercing a civilian population and of influencing the policy of a government by intimidation and coercion." *Id.*[7]

Plaintiffs thus adequately allege the objective appearance of intent by BOC. Based on these allegations, the Court easily finds that the plaintiffs have sufficiently pled grounds from which an objective observer could conclude defendant BOC intended to achieve any of the three results set forth under § 2331(1)(B): the attack at issue in this case, by its nature and context, appears to have been intended to intimidate or coerce the Israeli population, to influence the policies of the Israeli government by intimidation and coercion, and to affect the conduct of the

---

[7] The Court notes that plaintiffs additionally plead, "to the extent that § 2331(1)(B) imposes a subjective state-of-mind requirement," allegations to show that BOC *actually* intended to intimidate civilians, influence government policy, or affect government conduct. FAC ¶ 112. Plaintiffs thus allege that China, acting through BOC and "to strengthen its own position and undermine that of the United States," intentionally facilitated terrorist attacks against American interests. *Id.* BOC hotly objects, accusing plaintiffs of "blithely ignoring the fundamental implausibility, even irrationality," of "such scurrilous accusations." BOC's Mot. 22; BOC's Reply 15. Because the Court concludes that the relevant state of mind is objective, not subjective, the Court does not reach these arguments.

Israeli government by mass destruction. Although directly attributable to the PIJ, a reasonable person could easily infer similar intent of BOC by virtue of its having allegedly provided material support to PIJ despite having allegedly been aware of a substantial probability that its support would facilitate the planning, preparation for, and execution of terrorist attacks in Israel. *Cf. Boim III*, 549 F.3d at 708 (noting that mere financial support of a Hamas-affiliated charity *without* reason to impute intent from the charity to the financier did not create the requisite appearance of intent). Plaintiffs have thus adequately pled appearance of intent by BOC to achieve goals similar to those of the PIJ.

### iv. Plaintiffs Adequately Plead Transcendence of National Boundaries.

After pleading appearance of intent, plaintiffs must continue their allegations that BOC committed an act of international terrorism by pleading allegations either that the activities at issue "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." Plaintiffs allege that defendant BOC executed fund transfers "by and through BOC's branches in the United States . . . [to an] account . . . in Guanzhou, China." FAC ¶ 69. Plaintiffs thus plead facts showing that the provision of financial services transcended national boundaries.

### e. Plaintiffs Adequately Plead Ordinary Tort Requirements.

When evaluating primary liability under a federal tort statute, "the ordinary tort requirements relating to fault, state of mind, causation, and foreseeability must be satisfied for the plaintiff to obtain a judgment," even if not specifically enumerated as elements of the statute. *Boim III*, 549 F.3d at 692. When applied to an ATA claim, these traditional elements require

that a plaintiff show intentional misconduct and proximate causation.  *Id.* at 692; *Boim I*, 291

F.3d at 1011–12.  Plaintiffs have adequately pled both.

<strong>i.      Plaintiffs Adequately Plead Intentional Misconduct.</strong>

Because § 2333(a) provides for the automatic trebling of damages, courts require proof of

"intentional misconduct" on the part of the tortfeasor.  *Boim III*, 549 F.3d at 692.  As the Seventh

Circuit has explained, "[w]hen the facts known to a person place him on notice of a risk, he

cannot ignore the facts and plead ignorance of the risk."  *Id.* at 693 (citing *Makor Issues &*

*Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir.2008)).  Thus, proceeding in the same

manner after being notified of a risk will constitute intentional misconduct where the defendant

"knows that the consequences are certain, or substantially certain, to result from his act."  *Id.* at

694 (citing Restatement (Second) of Torts § 8(a), cmt. b.).  If the defendant proceeds with the

action in spite of the risk, "he is treated by the law as if he had in fact desired to produce the

result."  *Id.*

In this case, plaintiffs have pled facts alleging that BOC actually knew it was providing

financial services to an agent of the PIJ, thus risking the use of those funds in the furtherance of

the PIJ's terrorist attacks.  FAC ¶ 77.  Between July 2003 and April 17, 2006, the date of the Tel

Aviv bombing, BOC allegedly performed several wire transfers to and from the account of Said

al-Shurafa, whom plaintiffs allege is an agent of the PIJ.  *Id.* ¶ 69.  By pleading that Mr. Al-

Shurafa is a "senior officer and agent . . . of the PIJ" who acted "[p]ursuant to the PIJ's

instructions," plaintiffs have adequately pled facts alleging that provision of financial services to

Mr. Al-Shurafa constitutes the provision of financial services to the PIJ.  *Id.* ¶¶ 69–70; *see*

Restatement (Third) of Agency § 1.01 (noting that a principal-agent relationship is that where

"the agent shall act on the principal's behalf and subject to the principal's control"); *Nat'l*

*Council of Resistance of Iran v. Dep't of State*, 373 F.3d 157 (D.C. Cir. 2004) ("When one entity so dominates and controls another that they must be considered principal and agent, it is appropriate, under [the ATA], to look past their separate juridical identities and to treat them as aliases.").

BOC stresses that Mr. Al-Shurafa is an individual "who has never been designated as a member of a terrorist organization by any Government agency, and has never appeared on the OFAC list." BOC's Resp. to Pls.' New Auth. 2. BOC thus claims that it had no knowledge that it was effectively providing financial services to the PIJ. *Id.* Plaintiffs, however, allege that, in April 2005, "officials of the counterterrorism division of the Office of the Prime Minister of the State of Israel . . . met with officials of the PRC's Ministry of Public Security and the PRC's central bank . . . regarding the PIJ Transfers." FAC ¶ 77. In this meeting, the Israeli officials allegedly told the Chinese officials that the transfers were being made by the PIJ and the money transferred was being used to fund terror. *Id.* Israel allegedly demanded that China stop the BOC from providing further services to Mr. Al-Shurafa, but that China demurred. *Id.*

Plaintiffs further allege that "the PRC officials notified the BOC of the Israeli officials' statements that the PIJ Transfers were being made by the PIJ for the purpose of carrying out terrorist attacks and that the PIJ Transfers enhanced the PIJ's ability to plan, prepare for[,] and carry out such attacks," and that "the PRC officials also notified BOC of the Israeli officials' demand the BOC halt the PIJ Transfers, but the BOC (with the approval of the PRC) ignored this demand and continued to carry out further PIJ Transfers." *Id.* The Court must assume the truth of this allegation, which is plausible because it is reasonable to assume that, although BOC is not directly owned by China, *see* discussion *supra* Part III.B.3., China does exert a measure of control over the BOC through China's central bank, the People's Bank of China (PBC), PBC,

About PBC, http://www.pbc.gov.cn/publish/english/952/index.html (last visited Oct. 20, 2010) ("[T]he PBC function[s] as a central bank."). Such an assumption is buttressed by BOC's proclamation that is its "one of China's largest *state-controlled* commercial banks." BOC, *Annual Report 2008*, *supra*, at 1 (emphasis added). Thus, BOC's argument that plaintiffs have not adequately alleged knowledge by BOC itself, rather than China, *see* BOC's Mot. 26, is unpersuasive.

The Court must take plaintiffs' allegations to be true, and when doing so, plaintiffs' claim is facially plausible: if Israeli officials did inform China of the consequences of the provision of financial services to Mr. Al-Shurafa by BOC, China told BOC, and BOC continued to provide those services, plaintiffs make a valid claim under § 2333(a). *See e.g.*, *Goldberg*, 660 F. Supp. 2d at 432–33 (holding that ATA liability extends to where the recipient of material support was not formally designated as a foreign terrorist organization but the alleged violator either had knowledge that the ultimate beneficiary was such an organization or that the direct recipient was acting as an agent of the foreign terrorist organization); *Strauss v. Credit Lyonnais, S.A.*, No. 06-cv-702, 2006 WL 2862704, at *11 (E.D.N.Y. Oct. 5, 2006) (holding that allegations concerning the provision of financial services to charitable branches of a foreign terrorist organization could serve as a basis for liability under § 2333 where it was also alleged that the charitable branches acted as agents of such organization). This conclusion is buttressed by comparison to similar cases cited by BOC involving financial institutions. In the first case, the plaintiffs in *Stutts v. De Dietrich Group* alleged that several banks, acting as domestic correspondents for foreign banks, issued letters of credit that were used to fund the purchase of goods and services facilitating the chemical weapons program of Saddam Hussein. No. 03-cv-4058 (ILG), 2006 WL 1867060, at *1 (E.D.N.Y. June 30, 2006). The plaintiffs argued that the banks had or should have had

knowledge that they were funding terrorism because they would have had to review the letters of credit before issuing them. *Id.* at *2. The court found that this speculative allegation was insufficient under *Twombly*. *Id.* In the second case, *Terrorist Attacks I*, the court dismissed claims against banks where "[p]laintiffs offered no factual allegations" supporting the banks' alleged knowledge. 349 F. Supp. 2d at 831–34. Plaintiffs in this case, on the other hand, offer specific and plausible allegations as to how BOC had the knowledge alleged.[8]

BOC's alleged knowledge is all the more significant when compared with the sort of knowledge alleged in *Boim III*. In that case, the court faced the difficulty of evaluating the provision of financial assistance to a terrorist organization that also engages in peaceable pursuits. 549 F.3d at 698 ("Hamas is . . . engaged not only in terrorism but also in providing health, educational, and other social welfare services."). In this case, the Court faces no such difficulty: "the PIJ offers no social services"; it engages solely in terroristic violence. Fletcher, *supra*. Therefore, once BOC allegedly knew that it was providing financial services to the PIJ and continued to do so, BOC engaged in the sort of intentional misconduct prohibited by § 2333(a).

In addition to arguing that plaintiffs' allegations of BOC's knowledge are simply too implausible, BOC argues that the act-of-state doctrine prohibits the Court from considering allegations that China had been informed by Israel of the nature of the wire transfers. BOC's Mot. 25–26. This argument widely misses its mark. As the D.C. Circuit has explained:

> The act-of-state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed

---

[8] BOC alerts the Court to its public denial that that the alleged meeting between Israeli and Chinese officials ever took place. BOC's Mot. 25 n.9 (citing James T. Areddy, *Israeli Victims of Terror File Suit Against Bank of China*, Wall St. J., Aug. 28, 2008, at A5). The Court must nonetheless assume plaintiffs' allegations to be true.

within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398,
401 (1964). It is applicable when "the relief sought or the defense interposed
would [require] a court in the United States to declare invalid the official act of a
foreign sovereign performed within" its boundaries. *W.S. Kirkpatrick & Co., Inc.*
*v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990).

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).[9]

Plaintiffs do not ask the Court to inquire into the validity of any public act of China. They do

not, for example, ask the Court to say that China's alleged refusal to stop BOC was illegal under

Chinese law. They merely plead that China did, as a matter of fact, know that BOC was funding

the PIJ, a fact which invites the Court to say nothing about the validity of any act of China. *See,*

*e.g.*, *W.S. Kirkpatrick*, 493 U.S. at 406 (citing *Sharon v. Time, Inc.*, 599 F. Supp. 538, 546

(S.D.N.Y. 1984) ("The issue in this litigation is not whether [the alleged] acts are valid, but

whether they occurred.")).

Additionally, plaintiffs do not limit their allegations of BOC's knowledge to only the

time period after the April 2005 meeting. "Even prior to the Israeli officials' demand to halt the

PIJ Transfers, BOC knew and/or should have known that the PIJ Transfers were being made for

illegal purposes," based on several alleged attributes of the transfers that "are universally

recognized by all professional bankers, including BOC and its employees, as typical indicia of

transactions made for illegal purposes." FAC ¶¶ 78–79. For example, the transfers were made

in cash in large, round numbers, with no apparent legitimate business purpose. *Id.* ¶ 78. These

attributes allegedly put BOC on notice, based on its duty under the rules of the international

Financial Action Task Force and U.S. banking laws to "monitor, report[,] and refuse to execute

---

[9] Although related to the political-question doctrine insofar as the act-of-state doctrine
grows out of separation-of-powers concerns, the act-of-state doctrine "provides foreign states
with a substantive defense on the merits," rather than a defense to justiciability. *Republic of*
*Austria v. Altmann*, 541 U.S. 677, 700 (2004). Hence the Court's treatment of this argument
here.

suspicions and/or irregular banking transactions."  *Id.* ¶ 80–81.[10]  BOC takes issue with these

allegations of constructive knowledge and what should have been known, correctly arguing that

a civil action under § 2333(a) requires actual knowledge per the requirement of intentional

misconduct.  BOC's Mot. 27–28 (quoting *Boim III*, 549 F.3d at 693).  As the Seventh Circuit has

pointed out, "it would not be enough to impose liability . . . for violating [§] 2333 . . . that the

average person or a reasonable person would realize that the organization he was supporting was

a terrorist organization, if the actual defendant did not realize it.  That would just be negligence."

*Boim III*, 549 F.3d at 693.  Plaintiffs, however, do not intend or rely upon these allegations to

support their claim under the ATA; they are pled for the sake of plaintiffs' claims under Israeli

law.  Pls.' Opp'n 19.  Accordingly, the Court does not examine whether these allegations support

plaintiffs' ATA claim.

