UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------------X

SHERYL WULTZ, *et al.*,                                    Docket no.

                                                           08 Cv. 1460 (RCL)

                                  Plaintiff,

                    -against-

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                                  Defendants.

------------------------------------------------------------------------X


**PLAINTIFFS' S PROPOSED FINDINGS OF FACT**

**AND CONCLUSIONS OF LAW**


**A.      Introduction**

           This is a civil action for damages pursuant to the Foreign Sovereign

Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq*., against the Islamic Republic of Iran

("Iran"). The Iranian Ministry of Information and Security, Ayatollah Ali Hoseini

Khamenei, Ali Yunesi, Gholam Hossein Mohseni-Ejehei (hereinafter "the Iranian

defendants") and the Syrian Arab Republic ("Syria"), The Syrian Ministry of Defense,

Mustafa Tlass, Syrian Military Intelligence, Hassan Khalil, Assef Shawakat, Ali Douba,

The Syrian Air Force Intelligence Directorate and Ibrahim Hueiji. Plaintiffs are

American citizens who were victims and family members of victims of a Palestine

Islamic Jihad (hereinafter "PIJ") terrorist organization's suicide bombing perpetrated at a restaurant in Tel-Aviv Israel on April 17, 2006.

On August 22, 2008, Plaintiffs filed a Complaint against the Islamic Republic of Iran, the Syrian Arab Republic pursuant to the FSIA's terrorism exception, 28 U.S.C. § 1605A, and against Hezbollah pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333. (Dkt. # 1).

On January 13, 2009, Plaintiffs filed an Amended Complaint, which is the operative complaint. (Dkt. # 12).

Plaintiffs provided the Clerk with copies of the Summons and Amended Complaint and translations thereof into Persian and Arabic, and the Clerk then mailed the Summons and Amended Complaint by registered mail to the head of the Ministry of Foreign Affairs of each on March 12, 2009, in keeping with 28 USC 1608(a)(3). (Dkt. # 17, 18, 19). *See* 22 C.F.R. § 93.2 (detailing notice of suit requirements). Plaintiffs also filed a request for the Clerk to serve a copy of the Summons and Complaint with translations on the United States Department of State, in keeping with 28 USC 1608(a)(4), which the clerk then did on May 14, 2009 and June 30, 2009. (Dkt. # 24, 25, 39, 40, 41).

The Clerk noted return of service executed with respect to the defendants Syrian Arab Republic, Syrian Ministry of Defense, Syrian Military Intelligence, and Syrian Air Force Intelligence Directorate ("Syrian Defendants") as of September 8, 2009, and a due date of November 9, 2009 was set for the answers of these defendants. (Dkt. # 51).

The Clerk noted return of service executed with respect to the defendants Islamic Republic of Iran and the Iranian Ministry of Information ("Iranian Defendants") and as of October 1, 2009, and a due date of November 30, 2009 was set for the answers of these defendants. (Dkt. # 65, 67).

The Clerk then issued an entry of default against the Iranian Defendants on December 17, 2009. (Dkt. #66).

Meanwhile, on November 16, 2009, the Syrian Defendants appeared by counsel, Ramsey Clark, and filed a motion to dismiss for lack of jurisdiction. (Dkt. # 60). Plaintiffs opposed that motion (Dkt. # 68), the Syrian Defendants filed reply (Dkt. # 71). The Court entered an order denying the Syrian Defendants' motion on October 20, 2010. (Dkt. # 86).

On October 20, 2010 the Court entered an order dropping the individually named defendants, with plaintiffs' consent, since they were all sued in their capacity as officers of the Iranian Defendants and the Syrian Defendants, and hence the claims against them were duplicative. (Dkt. # 87).

Following the Court's denial of the Syrian Defendants' motion to dismiss, the Syrian Defendants failed to file an answer and defaulted. An application for the Clerk to enter a default was filed by the Plaintiffs on December 26, 2010 (Dkt. # 99). A motion for a default as against the Syrian Defendants was filed February 27, 2011 (Dkt. # 104). The Clerk entered a default against the Syrian Defendants on February 10, 2011 (Dkt. 105).

On February 28, 2011 the Plaintiffs filed a motion to hold an evidentiary hearing. (Dkt. # 109).

An evidentiary hearing was held on February 27 and 29, 2012 at which evidence was presented as to liability of the Syrian Defendants and the Iranian Defendants, and the plaintiffs' damages. Additionally, the declarations of two witnesses, Dr. Richard Edelmman, an economist, and Israeli Defense Forces Col. (Ret.) Ofer Saad. (Dkt # 127, 128).

Plaintiffs have moved for the entry of a judgment against the Iranian and Syrian defendants pursuant to the FSIA in the amounts to be set by the court. Notwithstanding defendants' default, the FSIA requires that a default *judgment* against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. §1608(e).

Thus, pursuant to § 1608(e), this Court cannot enter default judgment in this case unless it finds that the plaintiffs have shown "by evidence that is satisfactory to the Court" that the Court has jurisdiction and that the defendants are liable. *See e.g., Holland v. Islamic Rep. of Iran*, 496 F. Supp. 2d 1, 12 (D.D.C. 2005) ("Every case brought against a foreign state raises two distinct and crucial legal questions. First, the Court must look to whether it has jurisdiction to hear the claim. In the context of claims implicating the parameters of the FSIA, this jurisdictional determination is guided by an inquiry into whether the case falls within one of the statutory exceptions to the

sovereign immunity of a foreign state. Second, the Court must consider the actual liability of the defendant foreign sovereign.") (Citations omitted).

At the same time, under § 1608(e) "the Court may accept as true the plaintiffs' uncontroverted evidence." *Wachsman v. Islamic Rep. of Iran*, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (citing *Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)). *See also Botvin v. Islamic Rep. of Iran*, 604 F. Supp. 2d 22, 26 (D.D.C. 2009) (same); *Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008) (same); *Alejandre v. Rep. of Cuba*, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same).

The "satisfactory to the court" standard contained in 28 U.S.C. §1608(e) is identical to the standard for entry of default judgments against the U.S. government in Rule 55(e). *Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (1996).

For the reasons set forth below, and after reviewing Plaintiffs' Amended Complaint, expert witness testimony, and the entire record in this case, the Court finds that Plaintiffs have clearly demonstrated both the Court's jurisdiction and the Defendant's liability for their injuries "by evidence that is satisfactory to the Court." § 1608(e).

# I.      FINDINGS OF FACT

## A.      The Terrorist Bombing

For several months prior to April 17, 2006, the PIJ planned and made preparations to murder and injure Jewish civilians by carrying out a suicide bombing in a crowded public location in Tel Aviv, Israel. Pursuant to this plan, on April 17, 2006, at approximately 1:30 PM, an agent and operative of the PIJ, Sami Salim Mohammed Hammed ("Hammed") arrived at the Rosh Ha'ir restaurant near the old Central Bus Station in Tel Aviv, which was packed with diners, in order to carry out the suicide bombing (hereinafter the "Terrorist Bombing") on behalf and at the direction of the PIJ. The terrorist was carrying a powerful explosive device covered with nails and other metallic projectiles with which he had been provided by the PIJ for the specific purpose of carrying out the bombing. Hammed set off the explosive device shortly after 1:30 PM. The explosion killed eleven people and wounded dozens of others. Among the wounded were sixteen year old Daniel Wultz and his father, Yekutiel ("Tuly") Wultz, who were visiting Israel for the Passover holiday.

Daniel Wultz was critically injured in the bombing, and underwent multiple surgeries and other procedures in a desperate effort to save his life, but unfortunately succumbed to his injuries on May 14, 2006. Daniel Wultz was conscious immediately after the bombing and throughout much of his hospitalization. Between the time of the bombing and his death, Daniel endured extreme conscious physical pain

and suffering, as well as severe emotional pain as the result of his conscious awareness of both the fact and extent of his injuries, and the likelihood that he would die.

Tuly who was sitting next to his son at the time of the bombing, suffered serious physical injuries in the attack, as well as resultant psychological and emotional harm. One moment Tuly and Daniel were enjoying a father-son lunch; the next moment Tuly saw his son Daniel on the ground, obviously critically wounded and covered in blood and body parts which he at first thought were Daniel's, but turned out to be parts of the bodies of other victims of the bombing or perhaps the bomber himself. Both father and son were evacuated to a nearby hospital to undergo surgeries for their injuries. While Tuly survived the Terrorist Bombing, however, with long-term serious injuries, Daniel heroically fought for his life for the next 27 days in the hospital, underwent numerous surgeries and medical procedures, including amputations of his leg and fingers and bowel resection, before succumbing to his injuries. He died on May 14, 2006.

## B.     The Palestine Islamic Jihad

The PIJ is a radical terrorist organization formed in the Gaza Strip during the early 1980s. The PIJ's openly-declared goal is the creation of an Islamic state in the territory of Israel, the West Bank and the Gaza Strip, and the destruction of the State of Israel and the murder or expulsion of its Jewish residents. The PIJ seeks to achieve this goal by carrying out terrorist attacks against Jewish civilians in Israel, the West Bank

and the Gaza Strip. The PIJ proudly and openly acknowledges that it uses terrorism to achieve its political goals, intending to coerce and intimidate government decision-makers and the public in Israel to accept the PIJ's demands.

Between the time of its founding and April 17, 2006 (and until the present day), PIJ has carried out thousands of terrorist attacks in Israel, the West Bank and the Gaza Strip, in which scores of Israeli and U.S. citizens were murdered and hundreds more wounded. Between 1999 and April 17, 2006, the courts of the United States, including this Court, published a number of decisions finding that PIJ was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

The PIJ has been designed by the United States as a Foreign Terrorist Organization ("FTO") continuously since 1997 and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001. The PIJ receives a large portion of its funding from Iran, and is provided facilities and other material support by Syria. In addition, Iran provides the terrorist group with weapons and training. Since 1988 and until the present day, the PIJ's headquarters have been continuously located in Damascus, Syria.

The PIJ carried out the Terrorist Bombing utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by the Iranian and Syrian defendants for the specific purpose of carrying out that attack and other such acts of extrajudicial killing and international terrorism.

## II.      FINDINGS OF FACT REGARDING LIABILITY

The Court has determined the Iranian and Syrian defendants' liability for the provision of material support and resources to the PIJ, primarily through the testimony of three expert witnesses, Dr. Marius Deeb and Dr. Matt Levitt who provided live testimony, and Israel Defense Forces ("IDF") Colonel (Res.) Ofer Saad who submitted an affidavit. In addition, this Court takes judicial notice of judgments in other cases involving terrorist attacks perpetrated by the PIJ in which American citizens were killed and injured. Some of Plaintiffs' evidence is cumulative, but because of the level of detail and insight the witnesses provided regarding the provision of material support and resources by the Iranian and Syrian defendants to the PIJ to perpetrate terrorist attacks against civilian targets, the Court will quote at length from their expert testimony.

## A.      Declaration of Colonel (Res.) Ofer Saad

Plaintiffs have submitted the affidavit testimony Ofer Saad. Between 1989 and 2009, Saad served in the Intelligence branch of the IDF and retired from active service in 2009 having achieved the rank of Colonel. He is currently a Research Fellow at the Institute for Counter-Terrorism at the Interdisciplinary Center in Herzliya, Israel. He holds a B.A. in Middle Eastern and African Studies from Tel Aviv University, and completed course work toward a Masters degree in Security Studies at Tel Aviv University.

During most of his service in IDF Intelligence Colonel Saad specialized in Palestinian affairs and terrorism, and served as an officer in a variety of senior positions relating to those topics, including: Head of the Palestinian Sector in the IDF Intelligence Research Division (2005-2009); Adjutant to the Head of IDF Military Intelligence (2001-2005); and Head of the Palestinian Affairs Branch in the IDF Intelligence Research Division (1998-2001).

In the course of his service in IDF Intelligence he received and reviewed a large number of intelligence materials (including raw intelligence data obtained from electronic and human sources, as well as intelligence summaries and analyses compiled from such raw data) relating to the activities of the PIJ and to the material assistance provided to the PIJ by the Syrian government, both generally and specifically in respect to the April 17, 2006 suicide bombing from which this lawsuit arises. The basis for his testimony in his Declaration is the knowledge and information he acquired during his service in the IDF Intelligence Branch and the documents referenced herein.

Colonel Saad states that on April 17, 2006, a suicide bomber sent by the PIJ terrorist organization blew himself up at a restaurant in the old Central Bus Station in Tel Aviv. Eleven people were killed by the bombing, including Daniel Wultz, and scores of others were injured.

Shortly afterwards, the PIJ publicly took credit for the bombing, and even distributed an audiovisual recording featuring the suicide bomber giving his "last testament" before a backdrop of the PIJ organization's flags. The PIJ's Deputy Secretary-

General, Ziyad Nahala, who operated from the PIJ's headquarters in Damascus, Syria, confirmed that the PIJ had carried out the bombing and threatened that the PIJ would execute additional suicide attacks "in the heart of the Zionist entity" (*i.e.*, Israel). Some of those involved in abetting the bombing were later captured by Israeli security forces, and were tried, convicted and sentenced by the Israeli courts for their roles. The convictions and other court documents from those prosecutions (which Colonel Saad has examined) evidence that the bombing was carried out by a PIJ cell based in the city of Jenin, in the Palestinian Authority. However, as discussed below, the order to carry out the bombing came from the PIJ's headquarters in Syria.

The PIJ was originally established in the Gaza Strip. After being expelled from Gaza in the late 1980s, the PIJ leadership relocated the group's "military" (*i.e.,* terrorist) and political headquarters to Syria, where they have remained until today.

Syria's hosting of the PIJ in its territory is consistent with a decades-old policy of support for terrorism. Syria's government has used support for terrorism a tool for achieving its policy objectives since the 1960s. The form of such support has varied over the years in accordance with Syria's needs and the circumstances: at times the Syrian regime used its own agents to carry out terrorist attacks, while at other times Syria used terrorist organizations such as the PIJ as proxies to execute attacks that served its interests. As part of this policy, Syria has for decades hosted in its territory numerous terrorist groups, both Palestinian (*e.g.,* the PIJ, Hamas and the Popular Front for the Liberation of Palestine) and foreign (*e.g.,* the Kurdish terrorist group "PKK").

