## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHERYL WULTZ, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 08-cv-1460 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND OPINION

### I.    INTRODUCTION

This action arises out of the April 17, 2006 suicide bombing attack at the Rosh Ha'ir restaurant in Tel Aviv, Israel.  The explosion killed eleven people and wounded dozens of others. Among the wounded were two of the plaintiffs in this case: sixteen-year-old Daniel Wultz and his father Yekutiel "Tuly" Wultz.  Tragically, Daniel succumbed to his injuries and died on May 14, 2006.  Daniel's mother, Sheryl Wultz, and his siblings, Amanda and Abraham Wultz, are also plaintiffs in this action against defendants Islamic Republic of Iran ("Iran"), Iranian Ministry of Information and Security ("MOIS") (collectively, "Iranian Defendants"), Syrian Arab Republic ("Syria"), Syrian Ministry of Defense, Syrian Military Intelligence, and Syrian Air Force Intelligence Directorate (collectively, "Syrian Defendants").

This action is brought pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, which was enacted as part of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA").  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).  That provision, codified at 28 U.S.C. § 1605A,

provides "a federal right of action against foreign states." *In Re Islamic Republic of Iran*

*Terrorism Litig.*, 659 F. Supp. 2d 31, 40 (D.D.C. 2009).  Plaintiffs contend that, by providing

financial and logistical support to the terrorist group responsible for the attack, defendants are

legally responsible for the severe physical and emotional toll that the restaurant bombing

wreaked upon the Wultz family.  For the reasons set forth below, the Court finds that plaintiffs

have provided sufficient evidence to support their cause of action, and determines that

defendants are liable under the FSIA's state-sponsored terrorism exception for a total of

$332,068,634 in compensatory and punitive damages.

## II.    PROCEDURAL HISTORY

Plaintiffs here are the Estate of Daniel Wultz, Tuly Wultz, his wife Sheryl Wultz, and

their two children, Amanda and Abraham Wultz.  In their First Amended Complaint, plaintiffs

set forth a claim under 28 U.S.C. § 1605A(c) against defendants for their provision of material

support for the bombing, which plaintiffs allege was an act of extrajudicial killing.  First Am.

Compl. ¶¶ 93–105 [ECF No. 12].  This Court's prior Order transferred plaintiffs' claims under

the Antiterrorism Act, 18 U.S.C. § 2333, against defendant Bank of China to the United States

District Court for the Southern District of New York.  Mem. Op. & Transfer Order, Jan. 28, 2011

[ECF Nos. 102–03].  This Court also dismissed all individually named governmental defendants

as duplicative of the Iranian and Syrian Defendants.  Order Dropping Individually Named Defs.

Oct. 20, 2010 [ECF No. 87].

Plaintiffs served copies of the relevant papers, along with translations, by diplomatic

channels through the U.S. Department of State, as required by 28 U.S.C. § 1608(a)(4).

According to the diplomatic note, service was effected as to Syrian Defendants on September 7,

2009, and as to Iranian Defendants on October 1, 2009.  Return of Service/Affidavit, Sept. 17,

2009 [ECF No. 51]; Return of Service/Affidavit, Dec. 13, 2009 [ECF No. 67].  Under the terms of 28 U.S.C. § 1605A, defendants had 60 days to respond.  28 U.S.C. § 1608(d).

Syrian Defendants appeared and filed a motion to dismiss the First Amended Complaint. Def. Mot. to Dismiss, Nov. 16, 2011 [ECF No. 60].  After this Court denied Syrian Defendants' motion to dismiss, Order [ECF. No. 86], Syrian Defendants defaulted.  Clerk's Entry of Default, Feb. 10, 2011 [ECF No. 105].  Iranian Defendants did not appear or respond to the initial service. Therefore, the Clerk of the Court entered default on plaintiffs' behalf against Iranian Defendants on Dec. 17, 2009.  Clerk's Entry of Default, Dec. 19, 2009 [ECF No. 66].

On February 27 and 29, 2012, this Court held a two-day evidentiary hearing where plaintiffs presented evidence in order to obtain a default judgment in accordance with FSIA § 1608(e).  Based on the evidence presented to the Court at that hearing, as well as the additional affidavits filed with the Court, the Court makes the following findings of fact and conclusions of law.

III.    FINDINGS OF FACT

The Clerk of the Court entered Iranian Defendants' default on December 17, 2009, and Syrian Defendants' default on February 10, 2011.  However, prior to entry of final default judgment, the FSIA requires that courts evaluate the evidence before them to ensure that plaintiffs have established their right to relief "by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as true, and obligates courts to inquire further before entering judgment against parties in default."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotations omitted).

In considering whether to enter default judgment, courts in FSIA cases look to various sources of evidence to satisfy their statutory obligation. Courts may, for example, rely upon plaintiffs' "'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (alteration in original; quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)). In addition to traditional forms of evidence—testimony and documentation—plaintiffs in FSIA cases may also submit evidence in the form of affidavits. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006) (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006)). Finally, a FSIA court may "'take judicial notice of related proceedings and records in cases before the same court.'" *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50–51 (D.D.C. 2009)). Here, plaintiffs rely on documentary, affidavit, and testimonial evidence in support of their motion for default judgment.

### A.    The Palestinian Islamic Jihad

1.    For several months prior to April 17, 2006, an organization called the Palestinian Islamic Jihad ("PIJ") planned and made preparations to murder and injure Jewish civilians by carrying out a suicide bombing in a crowded public location in Tel Aviv, Israel.