### ii.  Plaintiffs Adequately Plead Proximate Causation.

To satisfy the ordinary tort requirement of causation and foreseeability, as well as the

textual requirement that injury be suffered "by reason of" an act of international terrorism,

plaintiffs must plead that an alleged act of international terrorism proximately caused their

injury.  § 2333(a); *Boim III*, 549 F.3d at 691–98; *Biton*, 310 F. Supp. 2d at 182 (citing *Boim I*,

291 F.3d at 1011–12 (interpreting "by reason of" language of § 2333(a) as requiring showing

that defendant's actions proximately caused plaintiffs' injuries)).  "Foreseeability is the

---

[10] "The Financial Action Task Force (FATF) is an inter-governmental body whose purpose is the development and promotion of policies, both at national and international levels, to combat money laundering and terrorist financing."  FATF, About the FATF, http://www.fatf-gafi.org/pages/0,3417,en_32250379_32236836_1_1_1_1,00.html (last visited Oct. 20, 2010).
   Among the relevant U.S. banking laws that may apply is § 2339B(a)(2), which requires that financial institutions, if and when an institution realizes it has terrorist funds, to hold such funds and report them to the U.S. Department of the Treasury.  Failure to do so, however, is not civilly actionable under § 2333(a).  *Linde v. Arab Bank, P.L.C.*, 353 F. Supp. 2d 327, 331 (E.D.N.Y. 2004).

cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions." *Biton*, 310 F. Supp. 2d at 182.

BOC could have reasonably anticipated plaintiffs' injuries, assuming plaintiffs' allegations to be true. BOC allegedly knew that it was providing financial services to an agent of the PIJ, and that the PIJ would use those funds for the sole purpose of engaging in terroristic violence against Jewish civilians in Israel. *See* discussion *supra* Part III.E.2.e.i. In light of these allegations, and as the Court discussed more fully above when considering causation with respect to standing, *see* discussion *supra* Part III.A.1.b., plaintiffs have adequately pled facts alleging BOC's proximate causation of plaintiffs' injuries. *See Weiss*, 453 F. Supp. 2d at 632 (concluding that plaintiffs pled proximate cause where they alleged that bank provided financial services to terrorists before terrorist attack).

### f.     Conclusions Concerning Count Two.

Plaintiffs have pled facts supporting the long chain of incorporations necessary under the ATA, alleging that they are eligible as the estate of and survivors of a U.S. citizen; that they suffered physical, emotional, and financial injuries; that BOC's provision of financial services to an agent of the PIJ was dangerous to human life; that BOC provided financial services to the PIJ knowing that funds transferred would be used to prepare for and carry out the murder of U.S. citizens abroad, the use of a weapon of mass destruction against a U.S. citizen abroad, and the detonation of an explosive device with the intent to kill and injure civilians; that BOC provided financial services to the PIJ knowing that it was a designated terrorist organization that has engaged in terrorist activity and terrorism; that BOC willfully conducted wire transfers knowing that funds transferred would be used to carry out acts intended to kill and injure for the purpose

of intimidating Jewish civilians and compelling Israel to accede to the PIJ's demands; that by doing so, BOC appeared to have the intent to intimidate civilians, influence government policy, or affect government conduct; that BOC's provision of financial services transcended national boundaries; that BOC acted knowingly and thus engaged in intentional misconduct; and that BOC's acts proximately caused plaintiffs' injuries. Plaintiffs have therefore pled facts sufficient to establish a claim of primary liability under the ATA upon which relief may be granted.

### 3. Plaintiffs Have Sufficiently Pled Count Three: Secondary Liability.

The Court must determine whether secondary liability for aiding and abetting the commission of acts of international terrorism by others is actionable under the ATA—an issue on which this Circuit has not ruled. BOC argues that is it not, but following a review of competing caselaw—circuits are split on the issue—and the legislative structure and history of the ATA, the Court concludes that plaintiffs may plead and have pled secondary liability.

### a. Secondary Liability Exists Under the ATA.

In addition to their primary-liability claim, plaintiffs allege that BOC aided and abetted the commission of an act of international terrorism—the Tel Aviv bombing—by the PIJ. FAC ¶¶ 116–25. In other words, under this theory, BOC should allegedly be held liable not because its provision of financial services itself was an act of international terrorism, but rather because it furthered the PIJ's terrorist act. BOC argues that liability for aiding and abetting another's commission of an act of international terrorism is not actionable under the ATA because the ATA does not specifically provide for a cause of action against secondary actors. BOC's Mot. 28–29; BOC's Reply 19. The Court disagrees.

As an initial matter, the Court is generally hesitant to imply secondary aiding-and-abetting liability under the ATA in light of the Supreme Court's ruling in *Cent. Bank v. 1st*

*Interstate Bank of Denver*, 511 U.S. 164 (1994). In *Cent. Bank*, the Supreme Court refused to recognize the availability of implied private rights of action for aiding-and-abetting liability under § 10(b) of the Securities Exchange Act of 1934. *Id.* at 164. The Court based its ruling on the lack of an express private cause of action under § 10(b), *id.* at 173; analysis of express private causes of action in the federal securities law, none of which imposed liability on aiders and abettors, *id.* at 178–79; and the lack of evidence that Congress had intended to provide for aiding and abetting liability under § 10(b), *id.* at 183–84.

"Congress has not enacted a general civil aiding and abetting statute. . . . Congress instead has taken a statute-by-statute approach . . . ." *Id.* at 182. *Cent. Bank* thus stands for the proposition that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* (citing *Elec. Lab. Supply Co. v. Cullen*, 977 F.2d 798, 805–806 (3d Cir. 1992)). However, this is only a presumption, and the Court held that the availability of a claim should ultimately be guided by "whether aiding and abetting is covered by the statute." *Id.* at 177. In this case, the presumption is overcome because Congress expressly created a private right of action under the ATA, Congress intended to incorporate common principles of tort law, and to refuse to recognize aiding-and-abetting liability would stymie Congress's intent. *See generally Boim I*, 291 F.3d at 1019–21; Brief for the United States as Amicus Curiae Supporting Affirmance, *Boim v. Quranic Literacy Inst.*, Nos. 01-cv-1969, 01-cv-1970, 2001 WL 34108081 (7th Cir. Nov. 14, 2001) [hereinafter U.S. Amicus Br.].

First, § 2333(a) provides an express private civil cause of action, whereas § 10(b) does not. *Boim I*, 291 F.3d at 1019. Thus, a cause of action for primarily liability under § 10(b) had

already been read into the securities laws, counseling against a further reading-in of secondary liability. *Id.* Because Congress has already expressly provided for a private cause of action under the ATA, the Court does not face a similar problem here. *Id.*

Second, Congress intended to incorporate general principles of tort law, including secondary liability, into the cause of action under the ATA. The statute provides in relevant part:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). "This text contains all of the elements of a traditional tort: breach of a legal duty (*i.e.*, commission of an act of 'international terrorism'); personal or economic injury; and an appropriate causal connection between the breach and the injury." U.S. Amicus Br., *supra*, at 9–10. Furthermore, the language of § 2333 does not impose any limitation on the class of defendants who might be held liable. "Any such restrictions therefore must arise, if at all, from background tort principles that Congress presumably intended to incorporate." *Id.* (citing *Molzof v. United States*, 502 U.S. 301, 305–07 (1992) (holding that the meaning of statutory language should be determined by background common-law principles against which Congress legislates)). The text of the statute thus invites inclusion of ordinary tort-law principles, which include secondary liability. *See generally* Restatement (Second) of Torts § 876.

Additionally, by defining international terrorism to include activities "that are a violation of the criminal law of the United States . . . or that would be a criminal violation if committed within the jurisdiction of the United States," § 2331(1)(A), Congress intended "to make civil liability at least as extensive as criminal liability," *Boim I*, 291 F.3d at 1020. That criminal law includes 18 U.S.C. § 2, "which creates liability for aiding and abetting violations of any other criminal provisions." *Id.*

The legislative history of § 2333 further supports the conclusion that the ATA permits a claim for secondary liability. For example, at a hearing on the bill that would become the ATA held by the Subcommittee on Courts and Administrative Practice of the Committee on the Judiciary of the U.S. Senate, a "former high-level Department of Justice attorney" testifying in favor of the ATA stated that the law would "bring all of the substantive law of the American tort law system" into play, including liability for aiding and abetting by "those who knowingly or negligently make it possible for some actor grievously to injure somebody else." *Antiterrorism Act of 1990: Hearing Before the Subcomm. on Courts & Admin. Practice of the Comm. on the Judiciary, U.S. Senate, 101st Cong., 2d Sess., on S. 2465*, 101st Cong. 136 (1990) (statement of Joseph A. Morris, Gen. Counsel, U.S. Info. Agency); U.S. Amicus Br., *supra*, at 13. After the bill was reported out of committee and introduced to the full Senate, Senator Charles Grassley explained that the bill "empowers victims with *all* the weapons available in civil litigation" and "accords victims of terrorism the remedies of American tort law," presumably including causes of action for secondary liability. 137 Cong. Rec. S4511 (daily ed. Apr. 16, 1991) (emphasis added). Congress has thus made clear its intent to permit claims for secondary liability under the ATA. Failure to honor that intent would "thwart[] Congress'[s] clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence." *Boim I*, 291 F.3d at 1020 (citing S. Rep. No. 102-342, at 22 (1992) ("[T]he imposition of liability at any point along the causal chain of terrorism . . . would interrupt, or at least imperil, the flow of money.")).

Several courts in addition to *Boim I* have extended liability to secondary actors under the ATA. *See, e.g.*, *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig.*, 690 F. Supp. 2d 1296, 1309–10 (S.D. Fla. 2010) (holding that plaintiffs had stated a claim

for primary liability, civil aiding-and-abetting liability, and conspiracy liability under the ATA); *Linde*, 384 F. Supp. 2d at 583 (holding that aiding-and-abetting liability and civil-conspiracy liability are available under the ATA); *Stutts*, 2006 WL 1867060, at *3 (discussing with approval the theory of secondary liability under the ATA but dismissing claim for insufficient allegations of causation); *Strauss*, 2006 WL 2862704, at *9 (discussing with approval the theory of secondary liability under the ATA but dismissing claim for insufficient allegations of knowledge); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1330 (D. Utah 2006) (holding that civil liability under the ATA extends to aiders and abettors who provide money to terrorists). Finally, in *Burnett I*, an opinion authored by another court of this District, the Court allowed allowed an aiding-and-abetting claim to proceed against alleged financiers of the September 11 attacks. 274 F. Supp. 2d at 105–07. Apparently the only case in this Circuit to have considered the issue, *Burnett I* approved of the Seventh Circuit's reasoning in *Boim I*. *Id.* (citing *Boim I*, 291 F. 3d at 1003, 1011–12). The Court is thus strongly persuaded that secondary liability exists under the ATA.

Only one court has come to the opposite conclusion. In *Boim III*, the Seventh Circuit concluded en banc that "statutory silence on the subject of secondary liability means there is none," and that because § 2333(a) "authorizes awards of damages to private parties but does not mention aiders and abettors or other secondary actors," a cause of action for secondary liability does not exist under the ATA. 549 F.3d at 689. In so concluding, the Court of Appeals implicitly overruled its previous finding in *Boim I*.

Although courts should presume that Congress does not create a cause of action for aiding and abetting unless it specifically says so in the text, such is still only a presumption, rebuttable where evidence strongly suggests that Congress did mean to allow secondary liability.

In this case, based on the structure of the ATA, the legislative history, and the persuasive authority of every court to have considered the question aside from *Boim III*, plaintiffs have convinced the Court to rebut the presumption.

### b. Plaintiffs Adequately Plead a Claim for Secondary Liability.

To make a claim for aiding-and-abetting liability, a plaintiff must plead facts showing the following:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), *cited in In re Chiquita*, 690 F. Supp. 2d at 1310 (quoting Restatement (Second) of Torts § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.")).

BOC has only argued that secondary liability simply does not exist under the ATA; it has not alternatively argued that plaintiffs have failed to plead any of the necessary particulars of such a claim. *See* BOC's Mot. 28–29; BOC's Reply 19–20. Accordingly, the Court has no reason to question whether plaintiffs have adequately so pled. The Court, therefore, will not belabor another analysis of the chain of incorporations. Suffice it to say that, as discussed in detail above, plaintiffs have pled facts showing that the party that BOC allegedly aided—the PIJ—performed a wrongful act causing injury—the Tel Aviv bombing, *see* discussion *supra* Part III.E.2.c.–d.—and that BOC, aware of its role, knowingly assisted the PIJ, *see* discussion *supra* Part III.E.2.e.i. Plaintiffs have therefore adequately pled facts supporting allegations of

secondary liability.  Plaintiffs have not failed to state a claim for secondary liability under the

ATA upon which relief may be granted.

### 4. Plaintiffs Have Sufficiently Pled Count Four: Negligence.

A defendant is liable for negligence under Israeli law when the defendant has a duty to

another and breaches that duty, causing injury to the other.  Plaintiffs have adequately pled that

BOC was under a duty to refrain from providing financial services to known terrorists, that BOC

beached that duty, and that BOC's breach caused plaintiffs to suffer serious physical, emotional,

and financial injuries.  The Court will therefore deny BOC's motion to dismiss for failure to state

a negligence claim.

### a. Liability for Negligence Requires Duty, Breach, Injury, and Causation.

Under Israeli law, the civil tort of negligence is codified in the new version of the Civil

Wrongs Ordinance (CWO), which provides in relevant part:

> When a person does some act which in the circumstances a reasonable prudent
> person would not do, or fails to do some act which in the circumstances such a
> person would do, . . . then such act or failure constitutes carelessness and a
> person's carelessness as aforesaid in relation to another person to whom he owes
> a duty in the circumstances not to act as he did constitutes negligence.  Any
> person who causes damage to any person by his negligence commits a civil
> wrong.