Syria's policy of support for terrorism was initiated by former President Hafez al-Assad, who ruled Syria between 1970 and 2000, and has been continued in full force by his son, current President Bashar al-Assad, who assumed power in 2000 upon his father's death.

Under the leadership of President Bashar al-Assad, Syria has engaged in a consistent policy of encouraging and supporting terrorism against Israel by the PIJ and other terror groups. This policy is intended to strengthen the radical Iranian-Syrian axis in the Middle East, to weaken Israel by undermining its society and economy, to bolster the Islamic forces in the region, and to torpedo any chance for an Israeli-Palestinian rapprochement.

The PIJ is a small group that focuses almost entirely on terrorism (in contrast to Hamas, for example, which in addition to its terrorist attacks engages in social, educational and other such activities, and has a large civil infrastructure in the West Bank and the Gaza Strip), and the PIJ has therefore historically lacked a significant indigenous financial or material base in the West Bank or Gaza (and, of course, has no presence at all in Israel itself). As a result, the PIJ is, and has always been, extremely dependent for its existence and operations on foreign support.

Since the late 1980s and until today, two states have provided the PIJ with material assistance: Iran and Syria. Iran's support to the PIJ has been mainly financial, while Syria has provided the PIJ with a geographical base, in Syria, where its leaders and operatives can freely function, train for and organize terrorist attacks. As noted

above, in the late 1980s, Syria permitted the PIJ's leaders to enter Syria and to establish and maintain the organization's headquarters in Damascus ever since. This "territorial platform" provided by Syria to the PIJ has been crucial to the PIJ's ability to plan and carry out terror attacks against Israel.

The PIJ's headquarters in Syria, located in offices in Damascus are, and since 1995 have been, headed by the two top leaders of the PIJ: Secretary-General Ramadan Shallah and Deputy Secretary-General Ziyad Nahala. Syria shelters Shallah, and allows him to live and run the PIJ freely on its territory, despite the fact that Shallah was listed as a "Specially Designated Terrorist" under U.S. law in 1995, and was indicted in a federal court in Florida in 2003.

For decades, Shallah, Nahala and their subordinates have conducted the day-to-day propaganda and political activities of the PIJ from their headquarters in Damascus. More importantly, the Damascus-based leadership of the PIJ has maintained on-going communications and contacts with the PIJ's cells and operatives "on the ground" in the West Bank and Gaza Strip, and provided them with both policy directives and operational instructions – including specific instructions to carry out terrorist attacks – as well as financial support.

Simply put: for the past several decades the PIJ's headquarters in Syria has provided both the orders and the funds necessary to PIJ cells in the West Bank and Gaza to carry out terrorist attacks in Israel. Since the mid-1990s, the PIJ has carried out

more than 30 suicide attacks against Israeli targets, in which approximately 130 people have been killed.

Additionally, for many years now Syria has allowed the PIJ to train its terrorist operatives at Syria's Ein Al-Sahab training camp, located northwest of Damascus. The training provided to PIJ personnel at Ein Al-Sahab includes a broad range of guerrilla and terrorist skills, including the use of weapons and explosives. PIJ trainees at Ein Al-Sahab travel to the West Bank and Gaza Strip upon the completion of their training, where they convey the knowledge they have acquired to other PIJ terrorists and/or use it to themselves carry out terrorist attacks.

In sum, during the past decades the Syrian government has provided critical material assistance to the PIJ, which greatly facilitated the PIJ's ability to carry out terrorist attacks in Israel. In light of the facts above it is fair and accurate to say that, if not for Syria's willingness to host the PIJ and allow it to operate and train in its sovereign territory, the PIJ's ability to execute terrorist attacks in Israel – including the April 17, 2006 bombing – would have been severely restricted if not non-existent. Indeed, without the support Syria has given the PIJ since its leaders were expelled from Gaza in the late 1980s, it is questionable whether the PIJ would exist at all today.

The Terrorist Bombing at issue in this case is a prime example of the direct role played by the PIJ's Syrian-based headquarters in executing terrorist attacks in Israel. The Israeli government learned (in a manner that Colonel Saad was not at liberty

to describe or disclose[1]) that the PIJ's headquarters in Damascus specifically ordered PIJ operatives in the West Bank to carry out the Terrorist Bombing on April 17, 2006 in which Daniel Wultz was murdered and Yekutiel Wultz was grievously injured, and that the operatives in the West Bank sent a report back to PIJ headquarters in Syria regarding the bombing after it was carried out.

On April 21, 2006, Israeli Prime Minister Ehud Olmert shared this information with a visiting group of American Senators. As the Associated Press reported at the time, Prime Minster Olmert told the Senators that "[t]he order for the Tel Aviv suicide bombing came from Damascus and when the operation was complete the report went back to Damascus." (*See* Exhibit 1 to Saad declaration).

Obviously, if Syria had not permitted the PIJ to establish its headquarters and operate on Syrian territory over the past decades, there would have been no PIJ headquarters in Damascus to give the order to carry out the Terrorist Bombing, and it is very doubtful whether the PIJ would even have still existed in 2006, after its expulsion from Gaza in the late 1980s.

---

[1] Indeed, if not for the fact that Prime Minister Olmert subsequently divulged these facts publicly, Colonel Saad would not be at liberty to mention them at all.

-15-

**B.      Testimony of Dr. Marius Deeb**

Plaintiffs also presented trial testimony of Marius Deeb, Ph.D., as well as his Curriculum Vitae. (27PM,[2] p. 21, Exhibit 34, Dr. Deeb CV). Dr. Deeb is an expert in middle east affairs, particularly Syrian and Iranian sponsorship of terrorism of Hezbollah, Islamic Jihad and Hamas.

Dr. Deeb obtained his Ph.D. in Arab and Islamic Studies at Oxford University in England. (27PM, p. 21, Exhibit 34). For the last 16 years, he has taught as a Professor at the School of Advanced International Studies at Johns Hopkins University. (27PM, p. 21, Exhibit 34). He teaches Masters and PhD candidates in the school's Middle East studies program (27PM, p. 45, Exhibit 34).

Over that time, Dr. Deeb has focused his studies and teachings on the topic of terrorism, in particular the Syrian Iranian, Hezbollah Hamas, and PIJ terrorism, which includes both terrorism against Western countries and against Israel. (27PM, p. 22, Exhibit 34).

---

[2] Because the court reporters paginated the transcript of each section of the hearing independently (*i.e.,* starting again from 1) the hearing transcripts will be referred to using the following convention: the transcript of the morning session of Feb. 27, 2012 will be referred to as 27AM, the transcript of the afternoon session of Feb. 27, 2012 will be referred to as 27PM, the transcript of the morning session of Feb. 29, 2012 will be referred to as 29AM, and the transcript of the afternoon session of Feb. 29, 2012 will be referred to as 29PM. Unless otherwise noted, the any references to "Exhibit ___" herein refer to the exhibits received in evidence at the hearing.

He has published numerous papers on the topic, as well as a book on Syria's terrorism entitled "Syria's Terrorist War on Lebanon and the Peace Process." (27PM, p. 22, Exhibit 34).

At trial, Dr. Deeb explained that the PIJ was established in 1980, influenced by the uprising in Iran. (27PM, p. 23). Over time, the PIJ became more active in terrorism, particularly from after 1992-1993, and consistently ever since. (27PM, p. 23). PIJ is headquartered in Damascus, Syria. (27PM, p. 23).

Rooted in the militant Islamic Interpretation of religion, the objective of the PIJ is the eradication of the State of Israel and liberation of the whole Palestinian territory under the British Mandate. (27PM, pp. 23-24). For the PIJ there can be no peace with Israel, no acceptance of the Jewish State, and the only way of achieving liberation, as shown from their very title, is through what they refer to as "*Jihad*," religiously motivated violence. (27PM, p. 24). In the context of the name "Islamic Jihad," Jihad is a term that means fighting the enemies of religion as perceived by the PIJ. (27PM, p. 24). For the PIJ, it means fighting, using arms and terrorism to achieve their objectives. (27PM, p. 24).

PIJ originally was an offshoot of the previous Islamic Resistance Movement, the terrorist Hamas organization. (27PM, p. 25). Hamas' roots date back to an earlier organization known as the Palestinian Society of Muslim Brothers established in 1945. (27PM, p. 25). PIJ emerged in 1980 when its founders left Hamas and established a new organization heavily inspired and influenced by the Islamic

Revolution in Iran. (27PM, p. 25). The PIJ and Hamas, however, remain similar in goals and methods, both engage in terrorism against Israel and the West. (27PM, p. 25).

PIJ and Hamas, which is also headquartered in Damascus have strong ties to Iran which has a close alliance with Syria. (27PM, p. 26). Funding for the two terrorist groups comes from Iran which transfers it through the Syrian Intelligence Service. The Syrian Intelligence Service provides the money directly to the heads of Hamas and the PIJ. Until he was assassinated in 1996, the former head of the PIJ, Fathi al-Shiqaqi, received the funds from Syrian Intelligence Service (27PM, p. 26). Since 1996, Ramadan Shalah has been the PIJ leader and receives the funding which is then provided to PIJ operatives to be used for terrorist operations. (27PM, p. 26).

Iranian money was passed through the Syrian Intelligence Service from the 1990s up until 2006 or 2007. (27PM, pp. 26, 32). After Hamas seized control of the Gaza Strip, Iran has been able to provide funds more directly to both Hamas and the PIJ.

Iran's influence with the PIJ grew with the signing of Oslo Accords between Israel and the Palestinians in 1993. (27PM, p. 27). These agreements made the PIJ which rejected all peace agreements with Israel more adamant to engage in violence. (27PM, p. 27).

During the Second Intifada, the outbreak of Palestinian violence against Israel in 2000 and continued until 2005, terrorist suicide bombers became the main weapon of the Palestinians against Israel. This was a direct result of the influence of Iran

and Syria which encouraged the PIJ and other terror organizations to engage in these types of attacks. (27PM, pp. 28-29). The PIJ, a smaller organization than Hamas, is responsible for approximately 25 percent of the suicide bombings perpetrated in Israel during this period. (27PM, pp. 27-28). The PIJ was taught and trained to use suicide bombers by the Hezbollah organization, an Iranian instrumentality, which had engaged in this method of attacks since 1983 (27PM, p. 29).

According to Dr. Deeb Syria's support for PIJ's suicide bombings is well established. Suicide bombing is glorified by the Syrian government as evidenced by the former Syrian President' infamous saying that "martyrdom is life." (27PM, p. 30). Syria is a totalitarian regime that maintains complete control over everything which occurs on Syrian territory, those who reside in Syria and those that organize and train there. (27PM, p. 31). Dr. Deeb testified that it would not be possible for the PIJ to be headquartered in Syria without the consent and approval of Syria. (27PM, p. 31). The money is passed through the Syrian intelligence services. (27PM, p. 26).

Syria's Alawite minority has held high positions in the Syrian government since 1970. This small community controls much of the armed forces and the intelligence services. (27PM, p. 32). Being a small minority in the Arab world, requires the Alawites to sell themselves to the rest of their countrymen and the larger Middle East. As such, the Syrian government, feels the need to constantly display they are fighting Israel and obstructing efforts at peace. (27PM, p. 32).

According to Dr. Deeb the Syrian government does not believe it is within their interest to make peace with Israel. (27PM, p. 33). Therefore, any organization which ideologically opposes peace with Israel, such as the PIJ, has found support from Syria. (27PM, p. 33).

The ethos of the Islamic Revolution in Iran has always been being anti-Western, against the U.S. in particular, and anti-Israeli. (27PM, p. 33). Any movement which is anti-Western, and anti-Israeli, as is the PIJ, has been provided support by Iran. (27PM, p. 33). Combating Israel provides the Iranian government with legitimacy and influence amongst Iran's Arab neighbors. (27PM, p. 33).

The Terrorist Bombing perpetrated by the PIJ, coincided with the elections for Israel's Knesset and forming of a government by the newly elected Prime Minister Ehud Olmert. (27PM, p. 40). Credit for the Terrorist Bombing was taken by the PIJ. (27PM, p. 41). The purpose of the Terrorist Bombing was to greet Israel's new centrist government with a heinous attack, to provoke the Israeli government's reaction and to prevent peace talks between Israel and the Palestinian Authority (27PM, pp. 40-41).

According to Dr.. Deeb the Terrorist Bombing, played into Syria's strategy at that time to prevent any kind of peaceful resolution of the Arab world's conflict with Israel. (27PM, p. 41). This operation was carried out in that context. (27PM, p. 41). It was then followed by the infamous operation where Israeli soldier Gilad Shalit was kidnapped in June 2006 and Hezbollah's attack on Israeli soldiers which provoked a war between Israel and Hezbollah, which lasted 34 days, from July 12th to August 14th,

-20-

2006. (27PM, p. 42). In all three instance, Iran was informed and played an important role in these terrorist operations. (27PM, p. 43).

**C.     Testimony of Dr. Matthew Levitt**

Plaintiffs additionally presented trial testimony of Matthew Levitt, Ph.D., as well as his Curriculum Vitae. (29PM, p. 7, Exhibit 45, Dr. Levitt CV). Dr. Levitt is an expert in counterterrorism and terrorist finance in the Middle East. (29PM, pp. 2-7, Exhibit 45).

He earned his bachelors in political science from Yeshiva University in New York and a masters of law in diplomacy, MALD, from the Fletcher School of Law and Diplomacy at Tufts University, with concentrations in international security, conflict resolution and the Middle East. (29PM, p. 2, Exhibit 45). He also holds a PhD., from the Fletcher School at Tufts, in international relations, where he wrote his dissertation on the impact of terrorist attacks on ongoing negotiations in the peace process in the context of the Oslo process, studying cases of Islamic extremism and Jewish extremism both. (29PM, pp. 2-3, Exhibit 45).