2.    At the time of the attack, PIJ was designated a terrorist organization by the State Department under Executive Order 13224. *See* Dep't of State, Bureau of Counterterrorism, *Individuals and Entities Designated by the State Department under E.O. 13224*, Jan. 26, 2012, http://www.state.gov/j/ct/rls/other/des/143210.htm (May 14, 2012, 11:40 AM).

3.    PIJ was established in 1980, influenced by the revolution in Iran. Its founder, Fathi Shiqaqi, preached the use of violence against Israel as a way to bring people back to a truer form

of Islam.  PM Hr'g Tr. 23, Feb. 27, 2012; PM Hr'g Tr. 8–9, Feb. 29, 2012; *see generally* Exh.

46, Marius Deeb, *Syria's Terrorist War on Lebanon and the Peace Process* (2003).

4.      PIJ was originally an offshoot of the Hamas organization.  Hamas' roots date back to an

earlier organization known as the Palestinian Society of Muslim Brothers established in 1945.

PIJ emerged in 1980 when its founders left Hamas and established a new organization heavily

inspired and influenced by the Islamic Revolution in Iran.  The PIJ and Hamas, however, remain

similar in goals and methods, and both engage in terrorism against Israel and the West.  PM Hr'g

Tr. 25, Feb. 27, 2012; PM Hr'g Tr. 8, Feb. 29, 2012; Decl. of Colonel Ofer Saad  ("Saad Decl."),

at ¶ 10.

5.      PIJ is headquartered in Damascus, Syria, and has strong ties to Iran—which in turn has a

close alliance with Syria.  Funding for the PIJ comes from Iranian Defendants which transfers it

through Syrian Defendants.  Until he was assassinated in 1995, the former head of the PIJ, Fathi

Shiqaqi, received funds from Syria through its intelligence services.  Since 1996, Ramadan

Shalah has lead the PIJ and continues to receive funding through Iran and Syria, which is then

provided to PIJ operatives for use in terrorist operations.  PM Hr'g Tr. 26, 29, Feb. 27, 2012; PM

Hr'g Tr. 11, 22, Feb. 29, 2012; Saad  Decl. ¶¶ 9–10.

6.      Iranian money passed through the Syrian Defendants from the 1990s up until at least

2006–2007, the time of this bombing.  After Hamas seized control of the Gaza Strip, Iran has

been able to provide funds more directly to both Hamas and the PIJ.  PM Hr'g Tr. 26, 32, Feb.

27, 2012; PM Hr'g Tr. 14, Feb. 29, 2012.

7.      During the Second Intifada, the outbreak of Palestinian-Israeli conflict in 2000 that

continued until 2005, terrorist suicide bombers became a common weapon of the Palestinians

against Israel.  This was a direct result of the influence of Iran and Syria which encouraged the

PIJ and other terror organizations to engage in these types of attacks.  The PIJ, a smaller organization than Hamas, is responsible for approximately 25 percent of the suicide bombings perpetrated in Israel during this period.  The PIJ was taught and trained to use suicide bombers by the Hezbollah organization, an Iranian funded organization, which has engaged in this method of attacks since 1983.  PM Hr'g Tr. 27–31, Feb. 27, 2012; Saad Decl. ¶ 10.

8.      The evidence shows that at the time of the April 17, 2006, bombing the PIJ was sheltered and headquartered in Syria with the consent and approval of the Syrian government.  For example, Syrian officials would escort potential suicide bombers and other terrorists to training camps within its borders.  PM Hr'g Tr. 30–31, Feb. 27, 2012; PM Hr'g Tr. 8–9, 26–27, Feb. 29, 2012.

9.      Based on the evidence presented by the expert witnesses at trial and the expert declarations submitted to the Court, the Court finds that PIJ received substantial logistical, financial, and technical support from both the Iranian and Syrian defendants.

10.      The Islamic Republic of Iran has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780, since January 19, 1984.  *See* United States Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/c14151.htm (May 14, 2012, 11:40 AM).

11.      The Syrian Arab Republic has been designated a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. 2405(j), section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780, since December 29, 1979.  *See* United States Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/c14151.htm (May 14, 2012, 11:40 AM).

### B.      The April 17, 2006 Suicide Bombing

12.     Pursuant to the PIJ's plan, during lunchtime on April 17, 2006, a suicide bomber arrived

at the Rosh Ha'ir restaurant in Tel Aviv carrying a powerful explosive device which had been

provided to him by the PIJ.  Saad Decl. ¶ 7.

13.     The explosion killed eleven people and wounded dozens of others.  Among the wounded

were sixteen-year-old Daniel Wultz and his father, Tuly Wultz, who were visiting Israel for the

Passover holiday.  Saad Decl. ¶ 7; AM Hr'g Tr. 23–69, Feb. 27, 2012.

14.     The bombing coincided with the elections for Israel's Knesset and forming of a

government by the newly elected Prime Minister Ehud Olmert.  The purposes of the bombing

were to greet Israel's new centrist government with a heinous attack, to provoke the Israeli

government, and to prevent peace talks between Israel and the Palestinian Authority.  PM Hr'g

Tr. 40–41, Feb. 27, 2012; Saad Decl. ¶ 7.

15.     The PIJ publically took credit for the bombing.  The PIJ distributed a video featuring the

suicide bomber giving his "last testament" on a background of PIJ flags.  PM Hr'g Tr. 41, Feb.

27, 2012; Saad Decl. ¶ 8.

16.     Both Iran and Syria were informed of and provided support for the bombing.  PM Hr'g

Tr. 42–44, Feb. 27, 2012; Saad Decl. ¶¶ 8, 20.