Civil Wrongs Ordinance (New Version) § 35, 2 LSI (New Version) 14–15 (1972), *filed as*

Naschitz Decl. Ex. A, ECF No. 15-14.  Israeli law thus imposes liability for negligence in a

manner roughly similar to American tort law: liability attaches where one has a duty to another

and breaches that duty, causing injury to the other.  *Compare id. with* Restatement (Second) of

Torts § 281 (outlining elements of a cause of action for negligence under American law).

### b.        Plaintiffs Adequately Plead Duty.

Duty, which Israeli courts divide into duty in fact and notional duty, depends on foreseeability.  Plaintiffs have pled facts alleging factual duty—that BOC could have foreseen that its acts would result in plaintiffs' injury—and facts alleging notional duty—that, consistent with judicial policy considerations, BOC ought to have foreseen that its acts would result in plaintiffs' injury.  Plaintiffs have, therefore, adequately pled duty.

### i.        Duties Arise When Injury Is Foreseeable.

The CWO elaborates on the element of duty, providing that "every person owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act," constituting negligence under § 35.  Civil Wrongs Ordinance (New Version) § 36, 2 LSI (New Version) 15 (1972).  *See generally* Ariel Porat, *Tort law*, *in* Introduction to the Law of Israel 127, 128–32 (Amos Shapira & Keres C. DeWitt-Arar eds., 1995).  The Israeli Supreme Court has further elaborated on the element of duty, holding that it consists of two parts: "duty in fact" and "notional duty."  CA 145/80 *Vaknin v. Beit Shemesh Local Council* 37(1) PD 113, 122 [1982], *translated in and filed as* Loughlin Decl. Ex. 8, ECF No. 15-9.  The answer to both whether a person is under a duty in fact and whether a person is under a notional duty "is in the foreseeability test."  *Vaknin*, 37(1) PD at 122.  The Israeli formulation of negligence thus differs slightly from the American formulation: the question of foreseeability, which is asked only when considering legal causation in the American formulation, is asked when considering duty as well as legal causation in the Israeli formulation.  *Compare id. with* 57A Am. Jur. 2d *Negligence* § 469 ("[American] courts commonly make foreseeability of injury or harm an element or test of proximate cause for negligence.").

The question of duty in fact, also called a "concrete duty," "is technical in nature," inquiring "whether a reasonable person *could* have foreseen, under the particular circumstances of the case, the occurrence of the damage." *Vaknin*, 37(1) PD at 125–26 (emphasis added). This question "takes into account the special facts of the circumstance." *Id.* at 125. A concrete duty arises when "a reasonable person could have foreseen, under the particular circumstances of the case, the occurrence of the damage." *Id.* at 126. However, even where a court finds that the defendant owed the plaintiff a concrete duty of care, it "has been held, as a matter of legal policy, that the concrete duty of care does not crystallize" with respect to the "natural and ordinary risks of common human activity." *Id.* To the extent that a risk is "natural and ordinary"—that is, taken into account by normal society when engaged in a particular action—there will be no liability under the tort of negligence. "[T]he question is not whether the plaintiff accepted the risk, but rather whether, as a matter of legal policy, a concrete duty of care should be imposed upon the tortfeasor for such risk. . . . There are reasonable risks that must be recognized and lived with on a daily basis." *Id.*

Unlike duty in fact, the question of notional duty "is normative in nature," inquiring "whether, as a matter of policy, a reasonable person *ought* to have foreseen the occurrence of the particular damage." *Id.* at 125–26 (emphasis added). This question is "disconnected from the concrete facts of the specific event." *Id.* at 125. Although there is a presumption "that where damage can be technically foreseen, there is a notional duty of care," *id.* at 123, the existence of a notional duty "is never derived automatically from a finding of technical foreseeability," CA 915/91 *State of Israel v. Levy* 48(3) PD 45, 65–66 [1994], *translated in and filed as* Loughlin Decl. Ex. 9, ECF No. 15-10. Rather, the presumption of notional duty can be "negated when there are reasons to do so as a matter of legal policy." *Id.* (internal quotation marks omitted).

Such reasons may be split into two categories: "the 'neighborhood' principle" and general principles of fairness and justice.  *Id.*

The neighborhood principle "negates the existence of a duty of care when the parties are 'remote' from one another."  *Id.*  Among the factors a court must consider when determining remoteness are whether the act is one of omission, whether the plaintiff's loss is directly attributable to some third-party act, and whether the plaintiff's loss is purely economic.  *Levy*, 48(3) PD at 67.  When even one such factor is present, "and especially if they appear cumulatively[,] the existence of neighborhood may not be derived from the existence of [technical] foreseeability."  The Israeli Supreme Court has made clear, however, that the presence of these factors "does not mean that . . . a duty of care will never be found."  *Id.* Rather, a court must "conduct a more precise study of the existence of neighborhood between the parties," which, though no longer presumptively derived from technical foreseeability, may still be found to exist.  *Id.*  For example, despite a finding of one or more of the aforementioned factors, neighborhood may be found to exist "where the risk to the injured party increased as a result of the conduct of the defendant."  *Id.* at 68.

Concerning general principles of fairness and justice, relevant legal policy considerations made by courts include

> the freedom of activity of potential defendants; the protection of both the personal integrity and the property of potential plaintiffs; the financial burden that would be imposed upon potential defendants if a duty of care were to be imposed; the possible influence of the court's decision on social behaviour; the extent to which the risk that resulted in the damage was unusual and unreasonable; the relative ability of the parties to spread the losses; the fear of burdening the courts with excessive litigation; and the fear of groundless or fraudulent claims.

*Porat*, *supra*, at 130; *see also Vaknin*, 37(1) PD at 123.  Notional duty exists only when, upon consideration of these factors, a court concludes that imposition of the duty would be "fair, just, and reasonable."  *Levy*, 48(3) PD at 65–66.

### ii. Plaintiffs Have Adequately Pled That BOC Was Under a Duty.

Concerning duty in fact, the technical inquiry into whether a defendant *could* have foreseen that his acts would lead to a plaintiff's injury, plaintiffs have pled that BOC provided financial services to the PIJ with full knowledge that those transfers would be used to fund terrorist attacks against people such as Daniel and his father.  FAC ¶¶ 77, 118; *see* discussion *supra* Part III.E.2.e.i.  Plaintiffs have therefore adequately pled that, as a matter of fact, BOC not only could have, but did, foresee the injurious result of its provision of financial services to the PIJ.

Concerning notional duty, the normative inquiry into whether a defendant *should* have foreseen that his acts would lead to a plaintiff's injury, BOC argues that Israeli negligence jurisprudence involving banks shows that any notional duty presumed from duty in fact would be negated.  BOC's Mot. 35–36.  In other words, no matter what plaintiffs may plead, their claim will not be one upon which relief can be granted, because notional duty will necessarily be negated.  The Court disagrees; because there is no Israeli caselaw directly on point, the Court will not extrapolate a general rule of Israeli negligence jurisprudence that banks will never be placed under a notional duty in a case with facts such as the ones pled here.

According to Prof. Naschitz, a duty attaches to banks under a theory of negligence in "cases where there is a direct relationship between the bank's functions and property interest." Naschitz Supp. Decl. ¶ 7.  Usually, such relationships exist directly between a bank and its

customers, but it can involve third parties "who rely on the proper conduct of a bank's operations or whose financial interests may be directly affected by the bank's conduct." Naschitz Decl. ¶ 9.

For example, in *Ayalon Ins. Co. v. Estate of Oppalger*, an heir to and executor of an estate embezzled funds of a decedent to his personal account. CA 8068/01 *Ayalon Ins. Co. v. Estate of Oppalger* 59(2) PD 349, 357 [2004], *translated in and filed as* Loughlin Decl. Ex. 11, ECF No. 15-12. The executor told the bank the transfers were necessary to distribute funds to the heirs, despite the fact that "at that time, it was not possible to distribute the funds of the estate between the heirs, because a succession order had not yet been given." *Id.* at 358. The Israeli Supreme Court held that the suspiciousness of the transfer should have alerted the bank to the executor's breach of his fiduciary duty to the other heirs, and with such notice the bank owed those heirs a notional duty to decline execution of the transfers. *Id.* at 372; *see also* CFH 1740/91 *Barclays Discount Bank, Ltd. v. Kostman* 47(5) PD 31 [1993] (extending notional duty to bank where employee abused position of trust with bank customers by using customers' funds for his own purpose), *translated in and filed as* Loughlin Decl. Ex. 10, ECF No. 15-11. Prof. Porat identifies several other cases where the Israeli Court extended the notional duty to banks for "failing to prevent criminal activities directed at their customers and at third parties." Porat Decl. ¶¶ 43–48. *See, e.g.*, CA 5379/95 *Sahar Insurance Co. v. Israel Discount Bank*, 51(4) PD 464 [1997] (extending notional duty to bank where car thief attempted to register ownership with the bank of a car owned by third party), *translated in and filed as* Pls.' Opp'n Ex. H, ECF No. 34-1; CA 542/87 *Credit and Savings Fund v. Awad* 44(1) PD 422 [1990] (extending notional duty to bank where bank failed to warn public of theft of checks that were forged and sold to money changers), *translated in and filed as* Pls.' Opp'n Ex. H, ECF No. 34-1; C.A. 168/86 *Bank Igud Israel, Ltd. v. Le Coudier Ltd.* 42(3) PD 77 [1988] (extending notional duty to bank where

third party suffered harm when transacting with a bank's customer), *translated in and filed as* Pls.' Opp'n Ex. H, ECF No. 34-1.

Prof. Naschitz argues that, despite the limited extension of the notional duty from banks to third parties, "there is no support in precedent for the proposition that the Bank of China had a duty of care towards the public at large and for the sake of public safety *per se* in the Israeli law of negligence." Naschitz Decl. ¶ 10. But plaintiffs do not plead that the Bank was under a *per se* duty. They allege only that, based on the facts of this case—that the Bank knew that it was providing financial services to the PIJ and that those services would further the PIJ's ability to conduct terrorism—it makes sense to extend the notional duty to the bank. FAC ¶ 136. The Court is not convinced that, under the precedent cited by BOC, an Israeli court will always dismiss a claim such as plaintiffs' for a negated notional duty. To the contrary, a close analysis of *Ayalon* implies that Israeli courts *would* entertain such a claim.

In *Ayalon*, the Israeli Supreme Court stated the general rule that a "bank is subject to the duty of foreseeing that its negligence would cause damage to a third party, even if said third party is not its customer . . . ." 59(2) PD at 371. This is because, based on relevant legal policy considerations, it is fair and just to extend a notional duty to banks with respect third parties foreseeably harmed by the bank's conduct. *Id.* at 369. Specifically, banks have "a special 'quasi-public' status, as perceived by the individual, as a result of which the general public places its confidence in the banks and tends to trust their operations without questioning or examining them." *Id.* But perhaps more importantly, "banks have deeper pockets to pay for damages, alongside the fact that banks are effective in preventing damage due to the skills and means of supervision available to them." *Id.* at 369.

The Israeli Court cautioned, however, that "insofar as we are concerned with the duty of care to a person who is not a customer of the bank, then the boundaries of the duty should be extremely limited." *Id.* at 372. Exploring that limitation with respect to the facts of the case, which involved embezzlement by an executor, the Court noted that, "as a rule, a bank should not be subject to the obligation of ferreting out, investigating, examining and scrutinizing the various actions taken by the executor of an estate in the estate account or taken by an attorney in a deposit account." *Id.* Instead, a "bank's obligation to know that the representative, as the owner of the account, is performing actions in the account which constitute a breach of the fiduciary duties to a party with an interest in the account, should be limited solely to cases where suspicious, unusual and exceptional circumstances exist to such an extent that the bank cannot remain indifferent to them, and cannot turn a blind eye." *Id.*

The alleged facts of the instant case are analogous. BOC allegedly knew that funds it was holding and transferring were for the use of the PIJ in the commission of terrorist attacks. FAC ¶ 77. That is certainly a suspicious, unusual, and exceptional use of banking services. It is therefore entirely plausible that an Israeli court, to refuse BOC the opportunity to turn a blind eye to its allegedly knowing facilitation of terrorism, would extend a notional duty to BOC just as it did in *Ayalon*. This conclusion is buttressed by the Israeli Supreme Court's own acknowledgment that "the trend in Israeli law insofar as pertains to the duty of care imposed on the banks is an expanding trend." *Ayalon*, 59(2) PD at 371.

Plaintiffs have therefore adequately pled that BOC was under a duty, both in fact and notional, to not provide financial services to the PIJ when BOC knew that such provision would lead to terrorist violence and plaintiffs' injury. Because the Court has found that plaintiffs have

adequately pled this duty, it will not further evaluate whether plaintiffs have also adequately pled

that BOC was under any other duties based on U.S. law or FATF rules.  *See* FAC ¶ 134.

<strong>c.      Plaintiffs Adequately Plead Breach.</strong>

Breach occurs when a person under a duty fails to exercise the care of a reasonable

person with respect to the duty.  Plaintiffs have alleged that BOC unreasonably continued to

provide financial services to the PIJ despite having actual knowledge that those services would

enhance the PIJ's ability to commit acts of terrorism and lead to plaintiffs' injury.  Plaintiffs

have, therefore, adequately pled breach.