After holding a Ph.D. fellowship at Harvard law school, which enabled him to do his field research in Israel, Gaza and the West Bank, Dr. Levitt was employed as a counterterrorism intelligence analyst at the FBI, focusing on Palestinian terrorist groups and their activities in the United States. (29PM, p. 3, Exhibit 45). Upon leaving the FBI in 2001 and for the next four years, Dr. Levitt held a position at the Washington

Institute for Near East policy founding a terrorism studies program. (29PM, pp. 3-4, Exhibit 45). In 2005 through 2007, Dr. Levitt also was employed by the United States Department of Treasury in the division of terrorism and financial intelligence as First Deputy to First Undersecretary Steward Levy, as well as Deputy Chief of a smaller U.S. intelligence agency. (29PM, p. 4, Exhibit 45).

In 2007, Dr. Levitt returned to the Washington Institute where he currently is employed and directs the Stein Program on counterterrorism and intelligence. (29PM, pp. 4-5, Exhibit 45). He is also employed as an adjunct professor, teaching a counterterrorism course at Johns Hopkins School of Advanced International Studies. (29PM, p. 5, Exhibit 45). Dr. Levitt additionally provides consulting, primary in terrorism, especially on the Middle East, as well as on illicit finance, the financing of terrorism in particular. (29PM, p. 5, Exhibit 45).

Dr. Levitt, testified that the PIJ has been designated as a terrorist organization by the United States, European Union, Australia, Canada and Israel. The PIJ seeks to establish an Islamic state in all of, what it describes as historic Palestine, including Israel, the West Bank and Gaza (29PM, p. 8) The PIJ engages in acts of violence and terrorism to achieve this goal. (29PM, p. 8)

The PIJ was founded by Fathi Shiqaqi, who was raised in the then Egyptian ruled Gaza Strip. (29PM, p.8 ). Shiqaqi, studied in an Egyptian University where he briefly was a member of the Muslim Brotherhood, eventually rejecting them as not being sufficiently radical (29PM, pp. 8-9).

Shiqaqi was inspired by the Iranian Revolution in 1979. (29PM, p. 9). After the assassination of President Sadat in 1981 Shiqaqi then identified as a radical Islamist was deported back to Gaza. (29PM, p. 9). It was in Gaza in the early 1980s that Fathi Shiqaqi, together with a small number of other extremists, Abdel Azizawdah, and Ramadan Shallah, founded the PIJ. (29PM, p. 9).

In the early 1980s, the PIJ was primarily engaged in small-scale attacks targeting the Israeli military. (29PM, p. 9). In 1986, the Israeli government detained and arrested Fathi Shiqaqi for smuggling weapons into Gaza. (29PM, p.10 ). He served two years in an Israeli prison. In 1988, Shaiqaqi expelled from Gaza and was taken to Lebanon and then Syria. (29PM, p. 10). The following year in 1989, it is believed he established the PIJ headquarters in Syria where it remains until today. (29PM, p. 10). In Syria, Fathi Shiqaqi established his first close relationship with Iran in meetings held at the Iranian embassy in Damascus and the Iranian embassy in Beirut. (29PM, p. 10).

According to Dr. Levitt, seized documents from front organizations such as Hamas-affiliated charities, and from the Palestinian intelligence services themselves, evidence meetings between terrorist groups chaired by Iranian officials as well as documentation of the Iranian Embassy in Damascus' role in encouraging the PIJ and other terrorist groups to carry out deadly attacks, to cooperate and put any ideological differences aside to accomplish their common goals. Iran offered financial incentives to these terror organizations for carrying out successful attacks. (29PM, pp. 10-11). This

trend of holding operational meetings in the Iranian embassy in Damascus would continue for many years. (29PM, p. 10).

Fathi Shiqaqi was assassinated in Malta in 1995. (29PM, p. 11). Later that year, a new leader emerged from PIJ, Ramadan Shallah, who was one of the original founders of the PIJ in Gaza. (29PM, p. 11). According to Dr. Levitt after a series of suicide bombing attacks were carried out in1994, 1995, and in early 1996 by the PIJ, Israel carried out a crack-down against PIJ operatives and decimated the terrorist group's capabilities. (29PM, pp. 11-12).

At the time of the Second Intifada the PIJ was enable to resurrect itself. (29PM, p. 12). Dr. Levitt noted that the Palestinian Authority released from prison some of the most dangerous PIJ members who very quickly began to perpetrate suicide bombings again utilizing Iran's financial assistance, weapons and intelligence support. (29PM, p. 12). Having carried out several murderous bombings, Iran greatly increased its financial support to the PIJ. (29PM, p. 13). According to Dr. Levitt, Iran increased the PIJ's budget by 70 to 75 percent. (29PM, p. 13).

Dr. Levitt noted that PIJ doesn't require quite as large of a budget as Hamas because it has no social welfare infrastructure all of these funds are utilized for operations. (29PM, p. 13). PIJ is able perpetrate terrorist attacks as well as support the families of people it is trying to recruit, so that they will know that if they are killed in terrorist operations or if they are they are imprisoned their families will be provided for. (29PM, p. 13). This serves as a powerful incentive for recruitment. (29PM, pp. 13-14).

Dr. Levitt testified that Iran provides several to tens of millions of dollars a year to PIJ. (29PM, p. 14). Iran is the paymaster, but Syria is the conduit and the host, with payments being channeled from Iran through Syrian Military Intelligence. (29PM, pp. 14, 27-29). Being provided safe haven and a base is a benefit of a tremendous value to the PIJ. As recently as 2009, Ramadan Shallah told the press, "I live in Damascus under shelter." (29PM, p. 15).

In February 2005, there was a truce declared between then Israeli Prime Minister Ariel Sharon and Mahmoud Abbas of the Palestinian Authority. (29PM, p. 16). Starting that month PIJ recommenced carrying out suicide bombings. (29PM, p. 16). The PIJ carried out seven or eight of them in succession including the Terrorist Bombing. (29PM, p. 16). The April 17, 2006 attack was actually the second suicide bombing to target this restaurant at the Old Central Bus Station. (29PM, p. 16). PIJ was seeking to do all in its powers to undermine the Palestinian-Israeli cease fire in order to embarrass the Palestinian Authority. (29PM, p. 17). Dr. Levitt testified that there's every reason to believe that PIJ was responsible for the Terrorist Bombing. (29PM, p. 17). PIJ not only issued a public claim of responsibility, they also made it clear by providing the name of the actual bomber and released the video recording of his "will." (29PM, p. 17).

According to Dr. Levitt PIJ has no income or revenue of its own. (29PM, p. 19). It is not known to run charities as front organizations throughout the world as Hamas does. (29PM, p. 19). It is entirely dependent on financial assistance, meaning cash and weapons and some training, from Iran, and on other types of support from

Syria, specifically safe haven, intelligence and base to organize its terrorist operations. (29PM, p. 19).

Dr. Levitt noted that both Syria and Iran support proxy groups to achieve foreign policy objectives. (29PM, p. 20). Moreover, both Syria and Iran are chartered members of the Department of State's list of terrorist sponsoring nations since the list was created in 1979. (29PM, p. 20). Both countries use groups like PIJ, Hezbollah and to enable them to extend their beyond what their intelligence and armed forces would be capable of achieving. (29PM, p. 20).

It is Syria's goal not merely to reclaim the captured Golan Heights region from Israel, but to continue its decades long war against it. The use of Palestinian terrorist groups along with Hezbollah is an effective and cheap means of doing this. (29PM, p. 20). Terrorism is a cost effective way for Syria to put significant pressure on Israel. It's also a means for it to create political leverage and bargaining power for itself with the United States and the European Union. (29PM, p. 20). In several instances, following PIJ attacks the United States, the European Union, and U.N. and Russia, have requested that Syria act to restrain the terrorist organization providing Damascus with ability to negotiate for something in return. (29PM, p. 21).

Iran has been each year since 1979, designated by the United States as the primary state sponsor of terrorism. (29PM, p. 21). Iran seeks to be able to have influence far beyond its border across the Middle East. (29PM, p. 21). It is not a frontline state with Israel, and instead uses these groups to further those interests. (29PM, p. 21).

According to Dr. Levitt in the course of Operation Defensive Shield, the IDF confiscated many Palestinian intelligence documents, which reveal in great detail listing specific sums, hundreds of thousands of dollars at a time, that the PIJ headquarters in Syria was sending to operatives in the West Bank. This was all money that's coming originally from Iran. (29PM, p. 22).

In 2006, not long after the Terrorist Bombing, the Israelis arrested several female PIJ operatives who were serving as couriers, going back and forth to Syria and smuggling funds. (29PM, p. 22). In another instance in 2006, that was reported by the Department of State, the Israelis raided a banking institution in the West Bank and confiscated millions in counterfeit Israeli shekels which they believe were produced in Iran and then smuggled through Syria into the West Bank. (29PM, pp. 22-23). This counterfeiting operation was a PIJ, Hamas and Hezbollah cooperative effort. (29PM, p. 23). The financial support from Syria and Iran is utilized by PIJ for funding terrorist attacks and also to provide for the families its operatives, thus providing an important incentive to assist the organization. (29PM, p. 23-25).

**D.     Findings in Other Cases**

This Court has heard evidence from Plaintiffs' three experts demonstrating that the PIJ was provided massive material support and resources by the Iranian and Syrian defendants to carry out terrorist attacks such as the Terrorist Bombing. Further, numerous courts, including this one, have found in the past that Iran

regularly perpetrates terror attacks through its surrogate, the PIJ. *See e.g., Haim v. Islamic Rep. of Iran*, 784 F. Supp. 2d 1, 7 (D.D.C. 2011) *(quoting Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 9 (D.D.C. 1998) for the finding that "Iran provides material support and resources to [Palestine Islamic Jihad] by supplying funds and training for the Shaqaqi Faction's terrorist activities in the Gaza Strip region."); *Belkin v. Islamic Rep. of Iran*, 667 F. Supp. 2d 8, 16 (D.D.C. 2009); *Elahi v. Islamic Rep. of Iran*, 124 F. Supp. 2d 97, 101 (D.D.C. 2000) ("Iran also operates in the Middle East through at least three surrogate organizations that receive Iranian funding: Hezbollah, a Lebanese Shiite organization; Hamas, or Islamic Resistance; and the Palestinian Islamic Jihad.").

## E.    Testimony of Yekutiel Wultz

The Court has heard the trial testimony from Yekutiel ("Tuly") Wultz, the father of the decedent Daniel. (27AM, pp. 6, 11, 13). Tully was born March 5, 1954 in Israel where he finished high school before serving in the IDF, where he achieved the rank of lieutenant. (27AM, pp. 11-12). Afterwards, he emigrated to the United States and studied finance and accounting for three years at Florida International University in Miami. (27AM, pp. 12-13).

From 1979 to 1981, Tuly worked as an air marshal, an armed undercover security guard, on Israeli airline flights. After he married Sheryl Wultz, he went into business for himself as a financial advisor and planner. (27AM, pp. 12-13).

Tuly became a United States Citizen in 1997 (27AM, p. 11; Exhibit 7, Yekutiel Wultz U.S. Passport).

Tuly and Sheryl's daughter Amanda was born a citizen of the United States on February 27, 1987. (27AM, p.13; Exhibit 5, Amanda Wultz U.S. Birth Certificate; Exhibit 6, Amanda Wultz United States Passport). Daniel was born two years later on December 6, 1989. (27AM, p.13; Exhibit 3, Daniel Wultz U.S. Birth Certificate; Exhibit 8, Daniel Wultz United States Passport). The Wultz had a third child, AbrahAM, born after Daniel's murder on November 29, 2007. (27AM, p.13; Exhibit 1, Abraham Wultz U.S. Birth Certificate; Exhibit 9, Abraham Wultz United States Passport).

Tuly testified that Daniel was a good student growing up, but above all, he cared about people and his family. (27AM, pp. 13-14). Daniel admired a lot of people, including his parents Yekutiel and Sheryl. He admired very much Yekutiel's father, who was a Holocaust survivor, and Yekutiel's cousin, Professor Avram Hershko. Avram was the first Israeli to win the Nobel Prize for biochemistry, and Daniel wanted to be just like him. (27AM, p. 15).

According to Tuly, Daniel was a natural pilot. At the age of 14 he started learning to fly a jet airplane. (27AM, p. 16). Daniel loved basketball and wanted to be a professional player. (27AM, p. 13-14).But he was also a great student, accelerating in math and science. (27AM, pp. 16-17). If he could not be a professional ball player he might have been a doctor, or a lawyer given his great arguing skills. (27AM, pp. 16-17).

Tuly testified that Daniel was always a very spiritual person, but he became more religiously observant as a teenager and and that a community rabbi, Rabbi Yisroel Spaltor was his mentor for his religious studies. (27AM, pp. 18-19). Daniel was so close to the Rabbi that he placed him on his speed dial. (27AM, p. 19).

In April 2006, Tuly, Sheryl, and Daniel took a Passover trip to Israel. (27AM, p. 19). Amanda, Tuly's and Sheryl's daughter, stayed in the United States at her University. (27AM, p. 19).

On April 17, 2006, the three were in Tel Aviv. Having left their rental car at the hotel and walked to a shopping center. (27AM, p. 20). By mistake, the driver took them to a restaurant about 10 minutes' distance from the shopping center where they had wanted to arrive. (27AM, p. 20). As it would have been too difficult to make a U-turn, they got out of the cab at the restaurant. When Daniel saw the restaurant was kosher, he wanted to return for lunch. (27AM, p. 21).

Sheryl, Daniel and Tuly walked to the shopping area until Daniel became hungry and asked his father to return to the restaurant to eat. (27AM, p. 21). Sheryl continued shopping. (27AM, p. 21). The restaurant was very small with nowhere to sit inside. (27AM, p. 21). All of the chairs and tables were outside on the sidewalk, surrounded by a gate. (27AM, pp. 21-22). Even though the seating was on the sidewalk there was a security guard at the entrance of the restaurant checking bags. (27AM, p. 22). Daniel was sitting with his back to the security guard and Tuly sat facing the guard. (27AM, p. 22).