### C.      Aftermath of the Bombing

17.     Daniel Wultz was conscious immediately after the bombing and during substantial parts

of his hospitalization.  Between the time of the bombing and his death, Daniel endured extreme

conscious physical pain and suffering, as well as severe emotional pain as the result of his

conscious awareness of both the fact and extent of his injuries, and the likelihood that he would

die.  Specifically, Daniel suffered from severe bleeding caused by multiple shrapnel wounds,

acute respiratory distress, a perforated bowel, multiple infections—including gangrene, staphylococcus aureus, mucormycosis, stentotrophanomus—acute renal failure, hemorrhagic and septic shock, and other injuries.  He received approximately 200 units of blood during his hospitalization.  Surgeons removed a number of his organs, including his spleen, left kidney, part of his pancreas and amputated two of his fingers and his right leg below the knee.  He spent the entire twenty-seven day hospitalization on a ventilator.  He was "fully alert" for a significant portion of this time.  AM Hr'g Tr. 37–47, Feb. 29, 2012.

18.     Daniel Wultz died from his injuries on May 14, 2006.  AM Hr'g Tr. 54–55, Feb. 27, 2012

19.     Tuly Wultz was sitting across from his son Daniel at the time of the bombing.  He suffered serious physical injuries in the attack, as well as resultant psychological and emotional harm.  Tuly suffered shrapnel wounds in his legs, forehead, face, and scalp, a fractured left tibia, and ruptured eardrums.  A nail was removed from his right leg.  Today, he continues to have an abnormal gait, constant ringing in his ears, little sense of smell and taste, and lower back pain.  Tuly also experiences flashbacks to April 17 "many, many times a day," nightmares almost every night, and Post-Traumatic Stress Disorder.  AM Hr'g Tr. 34–41, Feb. 27, 2012; PM Hr'g Tr. 11–12, Feb. 27, 2012; AM Hr'g Tr. 25–37, Feb. 29, 2012.

20.     Sheryl Wultz, Daniel's mother, suffered severe psychological and emotional harm as a result of the bombing.  Sheryl took a taxi to the hospital immediately after the explosion and remained there during Daniel and Tuly's hospitalization.  Her "life has never been the same in every way" since the bombing.  In the years that followed, Sheryl was "very upset, very depressed" suffering from "persistent grief."  Her family relationships, both with Tuly and Amanda, have been negatively impacted.  AM Hr'g Tr. 12–13, 48–74, Feb. 27, 2012; PM Hr'g Tr. 11–13, Feb. 27, 2012.

21.     Amanda Wultz, Daniel's sister, suffered severe psychological and emotional harm as a result of the bombing.  Amanda flew from the United States to Israel in the days following the bombing and remained in Israel until after Daniel's death.  Amanda is "not the same person" she was before the bombing.  She "had zero motivation" and made significantly poorer grades in school after the bombing.  Amanda gets "extremely anxious," which has negatively impacted both her family relationships and other personal relationships.  She also is "depressed" and suffers from "persistent grief."  AM Hr'g Tr. 49–73, Feb. 29, 2012.

22.     Abraham Wultz was born nineteen months after the bombing on November 29, 2007, and is the son of Tuly and Sheryl.  Pls.' Ex. 1.

23.     Tuly, Sheryl, and Amanda Wultz are all citizens of the United States of America and were so at the time of the April 17, 2006, bombing.  Exs. 2, 4–5.  Daniel was also a citizen of the United States of America at the time of the bombing and at his death.  Ex. 3.

## IV.   CONCLUSIONS OF LAW

Based on these findings of fact, the Court reaches the following conclusions of law:

### A.   Jurisdiction

Subject to certain enumerated exceptions—including the state-sponsored terrorism exception—the FSIA simultaneously provides immunity to foreign states from suit and denies all U.S. federal and state courts jurisdiction over such actions.  28 U.S.C. § 1604.  Under certain conditions, however, courts obtain original jurisdiction for suits against foreign states, and those states' general immunities are waived by operation of statute.  *See* 28 U.S.C. § 1330.  Based on the evidence here, these conditions have been met.

#### 1.   Subject Matter Jurisdiction

The state-sponsored terrorism exception provides that federal courts possess subject matter jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605A(a)(1).

Here, each of these prerequisites is met. First, plaintiffs have only identified monetary remedies in their First Amended Complaint, ¶¶ 93–105, rendering this a suit involving "money damages." Second, defendants Iran and Syria are plainly foreign states. With respect to defendant MOIS, the Syrian Ministry of Defense, Syrian Military Intelligence, and Syrian Air Force Intelligence Directorate, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Applying this definition, courts in this jurisdiction have been directed to ask whether an entity "is an integral part of a foreign state's political structure"; if so, that defendant is treated as a foreign state for FSIA purposes. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). The evidence in this case establishes that MOIS, Syrian Ministry of Defense, Syrian Military Intelligence, and Syrian Air Force Intelligence Directorate are essential parts of the political structure of Iran and Syria and acted as conduits for the states' provision of funds to terrorist organizations, including PIJ. Thus, defendants MOIS, Syrian Ministry of Defense, Syrian Military Intelligence, and Syrian Air Force Intelligence Directorate are foreign states for purposes of these proceedings. *See Fain v. Islamic Republic of Iran*, 2012 WL 1377595, at *7 (D.D.C. Apr. 20, 2012) (finding similar entities to qualify as a foreign state).

Third, plaintiffs suffered "personal injury or death." Tuly's severe physical injuries, Daniel's death, and the family's mental anguish clearly qualify under FSIA § 1605A(a)(1).