<strong>i.      Breach Occurs When a Person Under a Duty Acts<br/>Unreasonably With Respect to the Duty.</strong>

Even if a court concludes that a tortfeasor owes a plaintiff a factual and notional duty of

care, the tortfeasor will not be liable in all cases where his conduct causes damage to the

plaintiff.  *Vaknin*, 37(1) PD at 131; *see generally* Porat, *supra*, at 132–34.  The tortfeasor is only

obligated to take "reasonable precautionary measures and his liability will only crystallize if he

fails to take such measures."  *Vaknin*, 37(1) PD at 131.  Thus, a court must assess, through

application of a reasonable person standard, whether the tortfeasor took reasonable precautionary

measures under the particular circumstances of the case.  *Id.*

In conducting that reasonableness analysis, an Israeli court acts as the "reasonable

person" in that it determines the desired level of care in accordance with considerations of legal

policy.  *Id.*  Those considerations involve "balanc[ing] the individual plaintiff's personal interest

with the tortfeasor's interest in freedom of operation, against the backdrop of the public interest

in the continuation or cessation of such operations."  *Id.*  When striking the appropriate balance, a

court must also consider "the danger and extent of," "social importance of," and "measures

available to prevent the danger associated with" a defendant's tortious action.  *Id.*

### ii. Plaintiffs Have Adequately Pled that BOC Breached its Duty.

Plaintiffs have pled that, despite knowing that it was providing financial services to the PIJ, BOC nonetheless continued the provision of such services. FAC ¶¶ 77, 118. Plaintiffs have therefore adequately pled that BOC breached its duty to not continue the knowing provision of such services.

### d. Plaintiffs Adequately Plead Injury.

The Court has already concluded that plaintiffs have adequately pled allegations of physical, financial, and emotional injuries. *See* discussion *supra* Part III.E.2.c. Plaintiffs reiterate those allegations in the section of their complaint concerning negligence under Israeli law. FAC ¶ 137. Plaintiffs have therefore adequately pled that they suffered injury stemming from the Tel Aviv bombing.

### e. Plaintiffs Adequately Plead Causation.

Israeli courts divide a causation analysis into cause in fact and legal, or proximate, causation. Factual causation depends on a but-for test. By alleging that BOC's provision of financial services was necessary to the Tel Aviv bombing, plaintiffs have adequately pled factual causation. Legal causation depends on whether injury is foreseeable, whether injury is within the field of risk, and whether the causal chain fits common sense. By alleging that BOC had actual knowledge of the danger posed by its continuing provision of financial services to the PIJ, plaintiffs have adequately pled legal causation under all three proximate causal considerations.

### i. Factual Causation Exists Where, But For a Defendant's Act or Omission, a Plaintiff's Injury Would Not Have Occurred.

Israeli courts determine factual causation under the tort of negligence by applying a but-for causation test. *Id.* at 133. *See generally* Israel Gilead, *Causation, Risk, and "Evidential*

*Loss" in Israeli Tort Law*, *in* Developments in Austrian and Israeli Private Law 187 (1999)

[hereinafter Galid, *Causation*]; Porat, *supra*, at 146–47.  The Israeli Supreme Court has set forth

how the test is applied:

> Breach of the duty is the factual reason for the occurrence of the damage, [where] but for the breach of the duty, and had the appropriate precautions been taken, the chance that the damage could have been prevented is greater than the chance that it would have taken place anyway.

*Vaknin*, 37(1) PD at 133.  The Israeli Court has further clarified that "the meaning of this test is

that a breach of the duty is a factor *sine qua non*" resulting in injury, not merely a "fundamental

and substantial factor" contributing to injury.  *Id.* at 144.  *Compare id.* (testing whether "[b]ut for

the breach, there would not have been any damage caused") *with* 57A Am. Jur. 2d *Negligence*

§ 458 (testing whether "an actor's negligent conduct . . . is a substantial factor in bringing about

the harm").  The Court specifically left "aside as requiring further investigation" the question of

whether a substantial factor should be enough to satisfy factual causation.

Plaintiffs' legal expert takes issue with the application of the but-for causation test,

pointing out that "[t]here are numerous precedents in Israel . . . which apply causation tests

different from the 'but for' test . . . to situations involving multiple tortfeasors or multiple

causes."  Porat Deccl. ¶ 65 (citing CA 15/88 *Melech v. Kornhauser* 44(2) PD 89 [1990]; CA

285/86 *Nager v. Vilensky* 43(3) PD 284 [1989]).  The cases Prof. Porat cites, however, involve

unique situations not found in the ordinary tort case of one tortfeasor but for whose actions,

which did not combine with any other innocent cause, injury would not have resulted.  These

expansions of the but-for causation rule do not apply in this case.

First, in *Melech*, three dogs attacked and injured the plaintiff.  Galid, *Causation*, *surpa*, at

194–95.  Only two of the dogs' owners were known, and the injury could not be traced to only

one of the owners' dogs.  *Id.*  The Israeli Supreme Court nonetheless held the two owners jointly

and severally liable for the plaintiff's entire injury. *Id.* The Court thus carved out an exception to the but-for causation rule for "situations in which several tortfeasors acted separately and each caused a portion of the damage, but it is impossible to determine what portion each tortfeasor caused." Porat, *supra*, at 146; *see also* Israel Gilead, *Multiple Tortfeasors Under Israeli Law*, *in* Unification of Tort Law: Multiple Tortfeasors 103, 103, 103 nn.3–4 (W.V.H. Rogers ed., 2004) (discussing, with reference to *Melech*, Israeli courts' willingness to hold multiple tortfeasors "liable *in solidum* because the risk of harm caused by each one individually merge to form one unit of indivisible loss"). In this case, however, plaintiffs have not alleged that BOC and the PIJ acted separately, with each causing an indistinguishable part of the damage. Plaintiffs have instead pled a chain of causation from BOC to PIJ to the plaintiffs' injury. The expansion of the but-for causation test in *Melech*, therefore, does not apply in this case.

Second, in *Nagar*, negligent medical treatment caused a plaintiff to suffer a mental disability, but the plaintiff had a pre-existing mental disability before the negligent treatment was given. Galid, *Causation*, *supra*, at 194. It was therefore impossible to determine what portion, if any, of the plaintiff's post-treatment injury was the result of the treatment, as opposed to the pre-existing condition. *Id.* The Israeli Supreme Court nonetheless held the medical professional liable for the plaintiff's entire injury, shifting the burden to the professional to prove that treatment was not the cause of the injury. *Id.* The Israeli Court thus carved out an exception to the but-for causation rule where a plaintiff is "unable to show what portion of the damage was caused" by a defendant's negligence as opposed to some other innocent cause. Porat, *supra*, at 146. In this case, however, plaintiffs have not alleged that the chain of causation from BOC's allegedly negligent provision of financial services to their injury has been interrupted by some other innocent cause. Plaintiffs' expert, in one of his books, even makes clear that the *Nager*

exception only applies where "part of the litigated damage is positively known to have originated in a non-wrongful cause." Ariel Porat & Alex Stein, *Tort Liability Under Uncertainty* 82 (2001). That simply isn't what plaintiffs have alleged here.

Although Israeli courts may have "substantially relaxed the proof requirements that apply to causation issues" in some cases, *id.* at 131, the Court is not convinced that either case plaintiffs cite completely does away with the but-for test specifically retained by the Israeli Supreme Court in *Vaknin*. The Court will therefore evaluate factual causation by applying the but-for test.

ii. **Plaintiffs Adequately Plead That BOC Factually Caused Their Injury.**

BOC and Prof. Naschitz argue that "[b]ecause the injuries or deaths resulting from terrorist violence do not occur in the natural and ordinary course of a party's use of banking services, the allegations in the FAC to the effect that the Bank of China caused the alleged injuries by providing banking services to a customer cannot satisfy the 'but for' test of factual causation." BOC's Mot. 36; Naschitz Decl. ¶ 11. BOC and Prof. Naschitz thus misconstrue the question: the issue is not what happens in the ordinary course, but what happened in this very case and whether, but for what happened, plaintiffs would have been injured.

Prof. Porat argues for plaintiffs that but-for causation is shown by the allegation that BOC's conduct "facilitated the bombing attack which caused harm to the plaintiffs." Porat Decl. ¶ 65. Mere facilitation may be a substantial factor in causing such harm, but it is not necessarily a factor without which the harm would probably not have otherwise been inflicted. Prof. Porat thus also misconstrues the question: the issue is not whether BOC's actions were a substantial factor contributing to plaintiffs' injury, but rather, whether BOC's actions were the but-for cause of plaintiffs' injury.

Expert opinion aside, the Court concludes that plaintiffs have pled factual causation. Crucially, plaintiffs allege that the "PIJ carried out the PIJ Transfers in order to transfer and receive funds *necessary* for planning, preparing and carrying out the PIJ's terrorist activity, including bombing attacks against civilians generally and the Terrorist Bombing specifically." FAC ¶ 73 (emphasis added). Stated another way, plaintiffs' allegation that the fund transfers were necessary for the Tel Aviv bombing means that, without BOC's provision of financial services to the PIJ, the PIJ probably would not have been able to plan, prepare for, and carry out its attack. Plaintiffs thus sufficiently allege that, but for BOC's breach of its duty to plaintiffs by providing financial services to the PIJ with knowledge that the PIJ would use the funds for the attack, the attack probably would not have happened and plaintiffs probably would not have been injured.

### iii. Legal Causation Exists Where Injury Is Foreseeable, Within the Field of Risk, and Causation Fits Common Sense.

Liability for negligence does not attach when "it was the fault of some other person which was the decisive cause of the damage." Civil Wrongs Ordinance (New Version) § 64(2), 2 LSI (New Version) 21 (1972). Israeli courts use three tests to determine whether a plaintiff's negligence was the decisive cause of a defendant's injury: "the foreseeability test, the risk test[,] and the common[-]sense test." *Vaknin*, 37(1) PD at 146. *See generally* Porat, *supra*, at 147–49. Israeli courts use all three tests together when evaluating legal causation. *Vaknin*, 37(1) PD at 146 ("[A]ll three of these tests are good and proper . . . ."). Israeli courts also enjoy "considerable freedom of decision" when applying these "flexible causation test[s]." *Id.* (internal quotation marks omitted).

In a negligence case, the foreseeability test is the same as that already applied during the evaluation of duty in fact and notional duty. Porat, *supra*, at 147. Any foreseeability question is therefore usually settled during the analysis of duty, except in the case of independent intervening causes—those causes occurring after a plaintiff's act or omission and "not stimulated by a situation created by" the plaintiff—which Israeli courts usually consider during an analysis of legal causation. *Id.* at 147–48; 57A Am. Jur. 2d *Negligence* §§ 555–56 (discussing intervening causes generally and independent intervening causes specifically).

Concerning the risk test, "the question is what is the risk that the legislature sought to prevent, and when the field of risk is determined, any injurious outcome that falls within such field gives rise to the necessary legal causal link." *Vaknin*, 37(1) PD at 146 (internal quotation marks omitted). Reminiscent of Chief Judge Cardozo's concept of the zone of danger, *see Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928), the field of risk includes "the sorts of risks that normally arise from the type of conduct of which the defendant is accused," Porat, *supra*, at 149. This test is particularly relevant where the injury was not actually foreseen: if some injury is the ordinary result of the act alleged, such that the injury should have been foreseen, liability may attach even where the injury was not actually foreseen. *Id.*

Finally, the common-sense test asks whether common sense supports the existence of a causal relationship between the defendant's act or omission and the plaintiff's injury. *Id.* This "intuitive test . . . is generally only applied to render support to the other two tests." *Id.*

### iv. Plaintiffs Adequately Plead That BOC Legally Caused Their Injury.

Concerning the foreseeability test, because Israeli courts evaluate foreseeability during an evaluation of duty, it is "doubtful whether" application of the foreseeability test during an evaluation of legal causation "adds anything in cases in which liability is based on negligence."

Porat Decl. ¶ 12. The Court has already concluded that plaintiffs adequately pled that their injuries were foreseeable by BOC. *See* discussion *supra* Part III.E.4.b.ii. Accordingly, the Court will not belabor another foreseeability analysis here.

Concerning the risk test, BOC argues that "in the absence of a direct connection between BOC and the harm caused by the terrorist violence . . . or an allegation that BOC had actual knowledge of the use of an account for illegal or terrorist purposes," the injury allegedly suffered by plaintiffs falls beyond the field of risk in ordinary banking operations. BOC's Mot. 37; Naschitz Decl. ¶ 12. As to the direct connection, BOC argues that such a connection "is not and cannot be alleged." *Id.* As to actual knowledge, BOC argues that such knowledge "is not alleged except in the most sweeping and factually unsupported way." *Id.* The court disagrees. Plaintiffs have specifically and plausibly alleged BOC's knowledge that it was providing financial services to terrorists for terrorism. FAC ¶ 77; *see* discussion *supra* Part III.E.2.e.i. But moreover, the Court must accept plaintiffs' allegations as true. Whether those allegations are factually supported is a matter for trial, not this motion.