Tully saw a teenage male, dressed in dark jeans and a dark T-shirt with a heavy backpack approach the guard. (27AM, p. 23). When this individual was stopped by the guard, he did not speak, he only gestured. (27AM, p. 23). The guard asked him to open his bag and at that moment Tuly saw an evil smile appear on his face. (27AM, p. 23). With his experience as an air marshal, Tuly understood exactly what was about to happen. (27AM, p. 23). He tried to jump on Daniel, but as soon as he tried to get up, the terrorist detonated the bomb. (27AM, pp. 23-24). Tuly testified that he felt fire as he was thrown backwards from his chair. Daniel landed on top of him. (27AM, p. 24). Everything went quiet as the blast had injured his ears. Tuly saw Daniel mouthing "*Abba* [Hebrew for "dad"] pick me up, pick me up." (27AM, p. 24). Tuly, however. was unable to move. (27AM, p. 24). His leg was in terrible pain. (27AM, p. 24). He noticed that Daniel's back laws badly injured and looked like a "strainer." (27AM, p. 24). There were holes everywhere in the flesh caused by the bomb's shrapnel that went through him. (27AM, p. 24). He was bleeding heavily. (27AM, p. 24). All around him, Tuly saw other victims' body parts including hands and legs. (27AM, p. 27).

Tuly testified that he hit with shrapnel too. (27AM, pp. 27-28). He was hit in the leg and forehead and still has the scars today. (27AM, pp. 27-28). Most of the shrapnel went through Daniel and into Tuly's body. (27AM, pp. 27-28). By the time it reached Tuly, the shrapnel was at such a low velocity that it did not cause as much damage as it did to Daniel. (27AM, pp. 27-28). Daniel was his shield. He saved his life. (27AM, pp. 27-28).

As a result of the blast, Tuly lost a significant amount of his hearing. (27AM, p. 30). The eardrums perforated and there was nerve damage. (27AM, p. 30). He has almost no hearing in his left ear and only 40-50 percent in his right ear. (27AM, p. 30). The worst part is the tremendous and constantly loud ringing in his ears, that not only does not allow him to rest, but reminds him of the fateful day. (27AM, p. 31). He has also lost some of his senses of smell and taste. (27AM, pp. 31-32). In his left leg, where he was hit with shrapnel between his knee and ankle, he has no feeling and cannot control the leg between his knee and his toes. (27AM, pp. 32-33). He walks without a cane, but with a noticeable limp and much pain. (27AM, pp. 32-33).

Tuly testified that he underwent surgery to remove the shrapnel from both legs and head, and to fix his eardrums and crushed bones in his temple. (27AM, pp. 33-34). He has also required surgery to his spine to remove blisters that have formed as a result of his leg problems. (27AM, pp. 36-37).

Prior to the bombing, Tuly was very active, running and playing basketball with Daniel every day. (27AM, pp. 37-38). Not only will he not be able to play ball with Daniel, he is not able to teach his son Abraham how to play. (27AM, pp. 37-38).

Tuly experiences flashbacks and nightmares, every day and at night. (27AM, pp. 39-41). At night he wakes up in a sweat to a reoccurring images of the bombing and saying goodbye to Daniel the night before he passed away, 27 days after

the bombing. (27AM, pp. 39-41). He is unable to then go back to sleep. The flashbacks during the day are nonstop. (27AM, pp. 39-41).

When Daniel arrived at the hospital, he was taken to surgery for the next 13 hours. (27AM, p. 41). They immediately removed one of his kidneys, which was shredded and nonfunctioning, and attempted to save his other one. (27AM, pp. 41-42). They also removed his spleen. (27AM, pp. 41-42). When Daniel briefly woke up at the hospital he told the anesthesiologist that he wanted to live. (27AM, p. 43). He received 80 units of blood—an amount which is so large it is virtually unheard of. (27AM, p. 43).

Tuly testified that almost every day, for the remaining 27 days in Daniel's fight for survival, he seemed to undergo another surgery; the removal his right leg below the knee, a finger, another finger. (27AM, pp. 45-47). He was on dialysis. (27AM, p. 47). He would also have strange twitches, despite the medically induced coma. (27AM, pp. 47-49). Only once did they wake him from the coma to check for brain damage, but he could not talk because of a tracheotomy. (27AM, pp. 48-49). He clearly recognized his family there and still communicated. (27AM, p. 49). If the tears were not enough to show it, when his father asked him to blink if he was in paint, he blinked. (27AM, p. 47). He saw his sister Amanda, and with his lip he said to her "I love you." (27AM, p. 50).

After weeks of the Daniel's agonizing struggle to live, on the evening of May 13, the doctors told the family that Daniel would not make it. (27AM, pp. 53-54). They disconnected him from the machines, but according to his father Daniel's heart

kept going. (27AM, p. 54). The family sang him songs all night until he passed away the next day. (27AM, p. 54). His body was unable to bear all the infections. (27AM, p. 54).

Tuly was released from the hospital early so that he and his family could fly Daniel home to Florida and bury him near to the family's home. (27AM, pp. 56-57). Tuly still visits Daniel's grave every Friday to ask for forgiveness and to sing him a few songs since Friday was his favorite day of the week. (27AM, pp. 57-59).

Tuly, has testified that he often times now has thoughts of suicide, has lost his son and his desire to live life to the fullest. (27AM, pp. 61, 68). His business is suffering, and now he feels he is losing his daughter Amanda who moved to Chicago. (27AM, pp. 58-62). She had been doing well in University before Daniel's murder, but everything became difficult for her afterwards. (27AM, pp. 62-63). She barely finished up college at the University of Miami with help from friends and family. She has lost her drive and does not work full-time. (27AM, pp. 62-63).

Tuly's relationship with his wife Sheryl has also suffered. (27PM, p. 2). Sheryl is not the same person she used to be. She is very depressed, and these feelings are part of her life now. (27PM, p. 2). He recalled that the night that Daniel died, the mother of the PIJ suicide bomber went on television praising Allah for the death of "the dog." (27PM, p. 3). This was how she referred to Daniel. (27PM, p. 3). She stated that she could not wait for her other kids to follow in the path of her hero son. (27PM, p. 3). The tragic death of Daniel continues to haunt Tuly and his family. It is a dark cloud that hangs over their every waking hour.

**F.      Testimony of Dr. Alan Friedman**

Plaintiffs presented the expert testimony of Alan Friedman, M.D. Dr. Friedman received his Bachelors Degree from Yeshiva University in New York and his M.D. from Albert Einstein College of Medicine. (29AM, pp. 22-23; Exhibit 37, Dr. Friedman C.V.). He currently resides in Beit Shemesh, Israel and practices physiatry which is the practice of physical medicine and rehabilitation. (29AM, pp. 22-23). He is the head of Physical Medicine and Rehabilitation at Laniado Hospital in Netanya, Israel. (29AM, p. 23). He also practices ten days a month in New York. (29AM, p. 23).

Dr. Friedman reviewed Tuly's medical records as well as examined him on February 19, 2012. (29AM, pp. 23-24). Based on his review of the records and the examination of Tuly, Dr. Friedman testified as to Tuly's injuries.

From the bomb blast, Tuly had shrapnel wounds in his legs, his forehead, under his right eye, his left cheek and his scalp. (29AM, p. 26). He was in and out of consciousness, and was taken to Sourasky Medical Center. (29AM, p. 26). He was diagnosed with a comminuted fracture of the left tibia, which with an open wound and evidence of foreign bodies, a perforated bilateral tympanic membranes, eardrums, and general blast injuries. (29AM, p. 26). Tuly was taken to the operating room where they debrided or cleaned the wound and closed it. (29AM, p. 26). Dr. Friedman noted that Tuly told him that they had removed a small piece of bone with it and a piece of nerve. (29AM, p. 26). They also removed the shrapnel from the forehead, scalp, arms, legs. (29AM, p. 27).

He had an abdominal CAT scan done in the emergency – in the operating room, but that revealed no abdominal injury, internal bleeding. (29AM, p. 27). He was kept at the hospital for 27 days, at which time his son passed away, and he was discharged. (29AM, p. 27). Tuly received physical therapy while in the hospital and then informally from volunteers in his community when he returned to Florida. (29AM, p. 27). His main surgery was to the left leg. (29AM, p. 27). Dr. Friedman testified that Tuly's symptoms at this time were as follows: They removed a nail from the right leg, just below and medial to the knee, and he has numbness in that area. (29AM, p. 27). He has a left drop foot which causes his gait pattern to be abnormal and a compensatory gait pattern. (29AM, p. 27). Drop foot, meaning he is unable to raise the foot and it constantly stays at an angle. (29AM, p. 27). He is unable to raise it to clear the toes, and, therefore, the compensatory gait pattern is to raise the entire leg, bend the knee and raise it up so that the foot can clear the ground so that he doesn't trip or fall while he is walking. (29AM, p. 27). Medically, this is known as a steppage gait pattern. (29AM, p. 27).

Dr. Friedman testified that Tuly also has numbness in the left anterior, on the front and lateral, on the outside portion of the leg, as well as on the top part of the left foot. He is unable to wiggle his toes. When he walks he also get numbness on the sole portion of the left foot. (29AM, p. 28). He has severely decreased hearing in both ears. He has constant tinnitus and ringing in both ears. (29AM, p. 28). He has no improvement. (29AM, p. 28). He has had multiple audiology evaluations. (29AM, p. 28).

He has severe hearing loss in the left ear and hearing loss in the right ear. He has lost the ability to localize sound because of that, so if somebody calls him he does not know if they are behind him, to the right, to the left. (29AM, p. 28). He has lost the binaural ability to localize sound. (29AM, p. 28). He has lost his sense of smell and taste. (29AM, p. 28). For the first year he was unable to taste almost anything. (29AM, p. 28). Most of our taste is based on our smell. (29AM, p. 28). There are very few things that we can actually taste with our tongue – salt, bitter, sour – and any other thing we taste is based on our smell. (29AM, p. 28). To this day, Dr. Friedman stated, he reports a decreased sense of smell and an altered sense of taste. (29AM, p. 28).

Dr. Friedman summarized Tuly's injuries as, left shoulder pain, the decreased hearing and tinnitus. He has low back pain, especially when he walks. (29AM, p. 30). The pain increases with walking and bending. (29AM, p. 30). He's been told by his orthopedist that this is secondary to biomechanical changes. (29AM, p. 30). Tuly has also underwent surgery to synovial cysts that had developed on the facet of his lumbar spine. (29AM, p. 30). He had these removed twice. (29AM, p. 30). Tuly complains of nightmares and constant flashbacks of the event, and he also reports numbness. (29AM, p. 30). He also had significant weakness in the left, upper extremity. The shoulder region, and significantly so in the hand and wrist muscles. (29AM, p. 31).

In grading these Dr. Friedman testified as follows:

The grading range for strength is from zero to five, five out
of five being full strength, zero out of five being not even a

muscle twitch, one out of five being a muscle twitch. The determinant of true, per se, weakness that we would notice is three out of five. Three out of five is the ability to raise the limb against gravity through a full range of motion. Four out of five would be able to do that against some sort of resistance, and then there are plus and minuses in the scale.

His thumb muscle and opening his fingers, his grade is four out of five, and four plus out of five respectively. Wrist, bending the wrist is four to four plus.

His shoulder muscles is five minus, meaning there is some slight weakness there, but that is significant weakness. To have a level of four out of five, you need to have lost 20 percent of the muscles units, the motor units supplying those muscles.

In the leg, it's zero out of five, meaning there's not even a muscle twitch when he tries to move is great toe. When he tries to raise the foot up, there is only a muscle twitch, but no more than that. That graded as a one out of five. There is also some more proximal weakness in the leg, the ability to raise the leg completely up, as well as to raise the -- keep the knee elevated straight, against gravity and against resistance.

He has sensation loss in the left anterior and lateral leg, as well as the entire left foot. There is decreased pinprick sensation in the right leg. again, let me explain. Pinprick is graded on the level of zero, one or two. Two out of two, a pinprick level of two is, he feels it as sharp and as a pin. He may only feel it as pressure. That's decreased to one, and if he feels nothing, that's zero. So there is absent pinprick in the left leg and foot, and decreased pinprick in the right leg, near the scar below the knee where the shrapnel was reportedly removed. There is also decreased pinprick sensation in the left arm, from the shoulder down to the

-38-

elbow, and then almost absent pinprick from the – down the – in the left hand. Interestingly, there is increased pinprick sensation, meaning he feels it hyperesthetic, in the fifth digit of the left hand with the pinky finger, and the medial forearm, the inner part of the arm.

In summary, he has a left foot drop, signifying a peroneal nerve injury on the left. There is also suggestion of a tibial nerve injury in the left leg, causing the decreased plantar flexion and decreased sensation in portion of the foot, the sensory loss in the sural nerve distribution, and the superficial peroneal nerve distributions, the sensory loss in the axillary nerve distribution, in the arm, as well as diffusely in -- I'm sorry, in the left arm, as well as diffusely in the left forearm and hand, and hyperesthesia in the fifth digit of the left hand, which may signify additionally an ulnar nerve injury. He has loss of smell and, by extension, a loss of taste. He has a gait abnormality, secondary to the foot drop. He has low back pain, and he has reported the nightmares which would be consistent with the posttraumatic stress disorder.

(29AM, pp. 31-33).

According to Dr. Friedman the implications of these injuries are as follows:

The gait abnormality from shrapnel, or the surgery, or the fracture, but there is a nerve injury there. The foot drop may be more pronounced in the future. The implication is, if he were to suffer any other injury or, for example, a stroke that would affect the right leg, he would have a severe problem regaining any function because of the loss of the motor supply and the motor strength on the left side. So any additional small injury on the left might make that leg

essentially useless and him unable to walk what that, and anything that affected the right side would be relatively disastrous regarding his walking as he does not have any reserve and his injury on the left side.