While the First Amended Complaint does not explicitly plead the torts of assault, battery, and intentional infliction of emotional distress, this Court is required to "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged. . . ." *American Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). The Complaint will be read to include those personal injuries, as they necessarily flow from any act of extrajudicial killing. Fourth, the evidence establishes that the Iranian and Syrian Defendants supported the PIJ for the purpose of undertaking attacks such as the 2006 bombing and funneled money to the PIJ. The evidence also demonstrates that the defendants played necessary support roles leading up to the horrific attack. This is more than sufficient to satisfy the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Fifth, the 2006 bombing constitutes an extrajudicial killing that occurred as a direct and proximate result of defendants' conduct in providing financial and other assistance to the PIJ. On the basis of these findings, the Court has jurisdiction over plaintiffs' claims.

### 2.      Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity. Waiver of a foreign states' immunity can occur either by that state's own action or by operation of statute. The FSIA state-sponsored terrorism exception provides that such waiver occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claims is filed under this section," (2) "the claimant or the

victim was, at the time of the act . . . a national of the United States . . . ," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii) (emphasis added).

Here, the established facts warrant waiver of defendants' sovereign immunity as provided by the FSIA. First, Iran has long been designated by the U.S. Secretary of State as a state sponsor of terrorism and remains so designated today. United States Dep't of State, *Determination Pursuant to Section 6(j) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836-02, Jan. 23, 1984 ("Iran is a country which has repeatedly provided support for acts of international terrorism."). Syria has likewise been designated a state sponsor of terrorism and remains so designated today. 45 Fed. Reg. 1599 § 385.4(d); *see also* United States Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/c14151.h tm (May 14, 2012, 11:40 AM). Second, all plaintiffs (except the unborn Abraham Wultz) were American citizens at the time of the attack. Finally, because the bombing occurred in Tel Aviv, Israel—and not Iran or Syria—the FSIA's requirement that defendants be given an opportunity to arbitrate this claim is inapplicable here. For these reasons, defendants' immunity is waived and they may be held liable for the 2006 bombing.[1]

## B.    Liability

FISA § 1605A(c) creates a federal private right of action for victims of state-sponsored terrorism. Specifically, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or

---

[1] Plaintiff served the Complaint on Iranian Defendants through diplomatic channels on October 1, 2009, and on Syrian Defendants through diplomatic channels on September 7, 2009—as authorized under FSIA, 28 U.S.C. § 1608(a)(4). The Court thus has personal jurisdiction over the Iranian and Syrian defendants. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under 28 U.S.C. §1608).

resources for such an act" where (2) the act was committed, or the provision provided, by the

foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4)

"personal injury or death" (5) "for which courts of the United States may maintain jurisdiction

under this section for money damages."  28 U.S.C. § 1605A(a)(1), (c).  As the Court has recently

discussed at length, the third and fourth elements—causation and injury—"require plaintiffs to

prove a theory of liability" in which plaintiffs articulate a justification for the recovery the

damages which they seek, generally expressed "through the lens of civil tort liability."  *Rimkus*,

750 F. Supp. 2d at 176.  Therefore, the Court will apply the facts of this case to each of these

elements in turn.

### 1.      Act

On the basis of the evidence presented during the two-day evidentiary hearing, the

plaintiffs have sufficiently established that defendants were responsible for the horrific suicide

bombing that occurred in Tel Aviv, Israel, on April 17, 2006.  The evidence concerning the

actions of defendants demonstrates that they are culpable both for the extrajudicial killing of a

U.S. citizen, Daniel Wultz, and for the provision of material support to the members of PIJ

participating in the bombing, in satisfaction of the first element of liability under the federal

cause of action.

FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim

Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous
> judgment pronounced by a regularly constituted court [(3)]
> affording all judicial guarantees which are recognized as
> indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence presented

establishes that, prior to the suicide bombing, defendants instructed and encouraged members of

the PIJ to carry out the April 17 suicide bombing.  The evidence also shows that after the attack members of the PIJ reported their success back to the Iranian and Syrian defendants.  There is no evidence that this order was sanctioned by any judicial body, and the directive to use force against civilians was in contravention of civil guarantees recognized as indispensable to all free and civilized peoples.  Based on these findings, the April 17 suicide bombing constitutes an extrajudicial killing, undertaken by members of PIJ acting as agents for the Iranian and Syrian Defendants.

The FSIA declares that the concept of "material support or resources" is defined by reference to the U.S. criminal code.  28 U.S.C. § 1605A(h)(3).  That definition states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The testimony of three expert witnesses demonstrates that during the period leading up to the April 17, 2006 suicide bombing, the Iranian Defendants funneled money through the Syrian Defendants to the PIJ in order for the PIJ to carry out terrorist attacks.  The evidence also establishes that the safe haven, advice, encouragement, assistance, and facilities provided by Syrian Defendants substantially contributed to the PIJ's ability to train suicide bombers.  Taken together, these acts plainly constitute the provision of material support for FSIA purposes.

### 2. Actor

The Court has determined that defendants are responsible for the provision of material support which led to the April 17, 2006 suicide bombing and extrajudicial killing.  In addition, the evidence establishes that PIJ acted generally as an agent of the Iranian and Syrian Defendants

during this period, and that the defendants' financing, encouragement, and instruction prompted the April 17, 2006 suicide bombing.  Under such circumstances, defendants may be held vicariously liable for the extrajudicial killing perpetrated by the bombers.  *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 2d 51, 71–72 (D.D.C. 2010) (holding that defendant foreign state may be held liable where Hezbollah agents "acted at the behest and under the operational control of defendants").