This conclusion is buttressed by *Licci v. Am. Exp. Bank., Ltd.*, a recent case out of the Southern District of New York. No. 08-cv-7253, 2010 WL 1378807 (S.D.N.Y. Mar. 31, 2010). In *Licci*, a U.S.-based correspondent of a Lebanese Bank had provided routine banking services for the Lebanese bank, including wire transfers, that allegedly enabled Hamas to engage in terrorist attacks injuring the plaintiffs. *Id.* at *1. The court dismissed the negligence claims, concluding that "it is not reasonably foreseeable that the routine banking services performed by [the correspondent bank] would result in the death and bodily injuries suffered by plaintiffs in rocket attacks launched at Israel." *Id.* at *6. BOC thus argues that this case, too, should be dismissed for the same reason. Notice of New Auth. 3, Apr. 13, 2010, ECF No. 73. But this

case is distinguishable from *Licci*.  Plaintiffs have alleged that BOC provided financial services to a terrorist organization despite knowing those services would facilitate the PIJ's acts of terrorism against Israeli and American citizens.  FAC ¶¶ 77; 118.  In *Licci*, the plaintiffs alleged no such knowledge.  *See* 2010 WL 1378807.  The banking services allegedly provided by BOC to the PIJ are, therefore, by no means the *routine* sort of services provided by the correspondent bank to the Lebanese bank.  Far from supporting BOC's motion, *Licci* instead supports the Court's conclusion that plaintiffs have adequately pled proximate causation.  Because plaintiffs have adequately pled knowledge, the Court need not examine whether plaintiffs have also pled a direct connection supporting causation under the risk test.

Finally, concerning the common-sense test, BOC argues that "unless the banking services can be causally linked to the specific terrorist attacks that are the subject of the FAC, under the law of Israel it is the terrorists who committed the decisive wrongdoing and bear legal responsibility for the alleged damages which resulted, not the Bank of China."  BOC's Mot. 37.  The Court disagrees that common sense requires a specific link between particular services provided and a particular attack.  When a party provides anything of value to an organization engaged in terrorism, common sense dictates that the party has proximately caused the damage inflicted by that organization's terrorist attacks.  "Terrorists seldom kill for money, but they always need money to kill."  Terry Davis, Sec'y Gen., Council of Eur., Speech at the Joint Plenary of MONEYVAL and the FATF (Feb. 21, 2007) (transcript available at http://www.coe.int/t/dc/press/news/20070221_disc_sg_EN.asp), *quoted in* Gurulé, *supra* note 6, at 21.  Therefore, as a matter of common sense, plaintiffs' pleading that BOC provided valuable services to the PIJ suffices to show proximate causation.

### 5. Plaintiffs Have Sufficiently Pled Count Five: Breach of Statutory Duty.

Israeli tort law includes the tort of breach of a statutory duty, which acts as a civil private right of action for the violation any enactment of the Knesset, including penal enactments, so long as certain elements are met. A plaintiff must show that a defendant was under a duty imposed by an enactment, that the enactment was enacted for the benefit of the plaintiff, that the defendant breached that duty, that the breach caused a plaintiff injury, and that the injury was of the sort intended to have been prevented by the enactment. Plaintiffs have adequately pled all elements of a claim for breach of a statutory duty. The Court will therefore deny BOC's motion to dismiss for failure to state a breach-of-statutory-duty claim.

### a. Breach of Statutory Duty Operates as a General Private Cause of Action for Violation of Israeli Law.

Under Israeli law, the civil tort of breach of statutory duty serves as a private cause of action for nearly any violation of Israeli law, provided that certain conditions are met. Civil Wrongs Ordinance (New Version) § 63, 2 LSI (New Version) 20 (1972). The CWO provides, in relevant part:

> Breach of a statutory duty consists of the failure by any person to perform a duty imposed upon him by any enactment other than this Ordinance, being an enactment which, on a proper construction thereof, was intended to be for the benefit or protection of any other person, whereby such other person suffers damage of a kind or nature contemplated by such enactment . . . .

§ 63(a). Enactments include laws, ordinances, and regulations. Interpretation Ordinance (New Version) § 1, 1 LSI (New Version) 6–7 (1967) ("'enactment' means any Law[] or any regulation . . . ." "'Law' . . . means a legislative act of the Knesset and includes any Ordinance . . . ."). Plaintiffs cite three such enactments: the Prevention of Terrorism Ordinance, 5708-1948; the Penal Law, 5737-1977; and the Defense (Emergency) Regulations, 1945. FAC

¶ 146.[11]  Liability for breach of a statutory duty thus depends on several requirements: first, the

defendant must be under some duty imposed by an Israeli law other than the CWO; second, that

law must be intended for the benefit of either the plaintiff specifically, the group to which the

plaintiff belongs, or the public as a whole; third, the defendant must have breached the duty

imposed by the law; fourth, the defendant's breach must have caused a plaintiff injury; and fifth,

the injury suffered must be of the sort intended to have been prevented by the law that imposed

the duty.  *Vaknin*, 37(1) PD at 139; Porat, *supra*, at 135.

>           **b.**      **Plaintiffs Adequately Plead That BOC Was Under Duties**
>                       **Imposed by Three Israeli Penal Laws.**

"The first condition for making out liability for breach of a statutory duty is that the

tortfeasor be under a duty imposed by the statute."  *Vaknin*, 37(1) PD at 140.  *See generally*

Porat, *supra*, at 135–36.  Plaintiffs have alleged that BOC was under a duty to not violate three

penal laws: the Prevention of Terrorism Ordinance, 5708-1948 (PTO or "Ordinance"); the Penal

Law, 5737-1977 (PL); and the Defense (Emergency) Regulations, 1945 (DER or "Regulations").

FAC ¶ 146.  First, the PTO prohibits the giving of "money or money's worth" to any terrorist

organization, which is defined as any "body of persons resorting in its activities to acts of

violence calculated to cause death or injury to a person or to threats of such acts of violence."

Prevention of Terrorism Ordinance, 5708-1948, §§ 1, 4, 4(d), 1 LSI 76–77 (1948); *see also*

Loughlin Decl. Ex. 4, ECF No. 15-5 (unofficial translation).  Second, the PL prohibits the

payment of any contribution to any unlawful association, which include groups engaged in

terrorist activities.  Penal Law, 5737-1977, §§ 145 148, LSI (Special Vol.) 49 (1978), *filed as*

---

[11] Plaintiffs cite this third penal law as the "Defense Regulations (Emergency Period) – 1945."  FAC ¶ 146.c.  The more common citation of the law, and the one the Court will use, is "Defense (Emergency) Regulations, 1945."  *See, e.g.*, Gov't of Palestine, *The Defense (Emergency) Regulations, 1945* (1947).

Loughlin Decl. Ex. 5, ECF No. 15-6. Finally, the DER prohibit, among other things, the performance of any service for or the holding of any funds of any unlawful organization, including groups engaged in terrorist activities. *Defense (Emergency) Regulations* §§ 84(a)(iv), 85(1)(c), 85(1)(f), Palestine Gazette, Sept. 27, 1945, *filed as* Loughlin Decl. Ex. 7, ECF No. 15-8. In short, these three penal laws criminally prohibit the provision of support to terrorist organizations.

Plaintiffs have also alleged that BOC engaged in wire transfers outside the territorial jurisdiction of Israel. FAC ¶ 69. BOC could only have been under a duty to abide by these three penal laws if those laws applied extraterritorially to BOC's alleged conduct. BOC argues that plaintiffs fail to state a claim for breach of statutory duty because the three penal laws cited by plaintiffs do not, as a matter of law, apply extraterritorially to BOC's alleged conduct. BOC's Mot. 39. In other words, notwithstanding plaintiffs allegations that those laws do apply extraterritorially, plaintiffs have not stated a claim upon which relief could even possibly be granted. The Court disagrees: The laws pled by plaintiffs do apply extraterritorially, and plaintiffs have satisfactorily pled such extraterritorial application.

Penal laws only apply to foreign offences in certain circumstances. New Penal Code of the State of Israel §§ 13–17 [hereinafter New Penal Code], *translated in Penal Law: Draft Proposal and New Code*, 30 Isr. L. Rev. 5, 9–12 (1996); *see also* Loughlin Decl. Ex. 6, ECF No. 15.7 (alternate unofficial translation).[12] First, "Israeli penal law shall apply for foreign offences

---

[12] Both plaintiffs' and BOC's legal experts cite this law as the "Penal Law." Gross Decl. ¶ 74; Naschitz Decl. ¶ 20. BOC additionally refers to the law as the "The Penal Law of Israel (626/1996)." Loughlin Decl. ¶ 3.f. The unofficial translation of the law printed in the Israel Law Review, however, refers to the law as the "New Penal Code of the State of Israel." *Penal Law: Draft Proposal and New Code*, *supra*, at 5. The Court will use the name as given in the Law Review.

against . . . the security . . . of the State."  § 13(a)(1).  Second, "Israeli penal law shall apply for foreign offences against . . . the life, person, . . . or property of an Israeli national [or] resident of Israel . . . as such," § 13(b)(1), or against "the life, person, . . . or property of any Jew as such," § 13(b)(2).  That is, Israeli penal laws apply extraterritorially to offenses against the Israeli or Jewish people for the sake of their being Israeli or Jewish.  Third, "Israeli penal law shall apply to foreign offences against the life[ or] person . . . of an Israeli national or resident of Israel," not as such, where the maximum punishment for such an offence is "imprisonment for one year or more."  § 14(a).  (Other sections concerning extraterritoriality are not relevant to this case.  *See* §§ 15–17.)  This third category includes three additional criteria "where the offence is committed within the territory under the jurisdiction of another state."  § 14(b).  In such a case, Israeli law shall apply only when the offense "is an offence also under the law of [the other] state"—the double-criminality rule—when there is no defense under the law of the other state, and either when the person accused of a criminal act has not been acquitted in the other state, or if he has, when he has not paid any penalty or served any sentence handed down in the other state. § 14(b)(1)–(3).

BOC first argues that, concerning § 13, only § 13(b)(1) has any relation to this case; "the other parts of . . . § 13 are not applicable . . . ."  Naschitz Decl. ¶ 20.  The Court does not necessarily agree, but because the Court finds below that plaintiffs have adequately pled extraterritoriality under § 13(b)(1), the Court will not look further into whether they have also adequately pled extraterritoriality under § 13(a) or § 13(b)(2).

---

The New Penal Code has not been officially published in English and should not be confused with Penal Law, 5737-1977, which has been officially published in LSI (Special Vol.) (1978).

Concerning § 13(b)(1), BOC argues that the applicability of that section "turn[s] on a characterization of the defendant's motives and objectives as to whether" a particular act of which the defendant is accused "was directed against Israelis as such."  Naschitz Decl. ¶ 20.  This is because, according to BOC, Israeli criminal-law jurisdiction extraterritorially extends only to those who have shown their "Israeli-specific malicious intent" by committing offenses against Israelis as such, "thereby declar[ing] themselves enemies of Israel."  *Id.* ¶ 20.  BOC then further argues that plaintiffs have failed to allege that BOC had a motivation to harm Israelis for the sake of their being Israeli.  *Id.* ¶ 22.  Prof. Mann agrees: It is a requirement under § 13(b)(1) "that the defendant *intended* to injure . . . Israelis" as such.  Mann Decl. ¶ 35 (emphasis added).  The caselaw, however, shows that only knowledge is required, not intent.

The relevant Israeli Supreme Court case is CrimA 3827/06 *Doe v. State of Israel* [Mar. 27, 2007], *translated in and filed as* Pls. Opp'n Ex. H, ECF No. 34-1.  BOC's expert succinctly lays out the facts of that case:

> [T]he defendant was a money changer in the Gaza Strip who was contacted directly by the commander of the military branch of Hamas . . . . The Hamas military commander in Gaza requested that the defendant money changer in Gaza receive funds from persons in the Arab Gulf states and transfer such funds to the Hamas military commander.  The defendant money changer recruited his brother-in-law in Dubai to help with the transfers.  When there were difficulties in getting the funds in Dubai, the defendant went to Dubai himself to see if he could assist in collecting the funds in order to transfer them to the Hamas military commander. For each transfer of funds, the defendant received a payment of $1,500.

Mann Decl. ¶ 22; *Doe* ¶ 1.  Such conduct was not merely part of the defendant's "routine work" as a money changer.  *Doe* ¶ 12.  Instead, the facts showed that the defendant "harnessed himself willingly and knowingly to fundraising activity which supports terrorist activities," and those activities were directed at Israelis for the sake of their bring Israeli.  *Id.* ¶¶ 7, 12.  The defendant was therefore liable for a violation of § 85 of the Defense (Emergency) Regulations, which

extraterritorially applied to his actions in Gaza. *Id.* ¶ 1. The allegations in this case are strikingly similar. BOC has allegedly willingly provided financial services to the PIJ, despite knowing that such activity would support the terrorist activities of the PIJ, and that such activities would be directed against Israelis for the sake of their being Israeli. FAC ¶¶ 69, 77; *see* discussion *supra* Part III.E.2.e.i. Just as the money changer's actions in *Doe* were far from routine, so too is the provision of wire transfers with the knowledge that the money transferred will be used to finance terrorism.

BOC's expert argues that the *Doe* decision should be afforded relatively little weight because of the special relationship between Israel and Gaza, over which Israel had direct jurisdiction until 2006, before the *Doe* indictment was filed, but during the time in which the money changer made his wire transfers. Mann Decl. ¶ 27. "It seems fair to say that the application of Israeli law under Section 13 to Gaza cannot easily stand as a full fledged precedent for the application of Israeli law under Section 13 to other foreign entities . . . ." *Id.* No, it doesn't. That argument is unconvincing precisely because when the indictment of *Doe* was filed, Israel no longer had direct jurisdiction over Gaza. *Id.* Section 13 thus applied to Gaza just as it would to any other foreign territory. The Court can therefore safely extrapolate from *Doe* the Israeli jurisprudence of § 13 to conclude that Defense (Emergency) Regulations and similar statutes can apply extraterritorially to crimes directed against Israelis as such.