In addition, the steppage gait is an abnormal gait pattern that puts abnormal stresses on the spine and the pelvis. What this leads to is degenerative changes over time. For lack of a better term, you're rubbing the bones, and moving the hips and the pelvis the way it moves and rotates in all planes of space in an abnormal pattern. Since the entire axial skeleton –

* * *

The entire skeleton is joined, so one abnormality, such as in the foot, the ankle, the knee, plays up throughout the skeleton and can affect both hips, the back, and all the way up the spine. So the implication of his abnormal gait is that over time it is expected that -- it would not be surprising if he develops the pain which he did develop in the low back, and degenerative changes there. So, too, he mentioned to me that when he walks he gets pain in the left shoulder, and this would be consistent with the transmitted forces through the skeleton, all the way up and affecting either a joint level that's remotely connected to where his injury is. It's also significant that he has the weakness in the left arm and the sensory changes in the left arm, as it's quite possible that he has a radiculopathy or a pressed nerve in the neck, which has never formally been evaluated, causing the weakness. This, too, could be connected to his gait abnormality.

The implication of his numbness and tingling is that it's bothersome and puts him at obvious possible risk for sensory injuries in the future. A classic example would be not being able to feel fire, burning a hand or leaving a stove on or off.

-40-

If he were to develop diabetes, or another chronic injury that might affect the nerves, again, he's starting with less reserve, and these processes may be accelerated or made symptomatically more prominent by the fact that he is starting with a sensory loss in the left arm, left leg, and, to some extent, the right leg.

His tinnitus is constantly bothering him. These ENT physicians have recommending hearing aids as a result to try to cope with these, but he at this point does not wear the hearing aids but might need them in the future.

As mentioned before, his hearing is significantly decreased, more so in the left ear, and he has lost the ability to localize sounds. If something were to happen to the right ear, he would be in big trouble because his left ear, he has very poor word recognition. At this time he is able to compensate with the right ear, but if something were to happen to the right ear, then he would really lose the ability to recognize words.

Obviously, there's always a risk of tumor recurrence of cholesteatoma, and for that he requires constant follow-up and evaluation by his physicians.

He has decreased pleasure from food and eating because of the lack of smell, and that is not expected to change. Generally these injuries -- lack of smell does not improve or recover.

As far as the left arm, as before, he may either have a radiculopathy or an injury coming from the neck, or he may have the polyneuropathy, multiple and scattered injuries from the shrapnel affecting the left arm. Although he is right-handed, he told me that in the past his left hand was stronger than his right hand, but on my examination this is clearly not the case.

(29AM, pp. 33-36).

Dr. Friedman opined in his expert opinion that all of the foregoing injuries were a result of the Terrorist Bombing.

Dr. Friedman also opined regarding Daniel's injuries:

His diagnoses and procedures listed on the discharge summary are, as follows: There are 30 of them. Multiple trauma, hemorrhagic shock, left thoracotomy, packing of abdominal bleeding, embolization of bilateral iliac arteries, massive blood transfusion, partial pancreatectomy, left nephrectomy, ligation of the inferior vena cava, splenectomy, bilateral tube thoracostomy, bilateral pneumothoraces, right below knee amputation, cholecystectomy, duodenoplasty or a pyloric exclusion, re-explorative laparotomy, acute renal failure, MODS, which is multi-organ disease system or multi-organ failure, DIC, which is diffuse intravascular coagulopathy, septic shock, bilateral lower limb fasciotomies, right hemicolectomy, partial small bowel resection, initial suturing of bowel perforations, colon-sacral fistula, critical illness myopathy, hemodialysis, finger amputations, and infections and severe sepsis. I should note not all of those were listed on the discharge summary, but I took those from the notes in the hospital that were not added to the discharge summary. With such a long report, it's not necessarily unusual that the resident charged with the task is unable to go through the whole pile of records and enter every piece of information.

When he was admitted to the hospital, his Apache score, which is a score used in intensive care units to predict mortality -- it's a range up to 71 -- his score was 38; however, it should be noted that most people who come to an ICU have a score in the teens. Anybody over 50, essentially, doesn't make it beyond one or two.

I sat with the head of the intensive care unit at my hospital, Laniado Hospital, and essentially the 38 score implies a 70 percent mortality. It's an old score. It's been replaced in many places by more effective scores to reflect the new technology that we have, but it is still used in many places. Leave it to say that an Apache score 38 is quite severe.

\* \* \*

Initially, he was taken to the operating room with severe bleeding. An angiogram was done in the operating room to find the source of the bleeding, and they found that the inferior vena cava was the major source. The inferior vena cava is the large vein that returns all the blood from the chest, abdomen, arms and legs, to the heart. There is the superior vena cava that essentially returns the blood from the head. But a lesion of the inferior vena cava, in most people, would be lethal in and of itself. This was ligated in the operating room, and -- however, there was also additional sources of bleeding.

On the day of admission, they performed -- during the surgery they took out his spleen. They took out his left kidney, took out part of this pancreas, needed to do surgery on his small and large bowel because of perforations. Needed to do surgery on the lungs. He needed large amounts of blood. He received 57 units of packed red blood cells on the first day of admission alone, which is a massive amount of blood transfusions.

Throughout his course, it was difficult to specifically count up, but his father, Mr. Wultz, told me that he was told that he had received 200 units of blood throughout the hospitalization, and as best as I could count through the hospital records, this is accurate. That's red blood cell cells. He also received multiple transfusions of platelets and other blood factors to help with the clotting.

System-by-system, initially pulmonary. He initially developed an acute lung injury, which is not uncommon even without trauma, if someone receives large amounts of blood transfusions. This proceeded to acute respiratory distress syndrome, from which he never fully recovered. He was on a ventilator or respirator the entire hospitalization of 27 days. He also had bilateral pneumothoraces. This means that there was air between the pleural cavity and the lung. The implication of a pneumothorax is that the pressure, the air pressure from the outside compresses and can collapse a lung. So he had pneumothoraces. It's not exactly clear how large, on both sides, and that was treated appropriately in the emergency room, in the operating room, and he was on the respirator for the entire hospitalization.

The next system is bowel, or gastroenterologic. Initially in the operating room, they had to suture both his bowel and his large bowel because of perforations. CAT scans during his hospitalization revealed that there was free air in the abdomen, in the abdominal cavity, in the soft tissue, and in the rectum. The implication of free air is that there is a bowel perforation. The risk of a bowel perforation is sepsis. The bacteria in the intestine are, anybody familiar with news reports, when the E. coli affects the food supply, can be deadly. There are hundreds of different bacteria, and usually, again, in and of itself a bowel perforation is a serious injury, not only for the injury to the bowel, but more so because of the sepsis that it usually causes.

These injuries were sutured initially. Two days later he had a temperature of 40 degrees Celsius, which is high, and was found two have gangrene in his small intestine. They took him back to the operating room, resected a small portion of the small intestine, or small bowel, and also performed a right hemicolectomy. The colon, or large intestine, is an

-44-

inverted U, and they took out the right side of the colon. Initially, they packed, and on a subsequent surgery they went back and closed -- closed up those and connected those portions.

He continued to have leakage from the bowel, and he underwent another surgery. This time they performed a duodenoplasty, d-u-o-d-e-n-o plasty. The duodenum is the first portion of the small intestine. This was where they felt most of the leakage was coming from, so they essentially isolated it. They closed off both ends of the duodenum. They connected -- they did a jejunoplasty, connecting the jejunum, the second portion of the small bowel.

* * *

They connected the jejunum to the stomach, and they also took out the gallbladder from the cholecystectomy, the goal being trying to decrease all secretions coming through the duodenum, trying two seal off any leakage from the duodenum, as they felt that was the major source of the bowel leakage.

The leak got worse. He was given Sandostatin, which is a pancreatic enzyme. Actually, it's given to decrease pancreatic secretions, again, with the goal being to decrease secretions and subsequent bowel leakage.

Over time, he also developed a colon-sacrum, or a colon sacral fistula. This is an open tunnel from the large bowel to the sacrum. Again, in isolation, this is a very severe injury, as it basically allows bacteria from the outside world to enter directly into the body. This they were unable to close surgically as it was later in the hospital course, and he was too unstable to take back to the operating room for yet another surgery. As mentioned, he suffered multiple infections from the bowel leakage and injuries.

-45-

The next system is hematologic. Initially, as mentioned, he lost a lot of blood. He suffered DIC, diffuse intravascular coagulopathy. This has its own paradoxic body response. The body clots diffusely. It sends the clotting system into overdrive and forms thromboses throughout the body. Paradoxically, what that causes is bleeding because the body uses all of its clotting factors to make these emboli and to form these clots, and therein when it needs these to stop bleeding elsewhere in the body, it doesn't have them. So usually the end process, paradoxically, of DIC is bleeding. For this, they treated him with multiple transfusions of clotting factors, including the synthetic factor VIII, which is – VII. Sorry, VII – which is one of the clotting factors in the pathway of clotting. It's done – usually it's given once. If it helps, they try to give it a second time. In Daniel's case, they gave this four times. It actually stabilized, and his DIC stabilized midway through his hospital course; however, near the end of his course, due to the severe sepsis, his DIC again worsened, as is common in sepsis, and they were unable to control it at the end. But, again, near the end he received large amounts of blood transfusions.

As mentioned, he had the vena cava ligated in the operating room, and he also suffered emboli of the large arteries to both legs. The large artery that supplies each leg is the iliac artery. There is also a femoral artery which comes off of that subsequently, but he had emboli of both iliac arteries which caused other problems in the legs which I will get to now.

The limbs and orthopedic muscular system. He initially suffered multiple shrapnel wounds around the body. As mentioned, he had the emboli to the iliac arteries. What this causes is a lack of blood supply to the muscles, and can cause necrosis to the muscles.

In addition, the shrapnel wounds to the legs caused increased pressure in the muscle compartments of the legs. In the lower leg, as well as in the thigh, the muscles are compartmentalized and separated by facia on the inside. On the outside, they are covered by skin obviously. This gives no room for -- or very little room for swelling and expansion in severe cases of swelling. This occurred in both legs, and the treatment for this is to essentially relieve the swelling by cutting open the skin, called a faciotomy. He underwent faciotomies in both legs to decrease the swelling. He underwent multiple debridements of these wounds. Debridements are usually quite painful.

He subsequently developed gangrene in the right tibia, from which candida grew in a culture. The gangrene in the right tibia and the right foot, leg, caused them to -- led them to need to do a bilateral knee amputation on the right side. As well, the left side remained over the course of his hospitalization, a constant source of bleeding and muscle necrosis.

He also was diagnosed with a polymyopathy of critical illness, which is a diffuse muscle injury and diffuse muscle weakness seen in critically ill and often seen in ICU patients.

He underwent amputations of two fingers on the right hand. This was in an attempt to stem infection. He had positive mucormycosis, which is a fungus, cultures grown from the fingers, second and third digits of the right hand. These were amputated in an attempt prevent the spread of infection. He also had noted necrosis of the muscles and, in general, of the right hand.

The next body system is infectious disease. The following cultures were noted to be positive. Over time, he had a candida yeast infection which grew from his leg. Pseudomonas. He had Klebsiella which grew from the

bowel, and also he had grew from blood, bacteremia. He had staphylococcus aureus in his sputum, mucormycosis, as mentioned, as well as stenotrophanomus which grew from a skin wound.

The next body system is renal. He initially had he left kidney removed in the operation room because of injuries. He was in acute renal failure. The right kidney was not working. He needed hemodialysis throughout his hospital course.

Regarding his conscious state, according to the ICU nurses' notes, I can state as follows: On the 18th of April, which was the second day, the nurse wrote that he awoke in much pain.

On the 24th – and, again, there were multiple surgeries performed between these dates – thereport initially states he was minimally responsive during care. And then the note at 6:35 a.m. wrote, "More alert. Reactions seen in his eyes."

The next day, on April 25th, an ophthalmologist came to evaluate his eyes, looking for a source of infection. At 2:15 or 2:16 in the afternoon, he wrote, "He opens his eyes partially. He blinks to pain."

At 4:30 that day, the nurses documented that he opens his eyes to calling his name softly. Later that day they wrote that he was alert.

And then finally, near the end of the day on April 25th, they wrote that he was fully alert.

He remained fully alert in the nurses' notes from the 25th, the 26th, and the 27th. Starting on the 28th, they document that he opens his eyes and reacts to treatment, but he is no longer fully alert. He remains in this status on the 28th, 29th, 30th of April, and the first of May. From that point on, there is no documentation that he was alert or reactive to his environment.

* * *

He succumbed to his injuries, interestingly, in the discharge note they wrote, "After a strong and valiant battle on 4/27 from a diffuse septic injuries and sepsis."

(29AM, pp. 36-48).

Dr. Friedman also had the following to say about Daniel's conscious pain and suffering:

I realize. Bearing in mind, he's lying in an ICU bed on a ventilator with pain medication. However, when you – when a patient is awake, one of the reasons they need to sedate patients on a ventilator, in general, is because it's very painful and they fight against it. Just the fact of having a tube down your throat is very uncomfortable, and the breathing mechanism, the machine is doing the breathing for you. So you tend to – a patient tends to fight against it and cause abnormal breathing. That is one reason why they often sedate patients who are on ventilators. They can be fully alert. I mean, when they write that he is fully alert, he's fully alert. Meaning he knows what's going on. They are changing his dressing, and whether he's able to move or not is unclear. They actually don't document – although, they do, as I mentioned, document that he reacts to pain. He knows exactly what's going on. He can feel everything that's being done. He may or may not be able to help the nurses, you know, move a limb, try to move a little bit to make their job – he's in significant pain just in this case from the multiple surgical wounds. He had undergone an amputation, and that was still a fresh wound. His leg, he had open wounds on his leg, on his hand, again, just from these surgical wounds themselves. And I have to stress, just without any of those wounds and the tube down your throat, it's extremely

painful thing. But "fully alert" means he is fully aware of everything that's being done, what he's feeling, and, you know, what is going on around him.

(29AM, pp. 48-49).

## G.     Report of Dr. Richard B. Edelman

Plaintiffs have also presented the court with the report of economist Richard B. Edelman, Ph.D.