### 3.    Theory of Recovery—Causation & Injury

The elements of causation and injury in the federal cause of action created by 28 U.S.C. § 1605A require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered.  *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability.").  When determining the contours of these theories, the D.C. Circuit has cautioned that while the "extent and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal courts to fashion a complete body of federal law."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (2003).  Based on the Circuit Court's guidance, District Courts in this jurisdiction "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery.  *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61.  As previously discussed, the First Amended Complaint can be read to contain three theories of recovery: assault, battery, and intentional infliction of emotional distress.  First Am. Compl. ¶¶ 93–105.

#### (i)    Assault and Battery

Defendants are liable for assault in this case if, when they committed extrajudicial killing or provided material support and resources therefor, (1) they acted "intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact" by, those attacked and (2) those attacked were "thereby put in such imminent apprehension." *See Murphy*, 740 F. Supp. 2d at 73–75; Restatement (Second) of Torts § 21(1).  It is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm. *Valore*, 700 F. Supp. 2d at 76.  Tuly Wultz testified that just before the explosion, he "saw an evil smile" on the suicide bomber's face "and [he] knew exactly what was going to happen.  [Tuly] tried to jump on Daniel, but at soon as [he] tried, to get up he detonated the bomb."  AM Hr'g Tr. 23, Feb. 27, 2012.  Defendants therefore acted with the intent to and did put Tuly in imminent apprehension of harmful contact, making them liable for assault.

Iran is liable for battery in this case if, when it committed extrajudicial killing or provided material support and resources therefor, it acted "intending to cause a harmful or offensive contact with . . ., or an imminent apprehension of such a contact" by, those attacked and (2) "a harmful contact with" those attacked "directly or indirectly result[ed]."  Restatement (Second) of Torts § 13.  Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15.  Again, it is clear that defendants acted with intent to cause harmful contact and the immediate apprehension thereof: acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm. *Valore*, 700 F. Supp. 2d at 77.  Accepting as true the expert testimony that both Daniel and Tuly Wultz suffered severe physical injury from the suicide bombing, the Court concludes that defendants are liable for battery.

### (ii)      Intentional Infliction of Emotional Distress

This Court and others have frequently addressed the intentional infliction of emotional distress theory following the enactment of § 1605A.  Relying principally on the Restatement, courts have set for the following standard:  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)).  The scope of recovery under this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time."  Restatement (Second) of Torts § 46(2)(a)–(b).  The former qualification is of no consequence for most of the plaintiffs here as they are either the victims (Daniel and Tuly), or the spouse/mother (Sheryl) or daughter/sister (Amanda) of the bombing victims, and thus fall within even the strictest definition of immediate family.  *See Valore*, 700 F. Supp. 2d at 79 (noting that immediate family "is consistent with the traditional understanding of one's immediate family" and includes "one's spouse, parents, siblings, and children").

Abraham Wultz, however, was not born until November 29, 2007—more than nineteen months after the bombing.  As this Court more thoroughly discussed in *Davis v. Islamic Republic of Iran*, "a plaintiff bringing an action under § 1605A must have been alive at the time of the attack in order to collect solatium damages."  2012 WL 1059700, at *5 (D.D.C. Mar. 30, 2012) (Lamberth, C.J.).  Therefore, Abraham Wultz may not recover in this action and his claims are DISMISSED WITH PREJUDICE.

The issue of presence also warrants a bit more discussion.  Plainly, none of the plaintiffs in this action except for Daniel and Tuly were present at the April 17, 2006 suicide bombing.  However, this Court has previously recognized that the presence requirement is subject to a

caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'"  *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46).  As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims . . . . 'All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.'"  *Id*. at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  Thus, the Court concluded that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family."  *Id*.  Following *Heiser*, the presence requirement does not apply to this case, and defendants are liable for the mental anguish and suffering that Tuly, Sheryl, and Amanda Wultz have endured as a result of the April 17, 2006 suicide bombing.

### 4.    Jurisdiction

The Court has already determined in Part IV.A.1 that it is proper to exercise jurisdiction over defendants in this action, and that plaintiffs are only seeking monetary compensation.  This final element is satisfied, and thus defendants may be properly held liable under the federal cause of action embodied in FSIA § 1605A(c) for the April 17, 2006 suicide bombing.

## V.    DAMAGES

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Accordingly, those who survived an attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover

solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. at 82–83.

"To obtain damages against defendants in a FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)). As discussed in Part IV, plaintiffs have proven that the defendants' commission of acts of extrajudicial killing and provision of material support and resources for such killing was reasonably certain to—and indeed intended to—cause injury to plaintiffs. *See Peterson v. Islamic Republic of Iran (Peterson II)*, 515 F. Supp. 2d 25, 37 (D.D.C. 2007).

### A.     Pain and Suffering of Survivors

Assessing appropriate damages for physical injury or mental disability can depend upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson II*, 515 F. Supp. 2d at 25 n.26 (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)). In *Peterson II*, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id*. at 54. In applying this general approach, this Court has explained that it will "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries,

were rendered quadripeligic, partially lost vision and hearing, or were mistaken for dead,"
*Valore*, 700 F. Supp. 2d at 84, and will "depart downward to $2–$3 million where victims
suffered only minor shrapnel injuries or minor injury from small-arms fire," *id*.  The Court
typically awards $1 million to a victim who survives a few minutes to a few hours after the
bombing.  *See Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.C. 2000).  However,
"i[f] death was instantaneous there can be no recovery . . . ."  *Id.* at 112 (citation omitted).