Having so concluded, the only question remaining is whether plaintiffs have adequately pled extraterritoriality. They have. In addition to allegations of knowing provision of financial services to terrorists bent on murdering Israelis for the sake of their being Israeli, plaintiffs have pled that, "despite the fact that Defendant BOC's conduct did not take place in Israel, . . . Israel has extraterritorial criminal jurisdiction over . . . crimes against the lives and persons of Israeli

citizens as such, pursuant to § 13." FAC ¶ 147. Plaintiffs have therefore adequately pled extraterritoriality.

Concerning § 14, BOC argues that plaintiffs have failed to plead facts satisfying the double-criminality rule—the requirement of § 14(b)(1) that extends Israeli criminal law only to crimes both under Israeli law and the law of the place where the crime was allegedly committed. BOC's Mot 39–40; Naschitz Decl. ¶¶ 23–24; Naschitz Supp. Decl. ¶ 12. Because the alleged transfers were made to an account in China but plaintiffs have not pled any violation of Chinese law, BOC says that plaintiffs have failed to adequately plead extraterritoriality under § 14(b)(1). Naschitz Decl. ¶ 24. The Court, however, has already concluded that plaintiffs have adequately pled extraterritoriality under § 13(b)(1). Moreover, plaintiffs do not rely on § 14. Pls. Surreply 4 n.4 ("[T]he FAC and Prof. Gross rely solely on § 13 . . . ."). The Court, therefore, need not consider BOC's argument as to § 14.

### c. Plaintiffs Adequately Plead That the Relevant Penal Laws Were Intended for the Benefit of the Public.

"A second condition for making out liability for breach of a statutory duty is that the statute be intended for the benefit or protection of the plaintiff." *Vaknin*, 37(1) PD at 140 (internal quotation marks omitted). *See generally* Porat, *supra*, at 136. After pleading that a tortfeasor is subject to a statutory duty, a plaintiff therefore must plead that the duty is intended for the benefit or protection of the plaintiff. The CWO identifies an enactment as one "for the benefit or protection of any person if it is an enactment which . . . is intended for the benefit or protection of that person or of persons generally, or of any class or description of persons to which that person belongs." § 63(b). Although, at base, "any statute is intended . . . for the benefit and protection of the individual, since the State only exists for the individuals in it," § 63 mandates that Israeli courts distinguish between those intended for the benefit and protection of

the individual and the benefit and protection of the state. *Vaknin*, 37(1) PD at 141. The Israeli

Supreme Court has thus adopted the following distinction: "[A] statute will be [for] the benefit

or protection of another person if the statute prescribes norms and levels of conduct intended to

protect the interests of the individual." *Id.* But a statute will be for the benefit or protection of

the state if the statute is "aimed at protecting the interests of the State, or the government, and of

the collective fabric of life, and the lifestyle of the nation." *Id.*

In some circumstances, "a statute might be to the benefit of an individual even if all that

distinguished him was that he was part of the public." *Id.* at 136–37. This is because "a law that

might protect the interests of the individual might also protect the interests of all of the

individuals in the State, in the very same way." *Id.* at 142. It is conceivable that such a law

might just as well be designed to protect the state itself. A law can have such a "dual purpose."

*Id.* at 142.

BOC's motion does not contest that PTO § 4 is intended for the protection of the

individual. BOC's Mot. 39. BOC argues only that intent for individual protection "cannot be

satisfied with respect to *two* of the alleged predicate crimes because both Penal Law Sections

145-148 and Section 85 of the Emergency Defense Regulations protect solely state and

governmental interests and confer no legal rights on private persons in relation to the civil law of

torts under the CWO." *Id.* at 39–40 (emphasis added). Nonetheless, BOC's expert does argue that

the PTO should "not be interpreted as granting protection to private persons." Naschitz Decl. ¶ 26.

The Court finds that all three penal laws cited by plaintiffs bridge the gap between the individual

and the government, appearing to have been intended for both the benefit of the nation and the

individual.

With regard to PL § 148, the Court has no trouble in finding that the statute was intended

to benefit plaintiffs in this case. Section 148 is intended to inhibit the funding of "unlawful

associations" which includes, among other things, terrorist organizations. PL § 145. By inhibiting that funding, the statute attempts to indirectly prevent the commission of these associations' unlawful activities, which include acts of terrorism. There is nothing in the statute to suggest that preventing terrorist attacks is only intended to benefit the state and not the individual. As the Israeli Supreme Court has explained, the chapter of the Penal Law in which § 148 is found is "intended to protect the security of the state *and the security of the public*." AAD 8788/03 *Federman v. Minister of Defense* 58(1) PD 176, ¶ 9 [2003] (emphasis added), *translated and quoted in* Gross Decl. ¶ 70. Section 148 is thus intended to protect both individual and state interests. The same analysis applies to DER § 85 and PTO § 4, both of which are also intended to limit the resources available to terrorist organizations. Indeed, the Israeli Court in *Federman* also cited the Prevention of Terrorism Ordinance as a law with dual intent to protect the state and the public. 58(1) PD ¶ 9.

Nonetheless, Prof. Naschitz argues that none of the laws cited by plaintiffs should be construed as intended to benefit or protect the public at large. Naschitz Decl. ¶¶ 26–28. The Prevention of Terrorism Ordinance only applies when the Knesset has declared a state of emergency, which it has done under the authority of various statutes such that a state of emergency has always existed to support the application of the Ordinance since its enactment. *Id.* ¶ 26; Gross Decl. ¶¶ 54–55. Prof. Naschitz infers from this state-of-emergency requirement a "connection between the Prevention of Terrorism Ordinance and the protected interest of the State, as opposed to the protection of private persons." Naschitz Decl. ¶ 26. But Prof. Gross points out that no such inference is warranted, because the statutes granting the Knesset authority to declare a state of emergency do not prescribe any standard for the Israeli government to apply when deciding whether to make such a declaration. Gross Decl. ¶ 54–55 ("[T]here is *no*

legislation in Israel which defines or limits the grounds for the declaration of such an emergency.").  The Court therefore agrees with Prof. Gross: there is no reason to assume that the declaration of emergency on which application of the Ordinance depends implies that the Ordinance is intended to protect only the State itself, as opposed to individuals in the State, from the emergency, *id.* ¶ 56, particularly considering the dual purpose of the Ordinance as implied by *Federman*, 58(1) PD ¶ 9.

Concerning the Defense (Emergency) Regulations, Prof. Naschitz argues that the definition of "unlawful association" in § 84 evinces the intent that the law only protect the "interests of the State, the Government, its Ministers, and those acting on its behalf."  Naschitz Decl. ¶ 25.  Replacing, in underlined text, references to the Mandatory government with references to the modern Israeli government, Prof. Naschitz identifies the Regulations as defining unlawful associations to include those advocating, inciting, or encouraging:

> (i)        the overthrow by force or violence of <u>the constitution of Israel</u> or <u>the Government of Israel</u>;
> (ii)       the bringing into hatred or contempt of, or the exciting of disaffection against, <u>the Government of Israel or anyone of its ministers</u> in their official capacity;
> (iii)      the destruction of or injury to <u>property of the Government of Israel</u>;
> (iv)      acts of terrorism directed against <u>the Government of Israel or directed against servants of the Government of Israel</u>; or which has committed or has claimed to have been responsible for, or to have been concerned in, any such acts as are mentioned in sub-paragraph (ii), (iii), or (iv) . . . .

*Id.* ¶ 28 (quoting DER § 84(a)).  Prof. Naschitz makes the same argument concerning the Penal Law, which defines "unlawful organization" with substantially similar language.  *Id.*; PL § 145.

But Prof. Naschitz' focus on the specific language of these sections is unconvincing because the language alone is not dispositive.  Israeli courts must also "examine the policy of the legislator, as the judicial authority understands such policy."  *Vaknin*, 37(1) PD at 142.  This

court understands the policy of the Regulations to be the prevention of not only harm to Israel herself, but also to her people. Just as the Israeli Supreme Court has noted the dual purpose of the Penal Law and Prevention of Terrorism Ordinance, *Federman*, 58(1) PD ¶ 9, so too has it identified the dual purpose of the Civil Wrongs Ordinance, CrimA 312/73 *Masrawa v. State of Israel* 28(2) PD 805, 808, *translated and quoted in* Gross Decl. ¶ 35. In *Masrawa*, the Israeli Court noted that the Regulations were designed not only to combat those who seek to "undermine . . . the foundation of the State of law and the democratic regime," but also those who "endanger human life." *Id.* The Regulations therefore serve a dual purpose: to protect the state and also to "defend the public." *Id.* The same logic applies to the Prevention of Terrorism Ordinance.

The Court therefore concludes that the three laws plaintiffs have pled are intended to protect not only the interests of the state, but also those of the people. Having so concluded, the only question remaining is whether plaintiffs have adequately pled the intent of these statutes to benefit them as members of the public. They have. Plaintiffs have pled that the relevant sections of the Prevention of Terrorism Ordinance, Penal Law, and Defense (Emergency) Regulations "are intended for the benefit and protection of persons in general." FAC ¶ 148. Because the Court finds this pleading adequate, the Court will not look further into whether those statutes also apply for the specific benefit of any class of persons to which plaintiffs may belong.

### d.       Plaintiffs Adequately Plead That BOC Breached its Duties.

"A third condition of liability for breach of statutory duty is that the plaintiff breached the duty imposed on him." *Vaknin*, 39(1) PD at 140. Plaintiffs have alleged facts showing violations of the Prevention of Terrorism Ordinance, the Penal Law, and the Defense

(Emergency) Regulations. Plaintiffs have therefore adequately pled that BOC breached its duties under those laws.

### i. Plaintiffs Adequately Plead a Violation of Israel's Prevention of Terrorism Ordinance.

Israel's Prevention of Terrorism Ordinance criminally prohibits the provision of support to a terrorist organization. Specifically, "any person who," *inter alia*, "gives money or money's worth for the benefit of a terrorist organisation . . . shall be guilty of an offence." Prevention of Terrorism Ordinance, 5708-1948, § 4, 4(d), 1 LSI 77 (1948). The PTO defines a terrorist organization as "a body of persons resorting in its activities to acts of violence calculated to cause death or injury to a person or to threats of such acts of violence." *Id.* § 1, 1 LSI 76.

Plaintiffs have pled that "[t]he PIJ is a radical terrorist organization" that works toward its goal—"the destruction of the State of Israel"—"by carrying out terrorist attacks against Jewish civilians." FAC ¶ 27. These allegations sufficiently plead that the PIJ is a terrorist organization under the PTO.

BOC argues, however, that plaintiffs have not adequately pled that it is liable under the PTO for providing support to that organization. BOC's Mot. 41–42. Specifically, Prof. Naschitz argues that plaintiffs have not "alleged that the Bank gave money to terrorist organizations in order to fall within sub-section (d); the Bank has allegedly only served as a conduit to enable a terrorist operant to transfer money." Naschitz Decl. ¶ 16; Naschitz Supp. Decl. ¶ 24. Plaintiffs disagree, arguing that Israeli courts have extended liability for giving money under subsection (d) to a defendant's acting as a conduit for funds not belonging to the defendant. Gross Decl. ¶ 48–49 (citing CrimC (Jer) 8031/07 *State of Israel v. Farach* ¶ 22 (Jan. 28, 2008)). BOC's expert retorts that *Farach* involved an individual who facilitated terrorist fundraising, giving other people's money to terrorist organizations. Naschitz Supp. Decl. ¶ 24. Unlike the

defendant in *Farach*, says BOC, "[t]he Bank has not . . . procured the financial resources of others for the terrorist organizations." *Id.*

The Court will not resolve this argument because plaintiffs have adequately pled provision of support under another part of subsection (d): the giving of money's worth. BOC dismisses this part of subsection (d) out of hand, not even quoting the phrase "money's worth" in its motion. *See* BOC's Mot. 41–42. By its plain language, that phrase applies to "valuable services (such as banking services, wire transfers, etc.) which facilitate the transfer of money for the benefit of a terrorist organization." Gross Decl. ¶ 50. Plaintiffs have pled that BOC provided valuable services to the PIJ by performing wire transfers for an agent thereof. FAC ¶ 69. These allegations therefore sufficiently plead the provision of money's worth to a terrorist organization.

> ii.     **Plaintiffs Adequately Plead a Violation of Israel's Penal Law.**

Israel's Penal Law criminally prohibits the making of contributions to terrorist organizations. Specifically, any "person who pays or solicits a membership fee or a contribution for or on account of an unlawful association is liable to imprisonment." Penal Law, 5737-1977, § 148, LSI (Special Vol.) 49 (1978). Unlawful associations include, *inter alia*, "any body of persons . . . which . . . advocates, incites[,] or encourages . . . the overthrow by force or violence of the lawful government of Israel." *Id.* § 145(1), (1)(b). Plaintiffs sufficiently allege facts showing that the PIJ, seeking to destroy Israel, is an unlawful association. FAC ¶ 27. BOC does not contest that the PIJ is an unlawful association. Naschitz Decl. ¶ 17 ("There is no doubt that the Palestinian Islamic Jihad is a pernicious, 'unlawful association' . . . ."). BOC does contest, however, that plaintiffs have pled facts showing that it contributed to an unlawful association under § 148. BOC's Mot. 42.