In his report, Dr. Edelman valued Mr. Daniel Wultz's after-tax lost earnings and benefits based on a vocational report which indicates that in the absence of his passing, Mr. Wultz could have earned income at a level typically achieved by a male with an undergraduate university education. The conservative after-tax, survival-weighted loss, in February 2012 dollars less personal consumption expenditures, is $2,568,634.00. According to Dr. Edelman, this calculation means that if $2,568,634 is invested at prevailing interest rates, the past loss is immediately replaced and the future loss can be withdrawn each year over Daniel Wultz's work life. At the end of that time, the investment is depleted.

## H.     Testimony of Sheryl Wultz

Daniel's mother, Sheryl Wultz, is a United States Citizen, having been born in Richmond Virginia. (27AM, p. 48; Exhibit 2, Sheryl Wultz U.S. Birth Certificate; Exhibit 10, Sherl Wultz U.S. Passport). She grew up in Miami Florida where she graduated from high school. (27PM, p. 48). From there she went to Duke University

where she was graduated with a Bachelors degree in psychology and management in 1979. (27PM, p. 48). She attended law school and graduated from the University of Miami, passing the Florida Bar in 1983. (27PM, p. 48).

During the trial, Sheryl recalled Daniel's ambitious personality and his love for Judaic studies. (27PM, p. 55). She believed that me might have been a lawyer or possibly even a politician. (27PM, p. 55). For politics, he emulated his cousin, Congressman Eric Cantor. He also very much admired his rabbi, Yisroel Spalter. (27PM, p. 55). Daniel's grandfather on his father's side was a rabbi and the principle of a high school in Israel. (27PM, p. 55).

On April 17, 2006, Sheryl testified that she shopping when the bomb exploded. (27PM, pp. 55-56). She attempted to call her husband on his cell phone. (27PM, p. 56). She realized that he did not sound right and he told her that there had been a terrorist attack. (27PM, p. 56). When she asked how Daniel was, there was silence. (27PM, p. 56). Sheryl was horrified but managed to get to the hospital. When she arrived she found a state of chaos. (27PM, pp. 57-58). Because of the large number victims in the attack there were gurneys with the wounded everywhere. (27PM, p. 58). At first she was frantic and could not find Daniel. Finally, however, she was able to secure the assistance of a nurse who asked her to identify his clothing. (27PM, pp. 58-59). The nurse pulled out a camera that he was wearing and Sheryl confirmed that it was his. (27PM, p. 59). She broke down crying and the hospital brought a social worker to take her to the operating area. (27PM, p. 59).

Sheryl was emotionally overwhelmed with fear. She passed the time going between checking on her husband and on Daniel. (27PM, pp. 57-60). Their family in Israel made their way to the hospital, but it took them hours to arrive. (27PM, p. 60). She did not know what was happening with Daniel for nearly four hours, until the first team of doctors finished their shift and passed the surgery on to another team. (27PM, p. 60). They told her that Daniel was losing a lot of blood as it would not clot. (27PM, p. 61). They were not hopeful of his survival. (27PM, p. 61). There were so many holes in his abdomen from the shrapnel. (27PM, p. 61). The shrapnel went into him and ricocheted, causing damage and so many little tears that they could not sew them up fast enough. (27PM, p. 61). They finally called in a doctor from another hospital who had recently invented a new blood clotting procedure. (27PM, p. 62). He did the procedure and finally, after 13 hours, they were able to clot the blood. (27PM, p. 62). Sheryl endured these anguished hours standing by the operating room door.

Sheryl had no control over many of the decisions for Daniel's surgeries. (27PM, p. 64). As an example, she only learned that they needed to amputate his leg in a very roundabout manner. (27PM, pp. 63-64). Even for the decisions she did make, she felt that she didn't have enough information to properly formulate the right choice. She was nauseous all the time in the hospital. (27PM, p. 64). When they wanted to amputate his leg, she begged the doctors not to do it. (27PM, p. 64). There was no gangrene at the time, but they felt it would become infected if they waited any longer. (27PM, p. 64). To let it remain would make it much harder to control other infections Daniel was fighting.

(27PM, p. 64). There were many similar agonizing incidents during the 27 days that Daniel fought for life at the hospital.

Sheryl recalled that when they woke Daniel from his induced coma, they brought Tuly who was in the ICU, their daughter Amanda, her parents, and the Rabbi. (27PM, p. 66). Sheryl could not stop crying. Amanda, however, asked her to stop because she was making Daniel cry. (27PM, p. 66). Sheryl saw Daniel mouth the Amanda "I love you." (27PM, p. 66). When they asked him if he was in pain, he squeezed their hands. (27PM, p. 66). Since he could not talk, they had told him to say yes by squeezing their hands. (27PM, p. 66). Daniel clearly knew where he was and what had happened to him.

Sheryl testified that to lose a child is one thing, but to lose Daniel over 27 days was torture for their family. She has been unable to resume her life as it was before. Sheryl no longer has that zest for life and is badly depressed. (27PM, p. 68). She sometimes cries nonstop for long periods of time. (27PM, p. 69). She will go to sleep crying and wake up crying. (27PM, p. 69).

Sheryl, testified that this also all had a tremendous negative effect on Amanda. (27PM, p. 72). It happened at a time in her life when she went away to college. (27PM, p. 72). She had just left the home for the first time. (27PM, p. 72). She was in her second semester. (27PM, p. 72). She was doing really well. (27PM, p. 72). Graduating was not an easy thing for her, which is remarkable since she was an amazing student. She was top of her class at a very good, very well known, prep school, and had almost

perfect scores on the SATs. (27PM, pp. 72-73). After the attack, Amanda seemed depressed. (27PM, p. 73). She spent a lot of time in her room. (27PM, p. 73). She stopped going out with her friends and stopped socializing. (27PM, p. 73). She was very angry. (27PM, p. 73). Sheryl testified that Amanda just did not want to be close to her and her husband. (27PM, p. 73). Sheryl explained that maintaining her life in the wake of Daniel's murder has been hard. She realized she needed another child, to try and make herself and her husband a future. (27PM, p. 74).

Her son Abraham was born November 29, 2007.

## I.      Testimony of Amanda Wultz

Amanda was 19 years old when her brother Daniel was murdered in the Terrorist Bombing. (29AM, p. 50). She was born two years and ten months before Daniel and they shared a close and affectionate relationship, as one would expect between a brother and sister at their ages; though she joked she sometimes found him to be "annoying" – in the way that a younger brother is annoying to an older sister. (29AM, p. 50). At trial, Amanda recalled Daniel's exuberance and how she was jealous of how happy he could be. (29AM, p. 51).

Amanda did not learn of the bombing until the day after it occurred, when she received a telephone call from a friend's mother who wanted to check in on her. (29AM, p. 55). She turned on the television and to CNN and saw the ticker at the bottom of the screen said that there had been a suicide bombing in Tel Aviv. (29AM, p.

55). Amanda got really worried because she knew that her family had planned a mini-vacation to Tel Aviv. (29AM, p. 55). She tried calling her parents, but could not reach them by phone. At one point a call went though, no one responded on the other end, but she heard one of her aunts yelling "Rofeh, rofeh" ("doctor, doctor" in Hebrew). (29AM, pp. 55-56). She then called her aunt who told her that she had to speak to her mother. (29AM, p. 56). When she told her that she had been trying to call, her aunt told her she was on the other line with Amanda's mother and that that she would hang up with her to have her call Amanda. (29AM, p. 56).

Amanda testified that her mother then called and told her to sit down. (29AM, p. 56). Initially, she was horrified thinking that her father who she is very close with was dead. (29AM, p. 56). Her mother told her that her father was okay, but Daniel was seriously injured (29AM, p. 56). Amanda became angry that no one had called her earlier. (29AM, p. 56). She was relieved that her father was still alive, but then she became overwhelmed with anger that she had no thoughts about Daniel. (29AM, pp. 56-57).

Amanda flew to Miami, and then to Israel with her paternal grandfather. (29AM, p. 57). When she arrived, it unreal and like she walking on eggshells. (29AM, p. 57). It was a shock to see her brother. (29AM, p. 58). Because of renal failure and edema, his body had swelled to twice his normal size. (29AM, p. 58). He was yellow colored and his eyes were open and bulging although he was in a coma. (29AM, p. 58). She was horrified to see her younger brother this way.

Amanda remembered feeling like her mother was very cold and angry with her. (29AM, p. 58). Her mother was extremely nervous and insisted upon knowing every detail form the doctors. (29AM, p. 58). Whenever her family would talk to the doctors, Amanda would write down what they said and go look everything up to understand what was going on and possible offer any input that she could. (29AM, pp. 58-59).

Amanda testified that she felt very guilty. (29AM, p. 59). Her heart was breaking for Daniel. (29AM, p. 59). He appeared as if he was in a lot of pain. (29AM, p. 59). She wanted him to know how much she loved him. (29AM, p. 59). She did what she could to care for him in the hospital. (29AM, p. 60). Because of the tracheotomy, Daniel's mouth would dry out and they could not give him anything to swallow. (29AM, p. 60). To help she would wrap a gauze around a tongue depressor, wet it, and put it in his mouth. (29AM, p. 60). She would also get Vaseline to put on his lips. (29AM, p. 60). Although Daniel was not awake, he showed how much he appreciated it with his eyes and squeezes of his hand. (29AM, p. 60). She would ask if he wanted water, or if he was in pain, or wanted her to read him Psalms, and he would squeeze her hand to say yes. (29AM, p. 60).

There was a point when the doctors took Daniel out of sedation. (29AM, p. 61). He opened her eyes and when he saw Amanda, he was happy. (29AM, p. 61). When he saw their grandparents he started crying and would not stop. Amanda kept telling Daniel she loved him and he mouthed back "I love you." (29AM, p. 61).

-56-

As a result of Daniel's death, Sheryl and Tuly worked to become a cohesive unit to protect their marriage. (29AM, pp. 63-64). Unfortunately, Amanda felt that sometimes she was shut out. (29AM, p. 64).

Amanda testified that when Daniel died, she herself died too. (29AM, pp. 65-66). She has become compulsively obsessed with death and questions about life. (29AM, p. 66). She has experienced very deep feelings of anguish and depression. (29AM, p. 66-71). She sometimes wonders whether she is a burden to her parents. (29AM, p. 66). Amanda testified that prior to Daniel's murder she was very driven, focused and had goals. (29AM, p. 66). She wanted to be an investment banker for Goldman, Sachs. (29AM, p. 66). In the wake of Daniel's death she no longer sees the point in that. (29AM, p. 66).

She had been at Tufts University and getting very good grades at the time of the Terrorist Bombing. (29AM, p. 67). Afterwards, she transferred to Miami University and was only able to perform the bare minimum to complete her studies. (29AM, p. 66). She personally no longer had the desire to finish school and but only did so at the encouragement of others. (29AM, pp. 66-67). Her grades were mediocre. (29AM, p. 67). She had no motivation and simply went through the motions to get by each day. (29AM, p. 66).

She now lives in Chicago. She works part-time at a wine restaurant and finds respite in yoga classes and taking care of her dog. (29AM, p. 67). Amanda testified that before the Terrorist Bombing she felt invincible. Now, she feels nervous and fearful.

(29AM, p. 68). She is constantly anxious and worried that bad things are going to happen to those she loves and this has ruined many of her relationships with others. (29AM, p. 68).

Amanda has tried seeing therapists, five in total since Daniel's death, but has not found them to be helpful. (29AM, p. 70). She has sought other coping mechanisms and is concerned that her deep feelings of anguish might never go away. (29AM, p. 71). Amanda continues to experience extreme grief over the loss of Daniel and sadness over what has happened to her family and her life as a result. She misses her younger brother every day.

## J.      Testimony of Rabbi Yisroel Spalter

The Court also heard from Rabbi Yisroel Spalter, who has known the Wultz family for the more than 14 years. (29AM, p. 3). Rabbi Spalter is the rabbi at the Chabad of Weston in Florida, which is a community center, synagogue, and school. The Wultz family is one of 100 families that are part of this community. (29AM, p. 3).

Rabbi Spalter had known Daniel from the time that he was six years old. (29AM, p. 3). He became very friendly with Daniel when he was preparing him for his *Bar Mitzvah*. (29AM, p. 4). After Daniel's *Bar Mitzvah*, there were times when the two would talk every day. (29AM, p. 3). According to the Rabbi, Daniel was a very inquisitive young boy and wanted to know everything about everything, as far as

Jewish knowledge, and he frequently turned to Rabbi Spalter for guidance. (29AM, p. 5).

The Rabbi testified that Daniel was a very religious young man, meaning he truly sought for what was morally right. (29AM, p. 5). He was above average in his religious pursuits. (29AM, p. 6). Daniel learned and educated himself, and began to live the ideals of Judaism on a daily basis. (29AM, p. 6). He was also extraordinary in his concern for others. (29AM, p. 6). He would act to protect other kids in school. If there was an underdog of a kid that was not being treated well, Daniel stood up for them. (29AM, p. 6).

When Rabbi Spalter learned of what happened, he was deeply concerned for Daniel and the Wultz Family and he went to Israel to be with them. (29AM, pp. 7-8). When he arrived at the hospital in Israel, he first observed Tuly, who was being cared for at the hospital. (29AM, p. 8). He was in a wheelchair and badly bruised. (29AM, p. 8). He then visited Daniel who was lying unconscious in his hospital bed, hooked up to many machines. (29AM, p. 8).

Rabbi Spalter recalled that at the time the family had hope, but they were beside themselves with fear. (29AM, pp. 8-9). Any bit of support he could give was offered. (29AM, p. 9). It was, however, a very complex and chaotic situation. (29AM, p. 9). The Wultz' lives were turned upside down within a matter of one minute. (29AM, p. 9).

At one point, when the Rabbi was in the room with Daniel and the whole family, he asked if it would be okay if he put on Daniel *Tefillin*, a religious item that Jewish men place on their arm and head every morning. (29AM, p. 9). This is something Daniel had done every day before the Terrorist Bombing. (29AM, p. 9). When Rabbi Spalter took his hand and wrapped him, Daniel's eyes opened up for the first time since the attack. (29AM, p. 9).