     As described in this Court's findings of fact, Daniel Wultz was conscious immediately
after the bombing and during significant parts of his hospitalization.  For twenty-seven days
Daniel suffered from severe bleeding caused by multiple shrapnel wounds, acute respiratory
distress, a perforated bowel, multiple infections—including gangrene, staphylococcus aureus,
mucormycosis, stentotrophanomus—acute renal failure, hemorrhagic and septic shock, among
other injuries.  He received around 200 units of blood during his hospitalization.  The surgeons
removed a number of organs, including his spleen, left kidney, part of his pancreas and
amputated two of his fingers and his right leg below the knee.  He spent the entire hospitalization
on a ventilator.  He was "fully alert" for a significant portion of this time.  AM Hr'g Tr. 37–47,
Feb. 29, 2012.

     In considering the amount of award that Daniel should receive, it is helpful to compare
similar awards from previous terrorism cases.  This Court granted Terrance Valore, a soldier who
survived the 1983 Beirut bombing, an upward departure from $5 million to $7.5 million.  *Valore*,
700 F. Supp. 2d at 84.  Terrance suffered burns covering 90% of his body, shrapnel wounds, and
a split leg.  *Id.*  This Court awarded $7 million to Nathaniel Walter Jenkins, a soldier who
initially survived the Beirut attack but died seven days later.  *Peterson II*, 515 F. Supp. 2d at 53.
Nathaniel suffered a traumatic skull injury requiring brain surgery and also had a significant

portion of his body covered in excruciatingly painful burns. *Id.* [01-cv-2094, Special Master

Report, Nov. 16, 2005, ECF No. 78]. Jeffrey Nashton survived the Beirut bombing but suffered

"a skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left

leg, a bruised right left, two collapsed lungs, burns on his arms and back, and internal bleeding."

*Id.* at 56. Jeffrey, awarded $9 million, lived with the results of the Beirut attack, including severe

short-term memory loss, numbness in his extremities, a lazy eye, leg pain, and nightmares, for at

least 23 years after the bombing. *Id.* [01-cv-2094, Special Master Report, Aug. 16, 2006, ECF

No. 187].

It is difficult to compare the relative pain and suffering caused by the horrendous injuries

that Daniel, Terrance, Nathaniel and Jeffrey experienced. This Court finds that Daniel's

suffering should fall between the $9 million awarded Jeffrey Nashton and the $7–7.5 million

awarded to Terrance Valore and Nathaniel Walter Jenkins. Therefore, based on the exceptional

severity of Daniel's injuries and the fact of his conscious suffering for nearly one month, the

Court will depart upward from the baseline award and grant the Estate of Daniel Wultz $8

million for his physical pain and suffering.

As described in this Court's findings of fact, Tuly Wutlz experienced substantial physical

injuries from the suicide bombing. Tuly suffered shrapnel wounds in his legs, forehead, face,

and scalp, a fractured left tibia, and ruptured eardrums. A nail was removed from his right leg.

Today, he continues to have an abnormal gait, constant ringing in his ears, little sense of smell

and taste, and lower back pain. AM Hr'g Tr. 34–41, Feb. 27, 2012; PM Hr'g Tr. 11–12, Feb. 27,

2012; AM Hr'g Tr. 25–37, Feb. 29, 2012. Based on the serious nature of Tuly's injuries and in

light of awards in similar cases, this Court finds that he is entitled to a baseline award of $5

million for his substantial physical pain and suffering.

## B.    Economic Loss

In addition to pain and suffering, the plaintiffs have proven to the satisfaction of the Court loss of accretions to the Estate of Daniel Wultz resulting from his wrongful death in the April 17, 2006 suicide bombing. *See Valore*, 700 F. Supp. 2d at 85. This finding and award is based on the expert report of Dr. Richard B. Edleman which, after reviewing, the Court adopts in full. Decl. of Richard B. Edelman, Feb. 19, 2012 [ECF No. 127]. Therefore, the Estate of Daniel Wultz is entitled to an award of $2,568,634 for economic loss.

## C.    Solatium

This Court developed a standardized approach to calculating FSIA solatium damages in *Heiser v. Islamic Republic of Iran*, where it surveyed past awards in the context of deceased victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." 466 F. Supp. 2d at 269. Relying upon the average awards, the *Heiser* Court articulated a framework in which spouses of deceased victims were awarded approximately $8 million, while parents received $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that courts have "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'") (quoting *Peterson II*, 515 F. Supp. 2d at 51). As this Court recently explained, in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where "awards are 'valued at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011) (quoting *Valore*, 700 F. Supp. 2d at 85); *see also Bland*, 2011 WL 6396527, at *4–5 (D.D.C. Dec. 21, 2011). Children of a deceased

victim typically receive an award of $3 million, while children of a surviving victim receive $1.5

million. *O'Brien v. Islamic Republic of Iran*, 2012 WL 1021471, at *2 (D.D.C. Mar. 28, 2012);

*Anderson v. Islamic Republic of Iran*, 2012 WL 928256, at *2 (D.D.C. Mar. 20, 2012); *Bland*,

2011 WL 6396527, at * 4; *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 301 (D.D.C.

2003).