BOC strongly but conclusorally argues that by alleging a violation of § 148, plaintiffs have "arbitrarily and irresponsibly cited to any provision of the Israeli criminal law having anything to do with support for terrorist organizations regardless of whether the text of the Israeli statute bears any relation to BOC's alleged conduct in the FAC." *Id.* The Israeli Supreme Court has stated that, with regard to duties imposed by statute actionable for breach of statutory duty— what the Israeli Court calls a "valve term"—"the legislative guideline is very general and the real and concrete contents are [to be] prescribed by the judicial authority, on the basis of considerations of legal policy." *Vaknin*, 37(1) PD at 139. Given the lack of Israeli authority interpreting the valve term "contribution," *see* Gross Decl. ¶ 66, and BOC's failure to explain why its alleged actions fall beyond the scope of § 148, *see* Naschitz Decl. ¶ 17, the Court thus turns to legal policy considerations that Israeli courts would make when interpreting what it means to make a contribution to an unlawful organization.

To that extent, the Israeli Supreme Court has encouraged the perfecting of duties under the tort of statutory breach "in accordance with the judicial authority's feeling of social justice." *Id.* In the Court's opinion, § 148 is intended to prevent not only the provision or solicitation of money, but also any other things of monetary worth. This expansive interpretation is warranted as a matter of legal policy because limiting "contributions" to currency would likely lead to absurd results. For example, if an individual contributed $100,000.00 to the PIJ, and the PIJ subsequently purchased a stockpile of weapons, that individual would clearly be criminally liable under § 148. But if that individual were to first purchase the stockpile of weapons, then contribute those weapons to the PIJ, he would not be making a contribution of currency and, therefore, would not be criminally liable under § 148. As a matter of social justice, whereby the

policy is to prevent the benefit to the PIJ, it would make little sense to adopt such a restrictive interpretation of the statute.

The provision of goods and services is just as valuable as currency to terrorist organizations such as the PIJ, and as a matter of textual interpretation, the meaning of the phrase "pay a contribution" can include the provision of valuable services. The verb "pay" primarily means the giving of something of value—not necessarily money—in exchange for something. 11 *Oxford English Dictionary* 376 (2d ed. 1989) (defining "pay" as, *inter alia*, "[t]o give, deliver, or hand over (money, or some other thing) in return for goods or services"). Moreover, the payment made illegal by § 148 is not that which is made in exchange for violent services. Those who pay contributions to terrorists do not enter into contractual agreements whereby money is exchanged in consideration for the subsequent violence in which those organizations engage. "Pay" as used in § 148 simply means "provide." Thus, payment of a contribution can mean the mere provision of something of value. Valuable services include the provision of financial services. To that extent, the plaintiffs' allegations concerning BOC's provision of financial services to the PIJ provides a reasonable basis for liability under § 148.

Plaintiffs argue that the language "give[] money" in PTO § 4(d) has the same meaning as "pay[] a contribution" in PL § 148; that because giving money can include giving other people's money under *Farah*, so too can making a contribution; and that BOC's wire transfer therefore constitutes the making of a contribution giving rise to liability under § 148. Gross Decl. ¶ 67. Because the Court has concluded that plaintiffs have adequately pled liability under § 148 for the BOC's valuable provision of financial services, the Court need not consider this line of argument.

### iii. Plaintiffs Adequately Plead a Violation of Israel's Defense (Emergency) Regulations.

Before the Court addresses the elements of a violation of the Defense (Emergency) Regulations, 1945, the Court will discuss why those Regulations remain, for the most part, in effect today. The Regulations were originally implemented by British authorities under the British Mandate for Palestine. Alan Dowty, *The Jewish State: A Century Later* 95 (1998). Following the birth of the State of Israel, the Knesset adopted the Regulations as Israeli law by providing that "[t]he law which existed in Palestine on" the day of independence "shall remain in force, . . . subject to such modifications as may result from the establishment of the State and its authorities." Law and Administration Ordinance, 5708-1948, § 11, 1 LSI 9 (1948); *see* Shachar, *supra*, at 7; Dowty, *supra*, at 95. The Regulations remain in effect today where not annulled or superseded. Dowty, *supra*, at 95.[13] Plaintiffs have pled that BOC breached a statutory duty by violating DER § 85, which criminally prohibits the provision of services to terrorist organizations. FAC ¶ 146.c. Neither BOC nor its legal experts argue that § 85 or related sections of the Regulations have been annulled or suspended. *See* BOC's Mot. 42–43; Naschitz

---

[13] Some controversy exists among legal scholars over whether the Regulations actually should remain in effect today. Some argue that Britain repealed the Regulations the night before terminating its mandate over Palestine, which should have prevented the Regulations from becoming part of Israeli law through incorporation under the Law and Administration Ordinance. *See, e.g.*, Gail J. Boling, *"Absentees' Property" Laws and Israel's Confiscation of Palestinian Property*, *in* The Palestinian Yearbook of International Law, Vol. XI, 2000/2001, at 73, 108 n.136 (2003) (concluding that "Israel's attempt to preserve the preceding British law was invalid"); John B. Quigley, *Palestine and Israel: A Challenge to Justice* 103–04 (1990) ("[T]he regulations were not in force on May 14, 1948, and therefore, were not covered by the statute preserving the British law . . . ."). Regardless, the majority of the Regulations "remained on the books" after the mandate expired and remain valid to this day, Dowty, *supra*, at 96, a fact recognized even by critics of the Israel's continued use of the Regulations, *see, e.g.*, B'Tselem, *Defense (Emergency) Regulations*, http://www.btselem.org/english/Legal_Documents/ Emergency_Regulations.asp ("In 1948, Israel incorporated the Defense Regulations into its law . . . .") (last visited Oct. 20, 2010).

Decl. ¶¶ 18–19; Mann Decl. ¶¶ 23–24; Naschitz Supp. Decl. ¶ 20.  Accordingly, the Court concludes that these sections remain in effect.

Israel's Defense (Emergency) Regulations identify several criminal offenses relating to terrorist organizations.  Two offenses are relevant to this case:  First, "[a]ny person who . . . performs any service for an unlawful association, unless he proves that he *bona fide* believed that the . . . service was not for an unlawful association, . . . shall be guilty of an offence."  § 85(1), (1)(c).  Second, "[a]ny person who . . . has in his custody, possession, or control any . . . account . . . or any funds . . . related to or issued by or in the interests of . . . an unlawful association . . . shall be guilty of an offence."  § 85(1), (1)(f).  The Regulations define unlawful associations to include, *inter alia*, "any body of persons . . . which . . . advocates, incites[,] or encourages . . . acts of terrorism."  § 84, 84(a), 84(a)(iv).  Plaintiffs sufficiently allege facts showing that the PIJ, seeking to destroy Israel through terrorist violence, is an unlawful association.  FAC ¶ 27.

BOC does not contest that plaintiffs have pled that the PIJ is an unlawful association. Naschitz Decl. ¶ 18 ("[T]here is no doubt that the Palestinian Islamic Jihad is an unlawful association . . . .").  BOC also concedes that plaintiffs have pled a claim under § 85(1)(f):

> The FAC alleges that the Bank had in its possession an account and funds related to the interests of an unlawful association, through the account of the alleged terrorist operant.  Therefore the elements of Emergency Defence Regulations § 85(f) are *prima facie* disclosed by the allegations in the FAC.

Naschitz Decl. ¶ 19.  BOC's only comment in its motion regarding this concession is a cryptic footnote claiming that "Section 85(f) contains language which has at least a theoretical connection to the allegation in Count Two"—plaintiffs' primary-liability claim under the ATA. BOC's Mot. 43 n.23.  That footnote then cited to Prof. Naschitz's concession.  *Id.* (citing Naschitz Decl. ¶ 19).  Whatever the connection to Count Two, BOC's expert has conceded that

107

plaintiffs have pled a claim under § 85(1)(f). The Court, therefore, does not need to evaluate

whether plaintiffs have also pled a claim under § 85(1)(c). Plaintiffs have therefore adequately

pled a violation of the Defense (Emergency) Regulations.

> ### iv. The Court Will Not Consider Whether Plaintiffs Have Pled a Violation of Israel's Prohibition on Terrorist Financing Law.

Plaintiffs' Israeli-law expert points out that plaintiffs might have an additional violation

of Israeli criminal law that they could plead: violation of the Prohibition on Terrorist Financing

Law, 5765-2005. Porat Decl. ¶ 79.[14] As Prof. Porat points out, however, this law "was not

mentioned in the FAC." *Id.* Accordingly, the Court will not consider whether plaintiffs could or

did plead claims under it. It is important to note, however, that this new law does not at all affect

the validity of plaintiffs' causes of action for violation of other Israeli criminal laws: "The

provisions of this law are in addition to the provisions of any law, including the Defense

---

[14] Prof. Port cites this law as the "Law Prohibiting Terrorism Financing 5765-2005." Porat Decl. ¶ 79. The Israeli Ministry of Justice, however, cites the law as the "Prohibition of Financing Terrorism Law, 5763-2003." Israeli Ministry of Justice, Israel Money Laundering & Terror Fin. Prohibition Auth., Terror Financing, http://www.justice.gov.il/MOJEng/Halbanat+ Hon/TerrorFinancingNew.htm (last visited Oct. 20, 2010). The actual text of the law, as provided in an unofficial translation by the Ministry of Justice, cites the law with the year as 2004. *See* Prohibition on Terrorist Financing Law, 5765-2004, *available at* http://www.justice.gov.il/NR/rdonlyres/3979E348-2D87-471F-94D6-6B5E6076E654/6151/ ProhibitionTerroristFinancing.doc. There is therefore a question as to both the proper name and proper year of the law.

Perhaps the difference in name is merely a difference in translation. The Court will refer to the law by the terminology adopted by the government of Israel. Concerning the difference in the year, 2005 appears correct. Apparently introduced in 2003, the law was passed in 2004, but took effect in 2005. 2 U.S. Dep't of State, *International Narcotics Control Strategy Report* 272 (2008), *available at* http://www.state.gov/documents/organization/102588.pdf ("In December 2004, the Israeli Parliament adopted the prohibition on terrorist financing law 5765-2004 . . . . The Law went into effect in August 2005."). The Court will therefore use 2005 as the year of the law.

(Emergency) Regulations and the Prevention of Terrorism Ordinance, and do not derogate from them."  Prohibition on Terrorist Financing Law, 5765-2005, § 49.

              **e.**       **Plaintiffs Adequately Plead That Their Injuries Were Caused by BOC's Breach.**

"Another condition of liability for breach of a statutory duty . . . is that the breach of the duty is what caused the damage."  *Vaknin*, 37(1) PD at 144.  The Court has already concluded that plaintiffs have adequately pled allegations of physical, financial, and emotional injuries, *see* discussion *supra* Part III.E.2.c., which they re-plead under in the section of their complaint concerning breach of statutory duty, FAC ¶ 149.  The requirements of factual and legal causation discussed above in the section on negligence apply equally to breach of statutory duty.  *Vaknin*, 37(1) PD at 144 (noting that this causation analysis applied to "all torts that are based on damage"); *see* discussion *supra* Part III.E.4.e.i., iii.

On behalf of BOC, Prof. Naschitz, in the portion of his declaration concerning breach of statutory duty, restates his causation argument made concerning negligence: that there is an "absence of causation according to the 'but for' test of factual causation as well as the tests of legal causation under Section 64(2) of the Civil Wrongs Ordinance."  Naschitz Decl. ¶ 14.  BOC thus remakes its argument that plaintiffs' injuries were not foreseeable as the product of the provision of financial services; were not within the field of risk associated with provision of financial services; and are not, as a matter of common sense, related to the provision of financial services.  The Court has already dispensed with this argument, concluding that plaintiffs have adequately pled causation.  *See* discussion *supra* Part III.E.4.e.ii., iv.  Considering that plaintiffs have re-pled causation in the section of their complaint concerning breach of statutory duty, FAC ¶ 149, the Court again reiterates its conclusion that plaintiffs have adequately pled causation.

### f.  Plaintiffs Adequately Plead That They Suffered Injuries of the Sort Intended to Have Been Prevented by the Relevant Penal Statutes.

"Finally, it is a condition of liability for the tort of breach of statutory duty that the damage that in fact occurred be of the kind of damage that the legislature sought to prevent." *Vaknin*, 37(1) PD at 147. *See generally* Porat, *supra*, at 137–38. Plaintiffs have pled that the Prevention of Terrorism Ordinance, Penal Law, and Defense (Emergency) Regulations "are intended to protect [plaintiffs] from terrorist attacks and from all the damages which terrorist attacks are liable to inflict." FAC ¶ 148. BOC has argued that these laws are not intended for the benefit of plaintiffs, but neither BOC nor its experts have specifically argued that the injuries plaintiffs allegedly suffered were not of the sort that the laws were intended to prevent. *See* BOC's Mot. 39–40, Naschitz Decl. ¶¶ 25–29; Naschitz Supp. Decl. ¶¶ 19–21.

As the Court concluded above, however, these laws, intended to prevent members of the public from suffering acts of terrorism, are intended for the benefit of plaintiffs. *See* discussion *supra* Part III.E.5.c. It makes sense, then, that these laws are also intended to prevent plaintiffs' injuries—i.e., injuries stemming from a terrorist attack. Plaintiffs' allegations of injuries caused by BOC's provision of financial services which furthered the terrorist attack in question are, therefore, sufficient.