When the Rabbi returned home after four days, he brought news to the community which immediately rallied behind Daniel. (29AM, p. 11). The impact of Daniel's death on community was devastating. (29AM, p. 11).

The Rabbi testified that the Wultz family could not come to grips with what had happened, especially that he was such a religious boy. (29AM, p. 12). The loss of a child and in such a terrible way devastated the Wultzes. (29AM, p. 12). Rabbi Spalter believes that the family still has not recovered. (29AM, p. 12).

Rabbi Spalter and the Wultz family spent hours, days, and months together, having long conversations, and this clearly affected them. (29AM, p. 13). They could not work. (29AM, p. 13). They could not get back to life. (29AM, p. 13). The pain just caused them to retreat into themselves, and an inability to function properly. (29AM, p. 13). Rabbi Spalter has seen people who have gone through similar tragedies in their life, but he does not know if he saw quite such a thing before. (29AM, p. 13). The family had a hard time coping with it. It was a constant pain from which they never recovered. (29AM, p. 13). Obviously time heals a little bit, but it was never the same.

(29AM, p. 13). They did not function. (29AM, p. 13). Neither Tuly nor Sheryl were working. (29AM, p. 13). The entire household was depressed. (29AM, p. 13). There was nothing anyone could have said that would console them. (29AM, p. 14). They were frequently in tears. (29AM, p. 14). It was a constant struggle for them to wake up every morning. (29AM, p. 14).

In the Rabbi's opinion the family member that that had the most difficult time was Amanda. (29AM, p. 15). She was the only sister – the only sibling, and so naturally that was a struggle of faith, a struggle of guilt. (29AM, p. 14). The family had lot of struggles between them. (29AM, p. 14). This caused difficulties that continue until today. (29AM, p. 14). Amanda eventually left the house to be on her own. (29AM, p. 14). The Wultz family's life has changed permanently. (29AM, p. 18).

**K.      Testimony of Dr. Marc Agronin**

The plaintiff's presented expert testimony from family friend Marc Agronin, Ph.D. (27PM, p. 7). Dr. Agronin obtained his Bachelor's degree in psychology and philosophy from Harvard University. (27PM, p. 7). He obtained his medical degree from Yale University. (27PM, p. 7). He trained in psychiatry at Harvard University and completed a fellowship in geriatric psychiatry at the V.A. Medical Center in Minneapolis, Minnesota. (27PM, pp. 7-8). Dr. Agronin is currently the medical director for mental health and clinical research at the Miami Jewish Health Systems in Miami,

Florida. (27PM, p. 8). He is also an affiliate associate professor of psychiatry and neurology at the University of Miami Miller School of Medicine. (27PM, p. 8).

Dr. Agronin had been an acquaintance of the Wultz family through their synagogue before the Terrorist Bombing. (27PM, p. 9). After the bombing, Dr. Agronin offered any assistance to the family he could, given his professional background as a psychiatrist. (27PM, p. 10).

A month after the funeral, Dr. Agronin started spending time with the family to serve as a resource for them, given his expertise in psychiatrist working with individuals, war veterans, Holocaust survivors, and others who had gone through traumatic experiences. (27PM, pp. 10-11).

Tuly, Sheryl, and Amanda all were depressed. (27PM, p. 11). Tuly also clearly was suffering from symptoms of posttraumatic stress disorder ("PTSD"). (27PM, p. 11). This condition is something that, that has continued for him until today. (27PM, p. 11). At the same time when a trauma like this occurs, it impacts negatively on the family dynamics as well. (27PM, p. 11). Although the Wultz are a very large and a very close-knit family, this did not inoculate them from the effects of trauma and stress. (27PM, p. 12).

For the immediate family, Dr. Agronin testified that there is persistent grief that is persistent and continues to impact their lives and continues to prompt struggles. (27PM, p. 12). Tuly has persistent symptoms of what Dr. Agronin labels Post Traumatic Stress Disorder ("PTSD"), as he described; intrusive memories, recurrent

nightmares, and difficulty sleeping. (27PM, p. 12). All of these are symptoms consistent with PTSD. (27PM, p. 12). The family dynamics is also very difficult. (27PM, p. 12). It is impossible to lose one child experience such grief and at the same time meet the needs of another child. (27PM, p. 12). This has been very difficult for the Wultzes. (27PM, p. 12).

During the first year afterwards, Amanda was struggling with symptoms of depression and guilt over being the sole-surviving sibling. (27PM, p. 13). The effort to try to make sense of this and to restart the course of her life was very difficult for her. (27PM, p. 13). At the same time, for a young person like Amanda, she needed her parents to be there for her. (27PM, p. 13). With both parents undergoing such terrible grief, it was very difficult for Amanda. (27PM, p. 13).

The entire family's grief is ongoing. (27PM, p. 13). Tuly still faces daily symptoms of PTSD, which can make it difficult to put one's full energy and attention into work and into other relationships. (27PM, p. 13). According to Dr. Agronin the family has been able to adapt and find methods to channel their grief into ways that make it easier for them. (27PM, p. 13). They have had a lot of support to do that and, under the circumstances, they have done as well as someone could be expected to do. (27PM, p. 13). But the grief they face does not go away. (27PM, p. 14). They always have to live with that and face reminders of that all the time. (27PM, p. 14). For Tuly in particular, he carries with him physical reminders of what happened; scars, pain.

(27PM, p. 14). That often makes symptoms of PTSD worse because it is not just a mental experience, it is also a physical experience as well. (27PM, p. 14).

The symptoms of depression and persistent grief were most intense in the first year afterwards. (27PM, p. 15). Early on, symptoms included a continuously depressed mood, difficulty sleeping, difficulty concentrating, loss of interest in activities. (27PM, p. 15). When you put all of these symptoms together, it is difficult to work and it is difficult to enjoy day-to-day activities. (27PM, p. 15). The family members found it hard to enjoy and pursue any relationships with other individuals. (27PM, p. 15). This was very difficult the first year. (27PM, p. 15). Slowly, but steadily, these symptoms have improved for all three of them. (27PM, p. 15). But it is clear that the persistent grief continues to sap their energy and concentration and this zest for life that they had so much with them beforehand. (27PM, p. 15). The family will never fully recover from Daniel's death.

**L.      Testimony of Robin Braun**

Family friend Robin Braun also testified at trial. Ms. Braun provided her support for the Wultz family in the days after Daniel's death and continues until today. Robin has a BFA in theater and an MED in mental health and school counseling that she combined fourteen years ago to start a non-profit organization that does character education through performing arts. (29PM, p. 33).

Robin had known Sheryl growing up and became reacquainted when their sons were in the same first grade class. (29PM, p. 34). Robin became close to Daniel, he and her son Solomon become good friends in high school. (29PM, p. 35). Daniel was very loving, very caring, very respectful, very friendly, very outgoing, always smiling, and very inclusive. He was an extremely thoughtful and protective son. (29PM, p. 35). Robin would regularly host Sabbath dinner with a lot of boys. She remembers that when Daniel was over, he was always one of the only boys who used to ask her if there was anything he can do to help. (29PM, p. 36).

Daniel was also very inclusive. (29PM, p. 36). Robin's youngest son Aaron was nine years old at the time, and he loved Daniel. (29PM, p. 36). According to Robin, always made him feel like he was his friend too. (29PM, p. 36). They would all spend time together. Robin's oldest and my middle sons are only eleven months apart, so they were close to Daniel. (29PM, p. 36). But Daniel would always include her nine year old. (29PM, p. 36). He would say "come with us, Aaron." (29PM, p. 36). One time Solomon could not go out to play and Aaron thought he was not going to be able to either. (29PM, pp. 36-37). Instead, Daniel said, "you are my friend too; come on, let's go." (29PM, p. 37). So he and Aaron went. (29PM, p. 37). He was always looking out for other people at school. (29PM, p. 37).

Robin testified that Daniel was the champion of the underdog. (29PM, p. 37). He was always looking out for the people who were being made fun of. (29PM, p.

37). If a bully teasing somebody, Daniel would always stand up for the weak one. (29PM, p. 37).

After the Terrorist Bombing, the Wultz family experienced some very dark years. (29PM, p. 40). Robin related that Sheryl was crying all the time and could not get out of bed. (29PM, p. 40). It was very difficult for her. (29PM, p. 40). She was on antidepressants, and even then, it was really a struggle to get up and face the new day. (29PM, p. 40). Sheryl required sleeping pills to rest at night and then had trouble weaning off them when she wanted to try to get pregnant. (29PM, pp. 40-41). She had stopped working and had trouble concentrating on matters. (29PM, p. 40). Tuly was still badly injured and he was in a tremendous amount of pain. (29PM, p. 40). He also couldn't work, could not concentrate, and had no motivation. (29PM, p. 40). Robin also observed that Tuly can no longer walk to synagogue, which is a very problematic for an individual who observes the commandment not to drive on the Sabbath. (29PM, p. 41). Sheryl walks to synagogue by herself and Tuly is unable to accompany her. (29PM, p. 41).

As Robin testified the family spent years suffering with Amanda who was, like her parents, grieving and in tremendous pain. (29PM, p. 41). Life had become a real struggle for the entire family. (29PM, p. 41).

### III.    CONCLUSIONS OF LAW

This Court has subject-matter jurisdiction over this case pursuant to the Foreign Sovereign Immunities Act ("FSIA"), which is the sole basis for obtaining jurisdiction over a foreign state. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Although a foreign state is generally immune from jurisdiction in U.S. courts, the FSIA establishes certain exceptions. *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d at 50. (D.D.C. 2009). When the requirements of one of these exceptions are met and the foreign state is properly served, the FSIA provides both subject-matter jurisdiction over the action and personal jurisdiction over the foreign state. *Id.* Here, Plaintiffs' have satisfied the requirements of the FSIA's terrorism exception and have properly served the Iranian and Syrian defendants.

### A.    Personal Jurisdiction

"A foreign state…must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608 provides several methods to serve a foreign state, but only § 1608(a)(3) is relevant because there is no "special arrangement for service" in this terrorism case nor is Iran nor Syria a party to "an applicable international convention on service of judicial documents." *See* § 1608(a); *see generally Brewer*, 664 F. Supp. 2d at 50-51 (discussing service of process under § 1608 in a terrorism case). As discussed above, Plaintiffs have complied with the requirements of § 1608(a)(3) because they sent the Iranian and Syrian defendants a copy of the summons, complaint, and notice of suit,

along with Persian and Arabic translations of each respectively, and dispatched these documents by the clerk of the court to the heads of Iran's and Syria's Ministry of Foreign Affairs. Accordingly, this court has personal jurisdiction over Iran and Syria if Plaintiffs are able to establish that Iran and Syria are covered by immunity exceptions within the FSIA. *See Brewer*, 664 F. Supp. 2d at 51.

## B.     Subject-Matter Jurisdiction

In 2008, Congress enacted a comprehensive terrorism exception to the FSIA that was meant to waive sovereign immunity and provide terrorism victims with a cause of action in cases involving certain types of state sponsored terrorism. *See Brewer*, 664 F. Supp. 2d at 51. This terrorism exception is now codified as 28 U.S.C. § 1605A, and it has previously been applied to both Iran and Syria because they supported terrorist attacks against that harmed American nationals. *Valore v. Islamic Rep. of Iran,* 700 F. Supp. 2d 52 (D.D.C. 2010); *Gates v. Syrian Arab Rep.,* 646 F.3d 1 (D.C. Cir. 2011); *Wyatt v. Syrian Arab Rep.,* 736 F. Supp. 2d 106 (D. D.C. 2010). *See also Calderon-Cardona v. Dem. People's Rep. of Korea,* 723 F. Supp. 2d 441, 457 (D.P.R. 2010).

Section 1605A provides, in relevant part, that a foreign state shall be liable for providing material support or resources to a terrorist attack that injures or kills an American national provided that money damages are sought and that (1) the foreign state "was designated as a state sponsor of terrorism at the time of the act," and (2) "either remains so designated when the claim is filed under this section or was so

designated within the 6-month period before the claim is filed under this section." § 1605A(a)(2)(A)(I).

In this case, Plaintiffs' claims against the Iranian and Syrian defendants meet these requirements for purposes of subject-matter jurisdiction and liability. *See Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) (noting "the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action"). *See also Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008) (same).[3]

First, both Iran and Syria "were designated as a state sponsor of terrorism at the time of the act" that caused Plaintiffs' harm. Section 1605A(h)(6) defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. 2405 (j))…is a government that has repeatedly provided support for acts of international terrorism." Both Iran and Syria were so designated in 1979 when the list was first established. More importantly, Iran and Syria remained a designated state sponsor of terrorism at the time of the Terrorist Bombing in 2006.

----

[3] The fact that liability arises once sponsorship of terrorist activities is demonstrated for jurisdictional purposes is unsurprising since "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks. As a co-conspirator, both with its own agents, officials and employees, and with others, such as the terrorist organization and the ultimate perpetrators, the foreign state is also a joint tortfeasor." *Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998).

The other requirements of § 1605A are also met because Plaintiffs are American nationals seeking money damages for personal injuries or death that occurred from terrorist attacks that were materially supported by Iran and Syria. Section 1605A(h)(3) defines "material support or resources" as having the same meaning as in 18 U.S.C. § 2339A, which defines it to include "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or include oneself), and transportation, except medicine or religious materials." Section 2339A(b) further defines "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge" and "expert advice or assistance" as "advice or assistance derived from scientific, technical or other specialized knowledge."