 However, this Court has not specifically considered whether a family member entitled to

a solatium award should receive an independent solatium award for *each* family member killed

or injured.  For example, here Sheryl Wultz would be theoretically entitled to a baseline solatium

award of $5 million as the mother of a deceased victim (Daniel) and a separate $4 million

solatium award as the spouse of a surviving victim (Tuly)—for a total solatium award of $9

million.  This Court is concerned that combining multiple solatium awards would cause family

members of attack victims to recover larger solatium awards than most direct terrorist attack

victims recover in pain and suffering damages.  *See Davis*, 2012 WL 1059700, at *6 (citing

*Bland*, 2011 WL 6396527, at *5; *O'Brien*, 2012 WL 1021471, at *3) ("[I]t is inappropriate for

the solatium awards of family members to exceed the pain and suffering awards of the surviving

servicemen.").

 This Court finds that the better practice in cases where a family member is related to

multiple victims is to establish the family member's baseline at the higher of the figures and then

consider whether to grant an upward departure from that higher baseline.  In applying this

framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone,"

*Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when, *inter alia*, "evidence

establish[es] an especially close relationship between the plaintiff and decedent, particularly in

comparison to the normal interactions to be expected given the familial relationship; medical

proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

The evidentiary basis for the Wultz family's solatium awards could be no more heartrending. One moment Tuly Wultz was enjoying a peaceful meal with his son. The next, Tuly watched his son's body shredded by bomb shrapnel while he too was severely injured. After the explosion, Tuly spent twenty-seven days in great distress as he watched Daniel slowly pass away. The profoundness of Tuly's mental anguish is reflected in his own words: "Why am I here? What am I here and not Daniel? And I know [Sheryl] doesn't blame me, but it is me who blames me." AM Hr'g Tr. 61, Feb. 27, 2012. "I honestly can say I was very ashamed to be around. It is not normal . . . that the father will bury his son, and the only reason I'm here is because Daniel saved my life with his own beautiful body. . . I should have been dead." *Id.* at 68. Dr. Agronin testified that Tuly suffers from Post-Traumatic Stress Disorder ("PTSD"), persistent grief, and depression. PM Hr'g Tr. 14–20, Feb. 27, 2012. Based on these extraordinary facts, this Court finds that Tuly Wultz should receive an upward departure from the baseline and is therefore entitled to a solatium award of $7 million.

Sheryl Wultz frantically raced to the hospital after the bombing to find both her husband and her son severely injured. Sheryl testified that "My life has never been the same in every way. . . I don't have a zest for life that I had. I'm not driven . . . ." PM Hr'g Tr. 70, Feb. 27, 2012. Dr. Agronin testified that she too suffers from PTSD, persistent grief, and depression. PM Hr'g Tr. 14–20, Feb. 27, 2012. The lasting impact this bombing had on Sheryl as a mother and a wife cannot be understated. Sheryl would be entitled to a $4 million baseline as a spouse of a survivor and a $5 million baseline as the mother of a decedent. The Court will use the higher $5

million figure as her baseline, and because of the extraordinary facts presented here finds that

Sheryl Wultz should receive an upward departure of her solatium award to $6 million.

Amanda Wultz was in the United States at the time of the bombing but within a few days

traveled to Israel to be with her family.  She was close to her father and brother at the time of the

bombing.  After the bombing, she testified that "I feel like death is always following me. . . I'm

always [] looking out for signs that something is going to happen."  AM Hr'g Tr. 68, Feb. 29,

2012.  Her grades in school suffered because the bombing caused her to have "zero motivation."

*Id.* at 67.  Dr. Agronin testified that she too suffers from PTSD, persistent grief, and depression.

PM Hr'g Tr. 14–20, Feb. 27, 2012.  Amanda would be entitled to a $1.5 million baseline as the

daughter of a survivor and a $2.5 million baseline as the sister of a decedent.  The Court will use

the higher $2.5 million figure as her baseline, and because of the extraordinary facts presented

here finds that Amanda should receive an upward departure of her solatium award to $3.5

million.

### D.    Punitive Damages

Punitive damages, made available under the revised FSIA terrorism exception, serve to

punish and deter the actions for which they are awarded.  *In re Islamic Republic of Iran*

*Terrorism Litig.*, 659 F. Supp. 2d at 61; *Heiser II*, 659 F. Supp. 2d at 29–30; *Acosta*, 574 F.

Supp. 2d 15, 30 (D.D.C. 2008) (citing Restatement (Second) of Torts § 908(1)).  Punitive

damages are not meant to compensate the victim, but instead meant to award the victim an

amount of money that will punish outrageous behavior and deter such outrageous conduct in the

future.  In determining the proper punitive damages award, courts evaluate four factors: "(1) the

character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the

defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the

defendants." *Acosta*, 574 F. Supp. 2d at 30 (citing *Flatow*, 999 F. Supp. at 32 (citing Restatement (Second) of Torts § 908)).

The nature of the defendants' acts and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom. *See Bodoff*, 424 F.Supp.2d at 88 (determining a bus bombing, for which Iran was held liable, to be "extremely heinous").  "The defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 278 (D.D.C. 2003) (concerning a separate bus bombing for which Iran and MOIS were held liable).  The evidence shows that defendants completely lacked any semblance of remorse for this deadly attack—and in fact, encouraged and supported this and similar attacks.