### g.  The Double-Actionability Rule Has Been Replaced, and Its Replacement Does Not Apply.

BOC additionally argues that, regardless of extraterritorial applicability of the relevant Israeli penal laws, plaintiffs' claim based on those laws fails under the double-actionability rule because plaintiffs have not pled a violation of Chinese criminal law. BOC's Mot. 39–40; Naschitz Decl. ¶ 23; Naschitz Supp. Decl. ¶¶ 12–13. This argument is flawed in three ways: First, the double-actionability rule has been replaced. Second, the replacement rule is not

relevant to Israeli penal laws pled as elements of a civil cause of action for breach of a statutory duty. And third, even it were relevant, the Court would not apply the new rule because U.S. courts generally do not apply foreign choice-of-law rules.

The double-actionability rule was a choice-of-law doctrine applied by Israeli courts in tort cases that required a plaintiff to plead not only a valid claim under Israeli law, but also a valid claim under the law of the place where the tort was committed. CA 1432/03 *Yinon Food Prods. Mfg. & Mktg. Ltd. v. Kara'an* 59(1) PD 345, ¶¶ 10, 20 [2004] ("[T]he plaintiff must prove that he has a cause of action both in the law of the forum and the law of the place where the tort was committed."), *translated in and filed as* Pls.' Surreply Attach. 2, ECF No. 79-2. Essentially, Israeli courts would not go through a choice-of-law analysis to choose which law to apply—they would just apply both. *Id.* Israeli courts did, however, recognize an "exception[] in cases where it would not be justified to exercise the rule." *Id.* In such cases, courts could apply the law "of the state which has the most significant relationship to the tort and to the parties." *Id.* This rule, dating to the English case of *Phillips v. Eyre*, [1870] 6 Q.B. 1, as modified by *Chaplin v. Boys*, [1969] 2 All E.R. 108, was a holdover from English common law. *Yinon*, 59(1) PD ¶¶ 10, 20. After evaluating the movement away from this rule in England, other Commonwealth countries, mainland European nations, and the United States, *id.* ¶¶ 11–19, the Israeli Supreme Court concluded that "the role of double actionability should no longer be adhered to" in Israel. *Id.* ¶ 25. The Israeli Court's decision is unmistakable: "Today, when the English themselves . . . have parted from the rule, as have the Australians and Canadians, we as well shall no longer cling to it." *Id.* ¶ 26; *see also* Talia Einhorn, *Private International Law in Israel* ¶ 223 (2009) ("In . . . *Yinon*, the Israeli Supreme Court decided that the old, outdated English 'double-actionability' rule . . . would no longer apply to the choice-of-law in tort cases.").

The Israeli Supreme Court thus articulated a new choice-of-law rule: "[T]he applicable law is that of the place where the tort was committed." *Yinon*, 59(1) PD ¶ 30. This new rule, too, has an exception, albeit very limited: When "necessary for reasons of justice," a court may apply the law of a country other than that where the tort was committed when that other "country has a significantly closer relationship to the tort." *Id.* BOC argues that plaintiffs' failure to plead a violation of Chinese penal law undermined their claim based on Israeli penal law because the pleading did not satisfy the double-actionability rule. Despite the fact that the double-actionability rule is no more, this argument can also be entertained under the new rule. That is, the new rule strongly pushes Israeli courts to apply the law of the place where the tort occurred, and plaintiffs still have not pled a violation of Chinese penal law. The problem with this argument is twofold: First, in this case, there is no conflict of laws to warrant a choice-of-law analysis, and second, even if there were, the Court would apply American, not Israeli, choice-of-law rules.

In a tort case, the question of what law a court should apply arises when two or more nations' laws might apply differently to a particular set of facts, such that those laws are in conflict. For example, where two nations' negligence laws differ on whether a defendant was under a duty of care, a court will engage in a choice-of-law analysis to determine which negligence law to apply. But in this case there is no conflict. The tort alleged is the breach of a statutory duty, an Israeli tort that is not in conflict with any similar tort in any other country relevant to this litigation. *See Vaknin*, 37(1) PD at 135 ("The tort of breach of statory duty is special, and the manner in which it is included in the Civil Wrongs Ordinance is unparalleled . . . .") Because there is no conflict with any other relevant nations' similar tort, there is no occasion for the Court to apply the Israeli choice-of-law rule to favor application of

the tort law of the nation where the tort occurred. The elements of the Israeli tort are clear. They include the violation of duty imposed by an Israeli enactment, including Israeli penal laws, not any other nations' penal laws. BOC's contention that plaintiffs must plead the elements of China's penal laws is therefore entirely misplaced.

Regardless, even if the Court felt compelled to choose between the penal law of Israel and China, it would not rely on Israeli choice-of-law principles. "[W]here a question comes before a court which, according to the law of the forum as to conflict of laws, is to be determined by the law of another jurisdiction, . . . the law of such other jurisdiction as to conflict of laws is not taken into consideration." 16 Am. Jur. 2d *Conflict of Laws* § 6 (collecting cases). The Court would instead apply the American most-significant-relationship rule, *see* Restatement (Second) of Conflict of Laws § 6, a rule that the Israeli Supreme Court has explicitly criticized, *Yinon*, 59(1) PD ¶¶ 31–32.

BOC further argues that "a double[-]actionability requirement in tort arises in this specific case as a derivative of the double[-]criminality requirement under the Penal Law." Naschitz Supp. Decl. ¶ 13. That may be true, but only to extent that the Israeli penal law upon which a claim for breach of statutory duty is based applies extraterritorially under § 14 of the New Penal Code, which specifically requires double criminality under § 14(b)(1). Because plaintiffs have successfully pled extraterritoriality under § 13, which does not require double criminality, this argument is irrelevant.

### 6. Plaintiffs Have Sufficiently Pled Count Six: Vicarious Liability.

Plaintiffs lastly claim that BOC is vicariously liable for the terrorist acts of the PIJ under CWO § 12, which provides that "any person who joins or aids in, authorizes, counsels, commands, procures, or ratifies any act done or to be done, . . . or any omission made or to be

made, . . . by any other person shall be liable for such act or omission."  Civil Wrongs Ordinance

(New Version) § 12, 2 LSI (New Version) 8 (1972); FAC ¶ 155.  Liability under § 12 should be

distinguished from ordinary joint and several liability as well as from vicarious liability of an

employer or principal for the actions of his employee or agent, which are dealt with elsewhere in

the CWO.  *See* Civil Wrongs Ordinance (New Version) §§ 11, 13–14, 2 LSI (New Version) 8

(1972).  Although plaintiffs caption their claim under § 12 as one for "vicarious liability,"

liability of a defendant under § 12 is unique: "there is no prerequisite that the other person, which

actually inflicted the loss, be personally liable for the commission of a tort."  Israel Galid,

*Liability for Damage Caused by Others Under Israeli Law*, *in* Unification of Tort Law: Liability

for Damage Caused by Others 139, 142–43 (J. Spier ed., 2003).

      In one of the few Israeli Supreme Court cases on point, the Court evaluated whether the

holder of an allegedly infringed patent could make a claim under § 12 against the marketer of the

allegedly infringing product.  CA 1636/98 *Ray Bariach, Ltd. v. Havshush Vehicle Accessory

Trading House, Ltd.* 55(5) PD 337 [2001], *translated in and filed as* Loughlin Decl. Ex. 12, ECF

No. 15-13.  Looking to English law, the Israeli Court noted that the assignation of personal

liability to a joint tortfeasor "requires the coordination of an operation between two tortfeasors."

*Id.* at 349.  Quoting a leading treatise on English tort law, the Court noted that "'mere similarity

of design on the part of independent actors is not enough; there must be a concerted action

towards a common end.'"  *Id.* (quoting *Clerk & Lindsell on Torts* § 4-108 (Anthony M. Dugdale

et al. eds., 18th ed. 2000)).

      BOC argues that this language means that, to be liable under § 12, it "must have a

subjective intent to commit the same act as the principle wrongdoer."  Naschitz Decl. ¶ 30.

Because plaintiffs have merely pled that BOC knowingly assisted the PIJ, says BOC, plaintiffs

have thus failed to state a claim under § 12.  BOC's Mot. 43–45.  But the language quoted by the Israeli Supreme Court does not foreclose the applicability of § 12 to those with mere knowledge who tortiously assist another.  Awareness—i.e., knowledge—of the injurious nature of the act of another to be aided by a defendant, and the provision of aid despite that awareness, is sufficient to establish liability under § 12.  Galid, *Multiple Tortfeasors Under Israeli Law*, *supra*, at 106–07.  Indeed, mere negligent provision of assistance to a wrongdoer has been sufficient establish such liability.  *Id.*  Accordingly, plaintiffs need only plead BOC's knowledge, not intent, to support a claim under § 12.

This conclusion is further supported by an Israeli case partially provided by plaintiffs, which held: "Liability under § 12 requires a mental state of awareness . . . . A person participating in an enterprise which ultimately results in injury, will be liable [under section 12], if in joining the primary tortfeasor he knew where he was headed . . . ."  CA 6871/99 *Rinato v. Rom* 56(4) PD 72, *translated and quoted in* Porat Decl. ¶ 70.  BOC's expert points out that *Rinato* also held that "[i]t is required that the contribution or participation of the person be in the commission of the act of tort and not the inadequate commission of a permitted act."  *Id.* ¶ 12, *translated and quoted in* Naschitz Supp. Decl. ¶ 16.  For example, one will not be liable for aiding the negligent driving of another by lending the other one's car, a permitted act.  *Id.*  But BOC's alleged provision of financial services to terrorists is not analogous to the innocent lending of a car to a driver who turned out to be a bit careless.  BOC allegedly knew that its financial services would be used to further terrorist violence.  That is more like lending a car to someone who you knew would use it to intentionally mow down pedestrians.  From the excerpts provided by both parties' legal experts, *Rinato* thus supports the conclusion that plaintiffs need

only plead BOC's knowledge of the PIJ's violent intentions and the provision of financial services in spite of them to support a claim under § 12.

As discussed more fully above, plaintiffs have pled that BOC provided financial services to the PIJ by conducting wire transfers to a PIJ agent, that Israeli officials allegedly informed China, which informed BOC, that the transfers were enabling the terrorist activities of the PIJ, and that BOC did not stop making the transfers. FAC ¶¶ 69, 77; *see* discussion *supra* Part III.E.2.e.i. Coupled with plaintiffs' additional allegation that this knowing provision of financial services to fund terrorism "assisted PIJ to carry out the Terrorist Bombing," FAC ¶ 156, plaintiffs have therefore stated a claim upon which relief may be granted under § 12.[15]

### F. Duplicity of Plaintiffs' Claims.

As a matter of judicial economy, courts should dismiss a claim if it is duplicative of another claim in the same suit. BOC argues that plaintiffs' secondary-liability claim under the ATA is duplicative of their primary-liability claim under the ATA. The Court disagrees; because the two claims are not sufficiently identical, they are not duplicative.

### 1. Claims Duplicative of Others Should Be Dismissed.

Duplicative claims are those that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available. *McGee v. District of Columbia*, 646 F. Supp. 2d 115, 121–22 (D.D.C. 2009). As a matter of judicial economy, courts should dismiss claims that are duplicative of other claims. *See id.* at 121 (noting that, for example, "[c]ourts typically dismiss contract claims that duplicate contemporaneously-filed

---

[15] Because the Court has concluded that § 12 does not require a showing of actual intent, the Court need not consider any of plaintiffs other pleadings that might support such intent but that also might constitute political questions. *See* FAC ¶¶ 112, 123; discussion *supra* Part III.A.2.b.i.

discrimination or retaliation claims"); *see, e.g.*, *Park v. Hyatt Corp.*, 436 F. Supp. 2d 60, 66 (D.D.C. 2006) (dismissing generic "discrimination" claim as duplicative of other claims brought under the District of Columbia Human Rights Act and federal civil-rights statutes). If plaintiffs have pled any duplicative claims, the duplicates should therefore be dismissed.

### 2. Plaintiffs' Secondary-Liability Claim Is Not Duplicative of Their Primary-Liability Claim.

Plaintiffs have pled claims of both primary and secondary liability under the ATA, FAC ¶¶ 106–25, but BOC argues that secondary liability is duplicative of primary liability, BOC's Mot. 28. It is not. Plaintiffs' primary-liability claim alleges that BOC is liable for its own acts—the provision of financial services to the PIJ—while their secondary-liability claim alleges that BOC is liable for aiding and abetting the acts of others—the Tel Aviv bombing carried out by the PIJ. If plaintiffs fail to succeed on the merits of their primary-liability claim—for example, if they fail to prove that the provision of financial services to the PIJ itself constituted an act of terrorism—they might still succeed on their secondary-liability claim, which does not require a primary-liability chain-of-incorporations analysis with respect to BOC's own acts.

BOC argues that plaintiffs have conceded that their secondary-liability claim *is* duplicative of their primary-liability claim by agreeing in their opposition to BOC's motion that "if the jury ultimately finds BOC directly liable under § 2333, the aiding and abetting claim will be mooted." BOC's Reply 19; Pls.' Opp'n 21. Such is a total misconstrual of plaintiffs' argument. Far from conceding the point, plaintiffs correctly point out that at this stage of the litigation, "plaintiffs face the danger that the direct liability claim under § 2333 will not succeed." Pls.' Opp'n 21. In other words, because plaintiffs might fail on their primary-liability claim, but succeed on their secondary-liability claim, the two are not sufficiently identical to warrant dismissal of one as duplicative of the other.

## IV.    Conclusion.

For the reasons set forth above, BOC's motion to dismiss is denied.  A separate order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on October 20, 2010.