Based on the allegations in Plaintiffs' Amended Complaint and the evidence presented by Plaintiffs, there can be no doubt that the Iranian and Syrian defendants provided material support to the PIJ. In particular, The Iranian defendants provided the PIJ with funding, training, explosives, advanced weapons, equipment and expert advice. Similarly, the Syrian defendants provided the PIJ financial services, facilities, safehouses, lodging, bases, weapons, training, transportation and expert advice and assistance. The terrorist bombing attacks perpetrated by the PIJ on behalf of the Iranian and Syrian defendants directly caused Plaintiffs' injuries. As such, neither

Iran nor Syria is not immune from liability under the FSIA pursuant to § 1605A(a)(1) and it is specifically liable to Plaintiffs pursuant to § 1605A(c). The Iranian and Syrian defendants are jointly and severable liable for the injuries caused to the Wultz Plaintiffs.

## C.    Findings Regarding Liability

Section 1605A(c) of the FSIA expressly creates a federal statutory cause of action for plaintiffs in an action brought under § 1605A. Because the elements of a claim under § 1605A(c) must also be established in order to waive the foreign state's immunity and vest the court with subject-matter jurisdiction under § 1605A, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A are met. *See Kilburn v. Islamic Rep. of Iran*, ___ F. Supp. 2d ___, 2010 WL 1198561 at *19 (D.D.C. 2010) ("[T]he § 1605A(c) cause of action is fulfilled by demonstrating that the foreign sovereign performed acts described in subsection (a)(1) of § 1605A, which addresses immunity and subject matter jurisdiction…. Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."). *See also Gates v. Syrian Arab Rep.*, 580 F. Supp. 2d 53 (D.D.C. 2008) (same).[4]

---

[4] The fact that liability arises once sponsorship of terrorist activities is demonstrated for jurisdictional purposes is unsurprising since "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks. As a co-conspirator, both with its own agents, officials and employees, and with others, such as

Accordingly, since, as discussed *supra*, defendants' immunity is waived under § 1605A due to their provision of material support and resources to the PIJ, defendants are liable to plaintiffs under § 1605A(c).

## D.    Compensatory Damages

In actions brought under § 1605A, plaintiffs are entitled to "economic damages, solatium, pain, and suffering, and punitive damages." § 1605A(c).

On the matter of damages, the Court received testimony from each of the plaintiffs. However, quantifying the multiple layers of harm which plaintiffs suffer is difficult. As guidance for determining the quantum of damages, the Court is aided by the dozens of civil terrorism decisions under the FSIA. In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Haim v. Islamic Rep. of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.). "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." *Id.*

> This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents

the terrorist organization and the ultimate perpetrators, the foreign state is also a joint tortfeasor." *Flatow, supra* at 27.

> and children of deceased victims, and $2.5 million to siblings
> of deceased victims.

*Acosta v. The Islamic Rep. of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

There is also clear guidance from prior FSIA cases on awards to victims, like Yekutiel Wultz, who were injured in terrorist attacks. Surviving victims of terrorist attacks are generally awarded between $7 - 15 million for their own pain and suffering. *Campuzano*, 281 F. Supp. 2d 258 (D.D.C. 2003) (awards ranging from $7 - $15 million to victims for past and future pain and suffering, loss of prospective income, and past medical expenses), *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) ($20 million for pain and suffering and mental anguish), *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (26 injured survivors of the 1983 Beirut attack were awarded between $1.5 million and $12 million for battery).

Courts have also made significant awards to plaintiffs who endured the trauma and emotional impact of having a relative injured in a terrorist attack *Kirschenbaum v. Islamic Rep. of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008) ($2.5 million to each parent of injured U.S. citizen, parents suffered great emotional anxiety after hearing of the attack, endured the sight of their son with multiple open wounds, watched him suffer, and thereafter had to deal with the strain on their relationship with their son); *Blais v. Islamic Rep. of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) ($3.5 million for pain and suffering to each parent of U.S. serviceman severely injured in Saudi terrorist bombing); *Campuzano*, 281 F. Supp. 2d 258 ($2.5 million to mother for loss of solatium

and severe mental anguish from the physical and emotional changes to daughter); *Peterson v. Islamic Rep. of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ($2.5 million for pain and suffering to parents of servicemen injured in 1983 Beirut bombing).

Since the Terrorist Bombing was committed, members of Daniel Wultz' family have suffered ongoing anguish and suffering by reason of Daniel's murder, and their concomitant loss of Daniel's society, guidance and company. Plaintiffs' pain and suffering is obviously enormous, has been with them constantly since the day of the Terrorist Bombing and they will continue to experience the effects of the tragedy for the remainder of their lives.

As an American citizen, Yekutiel Wultz has a direct cause of action under 18 U.S.C. § 1605A. Tragically, he was injured and continues to suffer in multiple ways from the Terrorist Bombing. As discussed above, he was grievously wounded by the bomb blast and he remains permanently disabled today. He personally witnessed the explosion and saw the devastating injuries it inflicted upon Daniel and the other victims. These images continue to haunt him day and night as they interfere with his abilities to carry on with his life. While still himself undergoing intensive hospital care, he endured the torturous 27 day battle Daniel engaged in for survival.

In addition, he suffered the shocking loss of his beloved son with whom he shared a close and loving relationship. Yekutiel Wultz is therefore entitled to the following award for the following claim set out in the Plaintiffs' Complaint:

The first claim for relief (for damages under 28 U.S.C §1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Terrorist Bombing. The attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A. Yekutiel Wultz suffered severe physical, psychological, emotional and other injuries as a result of the Terrorist Bombing, including: disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and loss of future income.

The conduct of the Iranian and Syrian defendants was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Yekutiel Wultz as well. Like the rest of his family, Yekutiel was harmed on multiple levels by the Terrorist Bombing.

For his own physical injuries Yekutiel Wultz is awarded $15,000,000, as well as pre-judgment interest.

In addition, as the parent of Daniel Wultz he is awarded $8,000,000, as well as pre-judgment interest.

Defendants are jointly and severally liable for the full amount of his damages.

Sheryl and Amanda Wultz, who are both American citizens, each have a direct cause of action under 18 U.S.C. §1605A. Tragically, they too continue to suffer in multiple ways from the Terrorist Bombing. Suffering and the shocking loss of their beloved son and brother with whom each shared a close and loving relationship. Sheryl and Amanda Wultz are therefore entitled to the following award for the following claim set out in the Plaintiffs' Complaint:

The first claim for relief (for damages under 28 U.S.C §1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Terrorist Bombing. The attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A. Sheryl and Amanda Wultz suffered severe physical, psychological, emotional and other injuries as a result of the Terrorist Bombing, including: loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium; and loss of future income.

The conduct of the Iranian and Syrian defendants was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

The analysis detailed above regarding awards to direct terror victims and relatives of victims is applicable to Sheryl and Amanda Wultz as well. Like, Yekutiel Wultz they were harmed on multiple levels by the Terrorist Bombing.

As the mother of Daniel Wultz, Sheryl Wultz is awarded $8,000,000, as well as pre-judgment interest.

As the sister of Daniel Wultz, Amanda Wultz is awarded $5,000,000 as well as pre-judgment interest. Defendants are jointly and severally liable for the full amount of Sheryl and Amanda's damages.

Plaintiff, the Estate of Daniel Wultz is also entitled to an award for the pain and suffering Daniel endured during his heroic 27 day battle to survive. Daniel was conscious at times during his hospital care, experienced extreme pain, recognized those around him, attempted to communicate and understood what had happened to him. He underwent numerous surgeries and emergency medical procedures. In addition, the Estate is entitled to compensation for Daniel's lost wages and income.

The Estate of Daniel Wultz is awarded $10,000,000, as well as pre-judgment interest, and an additional award of compensation for lost income in the amount of $2,568,634.

Defendants are jointly and severally liable for the full amount of the Estate's damages.

Abraham Wultz[5] is an American citizen, and has a direct cause of action under 18 U.S.C. § 1605A. Tragically, he too was badly injured by the Terrorist Bombing

---

[5] While mindful of the Court's recent decision in *Davis v Islamic Rep. of Iran*, 2012 U.S. Dist. LEXIS 44296, the Court is requested to reconsider the matter of awarding compensatory damages to after-born sibling.

that took his older brother's life. As discussed above the attack devastated the Wultz family and inflicted upon them injuries from which they will never recover. The family has suffered irreparable harm and is not the same family that once was. Had Daniel not been murdered Abraham would have been born into a family over which a dark cloud of anguish and grief continuously hovers. Abraham Wultz is therefore entitled to the following award for the following claim set out in the Plaintiffs' Complaint:

The first claim for relief (for damages under 28 U.S.C §1605A(c)); namely, that defendants provided material support and resources which caused and facilitated the Terrorist Bombing. The attack was an extrajudicial killing within the meaning of 28 U.S.C. § 1605A. Abraham suffered psychological, emotional and other injuries as a result of the Terrorist Bombing, including: pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; loss of solatium.

The conduct of the Iranian and Syrian defendants was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

As discussed *supra*, the facts show that plaintiff Abraham Wultz has suffered and will continue to suffer significant emotional injury and loss of consortium and solatium due to the loss of an older brother he will never know, by being born to a father with physical and emotional psychological injuries, and by being born into a family whose emotional fabric and internal relationships have been disrupted, and

rendered partially dysfunctional, as the result of Daniel's murder and Tuly's injuries in the bombing.

The fact that Abraham was conceived several years after the bombing does not bar him from recovery. For at least half a century the law has recognized that "[i]t makes no difference how much time elapses between a wrongful act and a resulting injury if there is a causal relation between them." *Zepeda v. Zepeda*, 41 Ill.App.2d 240, 250 (Ill.App. 1963) ("[W]hat if the wrongful conduct takes place before conception? Can the defendant be held accountable if his act was completed before the plaintiff was conceived? Yes, for it is possible to incur, as Justice Holmes phrased it…'a conditional prospective liability in tort to one not yet in being.'"). *See also Bergstreser v. Mitchell*, 577 F2d 22 (8th Cir. 1978) (Under Missouri law a child stated a cause of action for injuries sustained as a result of negligence in the performance of a procedure upon the child's mother several years prior to the child's birth); *Jorgensen v Meade Johnson Labs., Inc.* 483 F2d 237 (10th Cir. 1973) (Oklahoma law recognizes that preconception conduct can give rise to duty of care to child born subsequently); *Lynch v. Scheininger*, 714 A.2d 970 (App. Div. 1998) (same). *See generally* Matthew Browne, 69 Fordham Law Rev. 2555, *Preconception Tort Law in an Era of Assisted Reproduction: Applying a Nexus Test for Duty*, (May 2001) (collecting numerous cases recognizing preconception duty of care).

In this case, there was expert testimony regarding the psychological impact of a traumatic event such as the murder of Daniel Wultz and the wounding of Yekutiel Wultz on after-born children:

> Q.     Based on your observations of the Wultz family and the, and what you've just described, can you, do you have opinion as to what the impact of this attack will be  long term on the Wultz children, Amanda and Abraham?
>
> A.     Well, on the one hand, they will have the very bittersweet memory, a memory of a beloved individual someone they lost as well. Now, for Abraham it is different because he never knew Daniel. And so, it's a memory, and yet it's still, Daniel will have a very much of a living presence for him throughout his entire life for many different reasons.
>
> And my guess would be that there will be feelings of guilt and anger that they will carry with them in one way or another throughout their entire lifetime. I often hear this from children of holocaust survivors who lost young children during the war, and after the war they had new children. And the children grew up in some ways haunted, but influenced by these other children who existed because they realized if not for the traumatic events of the war, they wouldn't exist. And clearly for their son, the youngest son, this will be an element throughout his lifetime.

(27PM, pp18-19, testimony of Dr. Agronin).

As the brother of Daniel Wultz, Abraham Wultz is awarded $5,000,000 as well as pre-judgment interest. Defendants are jointly and severally liable for the full amount of Abraham Wultz. damages.

E.      **Punitive Damages**

            In numerous previous civil terrorism cases tried under FSIA, judges have

awarded punitive damages to punish defendants and to deter future acts of terrorism.

Typically, courts have imposed punitive damage of three times of a state sponsor's

annual budget for the export of terrorism. *Acosta v. The Islamic Rep. of Iran*, 574 F. Supp.

2d 15, 31 (D.D.C. 2008), *Bodoff v. Islamic Rep. of Iran,* 424 F. Supp. 2d 74, 89 (D.D.C. 2006);

*Stern v. Islamic Republic of Iran,* 271 F. Supp. 2d 286, 301 (D.D.C. 2003); *Cronin v. Islamic*

*Rep. of Iran,* 238 F. Supp. 2d 222, 235-36 (D.D.C. 2002), *abrogated on other grounds by*

*Cicippio-Puleo v. Islamic Rep. of Iran,* 353 F.3d 1024 (D.C. Cir. 2004); *Eisenfeld v. Islamic Rep.*

*of Iran,* 172 F.Supp.2d 1, 9 (D.D.C. 2000). Even when the amount of the annual budget is

not known or cannot be determined the courts have followed the format set out in the

FSIA cases against Iran. *See* also *Calderon-Cardona v. Democratic People's Rep. of Korea*, 723

F. Supp. 2d 441 (D.P.R. 2010).

            Both the Iranian and Syrian defendants' demonstrated and well known

policy to encourage, support and direct a campaign of murder against civilians amply

justifies the imposition of punitive damages against them. This Court will adopt the

"typical punitive damages award of $300,000.00" as "[t]here is no reason to depart from

settled case law regarding the amount of punitive damages in terrorism cases." *Brewer*

*v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 58-59 (D.D.C. 2009), see also *Acosta v. Islamic*

*Rep. of Iran*, 574 F. Supp. 2d 15, 31 (D.D.C. 2008).

Accordingly, the Court will award punitive damages against the Iranian defendants in the amount of $300,000,000 to plaintiffs collectively and in the amount of $300,000,000 against the Syrian defendants collectively.

## <u>CONCLUSION</u>

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over the Iranian and Syrian defendants. Plaintiffs have established to this Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that Iran and Syria are liable for damages because it provided material support, resources and assistance to the PIJ terrorists who carried out the Terrorist Bombing on April 17, 2006, in which Daniel Wultz was murdered and his family members were grievously harmed. Accordingly, plaintiffs' motion for default judgment shall be granted and judgment shall be entered in the amounts described above.

_____

Royce C. Lamberth,
U.S.D.J.