As to deterrence and wealth, Iran and Syria are foreign states with substantial wealth and that have expended significant resources sponsoring terrorism.  Dr. Patrick Clawson, an expert on Iranian terrorism activities, has testified in several cases on the amounts of punitive damages that would serve to deter Iran from supporting terrorist activities against nationals of the United States.  *See*, *e.g.*, *Flatow*, 999 F. Supp. at 32; *Heiser II*, 659 F. Supp. 2d at 30.  Dr. Clawson declared that "the financial material support provided by Iran in support of terrorism is in the range of $300 million to $500 million a year." Clawson Aff. ¶ 4, *Valore*, 700 F. Supp. 2d 52 (03-cv-1959, ECF No. 58).  Dr. Clawson based his range on Iran's provision of approximately $200 million in direct cash assistance to Hezbollah in 2008, as well as the provision since 2006 of "many tens of millions of dollars" worth of sophisticated weaponry, including some 40,000 rockets. *Id.* ¶ 3.a. (citing U.S. Dep't of State, Country Reports on Terrorism 2008, at 183 (2009),

*available at* http://www.state.gov/documents/organization/122599.pdf).  Dr. Marius Deeb, an

expert who testified in this case but also testified in *Baker v. Socialist People's Libyan Arab*

*Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011), stated that Syria "spends between U.S.

$500,000,000 (at a minimum) and U.S. $750,000,000 annually on terrorism-related

expenditures."

 In addition, the Court finds it appropriate to examine awards that courts have issued in

similar state-sponsored terrorism cases.  Considering similar cases will assist this Court in

following the Supreme Court's instruction that a punitive damages award be "reasonably

predictable in its severity . . . so that [a] . . . bad man can look ahead with some ability to know

what the stakes are in choosing one course of action or another."  *Exxon Shipping Co. v. Baker*,

554 U.S. 471, 502 (2008).  In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C.

2008), Judge Collyer awarded a total of $300,000,000 ($150,000,000 per victim) in punitive

damages against Syria for the beheading of two civilian contractors.  Similarly, in *Acosta*, this

Court awarded $300,000,000 in punitive damages against Iran for the 1990 assassination of

Rabbi Kahane and wounding of two other American citizens in New York City.  574 F. Supp. 2d

at 30–31.  Magistrate Judge Facciola awarded a total of $450,000,000 ($150,000,000 per victim)

to the families of three victims executed during the hijacking of EgyptAir Flight 648.  *Baker v.*

*Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  In his survey

of FSIA punitive damages cases, Magistrate Judge Facciola noted that "this Court had, with one

exception, never awarded an amount higher than $300,000,000 in punitive damages against

Iran."  *Id.*  Therefore, in light of prior case law, the four factors this Court considers under the

Restatement, and the extreme reprehensibility of Iran and Syria's acts, this Court finds that it is

appropriate to award plaintiffs $300,000,000 in punitive damages.

However, there is one more step to the inquiry.  This Court must consider whether a $300,000,000 punitive damages award comports with recent Supreme Court guidance on punitive damages.  This Court recently addressed this issue in *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 16–26 (D.D.C. 2011) (Lamberth, C.J.), and will not rehash its detailed analysis from that case.  In sum, this Court in *Beer* held that foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from punitive damages awards and that the *Flatow* method for the calculation of punitive damages remains viable.[2]  *Id.* at 20, 26.  Therefore, plaintiffs are entitled to $300,000,000 in punitive damages.

### E.    Prejudgment Interest

Plaintiffs also request prejudgment interest.  Whether to award prejudgment interest is a question that rests within this Court's discretion, subject to equitable considerations.  *See Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008).  Because this Court has applied the framework in *Heiser* to its calculation of solatium damages, prejudgment interest is not appropriate for these awards.  *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 30 n. 12 (D.D.C. 2011) (concluding that pre-judgment interest was not warranted for solatium damages because the values set by the *Heiser* scale "represent the appropriate level of compensation, regardless of the timing of the attack.").  "In contrast to punitive damages . . . prejudgment interest is an element of complete compensation" and

---

[2] Even if the Supreme Court decides to expand its prior decisions and import the *Gore* guideposts for excessive punitive damages awards into the Fifth Amendment foreign-state context, this award would likely stand.  The Supreme Court has held that while "there is no bright line ratio," *State Farm v. Campbell*, 538 U.S. 408, 425 (2003), "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *id.*  Here, the Court applies an approximately 8.3:1 ratio of punitive to compensatory damages.  Given the heinous nature of religiously motivated terrorism and its dramatic impact on the Wultz family, the Court finds it appropriate to award punitive damages at the higher end of the "single-digit" spectrum.

therefore plaintiffs would only be eligible for prejudgment interest on their non-solatium compensatory damages. *Pugh*, 530 F. Supp. 2d at 264.

"Courts in this Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011) (awarding prejudgment interest in 2011 for a 1985 aircraft hijacking). The Court finds no delay here significant enough to warrant an award of prejudgment interest. Plaintiffs filed their case in August 2008. Iranian Defendants, having never even appeared in this case, have not prolonged the litigation. While Syrian Defendants' participation early in the case added some delay, the delay was not unreasonable for a complicated case involving a number of sovereign foreign entities and banks. Further, in determining the solatium, pain and suffering, and economic loss awards in this case, the Court has attempted to fully compensate plaintiffs' through today's date. Thus, the Court does not find any equitable grounds for awarding pre-judgment interest.

## VI.    CONCLUSION

When a state chooses to use terror as a policy tool—as Iran and Syria continue to do— that state forfeits its sovereign immunity and deserves unadorned condemnation. Barbaric acts like the April 17, 2006 suicide bombing have no place in civilized society and represent a moral depravity that knows no bounds. In stark contrast to the Iranian and Syrian thugs stands the courageous Wultz family. The Wultz family resolved to fight injustice with whatever tools were at their disposal, and their patient determination over the last six years is a credit to both themselves and to the memory of their beloved Daniel. This Court hopes that Wultz family may take some measure of solace in this Court's final judgment.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 14, 2012.